UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

________________________________

SUNCO TIMBER (KUNSHAN) CO. LTD.,

Plaintiff,

Civil Action
No. 22-CV-10833-MJJ

V.

September 10, 2025

LINDA SUN, ET AL

Defendants.

________________________________

BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA 02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

Yun Cheng
Lion's Law P.C
154 Wells Ave
Suite 1d
Newton, MA 02459
617-682-7101
Email: Connie@lionslawgroup.com

FOR THE DEFENDANTS:

Theodore J. Folkman
Taylor Makson
Rubin & Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617-330-7135
Email: Tfolkman@rubinrudman.com

Michele E. Connolly
Peter E. Ball
Fitch Law Partners LLP
84 State Street
11th Floor
Boston, MA 02109
617-747-7809
Email: Mec@fitchlp.com

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK: United States District Court for the District of Massachusetts is now in session. The Honorable Myong J. Joun presiding. Today is September 10, 2025. We're on the record in matter of *Sunco Timber Company Limited v. Sun, et al. Case Number is 22-CV-10833*. Will counsel please identify themselves for the record.

MR. BALL: You're plaintiff, I apologize.

MR. CHENG: That's all right. Good afternoon, your Honor. Yun Cheng on behalf of plaintiff.

THE COURT: Good afternoon.

MR. BALL: Good afternoon, your Honor. Attorney Peter Ball. With me is my partner Michele Connolly. We are here on behalf of all defendants except for Defendant Linda Sun and New Sun Limited Partnership. Your Honor, I will also note that one of our clients, David Sun, is also listening in but has his microphone muted and his video turned off.

THE COURT: Got it. Good afternoon.

MR. FOLKMAN: Good afternoon, your Honor. Ted Folkman for Linda Sun and New Sun Limited Partnership and my colleague, Taylor Makson, is here with me.

MS. MAKSON: Good afternoon.

THE COURT: Good afternoon. So, Mr. Ball, was it you who requested today's hearing conference?

MR. BALL: Yes, it was, your Honor, and would you like me to explain why?

THE COURT: Yes, please.

MR. BALL: Okay.

THE COURT: I think I know why. Where do you want to start.

MR. BALL: Okay. I will start by saying that, your Honor, we requested this conference really out of frustration. As the Court knows, we have been trying to take the deposition of the plaintiff and of its key people for quite some time. While the defendants, their banks, their lawyers, their accountants, basically our side of the "v" have now produced about 140,000 pages of documents. We have responded to merely 200 document requests. We've answered multiple sets of interrogatories. We've produced four deposition witnesses, I think on six different dates. Yet here we are having not yet had the opportunity to take our first deposition.

And your Honor is familiar with some of the history here, maybe not all of it. As you may recall, your Honor, we noticed the deposition of Sunco and of their principal, Mr. Wu, and two of their employees, Mr. Zhao, Z-H-A-O, and Mr. Xiao, X-I-A-O, in November and December of last year, and the Court is well familiar with some of the actions that the plaintiff has taken that have led to this imbalance of discovery.

Mr. Wu was originally designated as the 30(b)(6)

witness for the defendants -- for the plaintiff, and they said, oh, yeah, he's our key player. They said he's the principal and that Mr. Xiao and Mr. Zhao didn't know anything, and we were told that Mr. Xiao, X-I-A-O, was old and infirm at age 63, to which I take a bit of exception to, and that he would -- that he could not even travel to Hong Kong to have his deposition taken and that Mr. Zhao, Z-H-A-O, was threatening to quit the company, and as your Honor will recall, we had a lot of litigation over whether Mr. Wu, the then 30(b)(6) witness who plaintiffs said was the only one who knew anything, would be coming to the U.S. or be deposed in Hong Kong or remotely, and when the Court ruled that he would be deposed in Hong Kong but in person and on the plaintiff's nickel, then all of a sudden Mr. Wu didn't know anything and Mr. Xiao who was too sick to even go to Hong Kong was going to be one of the 30(b)(6) witnesses and Mr. Zhao who was threatening to quick was going to be the other 30(b)(6) witness and they were going to come to the United States; and we said, okay, fine, we will do that, and we said we still want to take Mr. Wu's deposition and we will do it in Hong Kong on our, defendants', nickel unless you tell us since he's -- since he doesn't know anything and since he's too sick to come to the U.S., if you tell us he's not going to testify at trial which would seem to naturally follow from what you're telling us about him, well, then we're glad to not take his deposition, but no, plaintiffs

