UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_______________________________

SUNCO TIMBER (KUNSHAN) CO. LTD.,

Plaintiff,

Civil Action
No. 22-CV-10833-MJJ

V.

March 4, 2026

LINDA SUN, et al,

Defendants.

_______________________________

BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA 02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

Connie C. Dai
&
Yun Cheng
Lion's Law P.C
154 Wells Ave
Suite 1d
Newton, MA 02459
617-682-7101
Email: Connie@lionslawgroup.com

FOR THE DEFENDANTS:

Michele E. Connolly
&
Peter E. Ball
&
Malgorzata A. Mrozek
Fitch Law Partners LLP
84 State Street
11th Floor
Boston, MA 02109
617-747-7809
Email: Mec@fitchlp.com

Theodore J. Folkman
&
Elizabeth Louise Gardon
Rubin & Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617-330-7135
Email: Tfolkman@rubinrudman.com

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK: All rise.

(The Honorable Court Entered)

THE CLERK: March 4, 2026. We are on the record in the matter of *Sunoco Timber Company Limited v. Linda Sun, et al, Case Number 22-CV-10833*. Will counsel please identify themselves for the record.

MS. DAI: Good morning, your Honor. Connie Dai for plaintiff.

THE COURT: Good morning.

MR. CHENG: Good morning. Yun Cheng for plaintiff.

THE COURT: Great, good morning.

MS. CONNOLLY: Morning, your Honor. Michele Connolly for all of the defendants except Linda Sun and New Sun Limited Partnership and I just want to note for the Court that David Sun is in the galley with us.

MR. BALL: Good morning, your Honor. Peter Ball for the same clients as Ms. Connolly.

MR. FOLKMAN: Good morning, your Honor. Ted Folkman for Linda Sun and New Sun Limited Partnership.

MS. GARDON: Good morning, your Honor. Elizabeth Gardon for Linda Sun and New Sun Limited Partnership.

MS. MROZEK: Good morning, your Honor. Malgorzata Mrozek for the same clients as Mr. Ball and Ms. Connolly.

THE COURT: Good morning, everyone. Ms. Connolly,

you're going to be arguing for the defendants?

MS. CONNOLLY: Yes, your Honor.

THE COURT: It's your motion so I will let you start.

MS. CONNOLLY: Thank you, your Honor. I have a slide show I set up so hopefully this will work.

So, your Honor, based on the facts as we've laid them out in our papers, based on all of the deposition testimony for plaintiff's witnesses which we provided the Court with, as well as the procedural background of this case, we believe that the question before the Court truly is not whether sanctions should be awarded, but instead, what type of sanctions should be awarded.

It can't seriously be argued that plaintiff made adequately prepared witnesses available to testify on the 30(b)(6) topics that we noticed, nor can it seriously be argued that plaintiff fulfilled its document production obligations.

We're now nearly four years into this case. It was filed, I believe, in May of 2022, and we still have very little of the discovery that we're entitled to. As the Court will recall, even getting these depositions on the calendar was no small undertaking. It involved a lot of motion practice, hearings, status conferences and it was a huge inconvenience for us all to travel halfway around the world to take these depositions but we were happy to do it with the assumption that we were going to get the discovery we were entitled to, but

when we showed up at the depositions, we discovered that plaintiff's witnesses were wholly unprepared for the majority of the topics, that they were prepared to discuss the facts that they wanted to discuss and not respond to questions. What's more, they engaged in obstruction and delay, filibustering, being evasive, trying to defer to counsel to answer questions, and then, of course, we had several impermissible instructions not to answer based on the attorney-client privilege and those instructions were based on the factual bases for plaintiff's claims. We're not talking here about tricky areas where there is a mix of advice and facts. We made very clear we were not asking for communications between counsel and client. All we wanted to know was the factual basis for the claims.

So I'd like to go through briefly the First Circuit's factors when it considers when deciding what sanctions to award. Looking at *AngioDynamics*, the court considers several substantive factors, including the severity of the discovery violations, legitimacy of the party's excuse for failing to comply, the repetition of the violations, the deliberateness of the misconduct, mitigating excuses, prejudice to the other party and the operations of the court, and the adequacy of lesser sanctions, and then procedurally, courts look at whether the party against whom sanctions are sought was given notice of the possibility of sanctions and the opportunity to explain its

misconduct and argue against the imposition of sanctions.

Here we think there is no question that the discovery violations are severe. With respect to whole claims that plaintiff has in this case, its fraudulent transfer claim, its reach and apply claims, its monies had and received claims, its veil-piercing claims, not only was the witness unprepared to testify about those topics and answer "I don't know" in response to virtually all of the questions, but when questioning continued, counsel for plaintiff instructed the witness not to answer on the ground of attorney-client privilege.

We don't think that there is any question that there has been a repetition of violations here. There have been repeated misrepresentations to the Court about the status of Mr. Wu, about the status of -- and I will refer to Mr. Bing Zhao as Mr. Z and Mr. Ruihua Xiao as Mr. X because my manner is not good enough to distinguish the two and I don't mean any disrespect by doing that - but there were misrepresentations about Mr. Z and X's availability. There was also misrepresentations about Ms. Qiong Xiao's continued relationship with the company such that we were told that she no longer had an affiliation with the company and we couldn't depose her, but it turns out that she, at least through the depositions in September and October, remained on Sunoco China's board.

The only real mitigating excuse that plaintiff offers here is cultural differences, that their client in China didn't understand what would be involved in bringing a lawsuit in the United States, and frankly, that's just not an excuse. They're the plaintiff. They chose to bring suit here. They certainly chose to avail themselves of our discovery procedures in seeking discovery from defendants. They served hundreds of document requests, got a few hundred thousand pages of documents from defendants, took depositions, served interrogatories, and we're not talking here about good faith disputes over the margins. We're talking about a wholesale refusal to make witnesses available to testify on certain topics. Obviously, this is highly prejudicial to the defendants.

The only claims against the affiliated entities, Sunco US, Eastman Street Woodworks, Eastman Street Distributors, Infinity Realty Company and New Sun Limited Partnership, the only claims against them are fraudulent transfer and reach and apply and we didn't get a single question answered substantively at deposition. We asked the factual basis for those claims and were told first by the witness "I don't know" and then, as I mentioned earlier, when we continued asking questions, counsel for plaintiff instructed the witness not to answer on the grounds that the factual basis for those claims was attorney-client privileged.

We have to look at the adequacy of lesser sanctions here. We don't think monetary sanctions work. It doesn't cure the prejudice involved here, and we don't think that there is any reason to think that if we went back and tried to do this again, if we tried to get more discovery, that it would somehow yield better results. We shouldn't have to go back and seek this discovery. We shouldn't have to spend the amount of time that history teaches us it will take to get additional discovery and we don't think that it will get us what we're entitled to in this case.

