## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUNCO TIMBER (KUNSHAN) CO., LTD. Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> LINDA SUN, individually, Defendant/Counterclaimant, <br><br> DAVID SUN, individually, SHILLOCK YUAN-SUN, individually, and INFINITY WOOD PRODUCTS, LLC, Defendants, <br><br> SUNCO, INC., Reach and Apply Defendant, and Fraudulent Conveyance Defendant Counterclaimant <br><br> EASTMAN ST. DISTRIBUTORS LLC, EASTMAN ST. WOODWORKS, INC., INFINITY REALTY COMPANY LLC, and NEW SUN LIMITED PARTNERSHIP, Reach and Apply Defendants, and Fraudulent Conveyance Defendants. | Civil Action No. 1:22-cv-10833 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Sunco Timber (Kunshan) Co., Ltd. ("Sunco China") moves for summary judgment pursuant to Rule 56 on its breach of contract claim against Infinity Wood Products, LLC ("Infinity"), and on its claims for piercing the corporate veil, fraudulent transfer, and reach-and-apply against all Defendants. Furthermore, Sunco China moves for summary judgment to dismiss all counterclaims asserted by Sunco, Inc. ("Sunco Inc.").

1

## FACTUAL BACKGROUND

### I.    Introduction: A Scheme to Defraud

This case is about a calculated and multi-layered scheme by defendant Sunco Inc. ("Sunco Inc."), its current owner defendant David Sun ("D. Sun") and prior owner defendant Linda Sun ("L. Sun"), its shell company Infinity Wood Products, LLC ("Infinity"), and its other related companies to abscond with millions of dollars worth of custom-made cabinets from Plaintiff Sunco Timber (Kunshan) Co., Ltd. ("Sunco China") and never pay for them.

For years, Sunco China was the only supplier for its mother company Sunco Inc. and the intermediary company Infinity, and Infinity was Sunco China's sole customer. (SOF ¶ 5-7)[1] The arrangement was simple: historically Infinity placed the orders, Sunco China shipped the cabinets, and Infinity paid the invoices in the ordinary course of business through funds received from Sunco Inc., as Infinity had no money of its own. (SOF ¶¶ 13–15, 64–65). Between July 2018 and July 2019, Sunco China shipped over $6.7 million worth of cabinets to Infinity. (SOF ¶ 16). Infinity gladly accepted the goods, then handed all the cabinets over to Sunco Inc., and Sunco Inc. sold them to its own customers for about $8 million. (SOF ¶¶ 17, 19–20).  Despite receiving the goods and making a massive profit, the Defendants disregarded Sunco China's request for payments and never paid Sunco China a dime of the $6.7 million debt. (SOF ¶¶ 18, 24). Instead, Defendants siphoned off the proceeds through a tangled web of commingled entities and trusts, actively concealing their assets and fabricating meritless defenses to evade judgment.

---

[1] *See* Statement of Facts ("SOF").

## II.     The Corporate Enterprise and Individual Defendants' Involvement

To pull off this scheme, the Defendants relied on a confusing web of interconnected entities that they operated as one single enterprise.[2] (SOF ¶ ¶59, 63). These entities include Sunco Inc, Infinity, Eastman St. Distributors, LLC ("Eastman Distributors"), Eastman St. Woodworks, Inc. ("Eastman Woodworks"), Infinity Realty Company, LLC ("Infinity Realty"), and the New Sun Limited Partnership ("NST")[3]. (SOF ¶¶ 48-58). At the center of this enterprise are D. Sun and L. Sun. Id.[4]

The lack of corporate separateness is astonishing. Infinity, the nominal purchaser of the $6.7 million in unpaid cabinets, is a classic shell company: it has no employees, no independent assets, and operates solely as a pass-through entity to acquire goods for Sunco Inc. (SOF ¶¶ 13, 64). Through at least 2020, all affiliated entities used the same accountant and the same attorney. (SOF ¶ 76). Through at least 2022, Eastman Distributors, Sunco Inc., Infinity, and Infinity Realty all maintained the same offices at 35 Eastman St. S. Easton, MA, and only changed their addresses to different locations after the initiation of this litigation. (SOF ¶¶ 49-56, 66, 77). Employees did not and cannot distinguish between the entities. (SOF ¶ 68) For instance, Catherine Li testified that while she understood herself to work for Sunco Inc, her office was prominently labeled "Infinity"; she thought Sunco Inc. changed the name to Eastman Woodworks, Inc.; and she handled invoicing and operations for both entities interchangeably. (SOF ¶¶ 69, 71, 72). Similarly, Shillock's email signature identified Eastman St. Woodworks as Sunco Inc.'s DBA, further confirming that these entities were interchangeable. (SOF ¶ 70). Eastman Distributors likewise had no employees of its

---

[2] For the purpose of make it easier for the Court to understand the complicated relationship among the Defendants, please see Exhibit 30 "Affiliated Entities & Individual Relationships".

