UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUNCO TIMBER (KUNSHAN) CO., LTD., <br><br> Plaintiff, <br><br> vs. <br><br> LINDA SUN, et al., <br><br> Defendants. | Civ. A. No. 1:22-cv-10833-MJJ |

**MEMORANDUM IN OPPOSITION TO THE PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND IN SUPPORT OF LINDA SUN AND NEW SUN LIMITED
<u>PARTNERSHIP'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Theodore J. Folkman (BBO No. 647642)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
egardon@rubinrudman.com

Dated: May 27, 2026

5081486_1

TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities............................................................................................................ ii

Preliminary statement ........................................................................................................ 1

Facts .................................................................................................................................... 2

    A.      Sunco China sued Linda in China for breach of fiduciary duty, and it lost. .................. 2

    B.      Linda and New Sun do not own or control Infinity........................................................ 4

    C.      In 2021, New Sun received a partial payment from Infinity Realty on its debt from a 2013 transaction. .................................................................................................................5

    D.      Sunco US made payments to Linda, or for her benefit. ................................................. 6

Argument ............................................................................................................................ 8

    A.      Standard of decision. ..................................................................................................... 8

    B.      Roadmap of the argument. ............................................................................................ 9

    C.      The claims for breach of fiduciary duty (Counts 6 and 7) fail because the Chinese judgment is res judicata. ............................................................................................... 9

        1.    The Chinese judgment is entitled to recognition. ....................................................... 10

        2.    There is reciprocity in the recognition of judgments between China and the United States. ............................................................................................................................. 19

        3.    The Chinese judgment is res judicata in China.......................................................... 20

        4.    The Chinese judgment is res judicata here. ................................................................ 21

    D.      The veil-piercing claim (Count 11) fails because it is undisputed that Linda has nothing to do with Infinity................................................................................................ 21

    E.      The fraudulent transfer claim (Count 12) fails because there is no evidence of any fraudulent transfer involving Linda or New Sun......................................................... 23

        1.    Sunco China has violated the Court's sanctions order by basing its claims on transactions it did not disclose in discovery. ............................................................. 23

        2.    Neither Linda nor New Sun is liable for a fraudulent transfer, whether on account of the installment payment to New Sun or the checks payable to Linda or for her benefit. ...................................................................................................................................... 25

    F.      The reach and apply claim (Count 13) fails. ............................................................... 27

Conclusion ........................................................................................................................ 28

5081486_1

TABLE OF AUTHORITIES

## Cases

*Ameen v. Amphenol Printed Circuits, Inc.,* 777 F.3d 63 (1st Cir. 2015) ......................................... 8

*Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (9th Cir. 1995) ............................................................. 15

*Bd. of Trs. of the Leland Stanford Jr. Univ. v. Zhang Yuzhen,* 2026 U.S. Dist. LEXIS 70634 (N.D. Cal. Mar. 31, 2026) ................................................................................................ 17, 18, 19

*Bridgeway Corp. v. Citibank,* 45 F. Supp. 2d 276 (S.D.N.Y. 1999), *aff'd,* 201 F.3d 134 (2d Cir. 2000) ...................................................................................................................................... 16

*CDM Smith Inc. v. Atasi,* 594 F. Supp. 3d 246 (D. Mass. 2022)............................................. 15, 20

*Cherkaoui v. City of Quincy,* 877 F.3d 14 (1st Cir. 2017).................................................................. 8

*Demoulas v. Demoulas Super Mkts.,* 424 Mass. 501 (1997) ......................................................... 10

*McCord v. Jet Spray International Corp.,* 874 F. Supp. 436 (D. Mass. 1994) .................. 21, 22, 23

*My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614 (1968)..................................... 24

*Patrick P. v. Commonwealth,* 421 Mass. 186 (1995) ....................................................................... 4

*Reich v. John Alden Life Ins. Co.,* 126 F.3d 1 (1st Cir. 1997)......................................................... 9

*Roche v. McDonald,* 275 U.S. 449 (1928) ..................................................................................... 23

*Sanchez Osorio v. Dole Food Co.,*665 F. Supp. 2d 1307 (S.D. Fla. 2009) .................................. 16

*Sangiovanni Hernandez v. Dominicana de Aviacion, C. Por A.,* 556 F.2d 611 (1st Cir. 1977).....11

*See De Prins v. Michaeles*, 236 F. Supp. 3d 482 (D. Mass. 2017)................................................. 32

*Shanghai Yongrun Inv. Mgmt. Co. v. Kashi Galaxy Venture Capital Co.,* 2024 N.Y. Misc. LEXIS 63459 (N.Y. Sup. Ct. Jun. 17, 2024) ...................................................................................... 17

*Shanghai Yongrun Inv. Mgmt. Co. v. Kashi Galaxy Venture Capital Co.,* 242 N.Y.S.3d 647 (App. Div. 2025) ............................................................................................................................... 17

*Shanghai Yongrun Inv. Mgmt. Co. v. Maodong Xu,* 160 N.Y.S.3d 874 (App. Div. 2022) ...... 17, 20

*Shanghai Yongrun Investment Management Co. v. Kashi Galaxy Venture Capital Co.,* 2021 N.Y. Misc. LEXIS 2492 (N.Y. Sup. Ct. Apr. 30, 2021) ................................................................. 17

*Soc'y of Lloyd's v. Ashenden,* 233 F.3d 473 (7th Cir. 2000) ......................................................... 14

*Society of Lloyd's v. Hamilton,* 501 F. Supp. 2d 248 (D. Mass. 2007)........................................... 15

*Tropigas de P.R. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53 (1st Cir. 2011) ........ 8

*Wright Mach. Corp. v. Seaman-Andwall Corp.,* 364 Mass. 683 (1974) ....................................... 23

## Statutes

G.L. c. 109A, § 2.......................................................................................................................... 28

G.L. c. 109A, § 3(a) ................................................................................................................ 29, 30

G.L. c. 109A, § 5(a)(1) ................................................................................................................ 28

G.L. c. 109A, § 5(a)(2) ................................................................................................................ 28

G.L. c. 109A, § 6(b) ..................................................................................................................... 28

G.L. c. 109A, § 8.......................................................................................................................... 28

G.L. c. 109A, § 9...................................................................................................................... 29, 31

G.L. c. 109A, §6(a) ...................................................................................................................... 28

G.L. c. 214, § 3(6) .................................................................................................................... 30, 31

G.L. c. 214, § 3(8)........................................................................................................................ 31

G.L. c. 235, § 23A................................................................................................11, 12, 14, 21, 23

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................ 8

**Treatises**

J. Chad Mitchell, *Recognition and Enforcement of Foreign-Country Judgments in the United States,* in 2 *International Aspects of US Litigation: A Practitioner's Deskbook* 607 (James E. Berger ed. 2017)................................................................................................. 15
*Restatement (Fourth) of the Foreign Relations Law of the United States* § 481 (2019) ...............11
*Restatement (Fourth) of the Foreign Relations Law of the United States* § 483 (2019) .............. 16
*Restatement (Fourth) of the Foreign Relations Law of the United States* § 484 (2019) .............. 21
*Restatement (Fourth) of the Foreign Relations Law of the United States* § 487 (2019) .........11, 23
Tobias Smith, *Body Count Politics: Quantification, Secrecy, and Capital Punishment in China,* 45 L. & Social Inquiry 706, 716 (2020)..................................................................... 18

5081486_1

PRELIMINARY STATEMENT

Sunco China's key claim is that it sold millions of dollars in cabinets to Infinity Wood Products, LLC and that Infinity failed to pay. Sunco China claims Linda Sun is liable for its loss. It has sued her before for the same loss. It sued in its home court, the Intermediate People's Court in Suzhou, China. It claimed $6,712,182.11, the same amount it claims here. The court held a trial. Sunco China lost. It did not appeal. The Chinese judgment is final. That should have been the end of Linda's involvement.