wouldn't agree to that despite all that they were saying about Mr. Wu's lack of knowledge and unavailability. So we said, fine, we will take Mr. Wu in Hong Kong on our nickel. We will take Mr. Xiao and Zhao here in the U.S., Mr. Xiao who apparently miraculously has recovered enough so that he can travel not only to Hong Kong but to the United States, and since then there has been sort of continuous slow walking by the plaintiffs here.

First, they applied for a visa for Mr. Xiao and Mr. Zhao and we were told they couldn't get the visa. We weren't told why. They said they want to apply again for the visa, again, with no explanation as to why it is that this time they might be allowed to come here when they were just denied a few weeks ago. We said, look, we really don't want to delay this. We want to get going but we will give you, in early August when we submitted our status report, we said, we will give you a little bit of time to see if they can get their, you know, second interview but let's plan to go forward. Let's pick some dates anyway. You know, we weren't told anything about any unavailability of counsel or anything like that.

So things are progressing. They tell us they have an appointment, Mr. Xiao and Zhao, for their re-interview this coming Monday, September 15, and we -- and meanwhile something else happens. It turns out that I have had to have some major surgery scheduled, your Honor, and not to be mysterious about

it, it's open heart surgery. I am told that fortunately that the problem is completely fixable, but I am going to be unavailable from October 30 when I have the surgery until the end of December and I am told largely I am unable to work.

So on August 29, shortly after the surgery was scheduled, we said, look, let's get -- you know, let's take this beforehand. You know, there is no reason to believe that Mr. Xiao and Zhao are going to get their visas when they re-interview on the 15th. Let's pick some dates now that we can go, and we gave them collectively a window of availability for the defendants' side from September 23 -- September 22 through about October 13, and if it turns out that Xiao and Zhao get their visas, fantastic. We will take their depositions here and we will worry about Wu down the road. We are in no hurry to go to Hong Kong, but their response to that was, oh, let's just see what happens with their visa interview and we said no. We don't have time to do that. Let's pick some dates. Let's pick some dates now, and, again, if we get good news on their visa interview, great, we will cancel the dates or we will shorten the trip. We don't get any positive reaction from that, Judge, and that's what led us to say in this status report we need to see you, Judge.

And then let me just bring you up-to-date on what's happened since we filed that status report and that is that we hear today from plaintiff's counsel that of the three lawyers

that are representing plaintiff, the only one who could possibly sit through these depositions on the defense side and defend these depositions is Ms. Dai, who is Connie Dai, who is not on the call today, and it so happens that Ms. Dai is completely unavailable for all of September or all of the remaining part of September all the way through October until past my window of availability due to my upcoming surgery. So, sorry, I guess you're out of luck. We got that news this morning, your Honor, and in our view and, of course it's ultimately going to be the Court who decides this, that's not acceptable. You know, that's not acceptable.

They have three lawyers. We're talking about defending depositions. We're not talking about taking depositions. Ms. Dai has not taken any -- I will note has not taken any of the depositions in the case so far and I think has only sat in on one or maybe two of the depositions or parts of two of the depositions. So she's not been one of the key litigators involved in this case, and frankly, had we known that she was going to have to be the one that was going to take this, to defend these depositions, and that she was going to be unavailable for all of September and October, then back in early August when we were submitting status reports to you, your Honor, and when none of this was being revealed and none of it was revealed even after I said on August 29, hey, we need to get these on the calendar because I now have the surgery

scheduled, we would have pushed to have these depositions taken in August.