With respect to the procedural factors, I don't think there can be any argument that plaintiff wasn't put on notice. When we filed our second motion to compel, the Court held a hearing on it, and at that hearing, the Court noted that if the witnesses weren't going to be adequately prepared to testify on the duly noticed topics, that the Court would entertain motion for sanctions.

At the September 10, 2025 hearing, when we still, after the months over the summer had been trying to schedule these depositions and still didn't have any deposition dates, the Court made very clear to counsel for plaintiff that it had to meet its discovery obligations or face the consequences. As the Court explained, "It seems to me that we have all been bending over backwards to try to make this work when you said Mr. Wu was going to be available first and then his health

concerns were raised about why he's not available and then stories changed multiple times with respect to the 30(b)(6) witnesses. I am not going to continue down this road. If you can't make your witnesses available, then I will entertain whatever motions from the defendants. It can't keep going on forever. I think we've all been patient enough."

The September 25, 2025 hearing, which was on defendants' emergency motion for a protective order when plaintiff wanted to make -- to have Mr. Wu be present at all depositions as their corporate representative, the Court again warned the plaintiff, "I don't appreciate sort of the flip-flopping by the plaintiff here, and I think I've said it seems fishy and there is a bit of gamesmanship. I think it's your client but I don't think it's fair to the defendants and I think I have made that known."

So let's talk about the sanctionable conduct and the gamesmanship that plaintiff has engaged in here, and particularly, I want to start with plaintiff's changing story regarding Mr. Wu's involvement. So when plaintiff filed this complaint and then filed its amended complaint, Mr. Wu was someone who had taken over the management of the factory. When we served interrogatories asking who the top managers of the company were, plaintiff responded, any interrogatory signed under penalties of perjury by Mr. Wu himself that the top managers of Sunoco China include Mr. Wu.

When we filed our first motion to compel Mr. Wu's deposition, Sunoco China identified him as the principal of Sunoco China and its anticipated 30(b)(6) designee. A month later, however, after the Court had ordered his in-person deposition, plaintiff's story changed. Suddenly, he wasn't willing to be made available for deposition and he wasn't the person to testify about these topics. He didn't really know much of anything at all.

This continued at the hearing on our second motion to compel where counsel for plaintiff made clear that Mr. Wu does not have the knowledge and the subject matter. However, when we went to take these depositions, as I referenced previously, we learned that plaintiff had intended for Mr. Wu to be their corporate representative at the deposition. Suddenly he was someone who had involvement with the company. Well, now, after having first said that he was the corporate designee, one of the top managers and someone who took over the factory, then having said he's not a director, officer, shareholder and he doesn't know anything about this case, when we move for sanctions --

THE COURT: Say that last part again.

MS. CONNOLLY: Yeah. So initially he was someone who took over the factory, he was a top manager at Sunoco China, and he was the principal of Sunoco China. When we sought his deposition, suddenly he didn't know anything about the factual

allegations of this case, he wasn't a director, an officer or a shareholder, and he wasn't the right person to talk to.

THE COURT: He was none of those things?

MS. CONNOLLY: He was none of those things according to plaintiff. When we filed our motion for sanctions, we anticipated that plaintiff would try to play games, have other witnesses be their 30(b)(6) designee, and then have Mr. Wu come forward at trial and where all the designees said "I don't know" in answer to questions, Mr. Wu would provide alternate testimony. And so one of the forms of relief that we asked for was that Mr. Wu not be allowed to come in and contradict the 30(b)(6) testimony or provide evidence that wasn't -- or factual bases that weren't disclosed at the 30(b)(6) deposition.

When we got plaintiff's opposition, I, for one, was very surprised to see this particular line in plaintiff's opposition, "Barring Mr. Wu's testimony would deprive the jury from hearing direct evidence given by Sunoco China's one key witness."

The story here keeps changing. This is clearly gamesmanship and clearly meant to put defendants at a disadvantage. We're entitled to talk to the people who have the knowledge of the facts and we were deprived that opportunity.

Now, plaintiff now claims that Mr. Wu was more

familiar with certain topics that we noticed in our 30(b)(6) notice such as the 2014 shares transaction, and just to refresh your Honor's recollection, plaintiff has brought claims against Infinity Wood Products claiming that Infinity Wood Products owes it money for cabinets Sunoco China shipped to Infinity Wood Products. Infinity Wood Products' defense is that in 2014 when Mr. Wu's company purchased 52 percent of the shares of Sunoco China from Sunco US, he was supposed to make installment payments. When he didn't make those payments, he proposed to use cabinets instead of cash as payment.

So we sought deposition testimony related to that share transaction and any amendments, the terms, et cetera. "Mr. Wu is more familiar with certain topics." This is what plaintiff wrote in their opposition to our motion for sanctions. However, that was one of the topics that we designated so it's not clear why Mr. Wu was not the designee. In its opposition to motions for sanctions, plaintiff also claims, as you'll see here on the screen, that Mr. Wu also has the most knowledge on plaintiff's defense to the defendants' counterclaim. Well, the counterclaim loan was one of the 30(b)(6) topics.

Now, of course, plaintiff doesn't have to make available the individual with the most knowledge on any given topic as long as they present a witness who is adequately prepared. Their witness, however, testified that he never

spoke to Mr. Wu in preparation for deposition. We asked, "Other than attorneys, did you speak with anyone else to prepare for this deposition?" Answer, "No." So if Mr. Wu is the person most knowledgeable on some of these topics, why didn't plaintiff's designee speak to him?

The Court may also remember that there were changing stories on the availability of Mr. Z and Mr. X. First, Mr. Z was so afraid of testifying that he would resign rather than sit for testimony, and Mr. X was too old and too infirm to even sit for his deposition remotely. Suddenly, after the Court ordered Mr. Wu to appear in person for a deposition, now Mr. Z and Mr. X are suddenly not only available but available to be the corporate designees on these topics, on all of the topics.

We asked Mr. Z and Mr. X at their depositions if those representations to the Court were true. Mr. Z said, "I never told anyone that I would resign rather than testify," and Mr. X made clear that he wasn't too old or too sick to come to the United States to testify.

I mentioned earlier it was clear that plaintiff's strategy was to show up and talk about its affirmative claims and nothing else.

When we asked Mr. Z:

"So you're here to testify today about the company's knowledge regarding Sunoco China and Sunoco US's business relations, correct."

Answer, "I need to know the payment for the goods between Sunoco China and Infinity. I need to know that relationship."