[3] Note: Since Defendant Shillock referred to New Sun Limited Partnership as "NST" in her deposition testimony, Plaintiff adopts that abbreviation here for consistency and to avoid confusion.

[4] Note: SOF ¶¶ 48-58 provide detail description about these affiliated entities and their connections to the individual defendants.

own; all its services, including accounting and warehouse functions, were performed by Sunco Inc. employees. (SOF ¶ 67). Both Infinity, Sunco Inc., Eastman Distributors, and Eastman Woodworks' revenues came from the sale of cabinets that manufactured by Sunco China, and Infinity Realty's revenues came from renting the warehouse to Sunco Inc. (SOF ¶¶ 60, 61, 78).

There were no financial boundaries between the defendant entities. The entities shared a single accountant who centrally managed their funds, offsetting amounts "back and forth" and issuing net payments rather than maintaining discrete, arm's-length transactions. (SOF ¶ 79). Sunco Inc routinely paid Infinity Realty's mortgage directly to the lender and satisfied obligations for NST. (SOF ¶ 80). When Infinity Realty sold a warehouse for $17 million in 2021, the proceeds were not retained by Infinity Realty. (SOF ¶ 81). Instead, the funds were scattered to pay severance to Sunco Inc. employees, clear Sunco Inc. liabilities, and to fund D. Sun and his wife Shillock's personal purchase of a condominium on Huntington Avenue. (SOF ¶¶ 81, 82). Additionally, Sunco Inc. would use NST funds to pay the personal expenses of L. Sun, and Linda would transfer money to NST. (SOF ¶¶ 83, 84). While these payments were recorded as distributions, they were simultaneously treated on Sunco Inc.'s books as offsets against a purported "management fee receivable," reflecting an internal recharacterization of funds rather than legitimate business transactions. (SOF ¶¶ 62, 84). Furthermore, between 2021 and 2022, Sunco Inc. and Eastman Woodworks also engaged in hundreds of thousands of dollars in unexplained intercompany transfers, which Shillock alleged she did not know the purpose of. (SOF ¶ 88).

D. Sun is the person who controlled everything. After taking over 100% ownership of Sunco Inc. from his mother around 2011, D. Sun became the president, treasurer, secretary, and director of Sunco Inc. (SOF ¶¶ 3, 4). He also owned and controlled Infinity, holding a 60% interest, and served as the sole member and manager of Infinity Realty. (SOF ¶¶ 12, 57, 74). He is the

4

resident agent for Eastman Distributors and the president, treasurer, secretary, and director of Eastman Woodworks. (SOF ¶¶ 51, 54). Every employee reported to him. For instance, Catherine Li, who handled the day-to-day ordering and invoicing with Sunco China, reported directly to D. Sun. (SOF ¶¶ 23, 73). He signed the account confirmation letter admitting that Infinity owed Sunco China nearly $5.9 million as of December 2018. (SOF ¶ 21). He also signed the checks that funneled money from Sunco Inc. to his mother and her trust. (SOF ¶ 85). He knew and acknowledged that the debt existed, he controlled the money, and he chose not to pay.

Shillock, D. Sun's wife, was also deeply involved. She held a 40% ownership interest in Infinity. (SOF ¶ 12). She participated in entity-level decision-making alongside D. Sun, and all the affiliated entities were under their common management. (SOF ¶ 59).[5] In 2021, Shillock's email records with Scott Olssen, the former accountant of Infinity and other affiliated entities, confirmed that Infinity's accounts payable to Sunco China reflected the full $6.7 million in unpaid cabinets. (SOF ¶ 22). She knew the debt was real. And when Infinity Realty sold the warehouse for $17 million, the proceeds were used in part to buy a personal condominium on Huntington Avenue for D. Sun and Shillock. (SOF ¶ 82). Shillock also managed all the bank accounts across the entities, including five checking accounts for Sunco Inc. and four for Eastman Woodworks. (SOF ¶ 87).