Instead, Sunco China has sought a do-over in this court. It brings the same claim for breach of fiduciary duty against her that it tried and lost at home. It also brings ancillary claims against Linda and against New Sun Limited Partnership to pierce Infinity's corporate veil, to avoid supposed fraudulent transfers, and (against New Sun) to reach and apply assets.

All these claims fail. The fiduciary duty claim fails because the Chinese judgment is res judicata. The veil piercing claim fails because Linda had no interest in Infinity, as Sunco China now concedes. The fraudulent transfer claim fails because neither Linda nor New Sun is a debtor of Sunco China or the recipient of any transfer from Infinity. The reach and apply claim fails because Sunco China cannot satisfy the statute.

In short, whatever becomes of Sunco China's contract claim against Infinity, Linda cannot be liable on claims she has already defeated, and neither she nor New Sun be liable on the ancillary claims. The Court should enter judgment in their favor on all counts of the amended complaint and enter judgment in Linda's favor on her counterclaim for recognition of the Chinese judgment.

1

5081486_1

<u>FACTS</u>

**A.      Sunco China sued Linda in China for breach of fiduciary duty, and it lost.**

Sunco China is suing Linda for breach of fiduciary duty. It already sued her on that claim in its "home court," the Suzhou Intermediate People's Court, and lost.

Sunco China sued Linda in December 2020 by filing a civil complaint with the Intermediate People's Court. With the complaint, Sunco China submitted documentary evidence. The complaint sought damages in the amount of $6,712,182.11 USD, the same amount Sunco China seeks here. It stated that the damages are to "compensate the plaintiff for the loss of payment of goods." The table attached to this memorandum as Exhibit 1 shows that each allegation of fact in the Chinese complaint appears, in substance though not in the same words, in the pleadings in this case.

The Chinese case was tried on October 28, 2021 before a panel of three judges. (SUMF ¶ 99). Both parties had counsel. (*Id*. ¶ 98). They argued their cases on the documentary evidence, as is common in Chinese litigation. (*Id*. ¶ 100). Although neither Linda nor Mr. Wu nor anyone else testified or asked to testify, each party had the right to offer witness testimony if it had wished. (*Id*. ¶ 98). After the trial, the Chinese court found that Linda, along with Xiao Ruihua and Xiao Qiong, was a director of Sunco China, though she had never been a shareholder; that Sunco China was a long-term supplier for Infinity; that David and Shillock were the managers of Infinity; and that David was Linda's son. (*Id*. ¶ 101). It found that while Linda, as a director, had a duty to the company, she was not liable for breach of her duty, because there was no evidence that there was anything unreasonable in the transaction between Sunco China and Infinity. (*Id*. ¶ 102). It found that there was no evidence that Linda had concealed anything. (*Id*.). And it found that there was no evidence that anything in the transaction between Sunco China and Infinity

2

violated Chinese law or Sunco China's articles of association. (*Id*.). The Chinese court issued its judgment in November 2021. (*Id*. ¶ 99).

One of Linda's defenses to the fiduciary duty claim, the basis of her counterclaim, and the centerpiece of her summary judgment motion is that the Chinese judgment in her favor is res judicata, so Sunco China's fiduciary duty claim is barred. Because Sunco China's argues that the court system where it chose to sue Linda fails to meet the bare minimum international standards for recognition of foreign judgments, we summarize the relevant features of the Chinese courts and procedure.

China has adopted a Civil Procedure Law, which provides rules governing civil and commercial litigation. (Ex. 40 at 8). China's high court, the Supreme People's Court, issues judicial interpretations of the Civil Procedure Law, which themselves are legally effective. (*Id*. at 8-9). The Supreme People's Court has also issued Minutes of the National Courts' Symposium on Foreign-related Commercial and Maritime Trials for the guidance of the lower courts. Unlike judicial interpretations, these Minutes do not have the force of law, but they can be cited in support of a court's reasoning, and courts should interpret the Civil Procedure Law in accordance with the Minutes. (*Id*. at 9).

The Civil Procedure Law requires a three-judge trial court to publish its reasoning and any dissent. (*Id*. at 10). (There was no dissent in Sunco China's case). It requires the judges to act impartially and forbids them from receiving gifts or benefits from the parties appearing before them, or their lawyers. (*Id*. at 10-11). It imposes civil and criminal liability on judges who embezzle, accept bribes, show favoritism for personal gain, or engage in other misconduct. (*Id*. at 11). It requires recusal when the judge has any relationship with a party or a lawyer that could

affect the impartiality of the trial or when the judge has accepted a gift from or has improperly communicated with a party or lawyer. (*Id.*).

China allows appeals and review of trial court judgments. The first appeal leads to a retrial of the case. (*Id.* at 20-21). This is similar to the old trial de novo practice in Massachusetts, though not in its details. *See generally Patrick P. v. Commonwealth,* 421 Mass. 186, 188 (1995) (giving overview of old system and noting its abolition). If no party appeals, then the first instance judgment is final once the appeal period has passed. (Ex. 40 at 21).  No party appealed from the judgment here. (Ex. 35; Ex. 34 at 31).

In addition to ordinary appeals, China also has a trial supervision system, which allows retrials in certain circumstances the Civil Procedure Law lists. This procedure can be invoked in three ways: a court can invoke it *sua sponte*; a public prosecutor can invoke it; or a party can invoke it within six months from the date the judgment becomes effective. (Ex. 34 at 29-30). No court or public prosecutor has invoked the trial supervision system, nor did Sunco China seek to use the trial supervision system to have the case retried (SUMF ¶ 103).

Thus Sunco China could have appealed and it could have sought review under the trial supervision system. But it did nothing. The Chinese judgment thus is final and enforceable in China. In 2023, the Chinese court issued the Certificate of Enforceability confirming that fact.

**B.    Linda and New Sun do not own or control Infinity.**

Sunco China's amended complaint alleged—falsely, as Sunco China now concedes—that Linda was an "equity holder[] of Infinity." It also alleged that she received distributions from Infinity, that she directed Infinity not to pay for the cabinets, that she had an undisclosed financial interest in Infinity, and that she caused Infinity to cease operations (Doc. No. 61 at ¶¶ 35, 37, 62, 64, 75, 81). Those false allegations were the reason the veil-piercing claim against Linda survived a motion to dismiss. (Doc. No. 32 at 15). Sunco China seeks summary judgment

4

on the veil piercing claim against all defendants, but it offers no evidence that any of its allegations about Linda were true. To the contrary, Sunco China now asserts, as an undisputed fact, the opposite of what it pleaded—that Linda "never had any ownership interest in Infinity." (SUMF ¶ 46, Doc. No. 224 at 9). It alleges no relationship between Infinity and New Sun. Nor does it argue that any evidence shows that Linda or New Sun ever controlled Infinity, that Infinity made any payments to them, or that either of them ever directed Infinity to do or not to do anything. In fact, the only evidence directly on point is the testimony of David Sun, who did control Infinity and who testified that Linda had *not* directed Infinity not to pay the invoices (although, David testified, she had told him she thought the invoices were not due, for the reasons that form the basis of one of Infinity's defenses). (Ex. 4 at 41:2-42:20).

Here are the facts. Linda was never a member or manager of Infinity. She did not tell Infinity not to pay for the cabinets. She did not cause Infinity to cease operations. She did not have any undisclosed financial interest in Infinity. (SUMF ¶¶ 106, 110). For its part, New Sun was set up to hold the beneficial interest in the Sun Family Trust, which owned real estate that Sunco, Inc. used in its business. (SUMF ¶ 112). It also had no relationship with Infinity.