So, you know, what we're requesting, your Honor, is that you order these depositions to go forward in the window that we've proposed, and to just give you a little bit more information, we had proposed a window of September 23 to I think October 12th or 13th. We have heard from the Commissioner that she's unavailable after October 3. So there is a window from September 22 to about October 2 when we can go there and we can take all three depositions, and hey, if this coming Monday it turns out that Xiao and Zhao get their visas, fantastic. We will let them come here and we will take their depositions here and then we will worry just about Mr. Wu. I don't expect that's going to happen. There is no reason we've been given to think it's going to happen, but if it happens, great, but what we're looking for right now, your Honor, is an order from you directing that these depositions go forward on that date. Everything is in place with one tiny possible exception which is we're told that there needs to be permission granted from the Central Authority in Hong Kong. I think we're optimistic that that would happen. I think we're even more optimistic if we get an order that the depositions are to go forward because the commissioner can then use that information to try and get the permission, but you know, otherwise, our bags are packed or will soon be packed and we're ready to go in

that window of time.

MR. FOLKMAN: If I may make one more update because I did get some more information just before the hearing today started, your Honor. I have been the one who has been coordinating with the commissioner and been involved in that process and I understand that the Hong Kong authority has indicated that it may want the Court, rather than the commissioner, that is to say you, your Honor, rather than the commissioner to be the one to ask for permission.

I have some experience having done this. I have done Hong Kong deposition permission requests before, and in my experience, it's been the commissioner rather than the court that asks. However, I also know that it's never smart to fight with city hall and so we may be asking you in the next day or two to do that.

THE COURT: And have you been given any reason as to why Attorney Dai can't be available to defend these depositions?

MR. BALL: Your Honor, I will let Mr. Cheng address that, but I mean, what we know is the e-mail that we got from him this morning which says the following -- I can find it quickly -- "Connie is the only one who can and will travel to Hong Kong if clients' visas are denied. She is the lead counsel and she manages client relationship. However, her schedule only allows a brief window in the last week of October

and the first week of November. From now until around October 7, her schedule is filled with depositions, hearings and a couple of transactions. After that, we plug right into a trial prep for a trial at Middlesex Superior Court on October 15 and it may last until October 22 or October 23. This trial will absolutely happen and no chance to settle at all unless the court continues it at its volition." And that was from Mr. Cheng this morning.

THE COURT: Mr. Cheng.

MR. CHENG: Yes, your Honor. So to my understanding, so we have two issues in front of you for this status conference. The first one, as my brother just mentioned, is the scheduling of the deposition in Hong Kong and the second one would be for them to identify the document referencing Mr. David Sun's deposition. So I will address the first one first.

So we do recognize defendants' concern regarding Mr. Ball's upcoming surgery and, you know, their desire to conduct Hong Kong depositions no later than early October. By the way, I am sorry about your health condition, Peter, and I hope everything goes well with your surgery, but you know, there are practical difficulties on our side as well. We have been acting in good faith to try to accommodate and to fit in to this schedule, but Connie Dai, our lead counsel, is prepared to travel to Hong Kong and she -- her availability is limited,

as my e-mail to the defendants. So we also have already informed the defendants way before this. We told them that Connie Dai would be the one to travel to Hong Kong to defend the deposition.

THE COURT: So, Mr. Cheng, what was the reason for not agreeing on the dates just in case that the visa doesn't come through? What's the reason not to agree on dates?

MR. CHENG: Absolutely, your Honor. We can show depo notices, we can show docket numbers to show that she has depositions scheduled starting from next week and until the beginning of October and then she has a trial scheduled on October 14.