Question, "So are you prepared today to testify about the manner by which Sunoco China tracked its accounts payable?"

Answer, "Excuse me. I am here to testify today to the accounts receivable of Sunco China." And this was repeated again and again. "There is no way I can answer that. I can only say that today I am here to testify and I'm prepared to testify on Sunoco China's accounts receivable."

In answer to another question, "I think your question is not directly related to this case. Today I'm here to testify on payments for the goods owed at the amount 6.7 million U.S. dollars.

In another response to another question about payables: Answer, "I am actually more concerned about the 5.8 million U.S. dollars, the amount in the audit report."

In response to another question, "As I said earlier, this is a transfer of shares among the shareholders and that's not relevant to this case. This case is about the outstanding account receivables."

Plaintiff had an agenda and its agenda was not to answer our questions.

On Topics 2 and 19 which related to Sunoco US's counterclaim against Sunco China where Sunco US says that Sunco

China owes it $2.4 million, plaintiff did nothing to prepare for it. We showed Mr. Z an audit report of Sunoco China that listed a payable to Linda Sun. We also showed him a request for confirmation of balances that Sunoco China sent to Linda Sun noting a payable to Linda Sun in the amount of nearly 21 million RMB. We asked him questions about it.

"Has it been paid off?

Answer, "I don't know."

"Did you do anything to investigate this payable prior to today's deposition?"

Answer, "I do not need to investigate this payable. I don't think we need to pay it."

Now, I understand that plaintiff disputes the existence of this payable and that is their right to do. What plaintiff is not permitted to do is to say, "I disagree with your theory of the case and, therefore, I am not going to give you any discovery on it and I am not going make a witness prepared to testify about it."

On the fraudulent transfers which is one of the only two claims against the affiliated entities in this case, in response to virtually every question I asked:

"Does plaintiff claim that Infinity Wood Products sold any cabinets to any person or entity other than Sunco US?

Answer, "I'm not sure."

"Does plaintiff claim that Infinity Wood Products

fraudulently transferred any assets other than cabinets?"

Answer, "I'm not sure."

"Does plaintiff claim that Sunco US fraudulently transferred any assets other than cabinets?"

Answer, "I am not very sure."

Question, "How many cabinets does plaintiff claim Sunoco US sold to Eastman Street Woodworks?"

Answer, "I don't know about that. I cannot recall."

Same question for Eastman Street Distributors, "I'm not sure."

Infinity Realty Company, "I'm not sure."

New Sun Limited Partnership, "I'm not sure."

Linda Sun, "I'm not sure."

David Sun, "I'm not sure."

Shillock Yuan Sun, "I'm not sure."

So we tried instead on the reach and apply claims.

"Does plaintiff claim that Eastman Street Distributors is currently holding any assets that belong to either Sunco US or Infinity Wood Products?"

Answer, "I'm not sure."

Same question with Eastman Street Woodworks, "I'm not sure."

Infinity Realty Company, "I'm not sure."

New Sun Limited Partnership, "I'm not sure."

Sunco US, "I'm not sure."

David Sun, "I'm not sure."

Shillock Yuan-Sun, "I'm not sure."

Linda Sun, "I'm not sure."

And I apologize for belaboring the point but I think it's important to show that this is not a case where a witness has testified to their knowledge and it may not be the full extent of all of the claims and later they want to come in at trial and maybe supplement some additional information that they simply couldn't recall because they had remembered so many other things. This is a case where the witness just didn't know the factual basis and couldn't give us any information about the factual basis.

And so for all of the entity defendants, all of the claims against them, we're now at the end of fact discovery and they have no idea what the factual basis for those claims are. None. That's not how trial is supposed to go.

With respect to Linda Sun and Shillock Yuan-Sun, there are also claims against them for piercing the veil of Infinity and for monies had and received. We went through a similar exercise for those asking plaintiff's 30(b)(6) designee for the factual bases for those claims and were given the same answers of "I don't know, I don't know, I don't know."

I am happy to go through some of the other topics with the Court, if the Court would like, but I don't want to take up too much of the Court's time on this.

I do think it's important to note Topic 22, the document maintenance. We asked for a witness prepared to testify about document maintenance as well as the efforts that plaintiff made to respond to defendants' document request. That was Mr. Z, and once again, he doesn't know anything. He doesn't know who maintains Sunoco China's e-mail server. He doesn't know who maintains a backup of the server. He doesn't know whether there is any automatic e-mail deletion protocols. He doesn't know whether a litigation hold went out. He doesn't know whether employees were told in any way not to delete files. And so we were deprived of the opportunity to investigate and probe their document production.

I do want to speak for just a moment about Mr. X. So he was designated on one topic, which is the management of Sunoco China, and while it's just one topic, it is an important topic because, as the Court has certainly seen, there is a lot of dispute over who managed what, when and Mr. Wu's involvement in this case. Mr. Xiao was obviously not the right person to testify on this topic and we don't fault him for this. He is functionally illiterate. He testified that he can read and write his name and it seems that's about it. He only achieved the fourth or fifth grade of education. And when we asked him point-blank whether he thought that he was the best person at Sunoco China to be able to give testimony about this topic, he answered, "I don't think I'm the best person." He didn't even

seem to understand that he was there as a corporate representative. We didn't get the answers to the questions that we were entitled to ask, and, again, we're not faulting Mr. X. We're faulting plaintiff for designating him when he clearly was an inappropriate person to testify.

It wasn't just lack of preparation, though. There was obstructive conduct throughout the depositions. Mr. Z in particular repeatedly answered questions by saying "You should speak to my counsel," again and again and again. Even when pressed, even when told it was his job to respond to questions, he would answer, "You should speak to my counsel."

All of the witnesses gave filibustering answers and we have gone through that in our papers. Obviously, filibustering is not the sort of thing that you can take a screenshot of and put it up on a screen in a tidy fashion because it would go over pages and pages.

There was a lot of argumentation and refusal to answer basic yes/no questions.

And then finally we come to the improper privilege assertions. So there is no question that facts are not privileged. That is a very basic principle. Facts are not privileged. Communications can be, but not facts. We tried multiple different ways to get answers from questions about the facts, making clear that we are not asking what the client or the witness told the lawyer, what the lawyer told the client,

just the factual basis for plaintiff's claims. Plaintiff's counsel objected and instructed the witness not to answer on the grounds that it was privileged.

We wanted to make sure that we were understanding correctly that this was an objection over the factual basis for a claim. So we asked counsel for plaintiff, "So you're asserting the attorney-client privilege over the facts that form the basis for these claims?" Plaintiff's counsel responded, "Yes."