L. Sun presents herself as a naive, innocent bystander who had no idea what was going on with any of the defendants' companies' finances. The facts prove otherwise. L. Sun founded Sunco Inc. in the 1980s and was its sole manager from 2005 to 2010, with all managers reporting directly to her. (SOF ¶¶ 1, 2). She also controlled and managed Sunco China from 2009 until 2019, serving as its president and chairman of the board, and even lived at the Sunco China factory to oversee the company and prevent it from keep losing money. (SOF ¶¶ 8-10). Far from being an innocent

---

[5] She was designated by defendants as the 30(b)(6) as the most knowledgeable person of the finances of the defendant entities.

outsider, L. Sun was deeply involved in the operations and control of both the U.S. and Chinese entities. (SOF ¶ 75). In fact, just days before fleeing Sunco China in June 2019, L. Sun suspiciously spent several evenings shredding voluminous documents and having an employee dispose of them in separate garbage bins. (SOF ¶ 11).

### III.    The Fraudulent Transfers of Assets

While Sunco China was waiting to be paid its $6.7 million, the Defendants were actively draining their assets. First, Infinity transferred $6.7 million worth of cabinets to Sunco Inc. for zero consideration, ensuring Infinity would be insolvent and completely unable to pay its debt. (SOF ¶¶ 19, 20). Second, between 2018 and 2021, Sunco Inc. wrote hundreds of thousands of dollars in checks to L. Sun and the Sun Family Trust, including lump-sum checks for $50,000, $30,000, $20,000, and $15,000, plus direct tax payments on her behalf, and many checks were signed by D. Sun himself. (SOF ¶ 85). When asked under oath, L. Sun claimed she had "never seen" the checks and could not provide any legitimate business reason for the payments. (SOF ¶ 86). Third, in 2021, while the dispute about the unpaid cabinets was pending, Infinity Realty sold the warehouse for $17 million and the proceeds were immediately funneled out to pay off Sunco Inc.'s liabilities and to fund personal real estate purchases for D. Sun and Shillock. (SOF ¶¶ 81, 82).

### IV.    The Fabricated "Offset" Defense

Faced with undeniable evidence of their $6.7 million debt, Defendants fabricated an excuse which served as their only defense for the nonpayment. (SOF ¶ 38). They claim that L. Sun and a non-party, Mr. Wu, made a secret "offset agreement" around 2016 or 2017. (SOF ¶ 39). D. Sun claims this phantom agreement allowed Infinity to cancel its debt for the cabinets because of an old 2014 dispute over selling shares in Sunco China to Mr. Wu's company, Jiangsu Qiyi. (SOF ¶¶ 25-27, 38-39).

This defense is entirely absurd:

1.      No Written Record: There are absolutely no documents, emails, or written records of this alleged offset agreement between Mr. Wu and L. Sun, nor any agreement between Infinity and Sunco China. (SOF ¶ 42).

2.      No Specific Details: D. Sun admitted that the alleged agreement did not even mention the specific cabinets in this lawsuit. He claimed it could apply to "any cabinets" ordered at any time. (SOF ¶ 41).

3.      No Authority: L. Sun had no ownership in Infinity and no authority to make deals for Sunco Inc after D. Sun took over the company in 2011. (SOF ¶¶ 45-47). In her own testimony, L. Sun admitted she had no knowledge of any "financial arrangement" between Infinity and Sunco China regarding the cabinets. (SOF ¶¶ 43, 44).

4.      No Confirmation: D. Sun, as the owner of Infinity and Sunco Inc., never participated in the negotiation of such alleged offset agreement, purportedly only heard about it from L. Sun, and never confirmed with Mr. Wu or anyone at Sunco China as to the existence of such an agreement. (SOF ¶ 40).

5.      Already Adjudicated: The underlying 2014 share transfer dispute was already fully litigated and resolved in a binding 2021 arbitration in China. (SOF ¶¶ 33, 34). The arbitral tribunal explicitly ruled that the share transfer obligations had been extinguished by separate, documented offset agreements related to environmental compliance. (SOF ¶¶ 28–32, 34, 35). The Chinese court confirmed the award was fully executed and the matter closed. (SOF ¶ 37). Both L. Sun and D. Sun acknowledged the existence of that arbitral decision. (SOF ¶ 36).[6]

---

[6] Note: the 2014 share transfer and the arbitration details are specifically explained in the SOF from 25-37.