**C.    In 2021, New Sun received a partial payment from Infinity Realty on its debt from a 2013 transaction.**

New Sun was established in 2002. (SUMF ¶ 58). Linda has always been a limited partner. (*Id*.). Sunco, Inc. was the general partner at all relevant times. (*Id*.). Since 2011, David has been the sole officer and director of Sunco, Inc., and Linda has had no role in the company. (*Id*. ¶¶ 3, 47).

Sunco, Inc. used a warehouse in its business. (*Id*. ¶ 61, 112). Until 2021, that warehouse was owned by the Sun Family Trust, a realty trust of which New Sun was originally the sole beneficiary. (*Id*. ¶ 112). In 2013, New Sun sold its beneficial interest in the Trust to Infinity

5

Realty Co., LLC for $6,665,885. The sale was seller-financed, and Infinity Realty gave New Sun a promissory note. (*Id*. ¶ 113). In September 2021, Infinity Realty made a partial payment to New Sun of $3 million. (*Id*. ¶ 115). From that amount, New Sun distributed approximately $2.88 million to Linda, a limited partner, in 2022. (*Id*. ¶ 116).

**D.      Sunco US made payments to Linda, or for her benefit.**

Because Sunco US used the warehouse in its business, it paid rent to the Sun Family Trust. (SUMF ¶ 61, 112). In effect, while New Sun was the trust's beneficiary, Sunco US paid rent to New Sun. (*Id*.). But after the sale of New Sun's beneficial interest in the warehouse, it paid rent to Infinity Realty. (*Id*.). Because seller financing left Infinity Realty indebted to New Sun for the warehouse purchase, Infinity Realty then made payments on that debt. (*Id*. ¶ 113).

Sunco China has pointed to several Sunco US checks from approximately 2018 to 2021 that it says were fraudulent transfers. But the checks' purpose and the mechanics of how the funds flowed from Sunco US to New Sun, Linda, or the taxing authorities are undisputed.

Shillock's affidavit explains that fourteen checks Sunco US issued payable to the order of "Sun Family Trust" were rent payments for use of the warehouse. (Ex. 44 ¶¶ 10-27). Instead of having Sunco US write a rent check to Infinity Realty and Infinity Realty write an installment payment check to New Sun LP, Sunco US wrote a single check that collapsed and simplified these transactions. (*Id*). The entities properly recorded these transactions in their books. (*Id*.). As Shillock explains, this is appropriate in the context of small business entities. (*Id*.).

To take an example, the $20,000 check dated November 30, 2018, which Sunco China claims is fraudulent, was properly recorded through a series of accounting entries explained in detail in Shillock's affidavit. (*Id*. ¶ 12-26). The entities recorded it as a payment of rent by Sunco US and a decrease in Sunco US's cash balance, a decrease in Infinity Realty's account payable to New Sun, a decrease in New Sun's account receivable from Infinity Realty, and an increase in

6

New Sun's cash balance. (*Id*.). The affidavit makes a similar showing for all fourteen checks payable to the order of Sun Family Trust. (*Id*. ¶ 27). None of these checks went to Linda, and none was for her benefit. The affidavit also explains the additional step when New Sun made distributions to Linda or when it made payments for her benefit (namely, two tax payments it made on her behalf). (*Id*. ¶¶ 28-34). In those cases, New Sun's books also reflect the payments made to Linda or on her behalf as distributions to her. (*Id*. ¶¶ 28-30).

Shillock's affidavit also shows that six other checks sent to taxing authorities on Linda's behalf between 2018 and 2021 were accounted for as advances to Linda. (*Id*. ¶ 35-51). The advances were recorded in an "Advance to Linda Sun" account on Sunco Inc's books. (*Id*.). At times, Linda paid down the advance account in cash. (*Id*.). At other times, Infinity Realty and New Sun LP made accounting entries that had the effect of reducing the amount of the "Advance to Linda Sun" account by recording a distribution to Linda from New Sun LP, reducing the balance Infinity Realty owed to New Sun LP on its promissory note, and reducing the rent Sunco, Inc. owed to Infinity Realty, as Shillock describes in detail in her declaration. (*Id*.).

The one check payable to Linda was a reimbursement to correct a mistake. David had inadvertently made a distribution from New Sun LP to its other limited partner, Joyce Sun (his sister, and Linda's daughter), drawn on Linda's personal bank account rather than Sunco, Inc.'s account. (As already explained, New Sun distributions were made using Sunco, Inc. checks, but Sunco, Inc., Infinity Realty, and New Sun all recorded the proper accounting entries, so that in substance, the transaction was a payment of rent to Infinity Realty, a partial payment on the promissory note by Infinity Realty to New Sun, and a distribution from New Sun to its limited partners). To fix his mistake, David gave Linda a check from Sunco, Inc. in the amount of the

7

5081486_1

check he had erroneously written using her personal bank account. That amount was then recorded as a distribution to Joyce. (*Id.* ¶ 52).

In short, the transfers to New Sun were partial payments of the debt Infinity Realty owed New Sun for the purchase of the warehouse. And some transfers were advances to Linda, who repaid them. There is no evidence that any of these transfers were made in bad faith, and they were transfers for value or else repaid.

ARGUMENT

**A.    Standard of decision.**

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de P.R. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (citation and internal quotation marks omitted). A fact is "material" if "its existence or nonexistence has the potential to change the outcome of the suit." *Id.* The Court must view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor. *See Ameen v. Amphenol Printed Circuits, Inc.,* 777 F.3d 63, 68 (1st Cir. 2015). But the non-moving party cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation" to try to defeat the motion. *Cherkaoui v. City of Quincy,* 877 F.3d 14, 18 (1st Cir. 2017) (citation and internal quotation marks omitted). It must instead point to "competent evidence" and "specific facts." *Tropigas,* 637 F.3d at 56. On cross-motions for summary judgment, the Court must "consider each motion separately, drawing inferences against each movant in turn." *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir. 1997).

8

**B.      Roadmap of the argument.**

We begin with the only claim that accuses Linda of personal wrongdoing: the claim for breach of fiduciary duty—a claim Linda has already beaten and should not have to litigate again. Sunco China does not seek summary judgment on that claim, but Linda does. The Chinese judgment Linda won in the lawsuit Sunco China brought against her is entitled to recognition. And once the Court recognizes it, it should give the judgment res judicata effect. We then turn to the ancillary claims: that Linda and New Sun are liable for Infinity's supposed breach of contract because the Court should pierce Infinity's corporate veil, because they received fraudulent transfers, or because Sunco China should be allowed to reach and apply assets in New Sun's hands. The veil-piercing claim fails because neither Linda nor New Sun owned or controlled Infinity. The fraudulent-transfer claim fails because neither Linda nor New Sun is a debtor of Sunco China, and the transactions Sunco China challenges were done in good faith and for value. And the reach-and-apply claim fails because the claim doesn't meet the requirements of the reach and apply statute.

**C.      The claims for breach of fiduciary duty (Counts 6 and 7) fail because the Chinese judgment is res judicata.[1]**

This is not the first time Sunco China has sued Linda for breach of fiduciary duty on account of the cabinet transaction between Sunco China and Infinity. The company brought the same claim against Linda in a Chinese court, and it lost. The Chinese judgment is res judicata,

---

[1] Sunco China pleads "breach of duty of loyalty" (count 6) and "breach of fiduciary duty" (count 7) as separate counts. In fact, there is just a single claim, a claim for breach of fiduciary duty. The claim, in China and here, was that Linda was a director of Sunco China and had a duty to it to disclose what she knew about Infinity. *See, e.g., Demoulas v. Demoulas Super Mkts.,* 424 Mass. 501, 530-31 (1997) ("To satisfy the principle of fairness to the corporation and to meet his duty of loyalty, the fiduciary must fully disclose to the corporation, all material facts concerning the opportunity"). We cite *Demoulas* just to make the point that a breach of the duty of loyalty *is* a breach of fiduciary duty, without prejudice to our assertion that if the claim ever had to be tried, it would be governed by Chinese law.

and Sunco China cannot relitigate the claim here after losing on the merits in the forum that it chose.