THE COURT: But that wasn't communicated to Mr. Ball or the other counsel for the defendants until -- when Mr. Ball --

MR. CHENG: Yes. It was not communicated to them until probably yesterday. That is correct because we were trying to accommodate the schedule. As to my e-mail last Friday to them, you know, we're trying to move around some depositions to see if we can fit in the schedule but we failed. We cannot -- those days just doesn't work for us, for Connie Dai, and by the way, Attorney Cutler will also be the co-counsel for that trial scheduled in October.

So, actually, I think the whole issue here is about logistics and I have a couple of suggestions. So my

understanding is that for Infinity defendants, Attorney Connolly is actually the lead counsel for that case so I am not sure if Attorney Ball has to go to Hong Kong to attend the deposition and --

THE COURT: I don't think that's your concern, Mr. Cheng. This case is over three years old. It should have been tried by now. I have been trying to work with you. Look, when issues came about about why Mr. Wu was not available and then all of a sudden these 30(b)(6) witnesses were designated, I didn't want to get into the details of why or how that happened. It smelled fishy to me but I didn't want to get into it. I wanted to impress upon all of you that I wanted discovery completed so we can set a trial date by requiring you to file these weekly status reports and it's not working. I am not going to give you three extra months.

MR. CHENG: I understand, your Honor.

THE COURT: Mr. Cheng, I am not going to give you three extra months to complete discovery. If Attorney Dai needs to cancel and reschedule the depositions in those other cases, she needs to do that, or whatever else she needs to do and make this case a priority. If she can't be there to defend the deposition, then somebody else needs to be there.

MR. CHENG: Your Honor, I hear your concern, but my suggestion is that I am thinking if Attorney Ball can attend the deposition virtually so it's good for his health and also

is more flexible about the scheduling.

THE COURT: It seems to me that we have all been bending over backwards to try to make this work when you said Mr. Wu was going to be available first and then his health concerns were raised about why he's not available and then stories changed multiple times with regard to the 30(b)(6) witnesses. I am not going to continue down this road. It has to be completed. Given what I have heard from Mr. Ball and Mr. Folkman, I know it's a tight window but it's going to have to be completed by October 3. I am not going to extend it any further. If you can't make your witnesses available, then I will entertain whatever motions from the defendants. It can't keep going on forever, Mr. Cheng. I think we have all been patient enough.

MR. CHENG: I hear you, your Honor, and can I address the second point that I want to make about the documents?

THE COURT: No. Let's make sure that you understand exactly about these three depositions first.

MR. CHENG: Right. I understand, your Honor. So. Mr. Wu will be available and those two deponents will be available. If they failed their second interview for the visa and your Honor wants my office to make at least one attorney available for, you know, to defend those depositions in Hong Kong.

THE COURT: All right, and it will be done by October

3, right?

MR. CHENG: Yes, your Honor. If that's your ultimate decision, then, I mean, yeah.

THE COURT: While we're on this topic, the plaintiff has been prepared to submit that $35,000 to you for it to be held in trust. We know for sure that at least one of these depositions is going to take place in Hong Kong, right?

MR. CHENG: Yes, but if only Mr. Wu's deposition will be conducted in Hong Kong, that will be out-of-pocket from the defendants.

THE COURT: Right. So I want that $35,000 deposited immediately. If it turns out that two of the depositions will be held here, great. We will figure it out. If there is any money left over, you can remit that back to the plaintiff but the whole point was to make sure that that money is there to reimburse counsel for defendants and I want to make sure that that's in an account.

MR. CHENG: Okay, your Honor.

THE COURT: So with regard to the documents --

MR. CHENG: Yes. So as we have mentioned multiple times in our status report, so we requested defendants' counsel to identify the documents that are referenced in David Sun's deposition, particularly the wire transfer records and the worksheet that he mentioned. So defendants' counsel identified two pieces of documents that are not wire transfers or

worksheets. So we want to ask this Court to order the defendants to identify by Bates number that any documents that records the alleged 2011 loan because we have requested multiple times and they have been really vague and couldn't provide any Bates number.