We tried to ask questions about the basis for interrogatory responses. Mr. Wu is the individual who signed them. We tried to ask him questions, and again, he was given the same instruction, "Don't answer, that's privileged."

Rather than walk through, you know, the multitude of interrogatory responses and get the same instruction and refusal to answer, we asked counsel to stipulate that if we ask questions about the factual basis for those claims, she would instruct the witness not to answer and the witness would follow that instruction.

So there is a number of the claims that we weren't allowed to ask questions on and the interrogatories we weren't allowed to ask questions about it. We have really been hamstrung in our ability to defend against plaintiff's claim and for Sunco US, and I don't speak for Linda Sun but I am certain Mr. Folkman would agree, that Ms. Sun has been hindered

in her ability to put forward her counterclaim.

The depositions also revealed the inadequacy of plaintiff's document production. As the Court may recall, we filed a motion to compel certain documents including documents referencing Sunco US's counterclaim loan. Plaintiff was emphatic it had no such documents. Saying, "Plaintiff has searched for documents regarding Sunoco Inc.'s non-existent 2011 loan and has found none." It said, "Plaintiff agreed to go back and search again for any minutes and records that reference the non-existent 2011 loan. No documents exist or were found." Again, "Plaintiff has looked for any unidentified and undocumented loans by Linda Sun to plaintiff and found that no such loans existed." Again, "Despite the absurdity and irrelevancy of defendants' requests, counsel has asked plaintiff to search its records multiple times for any record of any loan, whether from Linda Sun or the other defendants, and Plaintiff has found no such loan or documents or reference thereto." Again, "Plaintiff has searched its records multiple times for any record of any loan and has found none." These were all representations that plaintiff made to the Court in separate filings.

In reliance on those representations, the Court denied our motion to compel. In its order the Court wrote, "The motion is otherwise denied as plaintiff has represented that it conducted a thorough search for any loans by Linda Sun and have

not found any."

Well, as I mentioned earlier, we showed Mr. Z two documents that make a reference to a payable to Linda Sun. The first was an audit statement and the second was a confirmation of balances. About the audit statement we asked Mr. Z:

"Is this payable reflected on any other financial statements of Sunoco China?"

Answer, "It should be."

Question, "What other documents would this payable be reflected on?"

"Where it would be reflected it should be in the audit report every year."

When we showed him the confirmation of balances that I referenced earlier, one of Sunoco China's auditor asked Linda Sun to confirm that Sunco China owed her approximately 21 million RMB, we asked Mr. Z:

"Are there any other similar requests?"

His answer, "I'm not very sure about that."

Question, "Did you search for any requests for confirmation of balances made to either Sunco US or Linda Sun?"

Answer, "I'm not sure about that."

Now, bear in mind that Mr. Z was the corporate designee on the topic of plaintiff's response to the document requests. So if anyone should know whether they even searched for these documents, it should be him. It seems, however, that

Mr. Z wasn't even aware that we asked for documents in this case. We asked him:

"And you're aware that defendants asked for a bunch of documents in this case, right?"

And he answered, "I don't know what documents you're referring to."

So we clarified, "My question is a more general question. Are you aware that the defendants in this case asked for a variety of documents from the plaintiff?"

Answer, "That's doable. Whatever documents you need, just tell counsel."

Question, "Are you aware that the defendants in this case asked for a variety of documents a very long time ago?"

Answer, "Regarding this, you can directly communicate with our counsel. Whatever counsel asks me to look for, then I would provide it right away. So you don't need to ask me whether I knew about it or not. If you need a document, just inform our counsel and we will provide it. If you want, my counsel can ask for it and I can give it to you right away." So it seems that plaintiff did very, very little, if anything, to search for documents in response to our request.

Instead, it appears that plaintiff went on the hunt for documents that would support its case and nothing else. For example, they didn't search the e-mails of Mr. Wu and they didn't search the e-mails of Mr. X, the so-called top managers

at Sunoco China, and when asked why, Mr. Z testified, "Regarding this search, I feel since I searched the e-mails of Gao Yueyun, who is an accountant from our Finance Department and also the purchase orders related to this case, I think that was sufficient for us."

So we think it's absolutely clear here that we've been deprived of meaningful discovery and are severely prejudice in this case. As we noted in our papers, we think we would be justified in asking for default judgment here, but what we've tried to do is request relief that's tailored to the conduct that's designed to mitigate at least some of the prejudice here.

So we are seeking an order precluding plaintiff from relying on evidence that plaintiff failed to disclose in its Rule 30(b)(6) testimony. We asked plaintiff questions about the factual basis. It said, I don't know. It shouldn't be allowed to come in at trial and offer something that it didn't disclose to us. And, again, we're not talking about a case where we were given 30 reasons and they want to add one or two more at trial. We were told, "I don't know, I don't know, I don't know," again and again and again.

And we're not asking the Court to make any rulings here on the sufficiency of evidence or what it means for the claims or judgment. All we're saying is that if we asked the plaintiff at deposition for the factual basis for a certain

claim and they didn't provide evidence or a factual basis for it, they shouldn't be allowed to come in at summary judgment or trial and provide that information.

Assuming, looking forward and thinking that it was likely that Mr. Wu was going to be playing games and trying to come in at trial and testify and contradict what Mr. Z and Mr. X had said, we asked the Court in our moving papers to preclude Mr. Wu from contradicting or supplementing plaintiff's 30(b)(6) testimony, and in its opposition, plaintiff all but made clear that that's exactly its intent, identifying Mr. Wu as its one key witness.

They want to be able to say that was Mr. Z who testified and he didn't know or that was Mr. X who testified and he didn't know but here is Mr. Wu who knows the actual facts and he is a better person to testify and we don't think that he should be allowed to do it.

And on this point, with respect to the invocations of the attorney-client privilege, we think it's clear, as I said, that facts are not privileged, but even if they are privileged, well then they're not going in front of the jury. Certainly plaintiff can't be arguing that it can maintain a privilege about all the fact discovery and then at trial waive that privilege. That would obviously be unfair and improper. So if they're privileged, then they're not prejudiced by being told, "Okay, you can't introduce those fact as at trial." If we

can't ask about facts in discovery, they shouldn't be entitled to introduce those facts at trial.

We're also seeking an adverse inference instruction on documents not produced, a specific one with respect to the financial documents that Mr. Z testified exist and have references to the payable to Linda Sun. We're asking for an order instructing the jury that plaintiff failed to produce those documents and the jury can infer that such documents would have supported defendants' claims and defenses as well as Sunoco US's counterclaims.