## V.    Bad Faith Litigation: Hiding Sunco Inc. and the Fake Loan

The Defendants' bad faith extends directly into this litigation. Sunco Inc. is the center of everything in this case—it received the cabinets, sold them for $8 million, and funneled the money to the Sun family. (SOF ¶ 20). Yet, initially, the Defendants actively hid Sunco Inc.'s involvement and refused to answer interrogatories about it. (SOF ¶ 89).

When the Plaintiff discovered the truth and sought to add Sunco Inc. to this lawsuit, the Defendants abruptly filed a Motion to Dismiss to try and extract Sunco Inc. from this case. (SOF ¶ 90). When that failed, and more than two years into this litigation, Sunco Inc suddenly invented a counterclaim alleging a 2011 "loan". (SOF ¶ 91).

This counterclaim is a complete fabrication and there is no loan. Unsurprisingly, there is no loan agreement, no specific repayment terms, no interest rate, no record of the loan on tax returns, and no demand for repayment was ever made. (SOF ¶¶ 92-94). Furthermore, indemnification clauses in the 2014 Share Transfer Agreement explicitly required Sunco Inc. and L. Sun to bear responsibility for all pre-transfer liabilities, which legally barred this fabricated counterclaim. (SOF ¶¶ 95, 96).

## LEGAL AUTHORITY

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the nonmoving party must "set forth

specific facts showing that there is a genuine issue for trial," and may not rest on conclusory allegations or unsupported speculation. *Id.* at 324; *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**LEGAL ANALYSIS**

### A.  Breach of Contract

To prevail on a breach of contract claim under Massachusetts law, the plaintiff must establish the following elements: (1) a valid and binding contract existed; (2) the agreement was supported by consideration; (3) the plaintiff was ready, willing, and able to perform their obligations under the contract; (4) the defendant breached the contract; and (5) the plaintiff suffered harm as a result of the breach. *Bose Corp. v. Ejaz*, 732 F.3d 17 (2013), *Berkowitz v. Invaleon Techs. Corp.*, 650 B.R. 742 (2023), *Haven Real Estate Grp., LLC v. Bell Atl. Mobile of Mass. Corp.*, 236 F. Supp. 3d 454 (2017), *N. Am. Photon Infotech, Ltd. v. Acquia, Inc.*, 795 F. Supp. 3d 125 (2025).

Each element is satisfied here with undisputed fact. It is undisputed that a valid contract existed: Infinity submitted purchase orders for custom-made cabinets, Sunco China accepted those orders and manufactured the goods, and Infinity promised to pay. The agreement was supported by valid consideration. Sunco China fully performed its obligations—between July 2018 and July 2019, it manufactured and shipped over $6.7 million worth of custom cabinets, and Infinity accepted every shipment without objection. Infinity undeniably breached by failing to pay the $6,712,182.11 owed on the issued invoices. Defendants admitted that monies are unpaid by D. Sun executing the "account confirmation letter" and Shillock's email correspondence with the accountant. Infinity's failure to pay deprived Sunco China of millions of dollars in revenue, severely damaged its financial status, and caused substantial consequential harm to its operations.

9

Defendants do not deny these facts. Instead, they assert that an unwritten agreement between Linda Sun and Mr. Wu permitting Infinity to use the cabinets to offset the purchase price of the 52 percent shares from a 2014 transaction. However, Defendants' offset theory fails for the following reasons independently.

First, Defendants have produced absolutely no evidence supporting the existence of any such offset agreement. There is no documentation, no emails, and no specific terms. D. Sun admitted that he never participated in the negotiation of such alleged offset agreement, only heard about it from L. Sun. However, L. Sun could not even explain the details of the arrangement at her deposition. He also admitted that the alleged agreement did not identify the cabinets at issue and could purportedly apply to "any cabinets" ordered at any time.

Second, even assuming arguendo that Linda Sun attempted to make such an agreement, she lacked the authority to bind either Sunco Inc. or Infinity. After D. Sun acquired 100% ownership of Sunco Inc. around 2011, L. Sun had no role in the company, was neither an officer nor a board member of Infinity, and D. Sun testified he never authorized her to enter into such an agreement.