This argument has three steps. First, we show that the Chinese judgment is entitled to recognition. "Recognition of a foreign judgment is a prerequisite to its enforcement," including when a defendant seeks to "rely on a foreign judgment to preclude relitigation of a claim governed by the foreign judgment." *Restatement (Fourth) of the Foreign Relations Law of the United States* § 481 cmt. b (2019). Second, we show that the Chinese judgment would be res judicata in China under Chinese law. Third, we show that the Chinese judgment therefore is res judicata here. A foreign judgment that is entitled to recognition has "the same preclusive effect … as the judgment of a sister State entitled to full faith and credit," but not "greater preclusive effect in the United States than [it] would be accorded in the state of origin." *Restatement (Fourth)* § 487.

**1.    The Chinese judgment is entitled to recognition.**

The law of foreign judgment recognition in the United States is state law, not federal law. *Restatement (Fourth)* § 481 cmt. a; *Sangiovanni Hernandez v. Dominicana de Aviacion, C. Por A.,* 556 F.2d 611, 614 (1st Cir. 1977) ("The issue of whether a foreign judgment will be enforced by a federal court having jurisdiction by means of diversity of citizenship is governed by the laws of the state where the federal court is located"). Massachusetts' law on recognizing foreign money judgments, G.L. c. 235, § 23A, is based on the Uniform Foreign Money Judgment Recognition Act ("the UFMJRA").

Under the UFMJRA, the general rule is that "any foreign judgment that is final and conclusive and enforceable where rendered … shall be conclusive between the parties to the extent that it grants or denies recovery of a sum of money." G.L. c. 235, § 23A. The Chinese judgment is a judgment that "denies recovery of a sum of money," and thus it is "conclusive

10

between the parties" as long as it is "final and conclusive" in China. Although there are several grounds on which the losing party in a foreign lawsuit can resist recognition of the foreign judgment, Sunco (China) only asserts two: (1) that the Chinese judiciary "do[es] not provide impartial tribunals or procedures compatible with the requirements of due process of law"[2]—a surprising claim, since Sunco (China) obviously had the means to sue in the United States yet chose to sue in China—and (2) lack of reciprocity. (Ex. 38 at Response Nos. 7 and 8). Both claims fail.

**a.  The bar for refusing recognition to a country's entire judiciary is exceptionally high, and courts have rejected claims that Chinese judgments cannot be recognized.**

While the UFMJRA provides that a judgment "obtained by fraud" cannot be recognized, *see* G.L. c. 235, §23A, Sunco China does not claim any fraud, irregularity, or other problem in its Chinese case against Linda. Instead, it argues that no US court can ever recognize *any* Chinese judgment issued by *any* Chinese court, because the Chinese judiciary is so deficient that it would be wrong to recognize any Chinese judgment even if the proceedings in a particular case were fair and adequate. And because China, like Massachusetts, follows the rule of reciprocity, the implication is that no US court's judgment can ever be recognized in China. Sunco China wants to blow up the possibility of Sino-American judicial cooperation across the board, even though this is a run-of-the-mill commercial dispute and even though Sunco China offers no criticisms of the proceedings that took place in China.

Sunco China asserts: "it is Plaintiff understanding that Chinese courts do not provide impartial tribunals or procedures compatible with the requirements of due process of law." (Ex.

---

[2] (Ex. 37 at Ans. No. 7). Sunco China supplemented its interrogatory answer stating that "Chinese courts do not serve as impartial tribunals and do not provide the same level of rigorous application of the law to facts as do American courts." (Ex. 38 at Ans No. 7).

11

5081486_1

37 to Int. 7). Its witnesses' testimony belied that statement. After testifying that he did not understand what "impartial" meant or even what "fair" meant (Zhao Tr.  238:6-240:16, Doc. No. 199-7 at 22), Bing Zhao, the 30(b)(6) designee, testified that he "could not answer the question" whether the Chinese courts are impartial "with a yes or a no" and could not identify any facts that support the view that the Chinese courts are not impartial. (Zhao Tr. 243:18-24, 244:11-248:13, Doc. No. 199-7 at 23-24). In fact, he testified that the Chinese proceeding had been a helpful warm-up exercise for Sunco China, because the company realized that to win when it sued again, it would need to present more evidence than it had chosen to present to the Chinese court:

> Q.    … One of Linda Sun's argument in this lawsuit is that Sunco China already sued her in China and lost, and it should not be able to come to the United States and sue her again.
>
> In response to that argument, sunco China has said: We don't believe that the American Court should respect the Chinese Court's judgment because the Courts of China do not serve as impartial tribunals. They're not fair.
>
> Do you agree with that?
>
> [Objection and colloquy with interpreter].
>
> A.    In fact, through that case, we are actually very grateful to that case as well, because it taught us what to do next. In that case, it clearly informed us that for the amount of the payment of the goods Infinity owed Sunco China, the case confirmed that the amount is 6.7 million US dollars, and that case also pointed us to a clear direction.
>
> Regarding the outstanding account receivables, we should not just rely on the letters to Chase, the payment for the goods owed. In fact, we should filed the case for the outstanding accounts receivables.
>
> And the case also stated that Linda Sun is the company's director, and she sold the goods to Infinity. And according to our certification in October of 2020, the shareholders of Infinity [are] David Sun and Shillock Yuan-Sun. … The Court pointed us to a clear path. We felt that we won.

(Zhao Tr. 245:13-247:14, Doc. No. 199-7 at 24).

12

Sunco China's memorandum and its statement of undisputed material facts undermine its argument in other ways. It points to a Chinese judgment confirming an arbitral award that, it says, undermines Infinity's defense to the breach of contract claim. (Doc. No. 223 at 7; Doc No. 224 ¶ 37).[3] But Sunco China cannot have it both ways. If the Chinese judiciary is so systematically bad that its judgments cannot be recognized, then none of its judgments can be recognized, not just the judgments Sunco China doesn't like.

The UFMJRA requires the foreign "system" to "provide impartial tribunals" and "procedures compatible with the requirements of due process of law." G.L. c. 235, § 23A. This bare minimum of due process does not require due process in the US constitutional sense, but just procedures compatible with the requirements of due process. In other words, it requires procedures that are fundamentally fair. *See Soc'y of Lloyd's v. Ashenden,* 233 F.3d 473, 477 (7th Cir. 2000). This standard is "even less demanding than the test the courts use to determine whether to enforce a foreign arbitral award under the New York Convention." *Id.*

This Court has never held that a foreign judiciary fails to provide "impartial tribunals or procedures compatible with the requirements of due process of law." In *Society of Lloyd's v. Hamilton,* 501 F. Supp. 2d 248, 253 (D. Mass. 2007), the court rejected a challenge to the English judiciary. And in *CDM Smith Inc. v. Atasi,* 594 F. Supp. 3d 246 (D. Mass. 2022), it rejected a challenge to the Saudi judiciary. *CDM Smith* is particularly instructive, because the court noted concerns, also noted in the State Department's 2017 Country Report on Human Rights Practices, that the courts were "biased against non-Muslim litigants" and that there were "serious concerns about the impartiality of the criminal justice system." Still, the court focused

---

[3] Although Sunco China points to the judgment, it has not taken any of the steps necessary to show that the judgment is entitled to recognition in the United States. Thus the Court should not give the Chinese judgment confirming the arbitral award any effect.

on the particular tribunals at issue—the Saudi Labor Courts—and found there was insufficient evidence that those courts were biased towards Muslim litigants or that they were not impartial.