THE COURT: So these wire transfers relate to the defendants' counterclaim that there were some loans that were made by Sunco USA to Sunco China?

MR. CHENG: Correct.

THE COURT: Okay. All right, Mr. Ball.

MR. BALL: I am going to allow Ms. Connolly to respond, if I might, your Honor.

THE COURT: Sure.

MS. CONNOLLY: Yes, your Honor. This is much ado about nothing. The plaintiff asked Mr. Sun at his deposition about a number of documents and whether he had reviewed them and asked him if those documents had been produced. He was unable to say definitively whether they had been produced because he didn't personally look at the production. He said that he gave them to his counsel and then counsel represented to plaintiff that they had been produced. So what Mr. Sun reviewed that he testified about at his deposition has been produced.

THE COURT: So here is my question: Are there documents that support, at least the counterclaim, that these

loans were made from Sunco USA to Sunco China?

MS. CONNOLLY: Yes, there are, and they have been identified for the plaintiff both at deposition and in the Bates numbers that I provided to plaintiff.

THE COURT: The excerpts of that transcript that I reviewed didn't make it clear and it seemed a little -- well, it was a little confusing to me, to be honest. These are not the Rockland Trust statements. Does some other documents evidence the loans?

MS. CONNOLLY: Yes. There were worksheets that Mr. Sun was referring to. We have identified those by Bates number to plaintiff. Plaintiff has disagreed that these documents evidence the loans, but as Defendant Shillock Yuan-Sun testified, and she has a CPA, she's explained that she went through and looked through all of the accounting records and that it appears that these loans were miscategorized and these worksheets show where the loans were miscategorized, you know, what categories they were put in incorrectly. I understand that plaintiff disagrees with our interpretation of the document but there is not some other document out there that hasn't been produced.

THE COURT: All right. So your position is everything that can be produced as it relates to these loans have been produced, there is nothing more?

MS. CONNOLLY: Yes, your Honor.

THE COURT: All right. So Mr. Cheng, what I am going to do is I am going to exclude from evidence anything that has not been produced as of today.

MR. CHENG: Yes, thank you, your Honor, but I am still confused because the Bates number -- the document that according to Attorney Connolly's Bates number is called Insurance Funds to Property Replacement which I also attached as Exhibit 2 in one of our status reports and they're not wire transfers or worksheets. So that's part of where I'm confused and also --

THE COURT: Mr. Cheng, doesn't that actually help you then, that there weren't such loans?

MR. CHENG: Right. Okay, so we just want the defendants' attorneys' words that these two documents are the only things that shows the so-called loan, and if nothing else, we're good with that.

THE COURT: Right. So whatever they've produced, that is it. If they come up with some other documents between now and trial, that is not going to be allowed in trial.

MR. CHENG: Only those two Bates number documents are --

THE COURT: Whatever it is that they produced to you and they said these -- I am not sure why this is so complicated really. They have produced whatever documents and they said if they have identified documents specifically saying this is what

supports the loans, great. My point is they've represented to me that there isn't anything more and so you've got nothing to worry about in terms of some surprise before trial, right, because either what's been produced will be enough to prevail on their claim or there is nothing there.

MR. CHENG: Yes, your Honor. So I guess the confusing part is that those two documents that defendants identify by Bates number they were to address the so-called wire transfer and the worksheet that was referenced in David's deposition. That's okay. If those two documents are the things that David talked about, then we're okay with that. And also in the interrogatories, we also ask them to identify any documents that related to the so-called loan, 2011 loan, and that they said that there were bank statements from approximately March of 2011 to July 2011 and we just have their financial statements and/or trial banisters from Sunco USA and financial statements and/or trial banisters or their equivalent for plaintiff. So I want them to identify those documents by Bates number to show that what exactly they're talking about.