With respect to Ms. Qiong Xiao, apologies for the pronunciation, we're seeking a missing witness instruction. We asked for her to be deposed. Plaintiff said she is no longer with the company. We can't make her available. Turns out that was untrue. In her opposition papers, plaintiff faults us for not moving to compel. The reason we didn't move to compel is we relied on plaintiff's representation that Ms. Xiao was no longer with the company. Plaintiff shouldn't be able to make misrepresentations to us, have us rely on them in not bringing a motion to compel and then say you're not entitled to any relief because you didn't move to compel.

And then, finally, we're seeking an order precluding plaintiff from relying on any document not produced prior to September of 2025. A few minutes before their depositions began in Bangkok, counsel for plaintiff e-mailed us two

documents that relate to an arbitration in China between Sunco US and Sunoco China. We had served document requests seeking documents from that arbitration and plaintiff steadfastly refused. In multiple meet and confers, plaintiff refused. So they shouldn't be allowed to turn around now and give us literally minutes before depositions began to cherry-pick documents from that case, and so we're asking that those documents be precluded and any documents produced hereafter, absent good cause, be excluded from trial.

THE COURT: So what is the cutoff date, September what?

MS. CONNOLLY: I would say the date the first depositions began. That was September 28, I believe. So that's the relief we're requesting. We think that it's tailored to the misconduct here. We're not seeking the moon but we've been severely harmed by plaintiff's conduct here and our ability to proceed at trial if plaintiff is allowed to ambush us. You know, we will be severely prejudiced.

So if the Court has any questions, I am happy to answer them, otherwise I have said what I believe I need to say. I know that Mr. Folkman had a few things he wanted to say on behalf of his clients. I don't know if the Court would like to hear from plaintiff or Mr. Folkman now.

THE COURT: I will hear from Mr. Folkman first.

MR. FOLKMAN: Thank you, your Honor. I associate

myself with everything that Ms. Connolly said. Linda Sun in some sense tends to get lost in this because she's in some ways a minor player in a very large case but we do have one issue that is really specific to her and I just want to take about two minutes to explain the prejudice for her issue.

Her issue is that Sunoco China sued her in China, lost, and then is suing her now here in the United States on the same claim. We think that's an absolute defense to the main claim against her which is a claim for breach of fiduciary duty.

THE COURT: You've got the counterclaim, right?

MR. FOLKMAN: And that is the counterclaim. The counterclaim is a claim for you to recognize that judgment and give res judicata to that effect.

Now, there is a defense to that. The defense is, well, the legal system of China is systematically unclear so no American court should ever be able to recognize any judgment coming from a Chinese court. We have a response to that and that response is you don't get to say that. You're estopped because you chose to sue here there and you lost and so some of my questions in these depositions were aimed at why do you think that? And this is not just a question of law. It's a question of fact. What were you thinking? When did you know what you claim to know? Because what I anticipate is that Mr. Wu or Mr. Xiao or somebody is going to come and say

something like, well, you know, we learned after the case in China, after we sued Ms. Sun in China we learned something and now we know that the Chinese courts are unfair, but I was really prevented from inquiring in any way into any of this stuff, and I encourage you to look, if you'd like, at some of the testimony about this because what you will see, and, for example, if you were to look at Mr. Zhao with a Z's testimony at Page 241, after a whole bunch of coaching from the lawyers, you know, "I'm going to instruct the witness that he can answer if he feels like he's able to answer but it's really a question about the law," and the witness says, "This is really a question about the law, I can't answer it." If you read that testimony, you will see that I am trying to understand why they think that the courts of China are unfair.

We spent an enormous amount of time and money hiring Chinese law experts doing a lot of legal research, getting ready for summary judgment. It is unfair and unacceptable for us to be surprised with factual claims about the Chinese judiciary that they should know, they should be able to say. Not only could I not get these witnesses to say this is why we think the Chinese courts are unfair, I couldn't even get them to agree with me that the Chinese courts were unfair. Basically the answer was we respect the courts of China, and Mr. Wu went so far as to say, you know, you have to look at this on a case-by-case basis. None of them were prepared to

even stand behind their claims, let alone tell me why their claims are what they are.

So that's just a little vignette. I am sure that my sister could have given you fifty examples that are similar on all the other issues in the case, but on this issue which is specifically important to Mrs. Sun, it just can't be that they now get to come and provide a factual basis that really prevents us and tries to undercut arguments that we're trying to make today. Thank you.

THE COURT: Got it. Thank you.

MS. DAI: Good morning, your Honor. Allow me to give you a key summary of the case. This is essentially a payment collection case where Sunoco China was owed $6.7 million by Infinity, Inc. which is the first defendant that we filed the claim against.

THE COURT: I don't think you need to summarize what the case is. I know what the case is about. I know what your claims are and I know what their claims are, counterclaims. I just want to get to the heart of the issues that were raised by the motion.

MS. DAI: Okay. Yes, yes, your Honor. Your Honor, the defendants here is seeking the most serious sanction remedies and the very severe sanctions according to the law should be just inappropriate. So *Neponset* case says the trial dispositive remedies very severe even based on 30(b)(6)

deficiencies.

THE COURT: So it doesn't see like it's unreasonable to say if they didn't get the answer or they didn't get the information that they were looking for and discovery is now over that there shouldn't be new information either on summary judgment or at trial. That doesn't seem unreasonable.

MS. DAI: Right. Your Honor, let me -- just bear with me. The other thing I want to point out is that the 30(b)(6) deposition testimony is, according to the law, it's considered to be evidentiary admission. It's not considered a judicial admission. *Vehicle Market* case actually supports that a Court is not bound by the 30(b)(6) testimony and it can be explained, clarified and supplemented, and the contradiction can go to weight and impeachment.

Here, I want to address a few things. That -- one thing is that defendant asked for -- sorry, defendant. I'm sorry. Plaintiff should not be precluded from introducing evidence of any factual basis not disclosed by its 30(b)(6) witness. The plaintiff produced hundreds, if not over a thousand, documents and pages of documents that prior to the deposition and plaintiff also responded each interrogatory request and the document production request. Just because 30(b)(6) witness did not disclose or address some factual basis and render the exclusion of the information that come in in the documents and the response to interrogatories, that seems to be

prejudice.

And the second thing is that the defendants' counsel didn't ask -- there could be questions they didn't ask on the depo and there could be answers not solicited in the deposition and they could ask these questions at the trial. If we excluded this information, it's going to be prejudice to the plaintiff and plaintiff counsel can possibly do the same thing.