Third, Defendants' offset defense is defeated by their own conduct. Defendants contend that an offset agreement between Linda Sun and Mr. Wu, reached in or around 2016 or 2017, using the cabinets at issue to extinguish Mr. Wu's payment obligations. But Defendants subsequently initiated arbitration proceedings against Mr. Wu for nonpayment of those same obligations in 2019. If the alleged offset agreement involving the cabinets truly existed and satisfied the debt, there would have been no outstanding payment obligation and no basis for that arbitration claim. Unsurprisingly, Defendants did not mention any such cabinet offset agreement during the arbitration.

10

Fourth, an arbitration decision conclusively determined that Mr. Wu/Qiyi does not owe any amount in connection with the alleged share purchase, and Defendants do not challenge the validity of that decision. The arbitral tribunal explicitly ruled that the share transfer obligations had been fully extinguished by separate, documented offset agreements related to environmental compliance. Because the underlying debt no longer exists, there is nothing left to offset.

Finally, even if the underlying debt existed, it is legally irrelevant to this action. The 2014 share transfer involved a purported dispute between individual shareholders (Linda Sun/Sunco Inc. and Mr. Wu/Qiyi). Yet, Defendants attempt to apply this personal shareholder dispute to extinguish a distinct corporate obligation owed by Infinity to Sunco China for the delivery of goods.

Because Defendants' offset defense fails entirely, there is no genuine dispute as to any material fact. Plaintiff has established each element of its claim, and summary judgment should be entered in favor of Sunco China on its breach of contract claim.

## B. Pierce Infinity's Corporate Veil

Because this Court sits in diversity, Massachusetts law governs whether the corporate veil may be pierced. Under Massachusetts law, the court's analysis involves a two-pronged test established in *My Bread Baking Co. v. Cumberland Farms, Inc.*, which allows veil-piercing when there is either (a) active and direct participation by representatives of one corporation in the activities of another, resulting in fraudulent or injurious consequences, or (b) a confused intermingling of activities of two or more corporations with substantial disregard for their separate nature.

Additionally, Massachusetts courts consider twelve factors, often referred to as the "Pepsi factors," to determine whether the corporate form should be disregarded. These factors include:

(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning of funds by dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of dominant shareholders; and (12) use of the corporation to promote fraud. *Am. Well Corp. v. Indegene Ltd.*, 761 F. Supp. 3d 249 (2024), *Malaro v. Wilkie*, 640 F. Supp. 3d 192 (2022), *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346 (2012), *Munsell v. Colgate-Palmolive Co.*, 463 F. Supp. 3d 43 (2020), *Zimmerman v. Puccio*, 613 F.3d 60 (2010).

No single factor is determinative, and courts weigh these factors to assess whether the overall structure and operation of the entities mislead or justify disregarding the corporate form. *Am. Well Corp. v. Indegene Ltd.*, 761 F. Supp. 3d 249 (2024), *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346 (2012).

That standard is met here. Infinity was not a functioning, independent entity, but a mere shell company used by Defendants to extract millions of dollars in goods from Sunco China without payment. The record establishes a textbook case of both "active and pervasive control" and "confused intermingling" that justifies piercing the corporate veil.

First, there is complete common ownership and pervasive control. Since 2010, David Sun owned and controlled both Infinity and Sunco Inc. He held a 60% interest in Infinity (with his wife Shillock holding the remaining 40%) and was the 100% owner of Sunco Inc. All decisions for both entities were made centrally by D. Sun and Shillock, without any independent management or board oversight.

Second, as previously set forth in detail in the Factual Background, the entities were not operated as separate businesses. They shared the same office, accountant, and attorney. Employees

12

did not even distinguish between the entities. More importantly, their revenues were essentially coming from the same source.

Third, there was an obvious intermingling of business assets and siphoning of funds: As previously described in detail, a shared accountant centrally managed all entity finances, offsetting amounts "back and forth" rather than maintaining arm's-length transactions; Shillock managed all bank accounts across the entities; The $17 million warehouse sale proceeds were used for Sunco Inc. liabilities and personal real estate purchases; Sunco Inc. and Eastman Woodworks engaged in unexplained intercompany transfers; and NST funds were used to pay L. Sun's personal expenses.