Indeed, systematic rejection of a foreign judiciary by *any* US court is exceptionally rare. *See* J. Chad Mitchell, *Recognition and Enforcement of Foreign-Country Judgments in the United States,* in 2 *International Aspects of US Litigation: A Practitioner's Deskbook* 607, 616-18 (James E. Berger ed. 2017). We know of four cases in which it has happened, three during or shortly after war, revolution, or other upheaval. In *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406 (9th Cir. 1995), the court affirmed a refusal to recognize an Iranian judgment against the sister of the former shah in a judgment obtained three years after the Islamic Revolution. In *Bridgeway Corp. v. Citibank,* 45 F. Supp. 2d 276, 280 (S.D.N.Y. 1999), *aff'd,* 201 F.3d 134 (2d Cir. 2000), the court refused to recognize a 1995 Liberian Supreme Court judgment entered during a civil war in which the courts were not functioning according to the constitution and instead, the "warring factions" had each appointed supreme court justices, who "served at the will and pleasure of the appointing powers." The courts were not "function[ing] in most areas of the country," and where they were, they were "subject to political, social, familial, and financial suasion." Indeed, the judiciary collapsed altogether months later, when fighting broke out again. *Sanchez Osorio v. Dole Food Co.,* 665 F. Supp. 2d 1307 (S.D. Fla. 2009), is the one decision not obviously affected by war or revolution. There, the court refused to recognize a $97 million Nicaraguan judgment in an environmental tort case on the grounds that a Nicaraguan law enacted to govern lawsuits concerning a particular pesticide created a conclusive presumption that the pesticide caused the plaintiffs' sterility and did not allow the defendants to offer evidence to rebut that presumption. And in *Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362, 610, 617 (S.D.N.Y. 2014), the court refused to recognize an Ecuadoran judgment issued after the Ecuadoran Congress had "purged

14

the three highest judicial tribunals" and had "unconstitutionally replaced 27 of the 31 justices," among other changes during a time of political upheaval in the country.

It is right that such challenges should be rare. When a court deems a foreign legal system inadequate, it effectively says that no judgment from that state's courts should be recognized in the United States, even if the proceedings in a particular case were fair. *See Restatement (Fourth)* § 483 cmt. d (distinguishing systemic from proceeding-specific challenges). Courts should approach this question with respect and humility, bearing in mind that our own system is not itself beyond reproach.

We know of no US appellate court that has refused recognition of a Chinese judgment on the grounds that the Chinese judiciary is systematically inadequate. The judgment of the one trial court that took that view, *Shanghai Yongrun Investment Management Co. v. Kashi Galaxy Venture Capital Co.,* 2021 N.Y. Misc. LEXIS 2492 (N.Y. Sup. Ct. Apr. 30, 2021), was reversed on appeal. The lower court had relied on the US State Department's 2018 and 2019 country reports regarding China. But on appeal, the court reversed, holding that "the reports, which primarily discuss the lack of judicial independence in proceedings involving politically sensitive matters, do not utterly refute plaintiff's allegation that the civil law system governing this breach of contract business dispute was fair." *Shanghai Yongrun Inv. Mgmt. Co. v. Maodong Xu,* 160 N.Y.S.3d 874 (App. Div. 2022).[4]

---

[4] On remand, the defendant argued that the Chinese judgment had been obtained by fraud and was repugnant to public policy. The argument was that the judgment creditor had a relationship with a Chinese government official who deprived the defendant of "the opportunity to make a full and fair defense during the Chinese litigation." The judge dismissed the fraud and public policy defenses. *Shanghai Yongrun Inv. Mgmt. Co. v. Kashi Galaxy Venture Capital Co.,* 2024 N.Y. Misc. LEXIS 63459 (N.Y. Sup. Ct. Jun. 17, 2024). But on appeal, the court again reversed, holding that the defendant should have been allowed to try to prove that the judgment was obtained by fraud. *Shanghai Yongrun Inv. Mgmt. Co. v. Kashi Galaxy Venture Capital Co.,* 242 N.Y.S.3d 647 (App. Div. 2025). Sunco China has not raised fraud or public policy as a defense here.

5081486_1

A recent California decision, *Board of Trustees of the Leland Stanford Junior University v. Zhang Yuzhen,* 2026 U.S. Dist. LEXIS 70634 (N.D. Cal. Mar. 31, 2026), deserves comment, even though the case did not arise under the UFMJRA or the other widely-used uniform act, the Uniform Foreign Country Money Judgment Recognition Act. *Zhang Yuzhen* was a politically-charged case about the ownership of the diary of Li Rui, Mao Zedong's personal secretary, who spent twenty years in prison and work camps after publicly criticizing Mao, and who was later politically rehabilitated. His diary is kept at Stanford in accordance with his wishes, because he was concerned that the diary would be banned or destroyed by the Chinese government. But after Li died, his widow sued in China, seeking a declaration that she owned the diaries. A Chinese court ruled in her favor, and Stanford brought an action in the US to quiet title to the diary. The widow, Zhang Yuzhen, brought a counterclaim seeking recognition of the Chinese judgment.

The court refused to recognize the judgment. It cited several case-specific reasons. First, Stanford was not a party to the Chinese case and had not been served with process; it was only added to the case after the fact. *Id*. at *65-66. Second, Stanford did not have the chance to defend itself in the Chinese court, because that court would not allow its lawyers to appear. *Id.* at *67. Third, the proceedings were not open to the public, and the judgment was not included in an online database of Chinese judgments. *Id.* at *68-69.[5] Finally, there was "evidence that this particular proceeding … was dominated by the CCP," the Chinese Communist Party. *Id.* at *69. The court, perhaps conflating the systemic and case-specific reasons for refusing recognition,

---

[5] The court was wrong to give weight to the online database, China Judgments Online, because many cases are not included in the database, which is in any event a recent innovation. *See* Tobias Smith, *Body Count Politics: Quantification, Secrecy, and Capital Punishment in China,* 45 L. & Social Inquiry 706, 716 (2020). The situation is not unlike the situation here in Massachusetts, where, for example, all state court decisions are publicly available by visiting the courthouse, but some are not available in the major online databases.

16

5081486_1

reasoned that it could deny recognition "when the foreign judicial system … did not provide an impartial tribunal or due process of law in a particular case." *Id.*

None of this was so here. Sunco China was the plaintiff, so there was no issue about service of process or notice of the proceedings; it did have an opportunity to make its case; and Sunco China has not mounted any challenge to the tribunal's impartiality or to provision of due process "in [the] particular case." *Zhang Yuzhen suggests that* the Court should not recognize a particular foreign judgment obtained unfairly, without notice, and as the result of improper political pressure. Sunco China does not make such a claim.

### b. The Chinese courts provide adequate due process.

Linda has submitted a declaration from one of the world's leading experts on Chinese private international law, Dr. Jie Huang, Professor of Comparative and Private International Law and Interim Deputy Head of School at the University of Sydney Law School in Australia. (*See* Ex. 40). Dr. Huang explains the relevant Chinese laws and procedures and shows that China's judiciary meets the minimal due process standard for recognizing its judgments. Dr. Huang earned her S.J.D. degree from Duke University, with a dissertation entitled *Interregional Recognition and Enforcement of Civil and Commercial Judgments: Lessons from China from the US and EU Laws,* for which she won the highest prize of the Chinese Society of Private International Law. She is the Regional Rapporteur for the Pacific at the UN Centre for Trade Facilitation and Electronic Business, a research affiliate at the Kennedy School, and a non-resident associate in research at the Harvard University Fairbank Centre for Chinese Studies. She has been a visiting scholar at many leading global universities, including Harvard Law School. Dr. Huang's credentials are formidable.[6]

---

[6] A true copy of Dr. Huang's CV is attached to her report as Annexure 1.