THE COURT: That doesn't sound unreasonable, Ms. Connolly. I mean, can you identify by Bates number exactly what documents support that claim?

MS. CONNOLLY: Yes, your Honor, and not only can we do that, Ms. Yuan-Sun walked plaintiff through a number of these documents at her deposition. So I am sitting here very

confused to hear Mr. Cheng say that they don't know what documents we are talking about because there are Rockland Trust Bank statements that show these exact wires and Ms. Yuan-Sun went through them in detail.

THE COURT: Well, on that point, Mr. David Sun, I seem to recall him saying those Rockland Trust statements have nothing to do with the wire transfers.

MS. CONNOLLY: And as Mr. Sun said repeatedly to Attorney Cutler when he was asking questions about this, Mr. Sun is not the accountant. He doesn't deal with the accounting. The person to ask about that would be his wife, Ms. Yuan-Sun. She's the one who is familiar with the documents, the financial recordkeeping, and he did not have personal knowledge, but he was given a stack of fifty or so pages and asked to, you know, point out where the wires were and he made clear that his wife was the person to talk to and she did walk through those documents and explain for plaintiff exactly which wires were relevant. She even marked up one of the documents that became a separate exhibit at the deposition with her markups on them.

THE COURT: All right. Does that satisfy you, Mr. Cheng?

MR. CHENG: Yes, your Honor.

THE COURT: All right. Are there any other issues that we need to resolve today?

MR. FOLKMAN: Your Honor, if I may, just one point. First of all, I appreciate the amount of time you have taken with this. I also appreciate what you're saying about setting a trial date, and of course, we want, everybody wants, to have a trial date set. I also want to make sure that you understand that my client, Linda Sun, the main claim against her is a claim of breach of fiduciary duty and our main -- well, I don't know if it's our main defense, but one of our defenses on that issue is a legal defense about the recognition and enforcement of a Chinese judgment that she won. I want to make sure that we are going to have an opportunity to seek summary judgment on that issue because I think, you know, everybody wants to get to trial, it's been three years, but there are some issues in this case and Mr. Ball may have some others that really I think are amenable to summary judgment.

THE COURT: So assuming that the rest of discovery is going to be completed by October 3, the depositions, let's talk about what's left. Are you anticipating expert discovery?

MR. FOLKMAN: Not as -- well, we are going to submit an expert -- it's just an expert declaration with our summary judgment motion from a Chinese legal expert. In my experience, that is not treated as an expert witness, but I just want to make sure you know that. So from my perspective, I don't intend to call an expert witness for my defendants. I don't know whether Mr. Ball and Ms. Connolly have other plans for the

other defendants.

MS. CONNOLLY: It's certainly something we are considering, your Honor, and part of the issue here is we don't know what plaintiff is going to testify to because we haven't had the chance to ask a single question at deposition. Our thinking right now is that, you know, we may well have an expert but we can't answer definitively until we have the opportunity to depose plaintiff's witnesses.

THE COURT: All right. In that case, Mr. York, why don't we set a status date. What's today? Today is the 10th.

THE CLERK: Yes, your Honor.

THE COURT: Are you all available on October 6 or 7? How about October 7th, a Tuesday?

MS. CONNOLLY: Yes, your Honor.

MR. FOLKMAN: Yes, your Honor.

THE COURT: Great. It will be a Zoom call just like this. Mr. York, if we can set something up in the afternoon.

THE CLERK: Yes, your Honor. We will put it on for 3 p.m. on October 7.

THE COURT: So on October 7 what I would like to discuss with all of you is whether expert discovery is going to be necessary. If so, what the schedule is going to be. We will set a deadline for when summary judgment motions need to be filed and we will set a firm trial date on that date.

MR. CHENG: Okay.

THE COURT: Thank you very much.

**A-D-J-O-U-R-N-E-D**

\- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin____________ September 29, 2025
Jamie K. Halpin, CRR, RMR, RPR Date
Official Court Reporter