And the other thing I want to address is Mr. Wu. So Mr. Wu -- again, defendants attempt to prevent Mr. Wu, a key witness, a third-party witness, but Mr. Wu does have some ties with Sunoco China. I mean, they tried to prevent Mr. Wu from testifying and from jury hearing his testimony and Mr. Wu should not be precluded. He should be allowed to contradict and supplement the 30(b)(6) testimony. I mean, we are not ambushing anyone and we are not playing any games.

THE COURT: Ms. Dai, let me just stop you for a second.

MS. DAI: Sure.

THE COURT: So before any of these depositions happened, you were given a list of topics that the defendants wanted to explore about company representatives.

MS. DAI: Yes.

THE COURT: And then it was on you to then designate the best witness or a witness who would have the requisite knowledge on those topics to be able to be respond, right, at a

deposition.

MS. DAI: Yes.

THE COURT: And you did. And so why -- I don't understand this argument now, after you've had that opportunity, you have designated witnesses, those depositions happened, they said I don't know, why do you now get a chance to add? You've already had that chance.

MS. DAI: Right, right. Your Honor, I mean, I know that defendants pointed out, cherry-picked some of the deposition testimony, and there are parts that before that we actually present in our opposition and our two corporate designees, especially Mr. Z, he testified to the best of his knowledge --

THE COURT: And that's fine. He testified to the best of his knowledge.

MS. DAI: Right.

THE COURT: But what was -- the responses, the answers, the information that he offered in response to the deposition questions, he did his best, but it is what it is. Why shouldn't you be limited to that?

MS. DAI: Your Honor, Mr. Wu has, like my sister said, Mr. Wu is more knowledgeable on certain topics, especially it's not a topic that specifically designated to 30(b)(6) designee. Mr. Wu's company purchased 52 percent shares of Sunoco China in 2014 and his company. He can testify on that. The shares is

purchased 52 percent of Sunoco China. Yes, 30(b)(6) designee should be able to testify certain part of it but Mr. Wu -- because there was an argument. There was affirmative defense presented by the defense that Mr. Wu has not paid sufficient payment for this 52 percent share purchase price because he was saying they use that to offset the receivable the Sunoco China is going to be receiving, but Mr. Wu, the two documents that were produced to defendants prior to Mr. Wu's deposition -- by the way, Mr. Wu had two days of deposition, I believe. The documents were produced actually is a private agreement entered between Mr. Wu and Linda setting forth, they agreed that Mr. Wu spent two years to bring to the compliance of environmental regulation for Sunoco China which Sunoco China has been illegally operating without environmental valid license for about 15 years. The document said Mr. Wu spent two years, talked to the government, getting the compliance. Part of the money he is supposed to pay for the shares would be offset. So this is a very important information. I'm just jumping around, I'm sorry, talking about the two documents should not be precluded, and Mr. Wu should not be precluded of presenting to the jury.

THE COURT: Let me ask you this, just going back to Attorney Connolly's point earlier.

MS. DAI: I'm sorry, your Honor. Do you mind a little louder?

THE COURT: Sure. I just want to go back to -- well, I will just start from the beginning. Just to summarize the history of all of last year when we were trying to get these depositions to actually happen, plaintiff initially identified Mr. Wu as a key witness, right?

MS. DAI: Your Honor, if you talk about the discovery disputes with regard to Mr. Wu, so --

THE COURT: We're talking --

MS. DAI: Yeah.

THE COURT: I don't want to talk over each other's head. I would like you to just listen to my question and try to answer my question directly, okay. And so my memory is before June of 2025, I feel like we spent the entirety of 2025 over this, and initially, up until June is my memory, and the plaintiff had said that Mr. Wu was a key witness in terms of the person that defendants can inquire about company matters, right?

MS. DAI: Yes.

THE COURT: And then at some point that changed and said, no, he's not the most appropriate 30(b)(6) designee. We have other witnesses who would be better who might be more knowledgeable in these matters, right?

MS. DAI: Yes. At some point, yes, the client changed, yes.

THE COURT: But then we had problems with both of

them, I think, didn't we? There were discussions about whether these depositions of Mr. Z and Mr. X can actually happen. The later part of the summer, early part of the fall, I remember, having this conversation about, well, if Mr. Wu is not the right person and Mr. X and Mr. Z are, let's get it done, right?

MS. DAI: Uh-huh.

THE COURT: But reading the briefs, Mr. Z says, well, I never said I thought about resigning rather than testify in this case. So where did that come from?

MS. DAI: Your Honor, I don't know how to explain that. I have been spending time, five to ten remote sessions, with my client. Of course, the first thing I would say --

THE COURT: No, no, no, but you made that representation, right?

MS. DAI: I'm sorry. What representation did I make?

THE COURT: That he would rather -- that it was your understanding that the defendants could not depose Mr. Z because it was your understanding that he would rather resign from the company than to testify in this case.

MS. DAI: Right, that was provided by my clients at that time when I represented to the Court.

THE COURT: Client meaning Mr. Z or someone else?

MS. DAI: At that time Mr. Z, yep.

THE COURT: But Mr. Z says I never said that. How do you explain that?

MS. DAI: I don't know how to explain that, your Honor.

THE COURT: I mean, these things matter, right?

MS. DAI: I understand. But -- I understand, your Honor, but at the end of day, Mr. Z is here testifying as 30(b)(6). Mr. Xiao is testifying. Mr. Wu is going all the way to Bangkok and is testifying to the best of their knowledge. I understand your point, your Honor. Can I also make a few points?

THE COURT: No. So I also want to talk a little bit about Mr. X because at the time that representation was made again by you that it would be difficult to have him testify because he had poor health, he's up there in age, and at least from the papers that I read, neither of those things were true.

MS. DAI: Yes.

THE COURT: Any explanation?

MS. DAI: Yeah, your Honor, these representations were made by my client, and I don't have the explanation for you. So it was represented by the client at that time he was old, he couldn't travel. Of course, I've never seen him before I met him in Bangkok and I don't know what is the best way to explain.

THE COURT: But you agree it wasn't true?

MS. DAI: I guess.

THE COURT: All right. So let's talk about Mr. X.

MS. DAI: Yes, your Honor, let me explain. There was a very small board of directors after Linda Sun suddenly left the company and leaving 120 workers unemployed and Sunoco China has to borrow $2.6 million to pay unpaid wages and correct all the deficiencies in compliance with the law. There was a little bit manufacturing activity after 2019, going back to a little bit of furniture production. There is small board of directors still exists just to clean up the things including Mr. Wu, I believe, Mr. X and I believe his daughter is still on the board. The reason Mr. Xiao and you might be puzzled by my --

THE COURT: So Mr. X's daughter is still on the board?