Fourth, Infinity's complete lack of substance or independence confirms it functioned merely as an instrumentality. Infinity had no employees, no assets of its own, and no independent operational capacity. It acted solely as an intermediary to order cabinets from Sunco China and immediately transfer them to Sunco Inc. Prior to the events in dispute, Infinity could only pay Sunco China's invoices by first receiving money from Sunco Inc. Where the nominal contracting entity lacks the ability to perform, while affiliated entities and individuals retain control over the underlying business and its benefits, courts routinely conclude that the entity is a mere instrumentality. *Pepsi-Cola,* 754 F.2d at 14-15; Scott v. NG US 1, Inc., 450 Mass. 760, 767 (2008).

These facts establish that Infinity and Sunco Inc. did not operate as genuinely distinct entities, but rather as components of a single, centrally controlled enterprise designed to siphon assets and avoid liabilities.

That same analysis compels extending liability to the individuals who exercised that control. *Pepsi-Cola*, 754 F.2d at 14; M.C.K., 432 Mass. at 555. David Sun's complete ownership and direct involvement in the siphoning of funds establishes that he cannot invoke Infinity's nominal form to avoid liability. Shillock's participation in entity-level decision-making and her

13

management of all bank accounts across the entities confirms that Infinity functioned as an instrumentality of its controllers. L. Sun's deep historical involvement in the ownership structure, her receipt of hundreds of thousands of dollars in unexplained checks while Sunco China went unpaid, and her suspicious shredding of voluminous documents further underscores the use of the entity structure to effectuate Defendants' fraudulent scheme. To the extent Defendants rely on her actions to justify nonpayment, they cannot simultaneously disclaim her authority while invoking the corporate form to avoid liability.

Accordingly, the Court should pierce Infinity's corporate veil and hold the controlling individuals and affiliated entities liable for its obligations.

## C. Defendants Committed Fraudulent Transfers as a Matter of Law

Under the Massachusetts Uniform Fraudulent Transfer Act ("MUFTA"), a transfer is fraudulent under either an actual or constructive fraud theory. See Mass. Gen. Laws ch. 109A, § 5. Actual fraud requires proof that the transfer was made with "actual intent to hinder, delay, or defraud" creditors. Id. § 5(a)(1). Because direct evidence of intent is rarely available, courts infer intent from circumstantial evidence, including recognized "badges of fraud," such as insider transfers, retention of control, or transfers made in the face of mounting liabilities. See *Rodriguez v. Montalvo,* 371 F. Supp. 2d 3, 12 (D. Mass. 2005). Constructive fraud, by contrast, does not require proof of intent. A transfer is constructively fraudulent where the debtor did not receive reasonably equivalent value and was either insolvent, rendered insolvent, left with unreasonably small capital, or intended to incur debts beyond its ability to pay. Mass. Gen. Laws ch. 109A §§ 5(a)(2), 6(a). Courts analyze "reasonably equivalent value" through a fact-specific inquiry that considers both direct and indirect benefits to the debtor. See *Frank Sawyer Trust of May 1992 v. Comm'r,* 712 F.3d 597, 610 (1st Cir. 2013).

The record establishes that the transfers in this case are fraudulent as a matter of law under both theories. The first and most glaring transfer is the $6.7 million worth of custom cabinets. Infinity received these goods from Sunco China and immediately transferred them to Sunco Inc. without consideration, an entity under the exact same ownership and control. Transfers between insiders operating under centralized control is the ultimate indicator of a "badge of fraud," especially when the transferor is actively facing mounting liabilities for the very goods being transferred. Moreover, this transfer is undeniably constructively fraudulent. Infinity explicitly admits that it received zero consideration in exchange for giving Sunco Inc. $6.7 million in cabinets. Because Infinity had no employees, no independent operations, and no other assets, giving away these goods for free guaranteed that Infinity would be left entirely insolvent and unable to pay its debt to Sunco China.

The subsequent cash transfers further solidify the fraudulent scheme. Between 2018 and 2021, while the $6.7 million debt remained unpaid, Sunco Inc. siphoned hundreds of thousands of dollars directly to L. Sun, the Sun Family Trust, and tax authorities on her behalf. Likewise, when Infinity Realty sold its warehouse for $17 million in 2021, the proceeds were instantly drained to pay off Sunco Inc.'s liabilities and fund personal real estate purchases for D. Sun and Shillock. These coordinated insider transfers, executed for no legitimate business consideration while creditors were left unpaid, demonstrate a calculated intent to strip the enterprise of assets.