17

Dr. Huang's discussion of the Chinese judiciary is found at pages 10 to 16 of her report. She begins with an important qualification: her report focuses on civil and commercial cases "that do not involve politically sensitive matters." (Ex. 40 at 10). This reflects cases such as *CDM Smith* and *Shanghai Yongrun,* which suggest that deficiencies in the way foreign courts deal with politically sensitive cases should not lead to a wholesale rejection of the foreign judiciary.

Dr. Huang outlines the requirements of the Civil Procedure Law discussed above and explains their requirements of impartiality, publicity, the right to notice, and the right to legal representation. These are the same factors that US courts address under the heading of procedural due process. She then explains the increased emphasis in China in recent years on adhering to international norms. For example, she cites the Chinese government's view that state-owned enterprises should not be treated any differently than private enterprises in civil and commercial cases. Finally, she reviews the evidence that Chinese judgments have increasingly been recognized by courts around the world, even without any treaty obligations on recognition. She cites statistics showing recognition of Chinese judgments in Australia, the British Virgin Islands, Canada, Germany, Israel, Japan, the Netherlands, New Zealand, Singapore, South Korea, and the United Kingdom.

In short, her report shows that in non-political cases, the Chinese courts have the kinds of procedural rules and practices that are recognizable hallmarks of due process; that China has been working to meet international standards; and that courts around the world have recognized Chinese judgments. Nothing about this case is political. This, in other words, is just the kind of case the Chinese courts can hear and decide fairly. And if it *were* a political case, one would expect the Chinese court to favor Sunco China and Mr. Wu if it favored anyone. After all, Sunco

18

China was a Chinese company suing an American citizen who supposedly acted disloyally for the benefit of her American son and his American company. For his part, Mr. Wu was hired to "handle government relations." (Wu Tr. Vol. 1 at 51:4-7, Doc. No. 199-11 at 15). He testified that Mrs. Sun had looked to him to help Sunco China resolve "government relations issues." (Wu Tr. Vol. 1 at 118:24-119:5, Doc. No. 199-11 at 32).

> **2.    There is reciprocity in the recognition of judgments between China and the United States.**

Massachusetts is in a small minority of states that require reciprocity as a condition of judgment recognition. *See* G.L. c. 235, § 23A; *see also Restatement (Fourth)* § 484, rptr's n.10. China also requires reciprocity as a condition of judgment recognition. (Ex. 40 at 16-17). That creates a chicken-and-egg problem. If Massachusetts needs to know that China recognizes our judgments before it recognizes Chinese judgments, and if China needs to know that Massachusetts, or the United States, recognizes its judgments before it recognizes our judgments, how can any judgment ever be recognized across the Sino-American divide?

The cases solve that problem by requiring *de jure* recognition, not *de facto* recognition. In other words, what matters is whether Chinese law *would* recognize an American or Massachusetts judgment, not whether Chinese courts *already have* recognized such a judgment. For example, in *McCord v. Jet Spray International Corp.,* 874 F. Supp. 436 (D. Mass. 1994), where a Belgian resident sued a Massachusetts corporation in a Belgian court for breach of an employment contract, won, and sought to enforce the judgment in Massachusetts, the court did not ask whether the Belgian courts had enforced Massachusetts judgments. Instead, it asked whether, under the Belgian Civil Judicial Code, "Belgian courts *would* recognize a Massachusetts judgment." *Id.* at 439 (emphasis supplied).

19

China, too, requires *de jure* reciprocity rather than *de facto* reciprocity, or in other words, evidence that US courts *would* recognize Chinese judgments. (Ex. 40 at 17). Of course, US courts have recognized Chinese judgments in the past (*Id*. at 18-19), and so China would consider even *de facto* reciprocity to exist. If it is necessary to consider whether a Massachusetts court would recognize a Chinese judgment, the provisions of the UFMJRA show that a Massachusetts court *would* recognize a Chinese judgment, and thus *de jure* reciprocity exists. (*Id*. at 17-18). But Dr. Huang explains that from the Chinese perspective, the key question is not whether a *Massachusetts* court would recognize a Chinese judgment, but whether a *US* court would; this Court is a United States court, not a Massachusetts court. Thus the question is whether reciprocity exists between the two countries, not between China and one of the fifty US states. (*Id*. at 18-20).

**3.      The Chinese judgment is res judicata in China.**

Under the Chinese Civil Procedure Law and the judicial interpretations of the CPL, a party cannot relitigate a case when the first litigation has led to an "effective judgment." (*Id*. at 20-21). If a party disagrees with the outcome of a case, it can seek a retrial under China's trial supervision system (*Id*. at 22). It can, of course, also appeal. But if the disappointed party does neither thing, then "courts are precluded from accepting a subsequent lawsuit which involves the same parties, the same subject matter, and the same claims." (*Id*. at 24). There are exceptions, but none are relevant here. For example, a party can file a second lawsuit based on new facts occurring after the first judgment. (*Id*. at 25-26). It can file a second lawsuit if it withdrew the first lawsuit before judgment. (*Id*. at 26). Or it can seek a retrial within six months of the effective date of the original judgment, or at the latest, within six months from when the party knew or should have known of the grounds. (*Id*. at 30). None of the exceptions apply. (*Id*. at 34-35).

20

Dr. Huang has reviewed the complaint in this case and the complaint in the Chinese case, and she comes to the same conclusion under Chinese law that anyone reading the two documents would reach: they contain a claim between the same parties on the same subject matter. (*Id*. at 31-33). Therefore, under Chinese law the judgment is res judicata.

### 4. The Chinese judgment is res judicata here.

The Court should look to Massachusetts law to "measure the preclusive effect of" the Chinese judgment. *McCord,* 874 F. Supp. at 438. Massachusetts law provides that the foreign judgment should be treated just like a sister-state judgment entitled to full faith and credit. *See* G.L. c. 235, § 23A. Massachusetts gives sister-state judgments the same preclusive effect they have in the state where rendered. *See Wright Mach. Corp. v. Seaman-Andwall Corp.,* 364 Mass. 683, 688-89 (1974) (citing *Roche v. McDonald,* 275 U.S. 449, 451-52 (1928)). Thus once the Court has recognized the Chinese judgment, it must give it the same preclusive effect it has in China. Since res judicata would bar relitigation of the breach of fiduciary duty claim in China, it bars relitigation here. *See Restatement (Fourth)* § 487.

### D. The veil-piercing claim (Count 11) fails because it is undisputed that Linda has nothing to do with Infinity.

Count 11 alleges that Linda is liable for Infinity's failure to pay the $6.7 million allegedly owed on a veil-piercing theory. (Doc. No. 61 ¶ 173). The other defendants have shown comprehensively why the veil piercing claim fails generally, and we incorporate those arguments. But the claim against Linda fails for another simple reason: the facts about Linda's supposed relationship with Infinity that Sunco China pleaded to justify the claim are untrue, as Sunco China now admits.

Sunco China *alleges* that Infinity is under Linda's control; that she received distributions from Infinity; that she "disbursed all monies received by Infinity;" that she directed Infinity to

21

pay the proceeds of the cabinet sale to her and to David and Shillock; and that she "used Infinity to convert the cabinets for [her] own personal gain." (Doc. No. 61 ¶¶ 174-181).

None of this is true. In fact:

- Linda is not now, and never has been, a shareholder of Infinity. (SUMF ¶ 45, 105).

- Linda does not now have, and never has had, a beneficial interest in Infinity. (*Id*. ¶ 106).

- Linda is not now, and has never been, a director of Infinity. (*Id*. ¶ 107).

- Linda is not now, and has never been, an officer of Infinity. (*Id*. ¶ 108)

- Linda never directed or ordered Infinity not to pay for the cabinets. (*Id*. ¶ 111).