MS. DAI: Mr. X is Mr. Xiao. He has a very low level education. The reason that he had been picked, he was a board of director back in 2015, 2016 when Mr. Wu helped the company bring back to the compliance of environmental regulation compliance because Chinese -- there is a law in China saying if the company can slip back into compliance, Mr. Wu is a government relation person and the board of directors could be thrown into the jail and the Linda does not want that to happen so they decide to chose Mr. Xiao.

THE COURT: To be the fall guy? To be the fall guy? What does that mean?

MS. DAI: Essentially, he was picked because he has a low education level, he was naive, and if anything happened and

he can be the person to be blamed and Linda talked to him and picked him. So he worked extensively with the Chinese counsel in terms of managing the company's business after 2019 to some extent. They don't have a lot of business to manage at this point, but he is the best, your Honor, he is the best 30(b)(6) designee to assign to this particular only one topic out of the twenty something topics.

THE COURT: So the topic that you designated him for was the management of the company, the management structure, right?

MS. DAI: Right. Yes because he had closely working with the Chinese counsel and whoever is still left in the manufacturing. His specialty is manufacturing. So he is the -- we talked about it. He is the best person designated to that topic.

THE COURT: So a man who himself didn't know why he was designated, a man that Mr. Wu called illiterate, a man who says, look, I can only read and sign my name, otherwise I really -- a man who didn't know what positions Mr. Wu held in the company, that was the best person?

MS. DAI: Your Honor, this is the client -- this is the best. The client picked him as the best person and he should have understand he is designated in 30(b)(6) designee, he should have.

THE COURT: Let me ask you this, you say when you were

preparing with Mr. Z you met with him five or six times, spent anywhere between ten and twelve hours with him. I assume you spent some time preparing Mr. X as well.

MS. DAI: Absolutely.

THE COURT: And during that preparation -- and again, it's only one topic.

MS. DAI: Yes.

THE COURT: About the management structure of the company and so was it a surprise at the deposition he couldn't answer any of these questions?

MS. DAI: Your Honor, I believe he did answer some of the questions to the structure to some extent. Maybe not sufficient, I agree with you. I did the best I can, and Mr. X did the best that he can and the client thinks he's the best person for those topics.

THE COURT: All right. So you mentioned the daughter of Mr. X is still employed and you wanted to depose her but you didn't depose her because it was represented to you that she was no longer with the company?

MS. CONNOLLY: Yes, your Honor. We served the deposition notice and were told that she was no longer with the company.

MS. DAI: Your Honor, talking about the missing witness instructions.

THE COURT: No, no. Let's just talk about what

happened there. Why was that representation made that she's no longer with the company but she is with the company?

MS. DAI: Your Honor, she has been the board of directors of the company. She's not an employee, she's not an officer and she's not involved in management at all.

THE COURT: So what did you mean when you say she's out of plaintiff's control?

MS. DAI: To me, she's not an employee or officer. She's only a board of directors. I believe the corporation does not have the control of board of directors, and the other thing, your Honor, I want to mention is whatever testimony that can be anticipated from her is not material. It's going to be cumulative.

THE COURT: Let's not -- that's not the point.

MS. DAI: Okay.

THE COURT: I just want to get to -- I mean, it seems to be an inconsistency here. You notice the deposition specifically asking to depose her. Plaintiff says she's not in our control, they drop it because they accept that representation. Turns out, she is still with the company.

MS. DAI: Right. Again, your Honor, it's our position that she's not an employee. She's not an officer. She's only a board of directors.

THE COURT: I only bring it up because you earlier said that she's still with the company. These are your words I

am throwing back at you.

MS. DAI: When I said with, I made it clear that she's never been an employee, never an officer. She's only a board of directors. This is what I represented, your Honor. The *St. Michael's Credit Union* elements goes to that even if there was testimony solicited from her, she is the least involved in the management oversight of the company.

THE COURT: I know we're running a little bit over time here but I believe there was another person -- Ms. Wen -- I think W-E-N, Sun, S-U N, was that one of the witnesses you also wanted to depose?

MS. CONNOLLY: That one is a little trickier, your Honor. We served the Notice of Deposition and then we were told that she had resigned rather than having to testify but it turns out that she was still employed by the company when we were given that representation. However, it does appear that she resigned shortly thereafter.

THE COURT: Okay, all right.

MS. DAI: Yes. I think there was a four-day difference, your Honor. I was represented by the client around February 24 said that she is resigning and then I told you later that she resigned, it was February 28. There was three or four-day difference.

MS. CONNOLLY: Yes. Although, that was another instance of us getting changing stories. We were told she

resigned because she didn't want to testify but Mr. Z testified that she resigned, I believe, for, you know, commuting her child to school, it was more convenient.

THE COURT: All right. So we are running past the hour but let me just tell all of you that I did read everything that's been submitted. I've reviewed all of the exhibits, the deposition transcripts. I read through them all. So I will give you five minutes to sort of wrap up your arguments.

MS. DAI: Okay, your Honor, I would like to use the five minutes to bring up a few points. Earlier on my sister showed you a lot of "I'm not sure, I'm not sure, I'm not sure" from Mr. Z specifically with regard to the facts that they say is related to fraudulent transfer, pierce corporate veil and the reach and apply, if you remember, and in terms of this type with the attorney-client privilege, I could be a little bit overall protective with the clients and some of the instructions might not be the most appropriate, but I want to bring out that the facts relevant to this claims and the only facts that the plaintiff has produced and there was no other facts that they're going to produce is the Secretary of State filing of all the Infinity, Inc. and all the affiliated entities showing the common ownership, the common directorship, and the common officership and it's the only facts we have, and most of the facts, your Honors, is coming from the defendants. They produced the books and records, voluminous, financial

records, tax returns, and for this information, even me as a counsel, I was not able to dissect and draw any conclusion out of these documents to say -- to support the conclusion. So we had an expert look at the documents. Days after my brother filed response to this sanction motion, December 16 we provide expert report to the defendants. So we are not going to provide any more facts on this issue.

And one thing I want to point out, that early on we filed a motion to amend, that was sometime in 2024, and the defendants filed a motion to dismiss Sunoco, Inc. right away and it turns out the motion was denied by the court and the Sunoco, Inc., immediately after their motion was denied, they filed a supplemental response to disclose the first time that Infinity, Inc. transferred 6.7 worth of cabinets to Sunco, Inc., which is a party they instructed to dismiss and the court spent six months on this matter. They transferred to the cabinets without consideration. So after that there was a bunch of financial tax return documents produced by the other parties. These are the documents we rely on with regard to support of pierce corporate veil, fraudulent transfer and reach and apply. So that's one.