No reasonable fact finder could view this orchestrated asset-stripping as legitimate, arm's-length business activity. The transfers from Infinity to Sunco Inc. and the subsequent siphoning of funds were fraudulent as a matter of law, and summary judgment should be entered for Plaintiff.

### D. Plaintiff Is Entitled to Reach and Apply the Transferred Assets

Under Massachusetts law, a statutory "reach and apply" action is governed by Massachusetts General Laws Chapter 214 Section 3. This equitable remedy permits a creditor to reach property of a debtor that cannot be attached or executed upon through ordinary legal process. The Massachusetts Supreme Judicial Court has stated that the reach and apply statute "combines in a single proceeding two different matters or steps in procedure, one at law and the other in equity." *Stockbridge v. Mixer,* 215 Mass. 415, 418, 102 N.E. 646 (1913). A reach and apply claim proceeds in two steps. First, the plaintiff must establish the debtor's underlying liability. Second, the plaintiff must identify specific property or rights of the debtor—typically held by a third party—that are not subject to ordinary execution and seek to apply that property to satisfy the debt. See *Iantosca v. Benistar Admin Servs., Inc.*, 843 F. Supp. 2d 148, 152–53 (D. Mass. 2012).

Both steps are conclusively satisfied here. First, Infinity's underlying liability to Sunco China for $6,712,182.11 is undisputed. Second, Plaintiff has identified the fraudulently conveyed property: the $6.7 million in custom cabinets that Infinity transferred to Sunco Inc. for zero consideration, as well as the subsequent $8 million in proceeds generated when Sunco Inc. sold those exact cabinets to its customers. Infinity could not satisfy the debt itself. Instead, it acted as a shell to place the valuable assets into the hands of Sunco Inc., an insider under the exact same common control. Where a debtor transfers assets to an insider entity to evade a creditor, and those assets would otherwise be available to satisfy the claim, equity demands that the creditor be permitted to follow the assets. Accordingly, Plaintiff is entitled to reach and apply the assets transferred from Infinity to Sunco Inc. to satisfy the judgment in this action.

16

### E. Sunco Inc.'s Counterclaims Fail as a Matter of Law

Sunco Inc.'s five counterclaims—breach of contract, unjust enrichment, money had and received, quantum meruit, and promissory estoppel—all arise from the same alleged $2.4 million "loan" purportedly made in 2011. Although framed under different legal theories, each claim depends on the existence of a valid loan obligation owed by Sunco China. These counterclaims fail for four independent reasons.

First, there is no evidence that any loan existed, and no enforceable contract was ever formed. To form an enforceable contract under Massachusetts law, there must be an agreement between the parties on the material terms, and the parties must have a present intention to be bound. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67 (1st Cir. 2018); *Gibson Found., Inc. v. Norris*, 88 F.4th 1 (1st Cir. 2023). Courts consistently hold that the absence of material terms such as the interest rate, repayment schedule, or duration renders a contract too indefinite to be enforced. See *Conway v. Licata*, 104 F. Supp. 3d 104 (D. Mass. 2015) (finding contract unenforceable lacking specificity regarding compensation and duration); *Shea v. Millett,* 36 F.4th 1 (1st Cir. 2022) (declining to enforce contract omitting essential terms like time for payment). Here, after the close of discovery, Sunco Inc. has not identified any loan agreement, promissory note, repayment schedule, or interest terms. Even Sunco Inc.'s own financial records do not reflect the alleged $2.4 million as a loan or receivable. Sunco Inc. admits the purported loan had no fixed repayment date, no interest provision, and no defined terms governing repayment. Furthermore, no demand for repayment was ever made prior to the sudden assertion of these counterclaims—more than a decade after the alleged "loan" and two years into this litigation. Without definite terms, there is no enforceable contract.