We know of no Massachusetts case imposing veil-piercing liability on someone who neither owns nor controls the corporation and is neither a director nor an officer. The one piece of evidence that connects Linda to Infinity is David's testimony that while Linda did not direct him or Infinity not to pay Sunco China's invoice, she told him she did not think that Infinity owed Sunco China the money. (Ex. 4 at 41:2-42:20). That evidence, though, does nothing to support a veil-piercing claim.

The claim against New Sun must also fail, for want of any evidence connecting New Sun to Infinity in any way beyond simple common ownership and control, which of course is insufficient. *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619 (1968). The evidence about the checks discussed above shows that there was an indirect financial link between New Sun and Sunco, Inc., but there is no evidence of any transactions between Infinity and New Sun.

5081486_1

**E.     The fraudulent transfer claim (Count 12) fails because there is no evidence of any fraudulent transfer involving Linda or New Sun.**

**1.     Sunco China has violated the Court's sanctions order by basing its claims on transactions it did not disclose in discovery.**

The defendants sought discovery sanctions for reasons we will not rehash here. They are laid out in the defendants' joint memorandum (Doc. No. 201) and their reply (Doc. No. 207). The Court granted the motion. While it has not yet issued its written decision, its oral order of March 4, 2026 (Doc. No. 218) forbids Sunco China from relying on evidence that it failed to disclose in its Rule 30(b)(6) testimony. This was an especially important issue for the defendants because of the lack of clarity from the plaintiff about the basis for its fraudulent transfer claims. As counsel explained at the hearing, (Doc No. 220 at 7:15-25, 24:13-21), Sunco China simply refused to explain the basis of those claims during fact discovery. In its papers (Doc. 204 at 8-9), Sunco China has represented that the facts supporting the claims "are derived from reading and analysis of hundreds of pages of financial documents of multiple Defendant entities by a CPA," and that "[t]he detailed facts and analysis can only and will, be provided by an expert CPA." Its counsel said the same thing at the hearing on the motion for sanctions. (Doc. No. 220 at 43:9-44:7). And Sunco China did provide the defendants with an expert report, which is Exhibit 39.[7]

That report discusses only two transactions that involve Linda or New Sun that could arguably be fraudulent transactions: Infinity Realty's September 2021 payment of $3 million to New Sun in partial payment of what the expert characterized as an installment payment contract for the 2013 sale of New Sun's interest in the Sun Family Trust to Infinity Realty; and the subsequent 2022 distribution New Sun made to Linda, one of its limited partners. It says nothing

---

[7] Sunco China's failure even to cite its own expert report in its motion is telling though not surprising. The "expert," Zijing Chang, CPA, stated that she has "limited experience in forensic accounting." She does not explain the professional standards she followed—if she followed any at all—and she offers opinions that are not within an accountant's expertise, for example, opinions about what factors make it appropriate to pierce the corporate veil or opinions on the ultimate issue of fraud.

5081486_1

about transfers, whether in the form of checks or otherwise, that Sunco Inc. made to Linda or for her benefit. To be sure, all parties knew that Sunco Inc. had made such transfers, and Sunco China took discovery on them. The basic fact that the transfers happened is no surprise to anyone. What is a surprise is that Sunco China attempts to make them a cornerstone of its fraudulent transfer claim, given what it told the defendants and the Court about how it would disclose the basis of the claim.

We are confident that the Infinity Realty transaction and the subsequent distribution are not fraudulent transfers, and just in case Sunco China changes course and decides it want to raise them at trial even though it failed to raise them in its motion for summary judgment, we demonstrate below that Linda and New Sun are entitled to summary judgment on claims arising out of those transactions. But we did not prepare to make arguments addressing the transactions at the heart of the motion Sunco China actually brought. Most importantly, we did not retain an expert to review and opine on the financial data for Infinity Realty and New Sun that would have been important to oppose Sunco China's motion. This is precisely the reason that sanctions were necessary, and it is shocking that Sunco China, after telling us and telling the Court that the expert report would answer all questions about the basis of its fraudulent transfer claims, did not do what it said it would. Avoiding the bait-and-switch was the purpose of the sanctions. Sunco China has violated the Court's order and unfairly prejudiced Linda and New Sun. For this reason, the Court should deny Sunco China's motion to the extent that it relies on transactions not mentioned in its expert report and grant Linda and New Sun's motion to the extent that it relies on those transactions.

5081486_1

**2.      Neither Linda nor New Sun is liable for a fraudulent transfer, whether on account of the installment payment to New Sun or the checks payable to Linda or for her benefit.**

If Sunco China's theory of the case is right, then Infinity, the party that purchased the cabinets, was its "debtor" for purposes of the Uniform Fraudulent Transfer Act, because Infinity was "a person who is liable on a claim." G.L. c. 109A, § 2. A "claim," for purposes of the UFTA, is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* Neither Linda nor New Sun was Sunco China's debtor for purposes of the statute.[8]

The UFTA defines several kinds of fraudulent transfers:

- The debtor makes a transfer with actual intent to hinder, delay, or defraud any of its creditors, G.L. c. 109A, § 5(a)(1).
- The debtor makes a transfer without receiving a reasonably equivalent value in exchange, in certain circumstances, G.L. c. 109A, §§ 5(a)(2) and 6(a).
- The debtor makes a transfer to an insider for an antecedent debt when the debtor is insolvent, if the insider has reasonable cause to believe that the debtor is insolvent, G.L. c. 109A, § 6(b).

In each case, a fraudulent transfer is a transfer by a "debtor." Thus as an initial matter, the only potentially fraudulent transfer under §§ 5 or 6 was Infinity's transfer of the cabinets to Sunco US, because Infinity is the only "debtor" in the case—the only party that even allegedly owed Sunco China any money. We incorporate the other defendants' arguments to show why that transfer was not a fraudulent transfer under either § 5 or § 6 of the statute.

But this does not mean that Linda and New Sun are necessarily strangers to the UFTA claim. Under G.L. c. 109A, § 8, if the transfer of the cabinets was a fraudulent transfer to Sunco, Inc., then one of Sunco China's possible remedies—the only one that applies to its claims against

---

[8] Sunco China cannot say that Linda or New Sun is its debtor because Infinity is its debtor: as shown above, the veil-piercing claim fails, and so Sunco China cannot simply treat Linda and New Sun as identical to Infinity.

Linda or New Sun—is avoidance of the transfer. Under G.L. c. 109A, § 9, judgment avoiding a transaction could enter not just against the "first transferee," namely, Sunco Inc., but also "any subsequent transferee other than a good-faith transferee or oblige who took for value." So the question is whether Linda or New Sun received any transfers other than as "good faith transferee[s] … who took for value." Sunco China does not cite the relevant statute or seek to show that it could meet the statute's standard.

Sunco China's motion focuses on two things: the transfer of the cabinets from Infinity to Sunco US, and subsequent payments by Sunco US to or for the benefit of Linda. Neither supports a claim against Linda or New Sun under §§ 8 and 9 of the statute. The only alleged transfer by the "debtor" is Infinity's transfer of the cabinets; the Sunco US payments are not transfers by the "debtor" and therefore cannot give rise to liability under §§ 5 or 6, except, in theory though not on the facts of this case, through the downstream-transferee provisions of § 9.

The transactions by Sunco US were not transfers by Infinity—the only alleged "debtor"—and thus do not fall within §§ 5 or 6 of the statute in the first instance. For that reason alone, they cannot be avoided as fraudulent transfers. But even if Sunco China could trace those funds back to Infinity through its theory of the case, it still would have to show that Linda or New Sun was a downstream transferee that did not take in good faith and for value. It has not done so. The undisputed evidence is that the payments were payments or rent or payments towards the preexisting debt that Infinity Realty owed to New Sun. Payments to satisfy an existing obligation are transfers "for value" within the statute's meaning. G.L. c. 109A, § 3(a). Sunco China points to no evidence that Linda or any other recipient lacked good faith. That is enough to defeat any claim under § 9.