The second point I want to make, your Honor -- if I have one quick second. Your Honor, I want to say a few things about defendants should not be entitled to the jury instruction on their counterclaim and other documents they did not produce

and will not be harmful to the defendants. I mean, we not attending -- we not attempting to produce any other documents on any other subjects and the -- but the first jury instruction seems to be the most severe sanction remedy here. We're looking for something that if the Court had decided to entertain some sanctions we would like to have something that just is appropriate.

And I want to bring up one thing is the loan the Sunoco, Inc. alleged -- defendants alleged that there was a loan that's the only counterclaim. There was a loan by Sunoco, Inc. to Sunoco China many years ago and then my sister said after they produced the other reports, we produced one single report which was after Linda at the company so we had access to that financial records. Our records and their records show the same thing. There was a significant loan, I think it's worth approximately 2 million U.S. dollars advanced by Linda Sun to Sunco China, not advanced by Sunoco, Inc. to Sunoco China. And remember, your Honor, Linda was in control of all the documents while she was there and my client testified days before she left the company, she instructs, she gives three bags of documents to an employee to destruct the documents. So we represented to the Court that we searched and we did not have any documents to show there was no loan so we don't have those documents because there was no loan. So the defendant asking the Court to punish plaintiff for not producing documents

because we won't have. At the same time their client herself destroyed the document before she left. This seems to be a little ludicrous and they're going to be prejudice on the plaintiff --

THE COURT: So I am going to give more thought about the adverse instructions that they're asking for. However, let me just quickly check in with the parties. Summary judgment deadline is next week, March 13, but obviously, because of this, and part of it is my own fault for the delay that we're only having this hearing today, but I also don't want to further delay the filing of the summary judgment motion.

To the extent that you're looking for, as part of sanctions here, an order precluding plaintiff from using any evidence that has not been disclosed in summary judgment, I am going to allow that today. If there are any documents that were not produced by September 28, 2025, those are excluded. Would that allow you to now file that motion? Obviously, next week, I'm not going to hold you to the 13th but you tell me whether you're able to get moving on that.

MS. CONNOLLY: Your Honor, we had filed a motion seeking an extension of time to file motions for summary judgment until a certain number of weeks after the Court's ruling on this motion and I believe the Court granted that. So I don't believe that the deadline for next week is still in place. I think if we're limited to --

MR. CHENG: If I may, the later is April 17 or four weeks after the decision of this motion.

THE COURT: Yeah, so I don't want you to wait for my decision on this fully. There will be a decision, but if I make a ruling now that any evidence that was not disclosed by September 28 is precluded, that you can't use it in your motion for summary judgment, is there anything else you need from me?

MS. DAI: Your Honor, sorry, just one.

THE COURT: Go ahead.

MS. DAI: I just want to clarify. Are you saying that any documents not produced by September 28 --

THE COURT: Yeah.

MS. DAI: -- cannot be produced and used for summary judgment?

THE COURT: Right.

MS. DAI: But these two documents that I -- we produced it to defendants before deposing Mr. Wu which was October 1 or --

THE COURT: On the morning of or on the eve of the deposition itself you produced these documents?

MS. CONNOLLY: Literally minutes before, your Honor. I believe the depositions were supposed to start at about ten and we received them at something like 9:43.

MS. DAI: I think the night before.

MS. CONNOLLY: I could be wrong.

MS. DAI: The deposition was two days. You had the opportunity to ask him questions. Two pages, documents.

THE COURT: So that's precluded. You can't use that. I don't understand why that wasn't produced before.

MS. DAI: It just came out when we went to the hotel and talk about it.

THE COURT: I mean, mistakes happen but there is a history here so if I make that -- sort of draw that line at September 28, anything before that's been disclosed is fair game. Anything disclosed after that date is precluded, not only from the summary judgment motion but obviously at trial, but my bringing this up now is to make sure that with that ruling, at least part of the ruling because I'm not going to -- I want to think about the jury instruction just a little bit more. Would that now allow you to start working on your motion?

MS. CONNOLLY: Your Honor, I think the bigger issue is our concern that we're going to file a motion for summary judgment and then they're going to oppose it with affidavits and information and all of that that is not in the deposition testimony.

THE COURT: Right. So Mr. Wu, for example, is not going to be able to submit affidavits contradicting what Mr. X or Mr. Z said or adding facts that were never disclosed during discovery.

MS. CONNOLLY: Certainly we can file motions for summary judgment based on that. Your Honor, could I just make one point on what Ms. Dai said earlier? She said that plaintiffs have responded to all the interrogatories in this case. That's not true. Each of the affiliated entities served interrogatories on the plaintiff because all we've been told is the defendants moved assets among themselves and we were seeking more targeted information and plaintiff didn't respond to the Eastman Street Distributors, Eastman Street Woodworks or Infinity Realty Company, and we reminded them in the motion to compel that those hadn't been responded to and we still don't have a response to those.

THE COURT: Right, and so I think the universe is kind of set, right, in terms of what can and can't be used. I mean, certainly anything that you have already disclosed prior to September 28 is fair game. You can use it not only on the summary judgment motion but at trial but there has to be a clear cutoff and so I am setting that September 28 as the cutoff date. Whatever has not been disclosed can't be used.

MS. DAI: Your Honor, I just -- I want to say we will also file summary judgment so it will be cross summary judgment.

THE COURT: All right. So look at my standing order on how I like my cross-motions filed. I just don't want this to delay the filing of the summary judgment motion because we

have a trial date. So that's the other piece I wanted to quickly touch on. The trial date is November 2, I believe. Just in the last few weeks, there has been a conflict that has come up for me and so I can't do November 2 but can we start November 9?

MS. CONNOLLY: Certainly, your Honor, that works.

MS. DAI: That works.

MR. BALL: Yes.

THE COURT: You're still confident we can finish in two weeks?

MR. FOLKMAN: May I just ask one question since we're talking about this now, your Honor? Is any witness from China going to be traveling to the United States to testify? The Rules of Evidence say that that is ordinarily what should happen. I would ask the Court to direct the plaintiffs to make whatever arrangements are necessary to get their witnesses here.

THE COURT: Well, we're not going to go through the same problems that we did.

MR. FOLKMAN: That's my point.

THE COURT: And so have that conversation, meet and confer about that, and if you think it's going to be an issue, you know, with sufficient time, file a motion. I don't want that motion at the final pretrial, for example.

MR. FOLKMAN: Agreed. Thank you.

THE COURT: Great. Thank you very much.

MS. CONNOLLY: Thank you, your Honor.

**(A-D-J-O-U-R-N-E-D)**

\- - - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin____________ March 17, 2026
Jamie K. Halpin, CRR, RMR, RPR Date
Official Court Reporter