17

Second, Sunco Inc. cannot establish the required elements of its equitable claims. Quantum meruit and unjust enrichment require proof that a benefit was conferred under circumstances making retention unjust. *Guldseth v. Family Med. Assocs. LLC*, 45 F.4th 526, 533 (1st Cir. 2022); *Backman v. Smirnov*, 751 F. Supp. 2d 304, 309 (D. Mass. 2010). Promissory estoppel requires a clear promise inducing reasonable reliance. *John B. Cruz Constr. Co. v. Beacon Cmtys. Corp.*, 169 F.4th 89, 94 (1st Cir. 2026). And a claim for money had and received lies only where the defendant holds money that in equity and good conscience belongs to the plaintiff and no adequate legal remedy exists. *Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 28 (D. Mass. 2006). Sunco Inc. has produced no evidence satisfying these elements. The record contains no facts showing a reasonable expectation of repayment, any promise by Sunco China, or inequitable retention of funds. At summary judgment, such evidentiary gaps are fatal. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Third, all equitable counterclaims are independently barred by the statute of limitations. Claims for quantum meruit, unjust enrichment, money had and received, and promissory estoppel are governed by the six-year limitations period applicable to contract and quasi-contract claims. Mass. Gen. Laws ch. 260, § 2. These claims accrued at or near the time of the alleged 2011 transfer—when the benefit was conferred or funds received, or, at the latest, within a reasonable time after any alleged nonpayment. *Rousseau v. Diemer*, 24 F. Supp. 2d 137, 142 (D. Mass. 1998); *Brine v. Paine Webber, Jackson & Curtis, Inc.*, 745 F.2d 100, 104 (1st Cir. 1984); *Duplication Mgmt. v. Countrywide Home Loans, Inc.*, 501 B.R. 462, 491 (Bankr. D. Mass. 2013); *Palandjian v. Pahlavi*, 614 F. Supp. 1569, 1578 (D. Mass. 1985). Because the alleged conduct occurred in 2011, the limitations period expired no later than 2017. Sunco Inc. cannot revive these stale claims by recasting the same alleged transaction under different equitable labels.

Lastly, even assuming arguendo that a valid loan existed, the alleged obligation cannot be attributed to Sunco China. The parties' 2014 share transfer agreement expressly allocates responsibility for pre-existing liabilities to the transferor, including an indemnification obligation. Such contractual allocation is enforceable and bars recovery against a party not responsible for the liability. The alleged 2011 "loan" predates that agreement and falls squarely within its scope. Accordingly, this contractual allocation provides a complete and independent bar to all counterclaims, and warrants summary judgment in Plaintiff's favor.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, there is no genuine dispute as to any material fact regarding Plaintiff's aforementioned claims or Sunco Inc.'s counterclaims. Accordingly, Plaintiff Sunco China respectfully requests that this Court:

1.      Grant summary judgment in favor of Plaintiff on its breach of contract claim against Infinity Wood Products, LLC in the principal amount of $6,712,182.11, plus applicable pre-judgment and post-judgment interest;

2.      Grant summary judgment in favor of Plaintiff on its claim to pierce the corporate veil, holding Defendants David Sun, Shillock Yuan-Sun, Linda Sun, Sunco, Inc., Eastman St. Distributors LLC, Eastman St. Woodworks, Inc., Infinity Realty Company LLC, and New Sun Limited Partnership jointly and severally liable for Infinity's debt;

3.      Grant summary judgment in favor of Plaintiff on its fraudulent transfer claims, finding that the transfers of assets from Infinity to Sunco Inc. and other insiders were fraudulent as a matter of law;

19

4.    Grant summary judgment in favor of Plaintiff on its reach-and-apply claims, permitting Plaintiff to reach and apply the assets fraudulently transferred to Sunco Inc. and the affiliated Defendants to satisfy the judgment;

5.    Grant summary judgment in favor of Plaintiff dismissing all counterclaims asserted by Sunco, Inc. with prejudice; and

6.    Award Plaintiff its costs, reasonable attorneys' fees, and any such other and further relief as this Court deems just and proper.

DATED: April 17, 2026                                PLAINTIFF,
                                                     By its attorney,


                                                     /s/Yun Cheng
                                                     Connie C. Dai (BBO#683330)
                                                     Yun Cheng (BBO# 707028)
                                                     Lions Law, P.C.
                                                     154 Wells Ave
                                                     Newton, Massachusetts 02459
                                                     (617) 232-7503 Telephone
                                                     (781) 207-8574 Fax
                                                     connie@lionslawgroup.com
                                                     yun@lionslawgroup.com



                                                     /s/Timothy K. Cutler
                                                     Timothy K. Cutler (BBO#636124)
                                                     CUTLER & WILENSKY LLP
                                                     20 Walnut Street, Suite 1

                                                     Wellesley, Massachusetts 02481

                                                     (617) 232-7500 Telephone
                                                     tim@cutlerlegal.com

20

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this April 17, 2026.


*/s/Yun Cheng*
Yun Cheng