26

Sunco China's general suggestion that funds were "siphoned" through affiliated entities is no substitute for the statutory showing required to recover from a downstream transferee. The UFTA does not impose liability for generalized allegations of insider ties or corporate affiliation. It requires proof that a particular defendant received a particular transfer of the debtor's property and that the defendant is not a good-faith transferee for value. Sunco China has not even tried to make that showing for Linda or New Sun.

Although Sunco China does not rely on it in its own motion for summary judgment, New Sun received a large payment in 2021 from Infinity Realty on account of the preexisting debt Infinity Realty owed for the purchase of New Sun's beneficial interest in the warehouse. That transaction was self-evidently a transfer "for value." G.L. c. 109A, § 3(a). And there is no evidence that New Sun received the payment in bad faith. Thus, even on a theory Sunco China has not pursued, the statute would not permit recovery against Linda or New Sun.

Even if Infinity's transfer of the cabinets were a fraudulent transfer—a premise the other defendants have rebutted—Sunco China cannot show that Linda and New Sun received the proceeds of the cabinet sale in bad faith, or not for value. They are therefore entitled to summary judgment on Count 12.

## F.    The reach and apply claim (Count 13) fails.

Sunco China brings a statutory reach and apply claim against New Sun. (Doc. No. 223 at 16). Neither its motion nor its amended complaint explains which prong of the statute Sunco China seeks to use, but its discussion, which focuses on property "not subject to ordinary execution" (*Id*.), makes it clear that it is proceeding under G.L. c. 214, § 3(6), which concerns:

> [a]ctions by creditors to reach and apply, in payment of a debt, any property, right, title or interest, legal or equitable, of a debtor … which cannot be reached to be attached or taken on execution …

The claim fails because New Sun holds no "property, right, title, or interest" of the alleged debtor, Infinity, let alone any property or interest that "cannot be reached to be attached or taken on execution." There is no evidence that New Sun owes Infinity any money or has any other obligations to Infinity. Nor has Sunco China argued that Infinity has a right to a particular thing, or right, or sum of money that is in New Sun's possession. The real theory against New Sun is that it is the indirect recipient of the proceeds of Sunco, Inc.'s sale of the cabinets. As already explained, if Infinity's transfer of the cabinets to Sunco, Inc. was a fraudulent transfer, and if Sunco China could prove that New Sun was a downstream recipient of the proceeds but not a good faith transferee for value, then New Sun might be liable under the UFTA. If that were so, then Sunco China could "recover judgment for the value of the asset transferred … or the amount necessary to satisfy the creditor's claim, whichever is less." G.L. c. 109A, § 9(b). If Sunco China prevails on its fraudulent transfer claim, then, it could obtain a money judgment against New Sun, which it could seek to enforce by writ of execution. Thus § 3(6), which gives creditors a remedy when execution is not available, simply does not apply.

Sunco China might more usefully have relied on G.L. c. 214 § 3(8). That prong of the statute allows a creditor to reach assets that have been conveyed by a debtor to a third party with intent to defeat, delay, or defraud the debtor's creditors. But because § 3(8) is coextensive with UFTA, it fails for the same reasons Sunco China's fraudulent transfer claim fails. *See De Prins v. Michaeles*, 236 F. Supp. 3d 482, 490-491 (D. Mass. 2017).

CONCLUSION

Sunco China sued Linda for breach of fiduciary duty and lost. It cannot be allowed to litigate those claims again. No evidence supports Sunco China's claim that Linda, who has never been a member or manager of Infinity or had any interest in it, can be liable for Infinity's

28

supposed debt on a veil-piercing theory. And no evidence supports Sunco China's claim that

Linda or New Sun made or received any fraudulent transfers. The Court should grant the motion.

Respectfully submitted,

LINDA SUN and NEW SUN LIMITED
PARTNERSHIP

By their attorneys:

Theodore J. Folkman (BBO No. 647642)
Elizabeth L. Gardon (BBO No. 711867)
RUBIN AND RUDMAN LLP
53 State St.
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com
egardon@rubinrudman.com

Dated: May 27, 2026

29

5081486_1

| Allegations in the Chinese complaint | Allegations in the US complaint |
|---|---|
| **The defendant was originally the sole shareholder of the plaintiff …**<br><br>**The defendant … transferred 52% of [her] shares to Jiangsu Qiyi Investment Co., Ltd. in 2014.** | In 2003, Sunco was founded in Kunshan, China by L. Sun (Am. Compl. ¶ 23).<br><br>Commencing in 2014, L. Sun sold off equity interests in Sunco and brought in other shareholders. (Am. Compl. ¶ 29). |
| **The defendant continued to be the chairman of the board, substantially controlled the company, and was responsible for all matters related to external sales.** | L. Sun was the President and Chief Executive Officer of Sunco, managing and overseeing all aspects of the business, including order placement and processing, sales, production, operation, shipping, finances, and after sales customer service. (Am. Compl. ¶ 25).<br><br>L. Sun was the President and on the Board of Directors of Sunco and is still on the Board of Directors. (Am. Compl. ¶ 150). |
| **[A]ll of the plaintiff's business was foreign sales and [it] had only one customer.** | Until July 2019, Infinity had been Sunco's sole customer. (Am. Compl. ¶33). |
| **As of April 29, 2019, Infinity Wood Products, LLC owed the plaintiff US $6,712,182.11 for goods.** | Infinity accepted the cabinets and resold the cabinets making a profit estimated to be between $1,675,000 and $3,350,000, or greater, above the $6,712,182.11 contract price. (Am. Compl. ¶ 121).<br><br>Infinity breached the parties' contract by not paying Sunco for the cabinets. (Am. Compl. ¶ 122). |
| **On June 14, 2019, the defendant suddenly disappeared.** | On June 14, 2019, L. Sun left her home in Kunshan, China, abruptly and unannounced, for Massachusetts. To date L. Sun has not returned to Kunshan, China. (Am. Compl. ¶ 58). |
| **The plaintiff demanded payment from Infinity Wood Products, LLC, but the company ignored the request.** | Sunco has demanded payment for the cabinets. (Compl. ¶ 131).<br><br>Infinity … failed to pay for the … cabinets … (Am. Compl. ¶ 44). |

30

| | |
|---|---|
| **The plaintiff learned through inquiry that US Infinity Co. Ltd. was the company of [her] son David Sun.** | L. Sun had not disclosed to the Board of Sunco or the other top managers of Sunco that her son, D. Sun, and her daughter-in-law, S. Sun were the managers and owners of Infinity. (Am. Compl. ¶ 73).<br><br>Other board members only learned of the true natures of the roles that D. Sun and S. Sun played in Infinity after Infinity failed to pay for Sunco's outstanding invoices amounting to $6,712,182.11 in cabinetry and the company slipped into insolvency. (Am. Compl. ¶ 74). |
| **As one of the plaintiff's shareholders and serving as chairman, the defendant used [her] position to conduct related transactions, which resulted in the company being unable to claim the above-mentioned funds.** | L. Sun was the President and on the Board of Directors of Sunco and is still on the Board of Directors. (Am. Compl. ¶ 150).<br><br>L. Sun owed a duty of loyalty to Sunco not to compete or put her own financial interests ahead of the interests of Sunco. (Am. Compl. ¶ 151).<br><br>L. Sun owed a duty of loyalty to Sunco not to place the interests of Infinity or herself ahead of the interests of Sunco or pursue interest adverse to Sunco including competing with Sunco and diverting payments due Sunco for her own benefit. (Am. Compl. ¶ 152).<br><br>L. Sun breached her duty of loyalty by shipping Sunco goods to Infinity, a company she had a personal interest in and/or received a personal benefit from, either directly or indirectly and preventing Infinity from paying for the cabinets. (Am. Compl. ¶ 154). |

31

5081486_1