# Exhibit 3



# Arbitral Award
## Arbitral Award

Shanghai International Economic and Trade Arbitration Commission
(Shanghai International Arbitration Center)

Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)

# Shanghai International Economic and Trade Arbitration Commission
# (Shanghai International Arbitration Center)
# Arbitral Award

Claimant: Jiangsu Qiyi Investment Co., Ltd.

Domicile: Room 1801, Building 666, Changjiang South Road, Kunshan Development Zone, Jiangsu Province, China

Agent: Wu Jinggui  Attorney, Shanghai Hehong Law Firm

Zhao Yi    Attorney, Beijing Longan (Suzhou) Law Firm

First Respondent: Sunco, Inc.

Domicile: 163 Highland Ave # 1052, Needham, Ma 02494, USA

Second Respondent: LINDASUN (Chinese name: Sun Linda; United States of America Passport Number: 577710121)

Contact address: Infinity Wood Products LLC, 35 Eastman Street, South Easton, MA 02375 USA

Joint Agent of the First and Second Respondents: Shao Feng and Gong Jiong, Attorneys of    Jiangsu Hailianhai Law Firm

Third Respondent: Cinke Wood Industry (Kunshan) Co., Ltd.

Domicile: No. 327, Jinshang Road, Jinxi Town, Kunshan City, Jiangsu Province, China

Agent of the Third Respondent: Zhu Xuejiao, Attorney of Shanghai Hansheng (Kunshan) Law Offices

Shanghai

January 19, 2026

# Arbitral Award

(2026) Hu Mao Zhong Cai Zi No. 0007

The Shanghai International Economic and Trade Arbitration Commission (also known as "Shanghai International Arbitration Center", hereinafter referred to as "the Commission" or "SHIAC"), accepted, on December 30, 2021, the arbitration case concerning disputes under the Equity Transfer Agreement dated October 18, 2014 (hereinafter referred to as the "Agreement" or the "October 18 Equity Transfer Agreement"), based on the arbitration clause contained therein. The acceptance was made following the submission of a written arbitration application by the claimant, Jiangsu Qiyi Investment Co., Ltd. (hereinafter referred to as the "Claimant"), naming SUNCO, INC. (hereinafter referred to as the "First Respondent") as the first respondent, LINDA SUN (Chinese name: Sun Linda; passport number of the United States of America: 577710121; hereinafter referred to as the "Second Respondent") as the second respondent, and Cinke Wood Industry (Kunshan) Co., Ltd. (hereinafter referred to as the "Third Respondent"; unless otherwise specified, the First, Second, and Third Respondents are collectively referred to as the "Respondent Party") as the third respondent, and after the Claimant had completed the relevant procedures. This case number is ST2021137.

The arbitration proceedings in this case are governed by the Arbitration Rules of the Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center) (hereinafter referred to as the "Arbitration Rules") which have been in force since January 1, 2015. According to the Arbitration Rules, the place of arbitration in this case is Shanghai, China.

The Secretariat of the Association (hereinafter referred to as the "Secretariat") sent the Notice of Acceptance, Arbitration Rules and Panel of Arbitrators to the Claimant on December 30, 2021, and the Notice of Arbitration, Arbitration Rules, Panel of Arbitrators and the

1

Application for Arbitration and related evidentiary materials submitted by the Claimant to the Respondent on January 4, 2022.

According to Article 22 of the Arbitration Rules, the case was heard by an arbitral tribunal composed of three arbitrators. The Claimant selected Ms. Han Tianlan as the arbitrator; the Respondents failed to jointly select the arbitrator on time, and the Director of the Commission appointed Mr. Huang Feng as the arbitrator for the Respondents in accordance with the Arbitration Rules; in view of the failure of the parties to agree on the selection of the Presiding Arbitrator, the Director of the Commission appointed Mr. Chen Feng as the Presiding Arbitrator of the case in accordance with the Arbitration Rules. After all three arbitrators signed the Statement of Arbitrator, the arbitral tribunal was formed on August 19, 2022 to jointly hear the case. On the same day, the Secretariat sent the "Notice of Tribunal Formation" to all parties and handed over the case file materials to the arbitral tribunal.

The arbitral tribunal, in consultation with the Secretariat, scheduled a hearing on this case for September 23, 2022, and entrusted the Secretariat to send the Notice of Hearing to all parties on August 19, 2022.

On September 23, 2022, the arbitral tribunal convened to hear this case at the location of this Commission. The Claimant and the Third Respondent were represented at the hearing by their agents; the First Respondent and the Second Respondent were unable to attend the hearing after receiving written notice from the Secretariat and did not state their reasons. The arbitral tribunal conducted the hearing in absentia in accordance with the provisions of the Arbitration Rules. During the hearing, the Claimant presented its arbitration claims and the facts and reasons supporting them, and the Third Respondent presented its defense; the Claimant presented evidence, and the Third Respondent conducted cross-examination; thereafter, the representatives of the Claimant and the Third Respondent also answered questions from the arbitral tribunal and presented their arguments. Before the end of the hearing, after consulting the Claimant and the Third Respondent, the arbitral tribunal made arrangements for the post-hearing procedure.

After the first hearing, the Secretariat received the additional evidence submitted by the Claimant and forwarded the above-mentioned materials to the Respondents and the arbitral tribunal. At the same time, the Respondents were requested to issue a written cross-examination. The arbitral tribunal also entrusted the Secretariat to inform the First and Second Respondents of the fact that the case has been heard and to give them the right to apply for another hearing and to submit written information.

On November 28, 2022, the Secretariat received the "Cross-Examination Opinions" submitted by the Third Respondent, and forwarded the aforementioned materials to the other parties and the arbitral tribunal.

After consultation with the Secretariat, the arbitral tribunal scheduled a second hearing for this case at the location of the Commission on March 30, 2023, and entrusted the Secretariat to send the Notice of Second Hearing to all parties on February 16, 2023.

On March 16, 2023, the Secretariat received the Statement of Defense, Cross-Examination Opinion, and evidence submitted by the First Respondent and forwarded the aforementioned materials to the other parties and the arbitral tribunal, while requesting the other parties to provide written cross-examination opinions.

Due to unforeseen circumstances, the arbitral tribunal rescheduled the hearing originally scheduled for March 30, 2023, to April 21, 2023, and entrusted the Secretariat to send the Notice of Rescheduled Hearing to all parties.

On March 28, 2023, the Secretariat received the Objections to Second Hearing submitted by the Claimant and the Third Respondent, respectively, and forwarded the aforementioned materials to the opposing parties and the arbitral tribunal.

3

On April 21, 2023, the arbitral tribunal held a second hearing for this case at the seat of the Commission. The Claimant and the Respondent Party appointed agents to attend the hearing. Prior to the hearing, the Third Respondent submitted a Cross-Examination Opinion, which the Secretariat forwarded to the other parties and the arbitral tribunal. During the hearing, the Claimant presented its arbitration claims and the facts and reasons supporting them, and the Respondent Party presented its defense; the Claimant and the First Respondent presented evidence, and the other opposing parties conducted cross-examination; thereafter, all parties also answered questions from the arbitral tribunal and presented their arguments. Before the conclusion of the hearing, the arbitral tribunal made arrangements for post-hearing procedures after consulting with all parties.

After the second hearing, the Secretariat received the Cross-Examination Opinion and Agency Opinion submitted by the Claimant, the Application for Judicial Expertise, Application for Further Verification of the Original Equity Transfer Agreement, Application for Investigation and Collection of All Case Files of Case ST2019036, and supplementary evidence submitted by the First and Second Respondents, and forwarded the aforementioned materials to the opposing parties and the arbitral tribunal, while requesting the other parties to provide written comments on the applications submitted by the First and Second Respondents and written cross-examination opinions on the supplementary evidence.

On May 11, 2023, the Secretariat received the Written Comments, the Cross-Examination Opinions and the supplementary evidence submitted by the Claimant, and forwarded the aforementioned materials to the Respondents and the arbitral tribunal, and requested the Respondents to issue written cross-examination opinions on the Claimant's supplementary evidence.

On May 15, 2023, the Secretariat received the Cross-Examination Opinion and Written Comments submitted by the Third Respondent and forwarded the aforementioned materials to the other parties and the arbitral tribunal.

4

On May 22, 2023, the Secretariat received the Cross-Examination Opinion submitted by the First and Second Respondents, on May 23 received the Cross-Examination Opinion and supplementary evidence submitted by the Third Respondent, on May 31 received the Cross-Examination Opinion submitted by the Claimant, and on June 5 received the Cross-Examination Opinion submitted by the First and Second Respondents, and forwarded the aforementioned materials to the other parties and the arbitral tribunal.

On June 26, 2023, the Secretariat received the Special Opinion submitted by the First and Second Respondents, on July 3 received the Response Opinion submitted by the Claimant, on July 4 received the Agency Opinion submitted by the Third Respondent, on November 2 received the Expert Argumentation Opinion submitted by the Claimant, on November 9 received the Cross-Examination Opinion submitted by the Third Respondent and supplementary evidence submitted by the Claimant, on November 16 received the Cross-Examination Opinion submitted by the Third Respondent, on November 20 received the Application for Judicial Expertise, Cross-Examination Opinion, and Written Comments on the Expert Argumentation Opinion submitted by the Claimant submitted by the First and Second Respondents, and on November 29 received the Written Comments submitted by the Claimant, and forwarded the aforementioned materials to the opposing parties and the arbitral tribunal.

Regarding the expert evaluation application submitted by the First and Second Respondents, the arbitral tribunal, after deliberation, agreed to it in accordance with Article 39 of the Arbitration Rules and entrusted the Secretariat to notify all parties in writing of the decision on September 24, 2024, while requesting all parties to recommend expert evaluation institutions.

On October 10, 2024, the Secretariat received the Objections to the Arbitral Tribunal's Expert Evaluation Opinion submitted by the Claimant, on November 4 received the Further Objections to the Arbitral Tribunal's Expert Evaluation Opinion submitted by the

Claimant, on November 15 received the Written Comments on the Claimant's Further Objections to the Arbitral Tribunal's Expert Evaluation Opinion submitted by the First and Second Respondents, on November 22 received the Reply Opinion submitted by the Claimant, and forwarded the aforementioned materials to the opposing parties and the arbitral tribunal.

On December 3, 2024, the Secretariat received supplementary evidence submitted by the Claimant and forwarded the aforementioned materials to the Respondent Party and the arbitral tribunal, while requesting the Respondent Party to provide written cross-examination opinions.

On December 4, 2024, the Secretariat received the Application for Investigation and Collection of Evidence submitted by the First and Second Respondents and forwarded the aforementioned materials to the other parties and the arbitral tribunal, while requesting the other parties to provide written comments.

The Secretariat received the Claimant's Written Comments and the Third Respondent's Cross-Examination Opinions and Written Comments on December 10, 2024, and forwarded the aforementioned materials to the other parties and the arbitral tribunal.

Regarding the First and Second Respondents' applications for investigation and evidence collection, the arbitral tribunal granted approval in accordance with the provisions of the Arbitration Rules and sent a Letter of Request for Investigation and Evidence Collection to the Kunshan People's Court in Jiangsu Province on December 25, 2024, while also informing all parties in writing of the aforementioned decision.

The Secretariat received the Reply Letter from the Kunshan People's Court in Jiangsu Province on December 27, 2024, and forwarded the aforementioned materials to all parties and the arbitral tribunal.

Given that the parties failed to reach a consensus on the expert evaluation institution within the time limit specified by the arbitral tribunal, the arbitral tribunal appointed the Academy of Forensic Science (hereinafter referred to as the "Institute" or the "Expert Evaluation Institution") as the expert evaluation institution for this case and entrusted the Secretariat to forward the aforementioned decision, along with the Institute's qualification certificate materials, to all parties.

The Secretariat received the Claimant's Objections to the Re-balloting Procedure for Selecting the Expert Evaluation Institution on January 13, 2025, the Claimant's Objections on January 20, 2025, and the Respondent Party's Written Comments on January 23, 2025, and forwarded the aforementioned materials to the opposing parties and the arbitral tribunal.

Regarding the Claimant's objections, the arbitral tribunal entrusted the Secretariat to provide a written response to all parties on February 12, 2025: The arbitral tribunal's approval of the First and Second Respondents' application for expert evaluation complies with the provisions of the Arbitration Rules; the Secretariat, entrusted by the arbitral tribunal, conducted the procedure for selecting/determining the expert evaluation institution, and ultimately confirming the Academy of Forensic Science as the expert evaluation institution for this case was appropriate.

The arbitral tribunal entrusted the presiding arbitrator to schedule an expert evaluation hearing at the location of the Commission on March 28, 2025, and the Secretariat sent a Notice of Hearing to all parties and the expert evaluation institution on February 14, 2025.

On March 28, 2025, the presiding arbitrator held the hearing at the location of the Commission. The representatives of the Claimant, the First, Second, and Third Respondents, as well as staff from the expert evaluation institution, attended the hearing. Prior to the hearing, the Third Respondent submitted an Application for Expert Evaluation, which the Secretariat forwarded to the opposing parties and the arbitral tribunal. During the hearing, the Claimant and the Respondent Party raised no objections to the qualifications of the expert evaluation institution; regarding the Third Respondent's application for expert evaluation, all parties agreed to entrust the Institute with the expert evaluation together; the First, Second, and Third Respondents stated the matters and reasons for their application for expert evaluation, and the opposing parties expressed their opinions; the Claimant submitted the original copy of the disputed Equity Transfer Agreement; all parties

determined the matters for expert evaluation, as well as the evaluation materials and samples; the expert evaluators answered questions from all parties and the presiding arbitrator.

The Secretariat received the Claimant's Reply Opinions on April 1, 2025, and forwarded the aforementioned materials to the Respondent Party and the arbitral tribunal.

The Secretariat received the Forensic Appraisal Report issued by the Academy of Forensic Science on July 16, 2025, and forwarded the aforementioned materials to all parties and the arbitral tribunal, while also requesting all parties to provide written comments.

The arbitral tribunal, in consultation with the Secretariat, scheduled the third oral hearing of this case at the location of the Commission on July 23, 2025, and entrusted the Secretariat to send a Notice of Re-hearing to all parties on July 16, 2025.

On July 23, 2025, the arbitral tribunal held the third oral hearing of this case at the location of the Commission. Both the Claimant and the Respondent Party appointed representatives to attend the hearing. Prior to the hearing, the Claimant submitted supplementary evidence, and the First and Second Respondents submitted Written Comments on the Forensic Appraisal Report, which the Secretariat forwarded to the opposing parties and the arbitral tribunal. During the hearing, all parties expressed their opinions on the Forensic Appraisal Report, and the expert evaluators accepted inquiries from all parties and the arbitral tribunal; the Claimant presented its supplementary evidence, and the Respondent Party expressed its cross-examination opinions; all parties presented supplementary debate opinions, answered questions from the arbitral tribunal, and made their final statements. Before the conclusion of the hearing, after soliciting opinions from all parties, the arbitral tribunal made arrangements for the post-hearing procedures.

After the third hearing, the Secretariat received the Claimant's Reply Opinions and Agency Opinions, the First and Second Respondents' Situation Explanations and Opinions, Annexes, Agency Statements, and the Third Respondent's Reply Opinions and Agency Statements, and forwarded the aforementioned materials to the other parties and the arbitral tribunal.

Upon application by the arbitral tribunal, the Secretary-General of the Commission granted an extension of the award period for this case to January 19, 2026, in accordance with the provisions of the Arbitration Rules.

All legal documents, notices, and materials related to this case have been served on the parties and the arbitral tribunal by the Secretariat in accordance with Article 61 of the Arbitration Rules.

This case is now concluded. The arbitral tribunal has made an award based on the written materials submitted by the parties and the facts ascertained during the hearing, in accordance with the parties' agreement and legal provisions. The facts of the case, the analysis and findings of the arbitral tribunal, and the award are set forth as follows:

## I. THE FACTS OF THE CASE
### (I) The Claimant's Arbitration Request and Facts and Reasons

The Claimant filed an arbitration claim stating:

On October 18, 2014, the Claimant entered into the Equity Transfer Agreement in question with the First, Second, and Third Respondents, agreeing that the First and Second Respondents would transfer 52% of their equity in the Third Respondent to the Claimant. Article 3.11 stipulated that the First and Second Respondents should ensure that the Third Respondent's cumulative accounts receivable from the U.S. company should not exceed RMB20,000,000 and should be fully recovered by the end of 2019. However, in reality, the First and Second Respondents' accounts receivable from U.S. customers never fell below RMB20,000,000 and were not fully recovered by the end of 2019. As of December 31, 2019, the U.S. company owed the Third Respondent a payment of up to RMB46,730,580.43, which remains unrecoverable to this day.

In accordance with Article 2.1 of the Agreement, all taxes and fees incurred during the equity transfer process should be borne equally by the Claimant and the First and Second Respondents, each bearing 50%. According to Article 3.11 of the Agreement, 48% of the equity of the First and Second Respondents should belong to the Claimant. Additionally, according to Article 4.3 of the Agreement, the First and Second Respondents should also be liable for breach of contract. According to Article 6.1 of the Agreement, the Third Respondent should assume joint and several liability as a guarantor.

Accordingly, the Claimant filed the following arbitration claim:

1. 48% of the equity of the First Respondent in the Third Respondent is owned by the Claimant;

2. The First and Third Respondents shall perform the change registration procedures and transfer 48% of the shares of the First Respondent in the Third Respondent to the Claimant;

3. The First and Second Respondents shall pay liquidated damages of USD 2,160,000 (equivalent to RMB13,769,568, converted based on the exchange rate of USD to RMB6.3748 on December 20, 2021);

4. The First and Second Respondents shall pay RMB69,959.60 in the course of the transfer of the Claimant's equity;

5. The First and Second Respondents shall pay the Claimant's attorney's fee of RMB400,000;

6. The Third Respondent shall bear the guarantee liability for Items 3, 4 and 5 of the arbitration claim;

7. The First, Second and Third Respondents shall bear the arbitration fee, preservation fee, insurance guarantee fee and other expenses incurred in this case.

10

**(II) The Respondent Party's Defense Opinions**

The First and Second Respondents defended as follows:

1. The Claimant's arbitration claims are entirely without factual basis and should be completely denied in accordance with the law.

(1) The basic evidence relied upon by the Claimant for its arbitration claims, namely the Equity Transfer Agreement dated October 18, 2014, was forged by the Claimant.

Firstly, the First Respondent has never signed the "Equity Transfer Agreement" in question, nor has it authorized anyone, including the Second Respondent, to sign it.

Secondly, the "Equity Transfer Agreement" in question is clearly a forgery. The content of this "Equity Transfer Agreement" is identical to that of pages 1, 2, 4, 5, and 6 of the "Equity Transfer Agreement" genuinely signed by all parties on September 8, 2014, but only page 4 bears the signature of the second respondent. Only page 3 has been altered, with the main changes being to Article 3.11 and Article 5. The added content in Article 3.11 pertains to outstanding receivables, while Article 5 has been arbitrarily reduced in content. The ultimate goal was to ensure that the last line of page 3 of the "Equity Transfer Agreement" remained unchanged, making the content of page 4, signed by Sun Linda, identical to that of the "Equity Transfer Agreement" dated September 8, 2014 (hereinafter referred to as the "0908 Equity Transfer Agreement"). The Second Respondent believes that this "Equity Transfer Agreement" is a forged piece of evidence meticulously crafted by the Claimant and its controller, Wu Guoqing. It was created by either printing content on a blank page signed by the Second Respondent and then adding pages 1, 2, 3, 5, and 6, or by altering page 3 and integrating it with multiple copies of the "0908 Equity Transfer Agreement" signed by the second respondent that were in the Claimant's possession.

11

Furthermore, in the arbitration case initiated by the First Respondent against the Claimant in March 2019, which has now become effective [(2021) Hu Mao Zhong Cai Zi No. 0349, hereinafter referred to as the "349 Award"], neither party involved in the equity transfer raised the existence of this "Equity Transfer Agreement," which is clearly contrary to common sense. Article 6.8 of this "Equity Transfer Agreement" also includes an exclusive clause. If both parties had genuinely signed this "Equity Transfer Agreement", then the "0908 Equity Transfer Agreement," which served as the basis for the 349 Award, would have been a document whose validity had been excluded.

Lastly, on November 30, 2020, the first respondent filed a company dissolution lawsuit against the third respondent with the Jiangsu Suzhou Intermediate People's Court (hereinafter referred to as the "Suzhou Intermediate Court") [Case No.: (2020) Su 05 Min Chu No. 1634], with the Claimant as the third party. The first-instance judgment was rendered on November 29, 2021. During the litigation process, the Third Respondent presented the "Equity Transfer Agreement" signed by both parties on September 8, 2014, as evidence.

(2) The signing of the "Equity Transfer Agreement" dated October 18, 2014, is contrary to common sense and lacks the reliability and completeness of evidence.

Firstly, the "Equity Transfer Agreement" signed on September 8, 2014, which was actually implemented by both parties, is a rigorous and complete document. On the first three pages of the main text of the Equity Transfer Agreement, both the Second Respondent and Wu Guoqing have signed and dated the document. On the fourth page, in the section designated for Party A, the Second Respondent has signed and dated it, while also writing the name of the First Respondent (the

12

Claimant) there. In the section for Party B on the fourth page, the Claimant has affixed its official seal, and Wu Guoqing has signed and dated it in the area where the Claimant's seal is placed. On the fourth page, in the section for Party C, the target company (the Third Respondent) has affixed its official seal. The Claimant and the Third Respondent affixed their seals across the seams of all pages of the document. This demonstrates that both parties were extremely rigorous when signing the "Equity Transfer Agreement", which involved a transaction worth tens of millions of yuan. In contrast, the first three pages of the main text of the "Equity Transfer Agreement" dated October 18, 2014, bear no signatures whatsoever. The signatures and seals of all three parties (Party A, Party B, and Party C) on page 4 are placed in blank spaces. Additionally, the name of the First Respondent is missing under Party A, the Claimant's seal is missing under Party B, and the Second Respondent's signature is missing under Party C. This is highly unusual and forms a stark contrast with the "Equity Transfer Agreement" signed on September 8, 2014.

Secondly, the equity transfer consideration under the "Equity Transfer Agreement" signed on September 8, 2014, was RMB20 million. Both parties were extremely rigorous when signing it. The provisions of Article 3.11 of the "Equity Transfer Agreement" dated October 18, 2014, are equivalent to potentially relinquishing 48% of the equity. Even according to the attached balance sheet, the value of the 48% equity held by the First Respondent in the Third Respondent amounts to over RMB40 million, with the actual value far exceeding this amount. It is completely contrary to common sense for such an important agreement to be signed so hastily.

Thirdly, from the perspective of evidence reliability and completeness, the "Equity Transfer Agreement" dated October 18, 2014, lacks evidence reliability and completeness. Pages 1, 2, 3, 5, and 6 of this "Equity Transfer Agreement" can be arbitrarily altered by the Claimant unilaterally.

13

(3) After signing the "Equity Transfer Agreement" with the Claimant on September 8, 2014, the First Respondent duly fulfilled its contractual obligations. The shareholders of the Third Respondent were changed to the Claimant and the First Respondent, with Wu Guoqing becoming the legal representative and general manager, and the directors being changed to Wu Guoqing, Xiao Qiong, and the Second Respondent. Wu Guoqing and Xiao Qiong were appointed by the Claimant. The application for these changes, signed by Wu Guoqing, was submitted on September 18, 2014. This also confirms that the genuine "Equity Transfer Agreement" was signed on September 8, 2014. Subsequently, the Third Respondent was actually controlled by the Claimant and Wu Guoqing. According to the company's articles of association, the First Respondent no longer had any control over the company's decision-making or daily operations. It is impossible for the First Respondent to have signed clauses, such as Article 3.11, which it had no control over.

(4) Both the "Equity Transfer Agreement" dated September 8, 2014, and the "Equity Transfer Agreement" dated October 18, 2014, stipulate in Article 3.7 that "Party A guarantees that, until the completion of the industrial and commercial registration changes for the equity transfer, the existing receivables of Senke Wood Industry shall be enjoyed by Party A, and the existing debts shall be borne by Party A." Combined with the attached balance sheet, this actually means that the receivables of over RMB18 million owed by the Third Respondent to a U.S. company are enjoyed by the First Respondent, while the other payables of over RMB18 million owed by the Third Respondent to the Second Respondent are borne by the First Respondent. This clause shows that the Claimant actually purchased 52% of the equity in the third respondent, which had no debts and only real estate, corresponding to Article 1.1. Under these circumstances, it is logical for both parties to stipulate in Article 3.11 of the "Equity Transfer Agreement" dated September 8, 2014, that "Party A shall ensure that, within three years, the orders from U.S. Sunco, Inc. shall be produced by Senke Wood Industry, and the average annual..." This reflects the Claimant's legitimate desire to maintain the Third Respondent's business after acquiring its equity. In contrast, Article 3.11 of the "Equity Transfer Agreement" dated October 18, 2014, is completely illogical and contradicts Article 3.7. After stipulating in Article 3.7 that the receivables shall be enjoyed by Party A, it is illogical to then require Party A to ensure that the receivables are controlled

14

within RMB20 million. Furthermore, stipulating receivables for the end of 2019 and claiming interest from 2020 in an agreement signed in 2014 is completely detached from reality. It is evident that Article 3.11 of the "Equity Transfer Agreement" dated October 18, 2014, was maliciously altered by the Claimant.

2. The Claimant's arbitration claims lack any legal basis and should be entirely dismissed.

(1) Both the 349 Award and the " (2020) Su 05 Min Chu No. 1634" Civil Judgment have ruled that the First Respondent holds 48% of the equity in the third respondent, which is also reflected in the industrial and commercial registration of the Third Respondent.

(2) The Second Respondent is not a shareholder of the Third Respondent, nor was the Second Respondent the person in charge of the First Respondent when the "Equity Transfer Agreement" was signed. The Second Respondent was a director of the Third Respondent appointed by the First Respondent. Since 2011, the person in charge of the First Respondent has been Sun Fujun.

(3) The Second Respondent has no authority to sign any documents on behalf of the First Respondent disposing of the First Respondent's equity in the Third Respondent. The "Equity Transfer Agreement" signed on September 8, 2014, is the only document that has been confirmed by Sun Fujun, the person in charge of the First Respondent, to be effective for the First Respondent. It is also the only valid document confirmed by the First Respondent. The Claimant was

15

aware that Sun Fujun was the person in charge of the First Respondent and, after the "Equity Transfer Agreement" dated September 8, 2014, was signed, Sun Fujun signed it again on January 11, 2015.

(4) The First Respondent has fulfilled all its obligations under the "Equity Transfer Agreement" signed on September 8, 2014. The Claimant has not yet paid the RMB3 million it owes under the 349 Award, and the First Respondent has applied for enforcement.

In summary, the basic evidence relied upon by the Claimant for all its arbitration claims is forged and has no legal effect on the First Respondent. The Claimant's arbitration claims lack factual and legal basis.

The Third Respondent made the following oral defense:

The Third Respondent acknowledges the facts stated by the Claimant regarding the equity transfer and guarantee. There are now continuous disputes among the shareholders. The First Respondent has previously requested the dissolution of the Third Respondent at the Suzhou Intermediate Court, and the Second Respondent does not participate in board meetings. If the arbitration tribunal supports the Claimant's arbitration claims, the Third Respondent is willing to cooperate in handling the industrial and commercial registration changes.

**(III) The Claimant's agent submitted the following main proxy opinions after court hearing**

1. From the perspective of the formation background and signing process of the "Equity Transfer Agreement" dated October 18, 2014, this agreement represents the true intentions of both parties.

(1) The "Equity Transfer Agreement" dated October 18, 2014, reflects the true intentions of both parties. Its signing had a specific background and was the result of further negotiations and amendments/supplements to the two previous "Equity Transfer Agreements".

16

(2) The signing process of the three "Equity Transfer Agreements" (dated July 6, 2014, September 8, 2014, and October 18, 2014).

① On July 6, 2014, the Second Respondent (Party A) and Wu Guoqing (Party B) signed the first "Equity Transfer Agreement". Wu Guoqing duly paid the initial equity transfer consideration of RMB3 million as stipulated. However, since the Third Respondent was a foreign-invested enterprise, according to Article 1 of the then "Law of the People's Republic of China on Chinese-Foreign Equity Joint Ventures" (hereinafter referred to as the "Chinese-Foreign Equity Joint Venture Law"), Chinese natural persons could not be shareholders of foreign-invested enterprises. To facilitate the equity transfer, Wu Guoqing registered and established the Claimant on August 29, 2014.

② On September 8, 2014, the First Respondent, the Second Respondent (Party A), and the Claimant (Party B) signed the second "Equity Transfer Agreement," whose content was identical to the previous one except for the parties involved. Subsequently, on September 18, 2014, the Third Respondent submitted an application for project change approval (equity transfer, directors, legal representative) to the Jinxi Town Ecological Industrial Zone in Jiangsu Province, Suzhou. However, the application process stalled after an on-site inspection by the ecological industrial zone on October 8, 2014. The inability to proceed smoothly with the approval process affected the mindset of both parties to the contract.

③ The main reasons for the inability to proceed with the industrial and commercial registration of the equity transfer were as follows: On August 2, 2014, a particularly serious aluminum dust explosion accident occurred in the polishing workshop No. 2 of Kunshan Zhongrong Metal Products Co., Ltd., resulting in over 200 casualties and huge economic losses, and attracting national attention. The accident led the Kunshan municipal government to devote all its resources to medical treatment, reception and comfort of the victims' families, aftermath compensation, and enterprise safety production inspections. Starting from September 2014, various departments, including safety, environmental protection, and fire protection, launched a city-wide safety production inspection of enterprises

17

involved in dust, with layered inspections and escalating measures that lasted for months. The Third Respondent, whose production process involved dust, received special attention from government supervision. Conducting an equity transfer for such an enterprise involved in dust at that time, especially since the equity transfer was not between internal shareholders and the transferee was not from the same industry, and would result in a change of the majority shareholder, led the government to refuse approval out of a desire to maintain stability under the objective circumstances. Consequently, the industrial and commercial registration of the equity transfer was indefinitely delayed.

④ After signing the second "Equity Transfer Agreement" on September 8, 2014, and being unable to proceed with the equity transfer, both parties engaged in further negotiations. From the Second Respondent's perspective, it hoped to continue to have operational control over the Third Respondent and maintain overall company operations. Subsequently, the Second Respondent continued to control the Third Respondent until July 24, 2019, when it signed a power of attorney to Xiao Ruihua and Xiao Qiong. It should also be emphasized that, until the Second Respondent left on June 14, 2019, all payment vouchers of the Third Respondent were signed and approved by the Second Respondent, and the Third Respondent's procurement, production, shipping, and finances were all controlled by the Second Respondent.

From the Claimant's perspective, it had already paid RMB3 million in equity transfer consideration and had a contractual debt of RMB17 million remaining. However, it was unable to obtain registration for 52% of the equity and could only become a hidden shareholder. Furthermore, the Second Respondent had requested to retain control over the company's operations. Therefore, the Claimant

18

requested that Article 3.11 of the agreement be amended to include the following two clearer conditions: First, the current receivables must not increase and must be recovered within five years; second, the company must not be depleted, meaning its net assets must not decrease for at least five years. If either of these two conditions was met, the Second Respondent should transfer the remaining 48% of the equity to the Claimant. This amendment was a consensus reached by both parties based on the objective circumstances and good faith negotiations at that time.

⑤ Therefore, after the project change approval process stalled at the on-site inspection by the ecological industrial zone on October 8, 2014, and could not proceed further, the Second Respondent and Wu Guoqing, representing both parties, quickly formulated the aforementioned negotiation content. The industrial and commercial registration changes for the Third Respondent were not completed until April 28, 2015.

2. From the perspective of the "Forensic Appraisal Report" issued by the Academy of Forensic Science, the "Equity Transfer Agreement" dated October 18, 2014, is genuine and objectively exists.

① The Second Respondent in this case has long been operating the Third Respondent and is a businessman with extensive business experience. It is impossible for the Second Respondent to be unaware of the consequences of signing an agreement. As a person with full civil capacity, the Second Respondent should bear the consequences of signing the agreement. Moreover, this agreement is not a blank agreement but one with clear rights and obligations formulated after negotiations between both parties. Article 6.7 of the Agreement states, "This agreement is made in triplicate, with each party (Party A, Party

19

B, and Party C) holding one copy." The Second Respondent should have kept a copy of the Agreement. If the First and Second Respondents believe that the Claimant forged the agreement, they can simply produce their own copies of the agreement to prove it. However, the First and Second Respondents have consistently failed to produce their own copies of the equity transfer agreement in this case.

②  On March 28, 2025, the Second Respondent personally traveled all the way to China to appear in court and wrote samples of the handwriting "Sun Linda". The Forensic Appraisal Report has confirmed that the signature of the second respondent in the Equity Transfer Agreement dated October 18, 2014, is indeed its own. Moreover, the Second Respondent also attached the date "Second respondent 10/18/14" next to its signature. This fully demonstrates that the "Equity Transfer Agreement" dated October 18, 2014, genuinely exists. The Second Respondent simply refuses to produce its own copy of the equity transfer agreement in an attempt to persuade the arbitration tribunal to reject the Claimant's agreement, with the purpose of avoiding bearing the consequences of signing the agreement.

③  The Forensic Appraisal Report has confirmed that the Equity Transfer Agreement dated October 18, 2014, genuinely and objectively exists.

Appraisal Opinion 1 holds that: The signature at the end of page 4 of the agreement in question was written by "Sun Linda" herself. This shows that the Second Respondent's previous repeated denials of this signature were false statements, attempting to mislead the identification institution and the arbitration tribunal, resulting in a waste of a significant amount of judicial resources. The Second Respondent should bear the adverse consequences for this.

Appraisal Opinion 2 holds that: The paging seal on the agreement in question was formed by a single stamp impression; Appraisal Opinion 5 states that: The paging seal on the agreement in question was formed by a single stamp impression. This fully indicates that the six-page contract text of the agreement in question was formed first, followed by the stamping, which is consistent with the logic of signing a commercial contract.

Based on Appraisal Opinion 2, which states that the paging seal was formed by a single stamp impression, Appraisal Opinion 3 further points out that no signs of non-simultaneous stamping were found in the seal impressions at the end of the "Equity Transfer Agreement" and on the right side of the paging seal. Furthermore, during the court session on July 23, 2025, the appraisal personnel replied that: "These two seal impressions exhibit characteristics of the same stage and have synchronicity characteristics. Otherwise, the appraisal conclusion would have been unable to determine." This once again proves that the seal impressions at the end of the contract and the paging seal were formed simultaneously. This further demonstrates that both parties negotiated the text of the agreement in question before stamping it, and the agreement in question is complete, coherent, and identical.

Meanwhile, during the court hearing on July 23, 2025, the Claimant supplemented and submitted evidence in the form of a lawyer's letter dated June 25, 2019, issued by Shanghai Wenxue Law Firm to the Claimant, which was acknowledged by both parties involved in the case. This evidence demonstrates that the Claimant did not hold the official seal when the agreement in question was signed. This fact further indicates that the respondent's allegation that "the Claimant actually controlled the company's seal and that affixing the paging seal was a means employed by the Claimant to forge evidence" is purely baseless slander.

Appraisal Opinion 4 confirms that the printing characteristics of the printed text on pages 1 to 6 of the exhibit a high value of matching points, and the sum of these characteristics reflects that the six pages of the agreement in question were printed and formed by the same equipment. Appraisal opinion provides a detailed discussion on page 7, from which the authenticity, integrity, and identity of the agreement in question can be clearly seen.

First, the paper is the same: Page 7 of the Forensic Appraisal Report states that "the color, background pattern, and video spectral characteristics of the paper on pages 1 to 6 of the exhibit are consistent". This indicates that the paper used in the agreement dated October 18, 2014, is identical. Secondly, page 7 of the Forensic

Appraisal Report also describes that pages 1 to 4 of the exhibit constitute the main text with a vertical layout, while pages 5 and 6 are appendices, with page 5 featuring a horizontal layout (balance sheet) and page 6 featuring a vertical layout (income statement). The headers and the left and right margins, line spacing, and fonts in corresponding positions of the main text (pages 1 to 4) match.

Thirdly, the examination also revealed that the line quality, printing defects, and periodic traces, among other printing characteristics, of the printed text on pages 1 to 6 of the exhibit match.

Finally, page 7 of the Forensic Appraisal Report further describes: The ink color and Raman spectra of the black ink dots in the printed text on pages 1 to 6 of the exhibit are consistent, and the types of ink materials for the black ink dots are the same.

⑥ Regarding Appraisal Opinions 5 and 6, they have conclusively proven that the printing of the agreement in question preceded the affixing of seals and that the agreement was bound in one go.

⑦ The second sentence of Appraisal Opinion 4 points out that there are differences in the printing modes between the first three pages and the last three pages of the agreement in question. However, this difference does not affect the authenticity, integrity, or identity of the agreement.

Based on the detailed description of the forensic process and analysis in the Forensic Appraisal Report, it can be clearly understood that the agreement in question was printed using the same equipment, on paper of the same material, and with the same type of ink material for the black ink dots. Furthermore, the final seal and the paging seal were formed simultaneously and bound in one go. Page 7 of the Forensic Appraisal Report also explicitly states that "the printing characteristics of the printed text on pages 1 to 6 of the exhibit a high value of matching points", among other forensic findings, all pointing towards the authenticity, integrity, and identity of the agreement in question. Simple differences in printing modes do not affect the authenticity, integrity, or identity of the agreement in question.

The agreement was formed during the process of negotiation and modification, which is a common occurrence in commercial contract negotiations. The Claimant is also unclear about the specific reasons for the two printing modes. The existence of two printing modes printed by the same equipment precisely indicates that the Claimant did not do so intentionally or deliberately.

In summary, the appraisal opinion explicitly state that the signature "Sun Linda" on page 4 of the agreement in question at the place for signatures is indeed her own signature, that the impression of the seal on the right paging is complete and formed in one go, and that no signs of non-simultaneous sealing at the place for signatures and on the right paging of the agreement in question have been found. The printed text precedes the affixing of seals. In addition, the Forensic Appraisal Report further points out that the six pages of the agreement in question were all printed and formed by the same equipment, with identical paper. The color, background pattern, and video spectral characteristics of the paper on pages 1 to 6 of the exhibit are consistent. The headers and the left and right margins, line spacing, and fonts in corresponding positions of the main text (pages 1 to 4) match. The line quality, printing defects, and periodic traces, among other printing characteristics, of the printed text on pages 1 to 6 of the exhibit match. The ink color and Raman spectra of the black ink dots in the printed text on pages 1 to 6 of the exhibit are consistent, and the types of ink materials for the black ink dots are the same. The "printing characteristics of the printed text on the six pages of the exhibit a high value of matching points". All these forensic findings fully prove the authenticity, integrity, and identity of the agreement in question.

3. The Claimant's arbitration claims are supported by facts, contracts, and legal grounds and should be upheld.

(1) The Claimant has filed this arbitration claim entirely out of the original intention of safeguarding the interests of the third respondent and its own legitimate rights and interests. The Second Respondent and his family in the United States, through Infinity Wood Products, LLC

23

(hereinafter referred to as "Infinity Wood" or collectively as "Infinity Wood"), have deliberately defaulted on payments owed to the third respondent. As of June 2019, the cumulative amount of overdue payments has reached US$6,712,182.11, equivalent to over RMB48 million. They have deliberately siphoned off funds from the Third Respondent's factory in China and subsequently abandoned it.

This act has not only harmed the interests of Chinese enterprises but also infringed upon national interests, drawing continuous attention and queries from tax and audit authorities each year. The Second Respondent suddenly left the Third Respondent on June 14, 2019, and has not returned since. Subsequently, he entrusted lawyers to continuously initiate a series of lawsuits against the Claimant and the Third Respondent, attempting to dissolve the third respondent. His main objective is to swiftly siphon off the Third Respondent's funds, attempt to appropriate them for himself, ensure personal gains, and promptly withdraw from China, disregarding the numerous employee compensation and supplier payments owed, thereby significantly harming the interests of partners.

(2) The net assets of the Third Respondent have been decreasing year by year since August 2014, in violation of Article 3.11 of the Equity Transfer Agreement signed by both parties. As a shareholder of the Third Respondent, the Claimant's interests have been significantly infringed upon and should be legally protected according to the agreement. Since 2021, affected by the epidemic, tariffs, lawsuits, and other factors, the Third Respondent has incurred expanding losses and decreasing net assets.

(3) The Third Respondent urgently needs to streamline its equity structure. In accordance with the Equity Transfer Agreement dated October 18, 2014, the First and Second Respondents should be held liable for breach of contract and, in accordance with the agreement, transfer 48% of the equity to the Claimant. After the Second Respondent left, the Third Respondent faced compensation payments of RMB3,557,100 to over 100 employees, outstanding wages of

RMB1,610,000, accounts payable of RMB3,869,000, payable taxes of RMB1,790,000, payable expenses for the disposal of environmental hazardous wastes of RMB1,177,760 (paint residue and gun washing water produced before June 2019 but not disposed of), construction in progress, etc. Additionally, there were long-term deferred expenses of RMB6,830,000, outstanding loans of RMB16,250,000, and unpaid interest of over RMB2 million. The disputes with the Second Respondent over the years have subjected the third respondent to numerous difficulties, severely affecting its development. Considering the further survival and development of the Third Respondent, there is an urgent need to streamline its equity structure.

Commercial contracts are the result of business judgments and meticulous business calculations by businessmen. As long as the agreements of businessmen do not violate the peremptory provisions of laws and administrative regulations or public order and good morals, the agreements of businessmen should be recognized to protect their trust and expectations in engaging in transaction activities. Commercial arbitration should acknowledge and support the trust and expectations of businessmen at the time of contracting and strictly adhere to contractual agreements. The Claimant's arbitration claim for the respondents to fulfill their equity transfer obligations, pay penalties, and other expenses is supported by contractual and legal grounds, ample evidence, and possesses substantial reasonableness. The arbitration tribunal should uphold all of the Claimant's arbitration claims in accordance with the agreement.

**(IV) The main proxy opinions submitted by the agent of the Respondent after the court hearing**

The main arguments submitted by the agents of the First and Second Respondents after the hearing are as follows:

1. The Equity Transfer Agreement dated October 18, 2014, lacks the authenticity and legality required for conclusive evidence and should be deemed illegal evidence and not admitted.

(1) Rules for the review and determination of evidence

Although arbitration and litigation are different remedies for resolving civil disputes, both should review evidence based on

relevance, authenticity, and legality. The agents of the First and Second Respondents believe that the arbitration tribunal may refer to and apply the relevant provisions of the "Several Provisions on Civil Litigation Evidence" to review and determine the evidence in this case. Accordingly, the arbitration tribunal may comprehensively and objectively review and determine the "October 18, 2014, Transfer Agreement" using logical reasoning and daily life experience, combined with other specific circumstances of this case.

2. The conclusions and test results of the forensic opinions indicate a lack of integrity and consistency in the agreement.

(1) Although the fourth appraisal opinion confirms that "the printed text on the six pages of the Equity Transfer Agreement exhibit was printed and formed by the same equipment", it explicitly determines that "the printed text on pages 1 to 3 was not printed continuously in one go with the printed text on pages 4 to 6." The agents of the first and second respondents believe that for a normal equity transfer agreement, being "printed continuously in one go" is a basic requirement and conforms to normal logic and daily life experience. The forensic conclusion that it was "not printed continuously in one go" fully proves that the formation process of the agreement does not conform to normal logic and daily life experience.

(2) The printed text identification test "further found that the printed text on pages 1 to 3 of the exhibit consists of black, cyan, and red ink dots, while the printed text on pages 4 to 6 consists of black monochromatic ink dots," meaning that pages 1 to 3 were printed in color mode, while pages 4 to 6 were printed in black-and-white mode. For a normal equity transfer agreement, being printed in the same mode is also a basic norm. For a mere six-page agreement text, the fact that the first three pages and the last three pages are not even printed in the same mode indicates a degree of violation of normal logic and daily life experience that far exceeds common imagination.

Based on the fourth appraisal opinion and the printed text handwriting test conclusions, it is sufficient to determine that the "October 18, 2014, Transfer Agreement" violates normal logic and daily life experience and has obvious integrity and consistency flaws. The agreement clearly lacks the elements of evidence authenticity and legality.

3. Combining other relevant facts in this case,

it can be further determined that the agreement constitutes illegal evidence. In view of the opinions and test results of the documentary forensic identification indicating integrity and consistency flaws in the agreement, the arbitration tribunal may further determine that the evidence constitutes illegal evidence by combining it with other facts in this case:

(1) Inconsistency with the signing mode of previous agreement texts by the first and second respondents

There have been three agreement texts regarding the equity transfer relationship in this case, namely, those dated July 6, 2014, September 8, 2014, and October 18, 2014. The first two agreement texts clearly show that the First and Second Respondents signed on each page of the main text of the agreements, whereas the "October 18 agreement" was only signed on page 4, completely deviating from the signing mode of the previous two agreement texts by the First and Second Respondents.

(2) Inconsistency with the signing mode of previous agreement texts by the Claimant

Comparing the three agreement texts dated July 6, 2014, September 8, 2014, and October 18, 2014, the Claimant also signed on each page of the main text in the first two agreements, whereas the "October 18 Transfer Agreement" was only signed on page 4, inconsistent with the signing mode of the Claimant in the previous two transfer agreements.

(3) Extremely unreasonable from the perspective of the value of rights and interests involved in the changes to agreement terms

Article 3.11 on page 3 of the Equity Transfer Agreement signed on October 18, 2014: "Party A voluntarily waives its 48% equity in Party C, which shall be owned by Party B." The aforementioned clause represents a significant change to the rights and obligations in the Equity Transfer Agreement signed on September 8, 2014. Both parties are incumbent shareholders of the target company and should be fully aware of the value of the 48% equity in the target company (involving tens of millions). Once the aforementioned clause takes effect, the first and second respondents may lose substantial property rights and interests, while the Claimant will gain substantial property rights and interests. Both parties with normal cognitive abilities are fully aware of the severe legal consequences of this clause. It is extremely unreasonable for both parties to suddenly change the mode of signing on each page of the main text of the agreement text.

(4) From the perspective of the rigor of the signing mode in the previous two transfer agreements

In both the Equity Transfer Agreement dated July 6, 2014 (hereinafter referred to as the "July 6 Equity Transfer Agreement") and the Equity Transfer Agreement dated September 8, 2014, both parties not only signed on each page of the main text of the agreements but also signed the dates. The aforementioned signing mode fully demonstrates the rigorous attitude of both parties towards signing agreement texts. The three agreements are only 90 days apart. Comparing the July 6, 2014, Equity Transfer Agreement with the September 8, 2014, Equity Transfer Agreement, only the contract entities were adjusted, but the main content of the contracts remained unchanged. Even so, "Wu Guoqing" and "Sun Linda" signed their names and dates on each page of the main text of the agreements. However, the "October 18 Transfer Agreement," which involves significant changes to the rights and obligations of both parties, suddenly changes the rigorous attitude of both parties towards signing agreement texts, which is extremely unreasonable.

(5) The impact of the target company's act of affixing a paging seal on evidence determination

① Although the target company affixed a paging seal, it cannot change the objective fact that the first three pages and the last three pages of the agreement were not printed continuously in one go, i.e., it cannot change the objective fact that the agreement text lacks integrity and consistency.

②  Due to the limited amount of comparison exhibits, the identification agency cannot determine the formation time of the printed text, the formation time sequence between the signature and date handwriting at the place for signatures on page 4, the impression of the third respondent's seal at the place for signatures, and the printed text, or the formation time sequence between the impression of the third respondent's seal at the paging and the printed text on pages 1 and 5. In other words, it cannot rule out the possibility that the paging seal and the printed text were not formed at the same time, and of course, there is a possibility that the paging seal was formed afterward. Therefore, the aforementioned series of inconclusive findings can confirm that the paging seal cannot remedy the inherent integrity and consistency flaws of the transfer agreement.

③  Clause 3.11 of the agreement on page 3 unilaterally increases the contractual obligations and responsibilities of the first and second respondents. This clause can only take effect upon confirmation by the first and second respondents. Therefore, only the signatures of the first and second respondents can truly remedy the inherent integrity and consistency flaws of the transfer agreement. The act of the "target company affixing a paging seal" cannot achieve this goal, nor can it infer that this amended clause takes effect against the respondents.

④  Since the formation time sequence between the impression of the paging seal and the printed text on pages 1 to 5 cannot be identified, this result also cannot rule out the reasonable suspicion that the Claimant may have affixed the paging seal after actually controlling the target company. Therefore, the "target company's paging seal" not only cannot prove that the transfer agreement has integrity and consistency but also, on the basis of the forensic conclusion that the agreement text was not "printed continuously in one go" and that "the Claimant should be fully aware of the actual formation process of the agreement," it is more reasonable to interpret the act of the target company affixing a paging seal as an attempt to cover up the inherent integrity and

29

consistency flaws of the agreement. Emphasizing the "paging seal" while downplaying the need for confirmation by the first and second respondents regarding the "contract amendment" will only bring about a negative impression of "trying to hide something."

4. The First Respondent has never authorized anyone, including the Second Respondent, to sign the Equity Transfer Agreement dated October 18, 2014, and the Second Respondent has no authority to sign the Equity Transfer Agreement dated October 18, 2014.

(1) The subject qualification proof materials submitted by the First Respondent has no autho and the proof of changes in the First Respondent has no autho's equity have fully proven that the right holder of the First Respondent has no autho has been Sun Fujun since 2011.

(2) The Second Respondent is a director appointed by the first Respondent has no autho to the Third Respondent and exercises the rights of a director. The Second Respondent cannot represent the First Respondent has no autho in signing any documents disposing of the equity held by the First Respondent has no autho in the Third Respondent.

(3) The Second Respondent signed the Equity Transfer Agreement dated September 8, 2014, with the consent of the First Respondent. The right holder of the First Respondent, Sun Fujun, also signed and confirmed it. At the same time, all parties fulfilled the Equity Transfer Agreement dated September 8, 2014, and carried out industrial and commercial changes accordingly. The Equity Transfer Agreement dated September 8, 2014, is also the only valid and fulfilled written document signed by all parties regarding the equity transfer and other matters of the Third Respondent.

5. All parties performed the Equity Transfer Agreement signed on September 8, 2014.

(1) To put it in the most extreme way, without considering the authenticity of the Equity Transfer Agreements dated July 6, 2014, and October 18, 2014, there are currently three different Equity Transfer Agreements regarding the equity transfer matters of the Third Respondent. It is necessary to confirm which Equity Transfer Agreement all parties have actually fulfilled based on the actual performance. Based on the existing performance, it is clear that all parties have fulfilled the Equity Transfer Agreement signed on September 8, 2014.

After signing the Equity Transfer Agreement on September 8, 2014, Wu Guoqing applied for equity changes to the industrial and commercial administration department on September 18, 2014. The shareholders of the Third Respondent were changed to the Claimant and the First Respondent, the legal representative and general manager were changed to Wu Guoqing, and the directors were changed to Wu Guoqing, Xiao Qiong, and the Second Respondent, with Wu Guoqing and Xiao Qiong being appointed by the Claimant.

(2) In the arbitration case (Award No. 349) initiated by the First Respondent against the Claimant, which has taken effect, all parties as the subjects of the equity transfer recognized that they fulfilled the Equity Transfer Agreement signed on September 8, 2014. The previous arbitration tribunal also made an effective award based on the Equity Transfer Agreement signed on September 8, 2014. During the arbitration process, the Claimant never submitted or mentioned signing an Equity Transfer Agreement on October 18, 2014.

(3) The First Respondent filed a company dissolution lawsuit against the Third Respondent with the Suzhou Intermediate People's Court on November 30, 2020 [Case No.: (2020) Su 05 Min Chu No. 1634], with the Claimant as the third party. The first instance judgment was made on November 29, 2021. During the litigation process, the Third Respondent presented evidence confirming that they fulfilled the Equity Transfer Agreement signed by both parties on September 8, 2014. Both the First Respondent and the Claimant confirmed it.

6. Clause 3.11 of the Equity Transfer Agreement dated October 18, 2014, is a liability clause for breach of contract, and the provisions of this clause lack reasonableness, and the agreed penalty is obviously excessive.

(1) After the equity transfer and change, the actual controller of the Third Respondent is the Claimant, and the obligation to control external accounts receivable should be borne by the Claimant. It lacks reasonableness to agree that the respondents should bear the corresponding liability for breach of contract.

(2) Claimant's claim for the First Respondent to bear liability for breach of contract in accordance with Clause 3.11 should be limited to the actual losses of the Claimant. It is unfair for the Claimant to request the First Respondent to compensate for breach of contract losses with the 48% equity in the Third Respondent held by the First Respondent. In accordance with the agreement in Clause 3.7 of the Equity Transfer Agreement, during the industrial and commercial change, the external claims of the Third Respondent shall be owned by the First Respondent, and the external debts shall be borne by the First Respondent. According to the 2014 audit report, as of December 31, 2014, the external debts of the Third Respondent were mainly other payables recorded in the accounts owed to the Second Respondent, amounting to approximately US2.617 million. Even deducting this offset amount from the current amount claimed by the Claimant as owed by Infinity Wood, the actual amount of accounts receivable is less than US$4 million. Currently, the value of the 48% equity in the Third Respondent exceeds RMB80 million. According to the "Civil Code of the People's Republic of China" (hereinafter referred to as the "Civil Code"), if a party fails to perform its contractual obligations or performs them in a manner not in conformity with the agreement, causing losses to the other party, the amount of compensation for losses shall be equivalent to the losses caused by the breach of contract, including the benefits that could have been obtained after the performance of the contract; however, it shall not exceed the losses that the breaching party could have foreseen or should have foreseen at the time of concluding the contract as a possible result of the breach of contract. If the agreed penalty is excessively high compared to the losses caused, the people's court or arbitration institution may reduce it appropriately upon request by a party.

32

In summary, the First and Second Respondents believe that the Equity Transfer Agreement dated October 18, 2014, submitted by the Claimant has inherent integrity and consistency flaws and is highly suspected of being tampered with. Accordingly, this evidence does not meet the elements of evidence authenticity and legality and constitutes illegal evidence. The arbitration tribunal should exclude it and respectfully request not to support all of the Claimant's arbitration claims.

Main arguments submitted by the agent of the Third Respondent after the hearing:

1. The Equity Transfer Agreement signed by the Claimant and the Respondent Party on October 18, 2014, has been determined to be authentic through forensic appraisal and in conjunction with the facts ascertained in other cases. The content of the agreement does not violate laws or administrative regulations and represents the true intentions of all parties. All parties should abide by it. Clause 3.11 of the agreement stipulates that the First and Second Respondents should guarantee that the cumulative accounts receivable of the Third Respondent from the U.S. company should not exceed RMB20 million and should be fully recovered by the end of 2019, and the net assets should not decrease. However, in reality, the accounts receivable of the First and Second Respondents from Infinity Wood have never been less than RMB20 million and have not been fully recovered by the end of 2019. As of December 31, 2019, Infinity Wood owed the Third Respondent a goods payment of RMB46,730,580.43 (US$6,712,182.11), which remains unrecoverable to this day. The net assets have also significantly decreased, from RMB61,708,514.73 on August 31, 2014, to RMB59,262,894.13 on December 31, 2019, RMB43,555,310.97 on December 31, 2020, and RMB34,410,838.17 on June 30, 2025. This has caused multi-level negative impacts on the enterprise and the country, including tight cash flow, foreign exchange loss, waste of financial resources, etc., bringing direct losses to the Third Respondent and also harming national interests.

2. According to the agreement, upon the occurrence of any of the aforementioned circumstances, the First and Second Respondents voluntarily relinquish their 48% equity in the Third Respondent, which shall then be owned by the Claimant. Now that the conditions stipulated in the agreement have been met, and in order to enable the Third Respondent to return to normal business operations as soon as possible, the Third Respondent is willing to cooperate with the Claimant in handling the industrial and commercial registration changes.

The Second Respondent has not returned since leaving the company on June 14, 2019. Instead, the Second Respondent, along with the First Respondent, has initiated multiple lawsuits, including one to dissolve the Third Respondent, in an effort to quickly abandon the factory and withdraw from China as soon as possible. Affected by the U.S.-China trade war and tariff issues, despite receiving care and support from various government sectors, the Third Respondent is now struggling.

## II. Opinions of the Arbitral Tribunal

The arbitral tribunal has reviewed the relevant materials pertaining to this case, conducted hearings, and deliberated to express the following opinions on the disputes involved in this case:

### (1) Facts Ascertained by the Arbitral Tribunal

The arbitral tribunal has ascertained the following facts:

On July 6, 2014, the Second Respondent, as the transferor, and Wu Guoqing, as the transferee, signed the 0706 Equity Transfer Agreement, stipulating that the Second Respondent would transfer 52% of the equity in the Third Respondent to Wu Guoqing for a transfer price of RMB20 million, which included the transfer of ownership of the Second Respondent's property located at 39-101 Yilin Jiayuan, Jinxi Town, Kunshan, Jiangsu Province, to Wu Guoqing.

On September 18, 2014, the Third Respondent applied for industrial and commercial registration changes.On April 28, 2015, the third respondent completed the industrial and commercial registration changes, changing its company type from a wholly foreign-owned limited liability company to a Sino-foreign joint venture limited liability company, its legal representative from the second respondent to Wu Guoqing, and its shareholders from being 100% held by the first respondent to being 48% held by the first respondent and 52% held by the Claimant.

On October 18, 2014, the 1018 Equity Transfer Agreement indicated that the First and Second Respondents, as transferors, the Claimant, as the transferee, and the Third Respondent, as the guarantor of the transferor, signed the 1018 Equity Transfer Agreement, stipulating that the transferors would transfer 52% of the equity in the Third Respondent to the transferee for a transfer price of RMB20 million, which included the transfer of ownership of the transferors' property located at 39-101 Yilin Jiayuan, Jinxi Town, Kunshan, Jiangsu Province, to the transferee.

The differences between the clauses of these two agreements lie in Article 3.11 and Article 5. Specifically, Article 3.11 of the 0908 Equity Transfer Agreement stipulates: "Party A shall ensure that for the next three years, the orders from U.S. Sunco Inc. will be produced by the third respondent, and that the average annual purchase volume from U.S. Sunco Inc. to the third respondent shall not be lower than the average purchase volume in the year prior to the equity transfer, with the purchase price also being equivalent to the average price in the year prior to the equity transfer."Article 3.11 of the 1018 Equity Transfer Agreement stipulates: "Party A shall ensure that the cumulative balance of amounts owed by all U.S. companies to Party C does not exceed

RMB20 million and shall guarantee full recovery by the end of 2019; Party A shall ensure that Party C's net assets do not decrease after the signing of this agreement (i.e., the net assets as of December 31, 2019, shall not be lower than those shown in the attached financial statements). If any of the aforementioned situations occur, Party A shall voluntarily relinquish its 48% equity in Party C, which shall then be owned by Party B. At the same time, Party A shall ensure that all U.S. companies pay Party C interest at an annual rate of 6% starting from January 1, 2020."

Article 5 of the 0908 Equity Transfer Agreement stipulates that: "With respect to all information learned by Party A and Party B in this equity transfer agreement, including but not limited to Party A's business operations, financial status, trade secrets, technical secrets, etc., both Party A and Party B have an obligation to maintain confidentiality and shall not disclose or use such information to the outside world unless explicitly required by law or compelled by a judicial authority. When publicly disclosing or promoting this equity transfer matter to the outside world, Party A and Party B shall adopt a unified approach agreed upon through consultation to ensure that the business reputation of all parties is not impaired. Without the consent of one party, no party shall unilaterally make statements or write texts regarding this equity transfer to the outside world."Article 5 of the 1018 Equity Transfer Agreement stipulates that: "With regard to all information known to Party A and Party B in this Equity Transfer Agreement, including but not limited to Party A's business situation, financial situation, trade secrets, technical secrets, etc., both Party A and Party B are obliged to keep it confidential. Unless expressly stipulated by law or mandated by judicial authorities, neither party may disclose or use it to the public."

On September 18, 2014, the Third Respondent applied for a change in the industrial and commercial registration. On April 28, 2015, the Third Respondent completed the industrial and commercial registration changes, changing its company type from a wholly foreign-owned limited liability company to a Sino-foreign joint venture limited liability company, its legal representative from the second respondent to Wu Guoqing, and its shareholders from being 100% held by the first respondent to being 48% held by the first respondent and 52% held by the Claimant. On February 11, 2018, the legal representative of the Third Respondent was changed from Wu Guoqing to Xiao Ruihua. At present, the directors of the Third Respondent are Xiao Ruihua, Xiao Qiong, and the Second Respondent, with Xiao Ruihua serving as the chairman.

In July 2019, the First Respondent, as the Claimant, filed an arbitration application with this commission against the Claimant based on the Equity Transfer Agreement dated September 8, 2014, requesting the Claimant to pay RMB15 million in equity transfer funds, interest, and RMB3 million in liquidated damages. On April 29, 2021, this commission issued Award No. 349, making the following findings on the facts related to the disputes in that case: "1.Regarding the shareholders of Senke Wood Industry at the time of signing the disputed Transfer Agreement... The aforementioned facts confirm that Sun Linda did not acquire shareholder status in accordance with the Share Sale Agreement, and at the time of signing the disputed Transfer Agreement, the shareholders of Senke Wood Industry were the Claimant Sunco, INC.... Therefore, the arbitral tribunal finds that the offset agreement had the effect of debt settlement, and the respondent completed the debt settlement on July 30, 2016, thereby no longer being obligated to make payments to Sun Linda or to the Claimant for RMB15 million in equity

37

transfer funds. ... Based on the prior agreement between the parties, the arbitral tribunal supports the third arbitration request and finds that the respondent shall pay the Claimant liquidated damages of RMB3 million for its delayed payment of equity transfer funds. ...". Based on these findings, the arbitral tribunal awarded the respondent (i.e., the Claimant in this case) to pay the Claimant (i.e., the First Respondent in this case) liquidated damages of RMB3 million and dismissed the remaining arbitration requests of the Claimant in that case.

During the trial of this case, the First Respondent, Second Respondent, and Third Respondent submitted a judicial authentication application to the arbitral tribunal regarding the authenticity of the content of the "1018 Equity Transfer Agreement." The authentication institution accepted the authentication commission, and the authentication items included: (I) Whether the signature "Sun Linda" on page 4 of the Exhibit Equity Transfer Agreement was written by the Second Respondent personally. (II) Whether the seal impression "Cinke Wood Industry (Kunshan) Co., Ltd." on the right-hand side riding seam of the Exhibit Equity Transfer Agreement is complete. (III) Whether there are signs that the seal impressions "Cinke Wood Industry (Kunshan) Co., Ltd." on the signature and date on page 4 of the Exhibit Equity Transfer Agreement and on the right-hand side riding seam were not stamped at the same time. (IV) Whether the six pages of typed text on the Exhibit Equity Transfer Agreement were typed at the same time and printed by the same machine. (V) The chronological order of formation between the signature and date on page 4 of the Exhibit Equity Transfer Agreement, the typed text, and the seal impressions "Cinke Wood Industry (Kunshan) Co., Ltd." on the signature and the right-hand side riding seam. (VI) Whether the Exhibit Equity Transfer Agreement was bound in one go.

On July 8, 2025, the authentication institution issued the Forensic Appraisal Report, providing the following apraisal opinions: (I) The

signature "Sun Linda" on page 4 of the Exhibit Equity Transfer Agreement was written by the Second Respondent personally. (II) The seal impression "Cinke Wood Industry (Kunshan) Co., Ltd." on the right-hand side riding seam of the Exhibit Equity Transfer Agreement is complete and conforms to the characteristics of a single stamp impression. (III) No signs were found indicating that the seal impressions "Cinke Wood Industry (Kunshan) Co., Ltd." on the signature and the right-hand side riding seam of the Exhibit Equity Transfer Agreement were not stamped at the same time. It was impossible to determine whether the signature, date, and seal impressions "Cinke Wood Industry (Kunshan) Co., Ltd." on page 4 of the Exhibit Equity Transfer Agreement were formed at the same time as the typed text. (IV) The six pages of typed text on the Exhibit Equity Transfer Agreement were printed by the same machine, but the typed text on pages 1 to 3 was not continuously printed with that on pages 4 to 6. (V) The chronological order of formation between the seal impression "Cinke Wood Industry (Kunshan) Co., Ltd." on the right-hand side riding seam of the Exhibit Equity Transfer Agreement and the typed text on page 6 is as follows: The typed text was formed first, followed by the stamp impression. It was impossible to determine the chronological order of formation between the signature and date and the seal impression "Cinke Wood Industry (Kunshan) Co., Ltd." on page 4 of the Exhibit Equity Transfer Agreement and the typed text. It was also impossible to determine the chronological order of formation between the seal impression "Cinke Wood Industry (Kunshan) Co., Ltd." on the right-hand side riding seam of the Exhibit Equity Transfer Agreement and the typed text on pages 1 to 5. (VI) No signs were found indicating that the Exhibit Equity Transfer Agreement was not bound in one go.

The aforementioned facts are proven by the relevant evidence submitted by the claimant and the respondents, as well as the hearing transcripts and the Forensic Appraisal Report.

**(II) Applicable Law in This Case**

The arbitral tribunal has ascertained that the First Respondent is a company registered in the United States of America, and the Second Respondent is a U.S. national. Therefore, this case involves foreign elements. According to Article 41 of the Law of the People's Republic of China on the Application of Laws to Foreign-related Civil Relations, "The parties may choose the laws applicable to a contract by agreement. If the parties do not choose, the laws of the place where the party required to perform obligations most characteristic of the contract has its habitual residence or other laws with the closest connection to the contract shall apply."Article 6.5 of the Equity Transfer Agreement involved in the case stipulates that: "The establishment, validity, interpretation, performance, and settlement of disputes arising therefrom shall all be governed by the laws of the People's Republic of China."Based on this, the arbitral tribunal finds that the parties to this case have chosen the applicable law. Generally speaking, the laws of the People's Republic of China referred to here refer to the laws of mainland China, and the arbitral tribunal will apply the laws and regulations of mainland China to make an award on the disputes under the Equity Transfer Agreement in dispute.

The arbitral tribunal notes that on January 1, 2021, the Civil Code came into force, and laws such as the Contract Law of the People's Republic of China (hereinafter referred to as the "Contract Law") were simultaneously repealed upon the implementation of the Civil Code. The Several Provisions of the Supreme People's Court on the Application of the Time Effect of the Civil Code, which came into force simultaneously with the Civil Code, make provisions on the application of the Civil Code. Paragraph 1 of Article 1 of this judicial interpretation stipulates: "Civil disputes arising from legal facts that occurred after the implementation of the Civil Code shall be governed by the provisions of the Civil Code"; Paragraph 2 stipulates: "Civil disputes arising from legal facts that occurred before the implementation of the Civil Code shall be governed by the laws and judicial interpretations in force at that time, unless otherwise stipulated by laws or judicial interpretations." Referring to the aforementioned provisions and other specific provisions of this judicial interpretation on the retroactive application and transitional application of the Civil Code, the arbitral tribunal finds that since all the legal facts in this case occurred before the implementation of the Civil Code, i.e., before January 1, 2021, and there are no situations where laws or judicial interpretations stipulate

40

otherwise, the arbitral tribunal will still cite the Contract Law, the General Provisions of the Civil Law of the People's Republic of China (hereinafter referred to as the "General Provisions of the Civil Law"), and other repealed laws in the trial of this case. The issue of the validity of the aforementioned laws and regulations will not be separately emphasized in the following award. For matters that should be governed by the Civil Code, the arbitral tribunal will specifically indicate them.

**(III) Disputed Issues in This Case**

The disputed issues in this case: 1. Whether the 1018 Equity Transfer Agreement in dispute can be accepted; 2. Whether the 48% equity in the Third Respondent belongs to the Claimant; 3. The scope of fees that the First and Second Respondents should pay to the Claimant; 4. Whether the Third Respondent should assume guaranty liability.

1. Regarding whether the 1018 Equity Transfer Agreement in dispute can be accepted.

The Claimant argues that from the background and signing process of the 1018 Equity Transfer Agreement, it represents the true intentions of both parties. Regarding the background of the signing of the 1018 Equity Transfer Agreement, the Claimant mentions that after the major explosion accident in Kunshan, Jiangsu Province on August 2, 2014, the local government conducted safety inspections, which resulted in the indefinite delay of the equity transfer registration matters applied for based on the 0908 Equity Transfer Agreement. Due to the inability to proceed with the equity transfer registration and the Second Respondent's expression of a desire to continue having operational control over the Third Respondent, further negotiations were held with the Claimant regarding the operational control of the Third Respondent, leading to the changes in the conditions stipulated in Article 3 of the 1018 Equity Transfer Agreement. At the same time, the Claimant argues that according to the conclusions of the Forensic Appraisal Report, the signature on page 4 of the agreement in dispute was written by the Second Respondent personally, "Sun Linda". This indicates that the Second Respondent's repeated denials of this signature constitute false statements, and the Second Respondent should bear the adverse consequences thereof. Furthermore, the riding seam seal on the agreement in dispute was stamped in one go, and it was "the typed text that was formed first, followed by the stamp impression", which fully demonstrates that the six-page contract text was formed first, followed

by the sealing, conforming to the logic of commercial contract signing. Meanwhile, the Forensic Appraisal Report also points out that no signs were found indicating that the seal impressions on the signature and the right-hand side riding seam of the agreement in dispute were not stamped at the same time. Furthermore, during the hearing on July 23, 2025, the expert replied:   "These two seals conform to the characteristics of the same stage and have contemporaneity; otherwise, the appraisal conclusion would have been 'impossible to determine'." This further proves that the signature seal and the riding seam seal of the agreement in dispute were formed simultaneously. This further demonstrates that the parties to the agreement in dispute sealed it after negotiating the text of the agreement, and the agreement in dispute is complete, coherent, and consistent.

The respondents argue that the 1018 Equity Transfer Agreement dated October 18, 2014, lacks the authenticity and legality required for evidence to be used as a basis for a decision and should be deemed illegal evidence and not accepted. The conclusions of the judicial opinion and the test results indicate that the agreement lacks integrity and consistency. The Forensic Appraisal Report clearly states that "the typed text on pages 1 to 3 was not continuously printed with that on pages 4 to 6," and the authentication conclusion that "it was not continuously printed" fully proves that the formation process of the agreement does not conform to normal logic and daily life experience. Further examination of the typed text reveals that "the typed text on pages 1 to 3 of the exhibit is composed of black, cyan, and red ink dots,

while the typed text on pages 4 to 6 is composed of black ink dots only," meaning that pages 1 to 3 were printed in color mode, while pages 4 to 6 were printed in black-and-white mode. It is also a basic norm for a normal equity transfer agreement to be printed in the same mode. It is abnormal for a mere six-page agreement text to have different printing modes for the first three pages and the last three pages, and the formation state of this agreement text violates normal logic and daily life experience. At the same time, combined with other relevant facts of this case, it can be further determined that the agreement is illegal evidence. The 1018 Equity Transfer Agreement is inconsistent with the signing model of the agreement text of the Respondents, the signing model of the agreement text of the Claimant, and the equity value of the terms of the change of the agreement is also unreasonable. Moreover, the signing model of the 1018 Equity Transfer Agreement is not meticulous, and it is completely different from the signing model of the 0706 Equity Transfer Agreement and the 0908 Equity Transfer Agreement. Therefore, all parties fulfilled the 0908 Equity Transfer Agreement.

The arbitral tribunal finds that firstly, regarding the authenticity of the handwriting, seal impressions, and documents in the 1018 Equity Transfer Agreement disputed by the Claimant and the First and Second Respondents, the Authentication Report has issued six authentication conclusions. The conclusions confirm "Sun Linda" on page 4 of the 1018 Equity Transfer Agreement was written by the Second Respondent personally; no signs were found indicating that the seal impressions of the Third Respondent on the signature and the right-hand side riding seam were not stamped at the same time; the typed text on pages 1 to 3 was not continuously printed with that on pages 4 to 6; it was impossible to determine whether the signature of the Second Respondent and the two seal impressions of the Third Respondent were formed at the same time; it was impossible to determine the chronological order of formation between the signature of the Second Respondent, the seal impression of the Third Respondent on the signature, and the typed text; and it was impossible to determine the chronological order of formation between the seal impression of the Third Respondent on the right-hand side riding seam and the typed text on pages 1 to 5. Based on the aforementioned appraisal conclusions, what can be determined about the 1018 Equity Transfer Agreement is that the signature "Sun Linda" on page 4 was written by the Second

43

Respondent, and it is clear that the typed text on pages 1 to 3 was not continuously printed with that on pages 4 to 6. However, the appraisal institution was unable to determine whether the signature of the Second Respondent and the two seal impressions of the Third Respondent were formed at the same time, nor could it determine the chronological order of formation between the signature of the Second Respondent, the seal impression of the Third Respondent on the signature, and the typed text, as well as the chronological order of formation between the seal impression of the Third Respondent on the right-hand side riding seam and the typed text on pages 1 to 5.

According to the Civil Procedure Law of the People's Republic of China (hereinafter referred to as the "Civil Procedure Law") and relevant judicial interpretations, parties have the responsibility to provide evidence for their own claims. The party claiming the existence of a legal relationship shall bear the burden of proof for the basic facts giving rise to that legal relationship. In this case, the Claimant's claims regarding the ownership of the 48% equity in the Third Respondent and the request for the First and Second Respondents to bear liability for breach of contract damages should be supported by evidence proving the existence of the legal relationship underlying the claims. The evidence material submitted by the Claimant to prove the existence of this legal relationship is the Equity Transfer Agreement signed by the parties on October 18, 2014.

The parties shall submit a contract as proof of the existence of a legal relationship, and the contract shall be true, complete, and valid. Regarding the "1018 Equity Transfer Agreement" submitted by the Claimant, according to the conclusions of the Forensic Appraisal Report, it is impossible to determine the sequence between the signature of the Second Respondent and the impression of the Third Respondent's seal on this agreement, as well as the sequence in terms of formation time between the impression of the Third Respondent's seal on the right side of the paging suture and the printed text on pages 1-5. This has blurred the timeline of the contract signing process and affected the determination of the contract's overall integrity and consistency. Furthermore, the appraisal conclusions confirm that the typed text on pages 1 to 3 was not continuously printed with that on pages 4 to 6, making the form incomplete and not meeting the requirements for the integrity and consistency of the contract. Apart from the 1018 Equity Transfer Agreement, the Claimant has not provided any other evidence to support the signing of the 1018 Equity Transfer Agreement.

44

In addition, the Third Respondent clearly states that there is no original copy of the 1018 Equity Transfer Agreement submitted by the Claimant at the Third Respondent's place. Although the Claimant has submitted a lawyer's letter to prove that during the sealing of the 1018 Equity Transfer Agreement, the Second Respondent was actually in control of the Third Respondent, this letter only explains the handling of financial handover procedures and the content of the handover, and does not directly indicate that during the signing of the 1018 Equity Transfer Agreement, the official seal of the Third Respondent could only be accessed and used by the Second Respondent. Meanwhile, the changes in the content of the 1018 Equity Transfer Agreement indeed constitute a significant disposal of the equity rights of the First and Second Respondents in the Third Respondent.

Therefore, considering the form, content, and the fact that there is no original copy of the agreement at the Third Respondent's place, based on the existing evidence in this case and the authentication conclusions of the Forensic Appraisal Report, the arbitral tribunal does not accept the 1018 Equity Transfer Agreement.

The arbitral tribunal also notes that during the course of the case, the First and Second Respondents have proposed further verification of the original copy of the Equity Transfer Agreement. Given that the arbitral tribunal has already agreed to the authentication application of the First and Second Respondents, and the Claimant has submitted the original copy of the agreement in dispute during the appraisal process, and the appraisal institution has already issued the Forensic Appraisal Report, the arbitral tribunal finds that the aforementioned application of the First and Second Respondents has been processed. The arbitral

tribunal also noted that the First and Second Respondents have submitted an Application for Investigation and Collection of All Case Files of Case ST2019036. The arbitral tribunal finds that since the parties have already submitted Award No. 349 from the previous case, it is unnecessary to retrieve all the case files from the previous case, and therefore, does not agree to the aforementioned application.

2. Regarding whether the 48% equity in the Third Respondent belongs to the Claimant

As mentioned above, the arbitral tribunal did not accept the "1018 Equity Transfer Agreement" submitted by the claimant. The Claimant failed to submit other evidence to prove the ownership of the 48% shares in the Third Respondent. According to the provisions of the Civil Procedure Law, if a party fails to provide evidence or the evidence provided is insufficient to prove its factual claims, the party bearing the burden of proof shall bear the adverse consequences. Therefore, the Claimant's claim to confirm that 48% of the shares of the Third Respondent belong to the Claimant is not supported.

3. Regarding the scope of fees that the First and Second Respondents should pay to the Claimant.

The Claimant  claimed that the fees to be paid by the First and Second Respondents included three parts: liquidated damages, taxes and fees incurred during the equity transfer process, and legal fees.

Regarding liquidated damages, as mentioned above, since the arbitral tribunal did not support the Claimant's request that the 48% equity in the Third Respondent should belong to the Claimant, the First and Second Respondents did not bear any liability for breach of contract for failing to handle the equity change, and the arbitral tribunal did not support the Claimant's claim for liquidated damages.

Regarding taxes and fees incurred during the equity transfer process, the first and second respondents acknowledged that all parties had fulfilled the "0908 Equity Transfer Agreement". According to Article 1.2 of the "0908 Equity Transfer Agreement", all taxes and fees incurred during the equity transfer process should be borne 50% each by Party A and Party B, namely the First and Second Respondents, and the Claimant. The Claimant had provided evidence of the amount of taxes and fees paid during the equity transfer process, so the arbitral tribunal supported the Claimant's request for the First and Second Respondents to bear 50% of the taxes and fees.

Regarding legal fees, since the liability for breach of contract by the fFirst and Second Respondents had been addressed in the arbitration of the previous case, and the arbitral tribunal did not support the Claimant's arbitration request to acquire the 48% shares in the Third Respondent in this case, the arbitral tribunal did not support the Claimant's claim for legal fees incurred to protect its legitimate rights and interests.

4. Regarding whether the Third Respondent should assume guarantee liability.

As mentioned above, since the First and Second Respondents did not need to bear liability for breach of contract, and according to Article 6.2 of the "0908 Equity Transfer Agreement", taxes and fees were not within the scope of the guarantee liability of the Third Respondent, the Third Respondent did not bear any guarantee liability in this case.

**(IV) Arbitration Request of the Claimant**

1. Regarding the arbitration request to rule that the 48% equity of the First Respondent in the Third Respondent belongs to the Claimant.

As mentioned above, the arbitral tribunal did not support this arbitration request of the Claimant.

2. Regarding the arbitration request to rule that the First and Third Respondents fulfill the change registration procedures and transfer the 48% shares of the First Respondent in the Third Respondent to the Claimant.

As mentioned above, the Claimant's arbitration claim is not supported.

3. Regarding the arbitration request to rule that the First and Second Respondents pay liquidated damages of USD 2,160,000 (equivalent to RMB13,769,568, calculated at the exchange rate of USD to RMB of 6.3748 on December 20, 2021).

As mentioned above, the liability for breach of contract by the First and Second Respondents under the "0908 Equity Transfer Agreement" had been addressed in the aforementioned arbitration case, and the First and Second Respondents did not bear any liability for breach of contract in this case, so the arbitral tribunal did not support this arbitration request of the Claimant.

4. Regarding the arbitration request to rule that the First and Second Respondents pay the claimant taxes and fees of RMB69,959.60 incurred during the equity transfer process.

As mentioned above, the arbitral tribunal supported this arbitration request of the Claimant.

5. Regarding the arbitration request to rule that the First and Second Respondents pay the Claimant legal fees of RMB400,000.

As mentioned above, the legal fees incurred by the Claimant in this case should be borne by the Claimant itself, so the arbitral tribunal did not support this arbitration request of the claimant.

6. Regarding the arbitration request to rule that the Third Respondent bears guarantee liability for the 3rd, 4th, and 5th arbitration requests.

As mentioned above, no circumstances had arisen in which the Third Respondent should bear guarantee liability, so the arbitral tribunal did not support this arbitration request.

48

7. Regarding the arbitration request to rule that the First, Second, and Third Respondents bear various fees in this case, including arbitration fees, preservation fees, and insurance guarantee fees.

According to Article 47 of the Arbitration Rules, the arbitral tribunal considered that, as mentioned above, the First, Second, and Third Respondents did not need to bear liability for breach of contract in this case, so the arbitral tribunal did not support this arbitration request.

8. Regarding the forensic expertise fees in this case

Based on the appraisal evidence in this case and the conclusions of the Forensic Appraisal Report, the arbitral tribunal did not accept the "1018 Equity Transfer Agreement". However, the signature "Sun Linda" at the end of the document was written by the Second Respondent personally, and the impression of the seal of "Cinke Wood Industry (Kunshan) Co., Ltd." on the right side of the paging suture was complete. Therefore, according to Article 47 of the Arbitration Rules and in consideration of the actual circumstances of this case, the arbitral tribunal considered that the forensic expertise fees paid by the First, Second, and Third Respondents in this case should be borne by themselves.

## III. THE AWARD

The arbitral tribunal ruled as follows:

(I) The First and Second Respondents shall pay the Claimant taxes and fees of RMB69,959.60 incurred during the equity transfer;

(II) The Claimant's other arbitration requests are dismissed;

(III) The arbitration fee for this case is RMB622,865, which shall be borne by the Claimant and offset against the arbitration fee prepaid by the Claimant.

The payment obligations under the above-mentioned award (I) shall be fulfilled by the First and Second Respondents to the Claimant within ten days from the date of entry into force of this award.

This award is final and shall take effect from the date of issuance. (No text below)

(No text below)

| | | |
|---|---|---|
| Presiding Arbitrator: | | [signature] |
| Arbitrator: | | [signature] |
| Arbitrator: | | [signature] |

January 19, 2026 in Shanghai

[seal:] Shanghai International
Economic and Trade
Arbitration Commission
(Shanghai International
Arbitration Center)

51

**Contact Us**



**SHIAC Official Account**





City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "裁决书-2026.1.26" is, to the best of my knowledge and belief, a true and accurate translation from Chinese into English.

_____
Shayna Himelfarb

Sworn to before me this
February 3, 2026

_____
Signature, Notary Public



_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE



# 裁 决 书

## Arbitral Award

上海国际经济贸易仲裁委员会(上海国际仲裁中心)

Shanghai International Economic and Trade Arbitration Commission (Shanghai International Arbitration Center)

# 上海国际经济贸易仲裁委员会

# （上海国际仲裁中心）

# 裁 决 书

申 请 人：江苏奇意投资有限公司

住　　 所：中国江苏省昆山开发区长江南路 666 号楼 1801 室

代 理 人：吴景贵　上海合鸿律师事务所律师

　　　　　赵　毅　北京市隆安（苏州）律师事务所律师


第一被申请人：SUNCO, INC.

住 、 所：163 Highland Ave # 1052，Needham， Ma 02494，

　　　　　　USA

第二被申请人：LINDA SUN（中文名：孙琳达；美利坚合众国护

　　　　照号码：577710121）

联系地址：Infinity Wood Products LLC, 35 Eastman Street,

　　　　South Easton, MA 02375 USA

第一、第二被申请人共同代理人：邵峰、龚炯　江苏海联海律师事务所律师

第三被申请人：森科木业（昆山）有限公司

住　　 所：中国江苏省昆山市锦溪镇锦商路 327 号

第三被申请人代理人：朱雪娇　上海汉盛（昆山）律师事务所律师

上　　海

二〇二六年一月十九日

# 裁 决 书

（2026）沪贸仲裁字第 0007 号

上海国际经济贸易仲裁委员会（又名"上海国际仲裁中心"，以下称"本会"或"上海国仲"）根据申请人江苏奇意投资有限公司（以下称"申请人"）向本会提交的以签署时间为 2014 年 10 月 18 日的《股权转让协议书》（以下或称"协议"、"1018《股权转让协议书》"）中的仲裁条款为依据，并以 SUNCO, INC.（以下称"第一被申请人"）为第一被申请人、LINDA SUN（中文名：孙琳达；美利坚合众国护照号码：577710121；以下称"第二被申请人"）为第二被申请人、森科木业（昆山）有限公司（以下称"第三被申请人"；除特别说明外，第一、第二、第三被申请人以下合称"被申请人方"）为第三被申请人的书面仲裁申请，在申请人办理了相关手续后，于 2021 年 12 月 30 日受理了前述《股权转让协议书》项下的争议仲裁案。本案案件编号为 ST2021137。

本案仲裁程序适用自 2015 年 1 月 1 日起施行的《上海国际经济贸易仲裁委员会（上海国际仲裁中心）仲裁规则》（以下称"《仲裁规则》"）的规定。根据《仲裁规则》的规定，本案仲裁地为中国上海。

本会秘书处（以下称"秘书处"）于 2021 年 12 月 30 日向申请人寄送了《受理通知》、《仲裁规则》和《仲裁员名册》，

1

于 2022 年 1 月 4 日向被申请人方寄送了《仲裁通知》、《仲裁规则》、《仲裁员名册》以及申请人提交的《仲裁申请书》及相关证据材料。

根据《仲裁规则》第二十二条的规定，本案由三名仲裁员组成仲裁庭进行审理。申请人选定韩天岚女士为仲裁员；被申请人方未能按期共同选定仲裁员，本会主任根据《仲裁规则》的规定为被申请人方指定黄峰先生为仲裁员；鉴于各方当事人未能就首席仲裁员的人选达成一致意见，本会主任根据《仲裁规则》的规定指定陈峰先生担任本案首席仲裁员。前述三名仲裁员均签署了《仲裁员声明书》后，于 2022 年 8 月 19 日组成仲裁庭共同审理本案。秘书处于同日向各方当事人寄送了《组庭通知》，并向仲裁庭移交了案卷材料。

仲裁庭经商秘书处定于 2022 年 9 月 23 日开庭审理本案，并委托秘书处于 2022 年 8 月 19 日向各方当事人寄送了《开庭通知》。

2022 年 9 月 23 日，仲裁庭在本会所在地开庭审理本案。申请人及第三被申请人委派代理人出席了庭审；第一被申请人、第二被申请人经秘书处书面通知后未能到庭亦未说明理由，仲裁庭根据《仲裁规则》的规定对本案进行了缺席审理。庭审中，申请人陈述了其仲裁请求和所依据的事实及理由，第三被申请人发表了答辩意见；申请人进行了举证说明，第三被申请人进行了质证；此后，申请人、第三被申请人出庭

2

人员还回答了仲裁庭的提问，发表了辩论意见。庭审结束前，经征询申请人、第三被申请人的意见，仲裁庭对庭后程序作了安排。

第一次庭审后，秘书处收到申请人提交的补充证据，并将前述材料转寄被申请人方及仲裁庭，同时提请被申请人方发表书面质证意见。仲裁庭另委托秘书处将本案已经开庭审理的情况告知第一、第二被申请人，给予其申请再次开庭及提交书面资料的权利。

秘书处于 2022 年 11 月 28 日收到第三被申请人提交的《质证意见》，并将前述材料转寄其他方当事人及仲裁庭。

仲裁庭商秘书处定于 2023 年 3 月 30 日在本会所在地进行第二次开庭审理，并委托秘书处于 2023 年 2 月 16 日将《再次开庭通知》寄送各方当事人。

秘书处于 2023 年 3 月 16 日收到第一被申请人提交的《答辩状》、《质证意见》及证据，并将前述材料转寄其他方当事人及仲裁庭，同时提请其他方当事人发表书面质证意见。

仲裁庭因故将原定于 2023 年 3 月 30 日的开庭改期至 2023 年 4 月 21 日举行，并委托秘书处向各方当事人寄送了《改期开庭通知》。

秘书处于 2023 年 3 月 28 日收到申请人、第三被申请人分别提交的《不同意再次开庭的异议书》，并将前述材料转寄相对方当事人及仲裁庭。

3

2023 年 4 月 21 日，仲裁庭在本会所在地第二次开庭审理本案。申请人及被申请人方均委派代理人出席了庭审。庭审前，第三被申请人提交了《质证意见》，秘书处转交其他方当事人及仲裁庭。庭审中，申请人陈述了其仲裁请求和所依据的事实及理由，被申请人方发表了答辩意见；申请人、第一被申请人进行了举证说明，其他相对方当事人发表了质证意见；此后，各方当事人还回答了仲裁庭的提问，发表了辩论意见。庭审结束前，经征询各方当事人意见，仲裁庭对庭后程序作了安排。

第二次庭审后，秘书处收到申请人提交的《质证意见》、《代理意见》，收到第一、第二被申请人提交的《司法鉴定申请书》、《进一步核查〈股权转让协议书〉原件的申请》、《调查取证 ST2019036 案件所有案卷材料的申请书》及补充证据，并将前述材料转寄相对方当事人及仲裁庭，同时提请其他方当事人对第一、第二被申请人提交的申请发表书面评述意见及对补充证据发表书面质证意见。

秘书处于 2023 年 5 月 11 日收到申请人提交的《书面评述意见》、《质证意见》及补充证据，并将前述材料转寄被申请人方及仲裁庭，同时提请被申请人方对申请人的补充证据发表书面质证意见。

秘书处于 2023 年 5 月 15 日收到第三被申请人提交的《质证意见》、《书面评述意见》，并将前述材料转寄其他方当

4

事人及仲裁庭。

秘书处于 2023 年 5 月 22 日收到第一、第二被申请人提交的《质证意见》，于 5 月 23 日收到第三被申请人提交的《质证意见》、补充证据，于 5 月 31 日收到申请人提交的《质证意见》，于 6 月 5 日收到第一、第二被申请人提交的《质证意见》，并将前述材料转寄其他方当事人及仲裁庭。

秘书处于 2023 年 6 月 26 日收到第一、第二被申请人提交的《专项意见》，7 月 3 日收到申请人提交的《回应意见》，7 月 4 日收到第三被申请人提交的《代理意见》，11 月 2 日收到申请人提交的《专家论证意见》，11 月 9 日收到第三被申请人提交的《质证意见》及申请人提交的补充证据，11 月 16 日收到第三被申请人提交的《质证意见》，11 月 20 日收到第一、第二被申请人提交的《司法鉴定申请书》、《质证意见》、《关于对申请人提交的〈专家论证意见〉的书面评述意见》，11 月 29 日收到申请人提交的《书面评述意见》，并将前述材料转寄相对方当事人及仲裁庭。

就第一、第二被申请人的鉴定申请，仲裁庭经合议后根据《仲裁规则》第三十九条的规定予以同意，并于 2024 年 9 月 24 日委托秘书处将前述决定书面告知各方当事人，同时提请各方当事人推荐鉴定机构。

秘书处于 2024 年 10 月 10 日收到申请人提交的《就仲裁庭鉴定意见的反对意见》，于 11 月 4 日收到申请人提交的

《就仲裁庭鉴定意见的再次反对意见》，于 11 月 15 日收到第一、第二被申请人提交的《关于对申请人提交的〈就仲裁庭鉴定意见的再次反对意见〉的书面评述意见》，于 11 月 22 日收到申请人提交的《回复意见》，并将前述材料转寄相对方当事人及仲裁庭。

秘书处于 2024 年 12 月 3 日收到申请人提交的补充证据，并将前述材料转寄被申请人方及仲裁庭，同时提请被申请人方发表书面质证意见。

秘书处于 2024 年 12 月 4 日收到第一、第二被申请人提交的《调查取证申请》，并将前述材料转寄其他方当事人及仲裁庭，同时提请其他方当事人发表书面评述意见。

秘书处于 2024 年 12 月 10 日收到申请人提交的《书面评述意见》、第三被申请人提交的《质证意见》及《书面评述意见》，并将前述材料转寄其他方当事人及仲裁庭。

就第一、第二被申请人的调查取证申请，仲裁庭根据《仲裁规则》的规定予以同意，并于 2024 年 12 月 25 日向江苏省昆山市人民法院发送《调查取证函》，同时将前述决定书面告知了各方当事人。

秘书处于 2024 年 12 月 27 日收到江苏省昆山市人民法院出具的《回函》，并将前述材料转寄各方当事人及仲裁庭。

鉴于各方当事人未能在仲裁庭规定的时间内就鉴定机构达成一致意见，仲裁庭指定司法鉴定科学研究院（以下称

"司鉴院"或"鉴定机构")作为本案鉴定机构,并委托秘书处将前述决定随附司鉴院的资质证明材料转寄各方当事人。

秘书处于 2025 年 1 月 13 日收到申请人提交的《对再次进行鉴定机构摇号程序的反对意见》、1 月 20 日收到申请人提交的《异议书》、1 月 23 日收到被申请人方提交的《书面评述意见》,并将前述材料转寄相对方当事人及仲裁庭。

就申请人提出的异议,仲裁庭委托秘书处于 2025 年 2 月 12 日书面回复各方当事人:就第一、第二被申请人的鉴定申请,仲裁庭予以同意符合《仲裁规则》的规定;秘书处受仲裁庭委托进行鉴定机构选定/确定程序,并最终确认司鉴院作为本案的鉴定机构并无不当。

仲裁庭委托首席仲裁员定于 2025 年 3 月 28 日在本会所在地举行鉴定听证会,秘书处于 2025 年 2 月 14 日向各方当事人及鉴定机构寄送了《听证会通知》。

2025 年 3 月 28 日,首席仲裁员在本会所在地举行听证会。申请人、第一、第二、第三被申请人的代理人及鉴定机构工作人员出席了听证会。听证会前,第三被申请人提交了《鉴定申请书》,秘书处转交相对方当事人及仲裁庭。听证会中,申请人及被申请人方对鉴定机构的资质没有异议;就第三被申请人提出的鉴定申请,各方均同意一并委托司鉴院进行鉴定;第一、第二、第三被申请人陈述了鉴定申请事项及理由,相对方当事人发表了意见;申请人提交了系争《股权

7

转让协议书》的原件；各方当事人确定了鉴定事项、鉴定检材和样本；鉴定人员回答了各方当事人及首席仲裁员的提问。

秘书处于 2025 年 4 月 1 日收到申请人提交的《回复意见》，并将前述材料转寄被申请人方及仲裁庭。

秘书处于 2025 年 7 月 16 日收到司鉴院出具的《鉴定报告》，并将前述材料转寄各方当事人及仲裁庭，同时提请各方当事人发表书面评述意见。

仲裁庭商秘书处定于 2025 年 7 月 23 日在本会所在地第三次开庭审理本案，并委托秘书处于 2025 年 7 月 16 日向各方当事人寄送了《再次开庭通知》。

2025 年 7 月 23 日，仲裁庭在本会所在地第三次开庭审理本案。申请人及被申请人方均委派代理人出席了庭审。庭审前，申请人提交了补充证据，第一、第二被申请人提交了对《鉴定报告》的《书面评述意见》，秘书处将前述材料转交相对方当事人及仲裁庭。庭审中，各方当事人对《鉴定报告》发表了意见，鉴定人员接受了各方当事人及仲裁庭的质询；申请人对其补充证据进行了举证，被申请人方发表了质证意见；各方当事人发表了补充辩论意见，回答了仲裁庭的提问，并作了最后陈述。庭审结束前，经征询各方当事人意见，仲裁庭对庭后程序作了安排。

第三次庭审后，秘书处收到申请人提交的《回复意见》及《代理意见》、第一及第二被申请人提交的《情况说明》及

8

《意见》、附件、《代理词》和第三被申请人提交的《回复意见》、《代理词》，并将前述材料转寄其他方当事人及仲裁庭。

经仲裁庭申请，本会秘书长根据《仲裁规则》的规定同意本案裁决期限延长至 2026 年 1 月 19 日。

有关本案的一切法律文书、通知及材料等均已由秘书处依照《仲裁规则》第六十一条之规定送达当事人及仲裁庭。

本案现已审理终结。仲裁庭根据当事人提交的书面材料及庭审中查明的事实，依照当事人约定和法律规定作出裁决。现将本案案情、仲裁庭分析和认定意见及裁决分述如下：

## 一、本案案情

### （一）申请人的仲裁请求及事实和理由

申请人提起仲裁请求称：

2014 年 10 月 18 日，申请人与第一、第二、第三被申请人签订了案涉《股权转让协议书》，约定第一、第二被申请人将其在第三被申请人中的 52%股权转让给申请人，在 3.11 条约定，第一、第二被申请人应当保证第三被申请人对美国公司累计应收款不得超过人民币 20,000,000 元并且在 2019 年底全部收回，但是，实际上是第一、第二被申请人对美国客户的应收账款从未低于人民币 20,000,000 元，也没有在 2019 年底全部收回，截止到 2019 年 12 月 31 日，美国公司结欠第三被申请人货款高达人民币 46,730,580.43 元，至今无法收

9

回。

根据协议第 2.1 条的约定，在股权转让过程中产生的所有税费由申请人和第一被申请人、第二被申请人各承担50%，根据协议第 3.11 条约定，第一、第二被申请人的 48% 的股权应当属于申请人所有，同时根据协议第 4.3 条的约定，第一、第二被申请人还应当承担违约责任，根据协议第 6.1 条约定，第三被申请人应当承担连带担保责任。

据此，申请人提起仲裁请求如下：

1、第一被申请人在第三被申请人中的 48% 股权属于申请人所有；

2、第一、第三被申请人履行变更登记手续，将第一被申请人在第三被申请人中 48% 的股份过户给申请人；

3、第一、第二被申请人支付违约金 2,160,000 美元（折合人民币 13,769,568 元，按照 2021 年 12 月 20 日美元兑换人民币汇率 6.3748 换算）；

4、第一、第二被申请人支付申请人股权转让过程中的税费人民币 69,959.60 元；

5、第一、第二被申请人支付申请人律师费人民币 400,000元；

6、第三被申请人对仲裁请求第 3、4、5 项承担担保责任；

7、第一、第二、第三被申请人承担本案的仲裁费、保全

10

费以及保险担保费等各项费用。

### （二）被申请人方的答辩意见

第一、第二被申请人答辩如下：

1、申请人的仲裁请求无任何事实依据，对于申请人的仲裁请求依法应当全部不予支持。

（1）申请人的仲裁请求所依据的基础证据即 2014 年 10 月 18 日的《股权转让协议书》系申请人伪造的。

首先，第一被申请人从未签署过该份《股权转让协议书》，也从未授权任何人包括第二被申请人签署过该份《股权转让协议书》。

其次，该份《股权转让协议书》明显是伪造的。该份《股权转让协议书》与 2014 年 9 月 8 日各方真实签署的《股权转让协议书》第 1、2、4、5、6 页内容完全一致，但却仅有第 4 页有第二被申请人签字。内容仅有第 3 页进行了变动，主要条款变动为第 3.11 条及第五条。3.11 条增加的内容就是针对结欠的应收款，第五条无故减少了相关内容，最终目的就是保证《股权转让协议书》第三页的最后一行内容不变，使得第四页孙琳达签字页内容与 2014 年 9 月 8 日的《股权转让协议书》（以下或称"0908《股权转让协议书》"）内容完全一致。第二被申请人认为该份《股权转让协议书》是申请人及其控制人吴国庆处心积虑伪造的证据，是在第二被申请人签订的空白页上打印内容后添加第 1、2、3、5、6 页或者

11

申请人利用其手中有多份 2014 年 9 月 8 日第二被申请人签字的《股权转让协议书》篡改第 3 页内容而整合形成的。

再次，在第一被申请人于 2019 年 3 月提起的与申请人已生效的仲裁案件【（2021）沪贸仲裁字第 0349 号，以下称"349 号裁决"】中，作为股权转让主体的双方均未提出过签订有该份《股权转让协议书》，明显有违常理。该份《股权转让协议书》第 6.8 条也作了排他性的约定，如果双方真实的签订了该份《股权转让协议书》，那 349 号裁决中据以定案的 2014 年 9 月 8 日签署的《股权转让协议书》就是一份已被排除效力的文件。

最后，第一被申请人于 2020 年 11 月 30 日向江苏省苏州市中级人民法院（以下称"苏州中院"）提起了对于第三被申请人的公司解散诉讼【案号：（2020）苏 05 民初 1634 号】，申请人为第三人，该案一审于 2021 年 11 月 29 日判决，在诉讼过程中，第三被申请人举证提供的也是 2014 年 9 月 8 日双方签署的《股权转让协议书》。

（2）2014 年 10 月 18 日《股权转让协议书》的签署不符合常理且不具有证据的可靠性、完整性。

首先，双方实际履行的 2014 年 9 月 8 日签署的《股权转让协议书》，是一份严谨且完整的文件。《股权转让协议书》正文的前三页，第二被申请人与吴国庆均签名及签署日期，在第四页甲方处第二被申请人签名并签署日期，同时书写申

12

请人第一被申请人名称，在第四页乙方处申请人盖章，吴国庆在申请人盖章处签名并签署日期，在第四页丙方处标的公司第三被申请人盖章。申请人与第三被申请人在整份文件上加盖骑缝章。由此可以看出，双方对于签署标的高达数千万元的《股权转让协议书》是非常严谨的。而2014年10月18日的《股权转让协议书》，正文的前三页均没有任何签字，第四页中甲乙丙三方的签字、盖章均是在空白处，同时甲方处没有第一被申请人名称，乙方也缺少申请人的盖章，丙方处也没有第二被申请人的签字，这是极不符合常理的，且与2014年9月8日签署的《股权转让协议书》形成了鲜明的对比。

其次，2014年9月8日签署的《股权转让协议书》的股权转让对价为人民币2,000万元，双方在签署的时候就极其严谨，2014年10月18日《股权转让协议书》第3.11条的约定，相当于可能放弃48%股权，即使按照附件资产负债表的体现，第一被申请人所持第三被申请人48%股权的价值就高达人民币4,000多万元，实际价值更是远超该金额，如此重要的协议签订的确是如此的草率，完全有违常理。

再次，从证据可靠性、完整性的角度来看，2014年10月18日的《股权转让协议书》不具有证据的可靠性、完整性。该份《股权转让协议书》的第1、2、3、5、6页都是可以由申请人单方进行随意篡改的。

13

（3）第一被申请人在 2014 年 9 月 8 日与申请人签署《股权转让协议书》后，依法履行了协议义务，第三被申请人股东变更为申请人及第一被申请人，法定代表人及总经理变更为吴国庆，董事变更为吴国庆、肖琼、第二被申请人，其中吴国庆、肖琼为申请人委派，由吴国庆签字申请变更的时间均为 2014 年 9 月 18 日也可以印章双方真实的《股权转让协议书》签订于 2014 年 9 月 8 日。至此，第三被申请人实际已由申请人及吴国庆实际掌控，根据公司章程第一被申请人在公司决策及日常经营中已无任何控制权，第一被申请人是不可能去签订一个完全不由自己控制的 3.11 条约束条款。

（4）2014 年 9 月 8 日与 2014 年 10 月 18 日的《股权转让协议书》中，第 3.7 条都约定了"甲方保证森科木业截止到股权转让的工商变更手续完毕之前，现有债权由甲方享有，现有债务由甲方承担"，结合附件的资产负债表，实际包含第三被申请人对美国公司享有的应收款人民币 1,800 余万元由第一被申请人享有，对第二被申请人的其他应付款人民币 1,800 余万元由第一被申请人承担。该条款可以看出申请人实际购买了没有债权债务、实际只剩不动产的第三被申请人 52%股权，与 1.1 条相互对应。在此情况下，双方在 2014 年 9 月 8 日的《股权转让协议书》中约定第 3.11 条"甲方应确保三年内美国 Sunco, Inc.公司的订单由森科木业生产，美国 Sunco, Inc.公司从森科木业的每年平均……"是完全符合逻辑

14

的，体现了申请人收购股权后希望保持第三被申请人业务的正当心态。而 2014 年 10 月 18 日《股权转让协议书》的 3.11 条是完全不符合逻辑的，且与 3.7 条前后矛盾，在 3.7 条已经约定了应收款由甲方享有后，再要求甲方保证应收款控制在人民币 2,000 万元以内失去了逻辑性，同时在 2014 年的协议中就约定了长达 5 年以后的 2019 年底的应收款以及从 2020 年开始主张利息，更是脱离常识，由此不难看出，2014 年 10 月 18 日《股权转让协议书》的 3.11 条就是申请人恶意篡改的。

2、申请人的仲裁请求无任何法律依据，对于申请人的仲裁请求依法应当全部不予支持。

（1）349 号裁决及"（2020）苏 05 民初 1634 号"《民事判决书》两份文书中，都已经裁判持有第三被申请人 48%股权的为第一被申请人，第三被申请人工商登记 48%股权的持有人也是第一被申请人。

（2）第二被申请人并非第三被申请人股东，在签订《股权转让协议书》时第二被申请人也不是第一被申请人的负责人，第二被申请人是第一被申请人委派的第三被申请人董事。第一被申请人自 2011 年起负责人就是孙福君。

（3）第二被申请人无权代表第一被申请人签署任何处置第一被申请人持有的第三被申请人股权的文件，2014 年 9 月 8 日签署的《股权转让协议书》是经第一被申请人负责人

15

孙福君签字确认的唯一对第一被申请人产生效力的文件，也是第一被申请人确认的有效文件。申请人对于第一被申请人的负责人是孙福君是明知的，在 2014 年 9 月 8 日的《股权转让协议书》签订后孙福君于 2015 年 1 月 11 日在《股权转让协议书》上作了签字。

（4）第一被申请人已履行完毕 2014 年 9 月 8 日签署的《股权转让协议书》的义务，申请人尚未支付 349 号裁决的应当支付的人民币 300 万元，第一被申请人已申请强制执行。

综上，申请人全部仲裁请求所依据的基础证据系伪造的，对第一被申请人不产生任何的法律效力，申请人的仲裁请求无事实与法律依据。

第三被申请人口头答辩如下：

第三被申请人对于申请人所陈述的股权转让、担保的事实都予以认可，现股东之间矛盾纠纷不断，第一被申请人曾在苏州中院要求解散第三被申请人，第二被申请人也不参加董事会，如果仲裁庭支持申请人的仲裁请求，第三被申请人愿意配合办理工商变更登记。

（三）申请人代理人庭后提交了如下的主要代理意见

1、从 2014 年 10 月 18 日《股权转让协议书》的形成背景和签订过程来看，该协议书是双方真实意思表示。

（1）2014 年 10 月 18 日《股权转让协议书》为双方真实意思表示，该《股权转让协议书》的签订有其特定背景，

16

它是在双方前两份《股权转让协议书》的基础上的进一步协商结果和变更、补充。

（2）三份《股权转让协议书》（2014 年 7 月 6 日、2014 年 9 月 8 日、2014 年 10 月 18 日）的签订过程。

①2014 年 7 月 6 日，第二被申请人（甲方）与吴国庆（乙方）签订了第一份《股权转让协议书》。吴国庆依约支付了人民币 300 万元的首期股权转让款。但由于第三被申请人为外资企业，根据当时的《中华人民共和国中外合资经营企业法》（以下称"《中外合资经营企业法》"）第 1 条，中国国籍自然人不能作为外商投资企业的股东。为了股权转让顺利进行，吴国庆于 2014 年 8 月 29 日注册成立申请人。

②2014 年 9 月 8 日，第一被申请人、第二被申请人（甲方）与申请人（乙方）签订了第二份《股权转让协议书》，内容与前一份相比，除了主体不同外，条款皆无差异。后第三被申请人于 9 月 18 日向属地江苏省苏州市锦溪镇生态产业区提出了项目变更审批（股权转让、董事、法定代表人）申请，但申请并不顺利，流程进行到 10 月 8 日的生态产业区勘察后，已无法推进。由于审批无法顺利进行，股权变更登记也无法进行，影响了合同双方的心理。

③不能进行股权转让工商登记的主要原因是：2014 年 8 月 2 日，昆山中荣金属制品有限公司抛光二车间发生了特别重大铝粉尘爆炸事故，伤亡 200 多人，经济损失巨大，全国

17

舆论关注。事故导致昆山市政府部门所有力量都投入到了医疗救治、事故伤亡人员家属接待及安抚、善后赔偿和企业安全生产检查上。2014 年 9 月开始，对全市涉及粉尘的企业，安全、环保、消防等各个部门展开安全生产大排查，而且层层检查，层层加码，行动持续多月，第三被申请人生产过程涉及粉尘，受到政府监管的特别重视，而这种涉及粉尘的企业此时进行股权变更，由于第三被申请人股权转让非内部股东间的股权转让，受让人非同行业，特别是，本次股权转让将导致大股东换人，政府在当时客观情形下出于维稳心态，不同意审批，股权变更登记一事也就无限期拖延了下去。

④2014 年 9 月 8 日签署完第二份《股权转让协议书》后，股权变更无法进行，双方进一步进行了磋商。从第二被申请人的角度希望继续拥有对第三被申请人的经营权，继续掌控整个公司的运营，此后，第二被申请人也一直控制着第三被申请人，直到 2019 年 7 月 24 日签署授权委托书给肖瑞华和肖琼。还需要强调的是，在 2019 年 6 月 14 日第二被申请人出走之前，第三被申请人所有支付凭证都是第二被申请人签字审批，第三被申请人的采购、生产、出货、财务全由第二被申请人控制。

从申请人的角度，目前股权转让款已经交付了人民币 300 万元，未来还有人民币 1,700 万元的合同债务，但 52% 的股权却无法得到登记，自身仅能成为隐名股东，且第二被

18

申请人又提出了掌控公司经营权的要求，申请人遂要求将协议 3.11 条甲方的义务更改为以下两个更为清晰的条件：第一，当前的应收款不能再增加，且五年内必须要收回；第二，公司不能被做空，即至少五年内净资产都不能减少。如成就以上两个条件之一，第二被申请人方应将剩余股权 48%归申请人所有。这一变更是双方基于当时客观情况和诚信磋商达成的意思表示一致的合意。

⑤所以，在项目变更审批流程卡在 2014 年 10 月 8 日生态产业区勘察且无法推进后，第二被申请人和吴国庆代表双方很快形成了上述磋商内容，直到 2015 年 4 月 28 日进行了第三被申请人的工商变更。

2、从司鉴院出具的《鉴定报告》来看，2014 年 10 月 18 日《股权转让协议书》真实客观存在。

①本案中的第二被申请人长期经营第三被申请人，是一名具有丰富从商经验的商人，不可能不知道在协议上签名的后果。第二被申请人作为完全民事行为能力人，应当承担签订协议的后果，更何况该协议并非空白协议，而是双方协商之后形成的具有明确权利义务内容的协议。协议条款第 6.7 条载明，"本协议一式三份，甲乙丙各方各执一份"，第二被申请人理应会持有一份自己保管的协议。如果第一、第二被申请人认为申请人伪造了协议，完全可以拿出自己持有的协议来证明，第一、第二被申请人在本案中却始终不出具自己

19

持有的股权转让协议。

②2025 年 3 月 28 日，第二被申请人本人还不远万里来到中国专门出庭，书写"孙琳达"字迹的样本，《鉴定报告》已经证实，2014 年 10 月 18 日《股权转让协议书》中第二被申请人的签名确实是其所签。而且，第二被申请人还在签名旁边附上了时间，"第二被申请人 10/18/14"。这充分说明 2014 年 10 月 18 日《股权转让协议书》是真实存在的，第二被申请人只是不想拿出自己持有的股权转让协议，试图让仲裁庭否定申请人的协议，目的就是不想承担签订协议的后果。

③《鉴定报告》已经证实 2014 年 10 月 18 日《股权转让协议书》真实客观存在。

鉴定意见 1 认为：案涉协议第 4 页落款处为"孙琳达"本人所写。说明此前第二被申请人对该签字的一而再，再而三的否认为虚假陈述，企图误导鉴定机构，刻意误导仲裁庭，造成了大量司法资源的浪费，第二被申请人就此应当承担不利后果。

鉴定意见 2 认为：案涉协议骑缝章一次盖印形成；鉴定意见 5 认为：该骑缝章是"先有打印体字迹，后盖印"。这已经完全可以说明，案涉 6 页纸合同文本形成在先，盖章在后，案涉双方是在磋商好了案涉协议文本后，才盖章的，符合商事合同签订的逻辑。

基于鉴定意见 2 中骑缝章一次盖印形成，鉴定意见 3 进

20

一步指出，未发现检材《股权转让协议》落款处及右侧骑缝处的印文存在非同一时间盖印形成的迹象。且在 2025 年 7 月 23 日开庭中，鉴定人员已经回复："该两个印章符合同一个阶段特征，具有共时性特征，否则鉴定结论应为无法判断"。这也再次证明案涉合同的落款章和骑缝章是同时形成。进一步说明案涉双方是在磋商好了案涉协议文本后，才盖章，案涉协议完整、连贯、同一。

同时，申请人在 2025 年 7 月 23 日的庭审中已补充提交了案涉双方均认可的 2019 年 6 月 25 日上海问学律师事务所向申请人发的律师函的证据。该证据证明，签订案涉协议时，公章并不由申请人持有。这一事实进一步表明，被申请人所谓"申请人实际控制公司印章、加盖骑缝章系申请人伪造证据的手段"的指控纯属无端诽谤。

鉴定意见 4 证实，检材第 1 页至第 6 页打印体字迹的印刷特征符合点价值高，特征总和反映了案涉协议的 6 页纸张是由同一机具印制形成的特点，鉴定意见在第 7 页进行了详尽的论述，从中可以清晰地看出案涉协议的真实性、完整性和同一性。

首先，纸张相同：《鉴定报告》第 7 页指出，"检材第 1 页至第 6 页纸张的色泽底纹及视频光谱特性一致。"说明 2014 年 10 月 18 日协议所用的纸张完全相同。其次，鉴定报告第 7 页还描述，检材第 1 页至第 4 页为正文，内容为纵向版式，

21

检材第 5 页、第 6 页为附件，第 5 页为横向版式（资产负债表），第 6 页为纵向版式（利润表）。其中正文部分（第 1 页至第 4 页）页眉及内容的左右页边距、行间距等页面布局及对应部位的字体相符。

再次，检验还发现，检材第 1 页至第 6 页打印体字迹的线条质量、打印缺陷、周期性痕迹等印刷特征相符。

最后，《鉴定报告》第 7 页进一步描述：检材第 1 页至第 6 页上打印体字迹黑色墨点的墨迹色泽及拉曼光谱一致，黑色墨点的墨迹材料种类相同。

⑥有关鉴定意见 5、6，已经有力证明案涉协议的打印在前，盖印在后，案涉协议是一次性装订而成。

⑦鉴定意见 4 的第二句话指出，案涉协议的前 3 页和后 3 页打印模式存在差异。然而，此差异并不会对协议的真实性、完整性、同一性产生影响。

基于《鉴定报告》中对鉴定过程及分析说明的详细描述，可以清晰地了解到，案涉协议使用的是同一机具、相同材质的纸张和黑色墨点的墨迹材料种类也相同，且落款章和骑缝章是同时形成的，且一次性装订形成，《鉴定报告》第 7 页也明确描述指出"检材第 1 页至第 6 页打印体字迹的印刷特征符合点价值高"等诸多鉴定内容均指向涉案协议的真实性、完整性和同一性。单纯的打印模式差异并不会对案涉协议的真实性、完整性和同一性产生影响。协议在边协商边修改的

22

过程中形成，这是商业合同谈判中的常见现象。申请人也不清楚导致两种打印模式的具体原因。在同一机具印制下，两种打印模式的存在，恰恰表明申请人并非故意或刻意为之。

综上所述，鉴定意见明确指出，案涉协议第 4 页落款处的"孙琳达"签名确为其本人所写，右侧骑缝处印文盖印完整，一次盖印形成，且未发现案涉协议落款处及右侧骑缝处的印文存在非同一时间盖印形成的迹象。先有打印体字迹，后盖印。此外，鉴定报告进一步指出，案涉协议的 6 页纸张均由同一机具印制形成，纸张相同，检材第 1 页至第 6 页纸张的色泽、底纹及视频光谱特性一致。正文部分（第 1 页至第 4 页）页眉及内容的左右页边距、行间距等页面布局及对应部位的字体相符。检材第 1 页至第 6 页打印体字迹的线条质量、打印缺陷、周期性痕迹等印刷特征相符，检材第 1 页至第 6 页上打印体字迹黑色墨点的墨迹色泽及拉曼光谱一致，黑色墨点的墨迹材料种类相同，检材 6 页纸张上"打印体字迹的印刷特征符合点价值高"，以上种种鉴定结果充分证明了案涉协议的真实性、完整性和同一性。

3、申请人的仲裁请求具有事实、合同和法律依据，应予支持。

（1）申请人提起本次仲裁请求，完全是基于维护第三被申请人利益及自身合法权益的初衷。第二被申请人及其在美国的家人，通过美国盈枫利责任有限公司（INFINITY

23

WOODPRODUCTS，LLC；以下或称"盈枫利"），蓄意拖欠第三被申请人货款，截至 2019 年 6 月，至今拖欠货款累计达 6,712,182.11 美元，超过人民币 4,800 万元。其蓄意掏空第三被申请人，恶意将工厂资金转移到美国，随后抛弃工厂。

此举不仅损害了中方企业的利益，更侵害了国家利益，每年税务、审计部门对此持续关注并提出质疑。第二被申请人自 2019 年 6 月 14 日突然离开第三被申请人，至今未归，之后委托律师不断向申请人和第三被申请人提起一系列诉讼，企图解散第三被申请人。其主要目的是尽快掏空第三被申请人，将第三被申请人的货款试图占为已有，确保个人利益，迅速撤离中国，置众多员工及供应商应付款项于不顾，大大损害了合作伙伴的利益。

（2）第三被申请人的净资产从 2014 年 8 月开始逐年降低，均违反了双方签订的《股权转让协议》第 3.11 条。申请人作为第三被申请人的股东，利益受到了重大侵害应依约获得法律保护。2021 年至今受疫情以及关税、诉讼各方面的影响，第三被申请人亏损扩大，净资产减少。

（3）第三被申请人迫切需要理顺股权。依据 2014 年 10 月 18 日的《股权转让协议》，第一、第二被申请人理应承担违约责任，并按照协议约定，将 48%股权归属申请人。第二被申请人离开以后，第三被申请人面临 100 多名职工的补偿金人民币 355.71 万元、应付工资人民币 161 万元、应付款人

24

民币 386.9 万元、应付税金人民币 179 万元、应付环保危险废物的处置人民币 117.776 万元（2019 年 6 月以前生产而未处置的油漆渣、洗枪水等）、在建工程等等。另有长期待摊费用人民币 683 万元，借款人民币 1,625 万元未还，利息人民币 200 余万元未付。这些年与第二被申请人的纠纷使得第三被申请人经历了太多的困难，严重影响企业发展，考虑到第三被申请人的进一步生存和发展，迫切需要理顺股权。

商事合同是商人经过商业判断和周密商业计算后的结果，只要商人的约定不违反法律和行政法规的效力性强制性规定、不违反公序良俗，就应当认可商人的约定，以保护商人从事交易活动的信赖与预期。商事仲裁应当承认和支持商人在缔约时的这种信赖与预期，严守合同约定。申请人提起仲裁要求被申请人方履行股权变更义务、支付违约金和其他各项费用有合同依据、法律依据、充分的证据支撑，具备实质上的合理性，仲裁庭应依约支持申请人所有的仲裁请求。

**（四）被申请人方代理人于庭后提交的主要代理意见**

第一、第二被申请人于庭后提交的主要代理意见如下：

1、2014 年 10 月 18 日的《股权转让协议书》不具备定案证据应具备的真实性、合法性要件，应当认定该证据为非法证据并不予采信

（1）关于证据审核认定规则

仲裁与诉讼虽然是解决民事争议的不同救济手段，但均

25

应从关联性、真实性与合法性对证据进行审核，第一、第二被申请人代理人认为仲裁庭可以参照适用《民事诉讼证据若干规定》相关规定对本案证据进行审核认定。据此，仲裁庭可以运用逻辑推理和日常生活经验并结合本案其他具体情况对"20141018 转让协议"全面、客观地审核认定。

2、司法鉴定意见相关结论及检测结果表明协议缺乏完整性及一致性

（1）第（四）项鉴定意见虽确认"检材《股权转让协议》6 页打印体字是同一机具印制形成"，但明确认定"其中第 1 页至第 3 页打印体字迹与第 4 页至第 6 页打印体字迹不是一次连续印制形成"，第一、第二被申请人认为正常的股权转让协议"……次连续印制形成"是基本要求，也符合正常逻辑和日常生活经验，"不是一次连续印制形成"的鉴定结论已充分证明协议的形成过程不符合正常逻辑和日常生活经验。

（2）打印体字迹鉴定检验"进一步检验发现，检材第 1 页至第 3 页上打印体字迹由黑色、青色及红色墨点组成，第 4 页第 6 页上打印体字迹由黑色单色墨点组成"，即第 1 页至第 3 页为彩色模式打印，第 4 页至第 6 页系黑白模式打印，一份正常的股权转让协议采用同模式印制形成同样是基本常态，一份仅 6 页的协议文本前 3 页与后 3 页连打印模式都不一致，该协议文本的形成状态违背正常逻辑和日常生活经验的程度远超常人想象。

26

根据司法鉴定第（四）项鉴定意见及打印体笔迹检验结论，足以认定"20141018 转让协议"违背正常逻辑和日常生活经验，存在明显完整性和一致性瑕疵，该协议明显不具备证据真实性与合法性要件。

3、结合本案其他相关事实可以进一步认定协议属于非法证据

鉴于文书司法鉴定相关意见及检验结果表明协议存在完整性及一致性瑕疵，仲裁庭可结合本案其他事实进一步认定该证据属于非法证据：

（1）与第一、第二被申请人协议性文本签署模式不一致

关于本案股权转让关系先后有三份协议文本，即 2014 年 7 月 6 日、2014 年 9 月 8 日及 2014 年 10 月 18 日三份协议文本，前二份协议文本清晰显示第一、第二被申请人在协议正文每页签字，而"10 月 18 日协议"仅在第 4 页签字，与第一、第二被申请人前二份协议性文本签署模式完全背离。

（2）与申请人协议性文本签署模式也不一致

比对 2014 年 7 月 6 日、2014 年 9 月 8 日及 2014 年 10 月 18 日三份协议文本，前二份协议申请人同样在正文每页签名，而"10 月 18 日转让协议"仅在第 4 页签字，与前二份转让协议申请人的签字模式也不一致。

（3）从协议条款变更涉及的权益价值看极不合理

2014 年 10 月 18 日签署的《股权转让协议书》第 3 页第

3.11 条:"甲方自愿放弃所持丙方 48%的股权而归乙方所有",上述条款是对 2014 年 9 月 8 日《股权转让协议书》权利义务的重大变更,双方均系目标公司在任股东,均应非常清楚目标公司 48%股权价值(涉及数千万之巨),上述条款一旦成立并生效,第一、第二被申请人将可能失去巨额财产权益,相反,申请人将获取巨额财产权益,具有正常认知能力的双方均非常清楚该条款严重的法律后果,双方当事人突然改变协议性文本正文每页签字的模式就显得极不合理。

(4)从前二份转让协议双方签署模式严谨性看

2014 年 7 月 6 日《股权转让协议书》(以下或称 "0706《股权转让协议书》")、2014 年 9 月 8 日《股权转让协议书》双方不仅在协议正文每页签字,同时还签署日期,上述签署模式可以充分显示双方对于协议性文本签署的严谨态度,三份协议前后仅隔 90 天,2014 年 7 月 6 日《股权转让协议书》与 2014 年 9 月 8 日《股权转让协议书》比对仅调整了合同主体但合同主要内容没有任何变更,即使如此"吴国庆"与"孙琳达"均在该协议正文每页签署姓名及日期,而"10 月 18 日转让协议"涉及双方权利义务重大变更,双方却突然改变了协议性文本签署的严谨态度,极不合理。

(5)目标公司加盖骑缝章行为对证据认定的影响

①目标公司虽然加盖了骑缝章,但无法改变协议前 3 页与后 3 页不是一次连续印制形成的客观事实,即无法改变协

28

议文本缺乏完整性及一致性的客观事实；

②由于比对检材量少，鉴定机构无法判断打印体字迹形成时间，无法判断第 4 页落款处签名和日期字迹、落款处第三被申请人印文与打印体字迹的形成时间先后顺序，无法判断骑缝处第三被申请人印文与第 1 页页第 5 页打印体字迹的形成时间先后顺序，即无法排除骑缝章与打印体字迹并非同一时间形成，当然也就存在骑缝章事后形成的可能，因此，上述一系列无法判断结论可以印证骑缝章无法弥补转让协议客观存在的完整性及一致性先天缺陷。

③第 3 页协议书 3.11 条单方加重了第一、第二被申请人合同义务及责任，该条款只有第一、第二被申请人确认才可能成立并生效，因此，只有第一、第二被申请人签字确认才能真正弥补转让协议完整性及一致性的先天缺陷，"目标公司盖骑缝章"的行为无法实现这一目标也无法推定该变更条款对被申请人成立并生效。

④由于骑缝章印文与第 1 页至第 5 页打印体字迹形成时间进行先后顺序无法鉴定，此结果也无法排除申请人可能在实际控制目标公司后加盖骑缝章的合理怀疑，因此，"目标公司骑缝章"不仅不能证明转让协议具有完整性及一致性，相反，在司法鉴定结论明确协议文本不是"一次连续印制形成"、"申请人应非常清楚该协议的真实形成过程"的事实基础上，将目标公司加盖骑缝章的行为理解为试图弥补协议完

29

整性及一致性先天缺陷的掩盖行为则更为合理，刻意强调"骑缝章"而弱化"合同变更"需第一、第二被申请人签字确认相反会带来"欲盖弥彰"的负面印象。

4、第一被申请人从未授权任何人包括第二被申请人签署过 2014 年 10 月 18 日的《股权转让协议书》，第二被申请人无权签订 2014 年 10 月 18 日的《股权转让协议书》。

（1）根据第一被申请人提交的主体资格证明材料以及第一被申请人股权变动证明，已经充分证明了第一被申请人的权利人自 2011 年起就是孙福君的事实。

（2）第二被申请人系第一被申请人委派至第三被申请人的董事，其行使的是董事的权利，第二被申请人并不能代表第一被申请人签署任何处分第一被申请人持有的第三被申请人股权的文件。

（3）2014 年 9 月 8 日的《股权转让协议书》，第二被申请人是在经过第一被申请人同意的情况下签订的，第一被申请人的权利人孙福君也签字予以了确认，同时各方也履行了 2014 年 9 月 8 日的《股权转让协议书》并据此进行了工商变更，2014 年 9 月 8 日的《股权转让协议书》也是各方就第三被申请人股权转让等事宜签署的唯一有效且履行的书面文件。

5、各方履行的是 2014 年 9 月 8 日签署的《股权转让协议书》

（1）退一万步讲，在不考虑 2014 年 7 月 6 日及 2014 年 10 月 18 日《股权转让协议书》真实性的情况下，目前就第三被申请人股权转让事宜出现了三份不同的《股权转让协议书》，应当根据行情况确认各方实际履行的是哪一份《股权转让协议书》，根据现有履行情况可以明确看出各方履行的是 2014 年 9 月 8 日签署的《股权转让协议书》。

在 2014 年 9 月 8 日签署《股权转让协议书》后，由吴国庆于 2014 年 9 月 18 日向工商行政部门申请股权变更，第三被申请人股东变更为申请人及第一被申请人，法定代表人及总经理变更为吴国庆，董事变更为吴国庆、肖琼、第二被申请人，其中吴国庆、肖琼为申请人委派。

（2）在第一被申请人于 2019 年 3 月提起的与申请人已生效的仲裁案件（349 号裁决）中，作为股权转让主体的各方都认可履行的是 2014 年 9 月 8 日签署的《股权转让协议书》。前案仲裁庭也是依据 2014 年 9 月 8 日签署的《股权转让协议书》作出了生效裁决。在仲裁过程中申请人从未提交或提及 2014 年 10 月 18 日签订过《股权转让协议书》。

（3）第一被申请人于 2020 年 11 月 30 日向苏州中院提起了对于第三被申请人的公司解散诉讼【案号：（2020）苏 05 民初 1634 号】，申请人为第三人，该案一审于 2021 年 11 月 29 日判决，在诉讼过程中，第三被申请人举证确认履行的也是 2014 年 9 月 8 日双方签署的《股权转让协议书》。第一被

申请人、申请人均予以了确认。

6、2014 年 10 月 18 日《股权转让协议书》第 3.11 条性质为违约责任条款，该条款约定缺乏合理性且违约金约定明显过高

（1）股权转让变更后第三被申请人的实际控制人系申请人，对于对外应收款的控制义务应当由申请人承担，约定由被申请人承担对应的违约责任缺乏合理性。

（2）申请人依据第 3.11 条主张第一被申请人承担违约责任应当以申请人的实际损失为限，申请人要求第一被申请人以持有的第三被申请人 48%股权承担违约损失赔偿显失公平。按照《股权转让协议书》第 3.7 条的约定，在工商变更时第三被申请人对外债权归第一被申请人，对外债务由第一被申请人承担。根据 2014 年度的审计报告，截止 2014 年 12 月 31 日第三被申请人的对外债务主要是账面记载结欠第二被申请人的其他应付款按照当时的汇率约为 283 万美元，对外债权主要是对盈枫利的应收款约为 261.7 万美元。即使按照目前申请人主张的盈枫利欠款金额扣除该部分抵消款，实际应收款金额不足 400 万美元，目前第三被申请人 48%股权的价值超过人民币 8,000 万元，根据《中华人民共和国民法典》（以下称"《民法典》"）规定当事人一方不行合同义务或者履行合同义务不符合约定，造成对方损失的，损失赔偿额应当相当于因违约所造成的损失，包括合同履行后可以获

得的利益；但是，不得超过违约一方订立合同时预见到或者应当预见到的因违约可能造成的损失。约定的违约金过分高于造成的损失的，人民法院或者仲裁机构可以根据当事人的请求予以适当减少。

综上，第一、第二被申请人认为申请人提交的 2014 年 10 月 18 日的《股权转让协议书》存在完整性及一致性先天缺陷，该协议存在被篡改的重大嫌疑，据此，该证据不符合证据真实性及合法性要件，属于非法证据仲裁庭应当予以排除，恳请不予支持申请人的全部仲裁请求。

第三被申请人代理人于庭后提交的主要代理意见：

1、申请人与被申请人方于 2014 年 10 月 18 日签订的《股权转让协议书》，经过司法鉴定并结合他案查明的事实，可以确定该份股权转让协议是真实的，协议内容不违反法律、行政法规的规定，是各方的真实意思表示，各方均应遵守。协议 3.11 条约定，第一、第二被申请人应当保证第三被申请人对美国公司累计应收款不得超过人民币 2,000 万元并且在 2019 年底全部收回，净资产不能减少。但实际上，第一、第二被申请人对盈枫利的应收账款从未低于人民币 2,000 万元，并且也没有在 2019 年底全部收回，截止到 2019 年 12 月 31 日，盈枫利结欠第三被申请人货款高达人民币 46,730,580.43 元（6,712,182.11 美元），至今无法收回。净资产也大大减少了，2014 年 8 月 31 日净资产为：人民币 61,708,514.73 元，

33

2019 年 12 月 31 日净资产为：人民币 59,262,894.13 元，2020 年 12 月 31 日净资产为：人民币 43,555,310.97 元，2025 年 6 月 30 日净资产为：人民币 34,410,838.17 元。给企业和国家造成多层面的负面影响，现金流紧张、外汇流失、财政资源浪费等，给第三被申请人带来了直接损失，同时也损害了国家利益。

2、根据协议约定，出现以上任一情形时，第一、第二被申请人自愿放弃所持第三被申请人 48%的股权，并归申请人所有。现协议约定的条件已成就，为使第三被申请人早日回归正常经营轨道，第三被申请人愿配合申请人办理工商变更登记。

第二被申请人自 2019 年 6 月 14 日离开公司后，至今未归，反而和第一被申请人提起解散第三被申请人等多个诉讼，力求尽快抛弃工厂，尽早撤出中国。受中美贸易战、关税问题影响，虽然得到政府各方面的关怀，但第三被申请人现在举步维艰。

## 二、仲裁庭意见

仲裁庭审阅了本案有关材料，经过开庭审理并合议，对本案所涉争议发表以下仲裁庭意见：

### （一）关于仲裁庭查明的事实

仲裁庭经审理查明：

34

2014 年 7 月 6 日，第二被申请人作为转让方、吴国庆作为受让方签订了 0706《股权转让协议书》，约定第二被申请人将第三被申请人的 52%股权转让给吴国庆，转让价款为人民币 2,000 万元，转让价款包括第二被申请人位于江苏省昆山锦溪镇倚林家园 39-101 房屋的所有权转让给吴国庆。

2014 年 9 月 8 日，第一被申请人和第二被申请人作为转让方、申请人作为受让方、第三被申请人作为转让方的担保方，签订 0908《股权转让协议书》，约定将转让方持有的 52%第三被申请人的股权转让给受让方，转让价款为人民币 2,000 万元，转让价款包括转让方位于江苏省昆山锦溪镇倚林家园 39-101 房屋的所有权转让给受让方。

2014 年 10 月 18 日，1018《股权转让协议书》载示第一被申请人和第二被申请人作为转让方、申请人作为受让方、第三被申请人作为转让方的担保方签订 1018《股权转让协议书》，并约定将转让方持有的 52%第三被申请人的股权转让给受让方，转让价款为人民币 2,000 万元，转让价款包括转让方位于江苏省昆山锦溪镇倚林家园 39-101 房屋的所有权转让给受让方。

经仲裁庭比对，0908《股权转让协议书》与 1018《股权转让协议书》签约主体一致，甲方为第一被申请人、第二被申请人；乙方为申请人；丙方为第三被申请人。这两份协议书的条款差异在于第 3.11 条、第五条内容，其中，0908《股

35

权转让协议书》第 3.11 条约定："甲方应确保三年内美国 Sunco Inc 公司的订单由第三被申请人生产，美国 Sunco Inc 公司从第三被申请人的每年平均采购量不低于股权转让前一年的平均采购量，采购单价也等同股权转让前一年的平均单价。"1018《股权转让协议书》第 3.11 条约定："甲方应确保丙方销往所有美国公司累计余额结欠丙方的款项不超过人民币贰仟万元，应保证在 2019 年底前全部收回；甲方应确保丙方自本协议签订后净资产不能减少（即 2019 年 12 月 31 日的净资产不低于后附报表显示的净资产），如上述情况出现之一，则甲方自愿放弃所持丙方 48% 的股权而归乙方所有。同时甲方应保证所有美国公司自 2020 年 1 月 1 日起按照年利率 6% 支付丙方的利息。"

0908《股权转让协议书》第五条约定："对本次股权转让协议中，甲方与乙方对所了解的全部资料，包括但不限于甲方经营情况、财务状况、商业秘密、技术秘密等全部情况，甲方与乙方均有义务保密，除非法律有明确规定或司法机关强制要求，任何一方不得对外公开或使用。甲方与乙方在对外公开或宣传本次股权转让事宜时，采用经协商的统一口径，保证各方的商誉不受侵害，未经一方同意，任何一方不得擅自对外发表有关本次股权转让的言论、文字。"1018《股权转让协议书》第五条约定："对本次股权转让协议中，甲方与乙方对所了解的全部资料，包括但不限于甲方经营情况、财务

36

状况、商业秘密、技术秘密等全部情况，甲方与乙方均有义务保密，除非法律有明确规定或司法机关强制要求，任何一方不得对外公开或使用。"

2014 年 9 月 18 日，第三被申请人申请办理工商登记变更。2015 年 4 月 28 日，第三被申请人办理工商登记变更，公司类型由有限责任公司（外国法人独资）变更为有限责任公司（中外合资），法定代表人由第二被申请人变更为吴国庆，股东由第一被申请人 100%持股变更为第一被申请人持股 48%，申请人持股 52%。2018 年 2 月 11 日，第三被申请人法定代表人由吴国庆变更为肖瑞华。目前第三被申请人的董事分别为肖瑞华、肖琼、第二被申请人，其中肖瑞华任董事长。

2019 年 7 月，第一被申请人作为申请人，以申请人为被申请人，依据 2014 年 9 月 8 日的《股权转让协议书》向本会申请仲裁，要求申请人支付股权转让款人民币 1,500 万元以及利息、违约金人民币 300 万元，本会于 2021 年 4 月 29 日作出 349 号裁决，就该案所涉争议相关事实作出如下认定："1.关于系争《转让协议》签订时的森科木业股东……上述事实可以认定孙琳达并未根据《股份售让协议书》获得股东资质，系争《转让协议》签订时森科木业的股东为申请人 Sunco, INC.。……因此仲裁庭认定，折抵协议产生了债务抵销的效果，被申请人于 2016 年 7 月 30 日完成债务抵销，自

此不再向孙琳达负有支付义务，亦不再负有向申请人支付1500万元股权转让款的义务。……仲裁庭根据双方的事先约定，支持第三项仲裁请求，认定被申请人应当向申请人就其延迟支付股权转让款项的违约行为支付违约金 300 万元。……"，据此仲裁庭裁决被申请人（即本案申请人）向申请人（即本案第一被申请人）支付违约金人民币 300 万元，对于该案申请人的其余仲裁请求不予支持。

本案审理过程中，第一被申请人、第二被申请人、第三被申请人向仲裁庭提交关于"1018《股权转让协议书》"内容真实性等的司法鉴定申请，鉴定机构接受鉴定委托，鉴定事项包括：（一）检材《股权转让协议书》第 4 页落款处"孙琳达"签名是否第二被申请人本人所写。（二）检材《股权转让协议书》右侧骑缝处"森科木业（昆山）有限公司"印文是否完整。（三）检材《股权转让协议书》第 4 页落款处签名和日期字迹、落款处及右侧骑缝处"森科木业（昆山）有限公司"印文是否同一时间形成。（四）检材《股权转让协议书》6 页打印体字迹是否同一时间形成是否同一机具印制形成。（五）检材《股权转让协议书》第 4 页落款处签名和日期字迹、落款处及右侧骑缝处"森科木业（昆山）有限公司"印文与打印体字迹的形成时间先后顺序。（六）检材《股权转让协议书》是否一次装订形成。

2025 年 7 月 8 日，鉴定机构出具《鉴定报告》，发表如

38

下鉴定意见：（一）检材《股权转让协议书》第 4 页落款处"孙琳达"签名是第二被申请人本人所写。（二）检材《股权转让协议书》右侧骑缝处"森科木业（昆山）有限公司"印文盖印完整，符合一次盖印形成的特征。（三）未发现检材《股权转让协议书》落款处及右侧骑缝处"森科木业（昆山）有限公司"印文存在非同一时间盖印形成的迹象。无法判断检材《股权转让协议书》第 4 页落款处签名、日期字迹及其与落款处及右侧骑缝处"森科木业（昆山）有限公司"印文是否同一时间形成。（四）检材《股权转让协议书》6 页打印体字迹是同一机具印制形成，其中第 1 页至第 3 页打印体字迹与第 4 页至第 6 页打印体字迹不是一次连续印制形成。（五）检材《股权转让协议书》右侧骑缝处"森科木业（昆山）有限公司"印文与第 6 页打印体字迹的形成时间先后顺序为：先有打印体字迹，后盖印。无法判断检材《股权转让协议书》第 4 页落款处签名和日期字迹、落款处"森科木业（昆山）有限公司"印文与打印体字迹的形成时间先后顺序。无法判断检材《股权转让协议书》右侧骑缝处"森科木业（昆山）有限公司"印文与第 1 页至第 5 页打印体字迹的形成时间先后顺序。（六）未发现检材《股权转让协议书》存在非一次装订形成的迹象。

　　以上事实，均由申请人、被申请人提交的相关证据及庭审笔录、《鉴定报告》证明证实。

### （二）关于本案的法律适用

仲裁庭查明，本案第一被申请人系注册于美利坚合众国的公司，第二被申请人系美国籍人士，故本案属具有涉外因素的案件。根据《中华人民共和国涉外民事关系法律适用法》第四十一条规定，"当事人可以协议选择合同适用的法律。当事人没有选择的，适用履行义务最能体现该合同特征的一方当事人经常居所地法律或者其他与该合同有最密切联系的法律。"案涉《股权转让协议书》的第 6.5 条约定："本协议的成立、有效性、解释、履行及由此产生的争议的解决，均应适用中华人民共和国法律。"据此，仲裁庭认为，本案各方已经选择了法律适用。通常而言，这里所指称的中华人民共和国法律是指中国内地法律，仲裁庭将适用中国内地法律、法规对案涉《股权转让协议书》项下的争议作出裁决。

仲裁庭注意到，2021 年 1 月 1 日，《民法典》开始施行，《中华人民共和国合同法》（以下称"《合同法》"）等法律随《民法典》的施行而同时废止，与《民法典》同时施行的《最高人民法院关于适用〈中华人民共和国民法典〉时间效力的若干规定》就《民法典》的适用问题作出规定，该司法解释第一条第一款规定："民法典施行后的法律事实引起的民事纠纷案件，适用民法典的规定"；第二款规定："民法典施行前的法律事实引起的民事纠纷案件，适用当时的法律、司法解释的规定，但是法律、司法解释另有规定的除外"。参照上

40

述规定以及该司法解释关于《民法典》的溯及适用和衔接适用的其他具体规定，仲裁庭认为，由于本案中的法律事实均发生于《民法典》施行之前，即发生于 2021 年 1 月 1 日之前，本案也没有存在法律、司法解释另有规定的情况，仲裁庭在审理本案时，依然引用《合同法》、《中华人民共和国民法总则》（以下称"《民法总则》"）等已经失效的法律，以下裁决中不再单独强调《合同法》及《民法总则》等相关法律法规的效力问题。对于应当适用《民法典》的事宜，仲裁庭会特别注明。

### （三）关于本案的争议焦点

本案争议焦点为：1、案涉 1018《股权转让协议书》是否能被采信；2、第三被申请人中的48%股权是否属于申请人所有；3、第一被申请人、第二被申请人应向申请人支付的费用范围；4、第三被申请人是否应承担担保责任。

1、关于案涉 1018《股权转让协议书》是否能被采信。

申请人认为，从 1018《股权转让协议书》的形成背景和签订过程来看，该协议书是双方真实意思表示。对于 1018《股权转让协议书》签订的背景，申请人提及因 2014 年 8 月 2 日江苏省昆山重大爆炸事故发生后，当地政府对安全生产进行排查，导致依据 0908《股权转让协议书》申请的股权变更登记事项被无限期拖延。由于股权变更登记无法进行，加上第二被申请人表示希望继续拥有对第三被申请人的经营权，故

41

与申请人就第三被申请人的经营权进行了进一步磋商，达成了 1018《股权转让协议书》内约定的条件，也就是第 3 条相关条款的变更。同时，申请人认为，根据《鉴定报告》的结论，案涉协议第 4 页落款处为"孙琳达"本人所写。说明此前第二被申请人对该签字的一而再，再而三的否认为虚假陈述，第二被申请人就此应当承担不利后果；且案涉协议骑缝章一次盖印，该骑缝章是"先有打印体字迹，后盖印"，这已经完全可以说明，案涉 6 页纸合同文本形成在先，盖章在后，案涉各方是在磋商好了案涉协议文本后，才盖章的，符合商事合同签订的逻辑；同时，《鉴定报告》内也指出，未发现检材《股权转让协议》落款处及右侧骑缝处的印文存在非同一时间盖印形成的迹象。且在 2025 年 7 月 23 日开庭中，鉴定人员已经回复："该两个印章符合同一个阶段特征，具有共时性特征，否则鉴定结论应为无法判断"。这也再次证明案涉合同的落款章和骑缝章是同时形成。进一步说明案涉各方是在磋商好了案涉协议文本后，才盖章，案涉协议完整、连贯、同一。

被申请人方认为，2014 年 10 月 18 日的《股权转让协议书》不具备定案证据应具备的真实性、合法性要件，应当认定该证据为非法证据并不予采信。司法意见相关结论及检测结果表明协议缺乏完整性及一致性。《鉴定报告》明确认定"其中第 1 页至第 3 页打印体字迹与第 4 页至第 6 页打印体

字迹不是一次连续印制形成","不是一次连续印制形成"的鉴定结论已充分证明协议的形成过程不符合正常逻辑和日常生活经验。打印体字迹鉴定检验"进一步检验发现,检材第1页至第3页上打印体字迹由黑色、青色及红色墨点组成,第4页第6页上打印体字迹由黑色单色墨点组成",即第1页至第3页为彩色模式打印,第4页至第6页系黑白模式打印,一份正常的股权转让协议采用同模式印制形成同样是基本常态,一份仅6页的协议文本前3页与后3页连打印模式都不一致,该协议文本的形成状态违背正常逻辑和日常生活经验。同时,结合本案其他相关事实可以进一步认定协议属于非法证据,1018《股权转让协议书》与被申请人协议性文本签署模式不一致、与申请人协议性文本签署模式也不一致、协议变更条款的权益价值也不合理,且1018《股权转让协议书》签署模式并不严谨,与 0706《股权转让协议书》、0908《股权转让协议书》的签署模式完全不同。所以各方履行的是0908《股权转让协议书》。

仲裁庭认为,首先,关于申请人与第一、第二被申请人争论的1018《股权转让协议书》上字迹、印文以及文件的真实性,《鉴定报告》共出具了六条鉴定结论,鉴定结论中确定了1018《股权转让协议书》第4页落款处"孙琳达"签名为第二被申请人本人所写;落款处与右侧骑缝处第三被申请人印文未发现非同一时间盖印形成的迹象;第 1-3 页与第 4-6

43

页打印字迹不是一次连续印制形成；无法判断第二被申请人的签名与第三被申请人的两处印文是否同一时间形成；无法判断第二被申请人的签名和落款处第三被申请人印文与打印体字迹的形成时间先后顺序；无法判断右侧骑缝处第三被申请人印文与第 1-5 页打印体字迹的形成时间先后顺序。根据上述鉴定结论，对于 1018《股权转让协议书》可以确定的是，第 4 页落款处"孙琳达"的签名是第二被申请人本人所写，并明确第 1-3 页与第 4-6 页不是一次连续印制形成的。但鉴定机构无法判断第二被申请人的签名与第三被申请人的两处印文是否同一时间形成，亦无法判断第二被申请人签名和落款处第三被申请人印文与打印体字迹的形成时间先后顺序，以及右侧骑缝处第三被申请人印文与第 1-5 页打印体字迹的形成时间先后顺序。

根据《中华人民共和国民事诉讼法》（以下称"《民诉法》"）及相关司法解释的规定，当事人对自己提出的主张，有责任提供证据。主张法律关系存在的当事人，应当对产生该法律关系的基本事实承担举证证明责任。本案中申请人对其主张第三被申请人 48%股份的权属以及要求第一、第二被申请人承担违约赔偿责任的申请，应当提供证据证明申请所依据的法律关系存在，而申请人举证法律关系存在的证据材料是一份各方在 2014 年 10 月 18 日签订的《股权转让协议书》。

当事人提交合同作为法律关系存在的证明，合同应当是

44

真实、完整、有效的。申请人提交的 1018《股权转让协议书》，根据《鉴定报告》的鉴定结论，无法判断该份协议书上第二被申请人签字与第三被申请人印文的先后顺序，以及右侧骑缝处第三被申请人印文与第 1-5 页打印体字迹的形成时间先后顺序，这使合同签署过程的时间线模糊，影响对合同内容整体性、一致性的认定。且，鉴定结论确认第 1-3 页与第 4-6 页不是一次连续印制形成的，形式上并不完整，不符合合同整体性和一致性的要求。而申请人除了 1018《股权转让协议书》协议文件之外，未就 1018《股权转让协议书》的签订提供其它证据予以佐证。

此外，第三被申请人明确表示申请人提交的 1018《股权转让协议书》在第三被申请人处没有原件。虽然申请人提交了一份律师函用于证明 1018《股权转让协议书》盖章时，第二被申请人实际控制第三被申请人，但该份律师函内仅说明了财务交接手续办理以及交接内容情况，并不能直接说明1018《股权转让协议书》签订时，第三被申请人的公章仅能由第二被申请人接触并使用。同时，1018《股权转让协议书》中变更的内容，对于第一、第二被申请人来说，的确是对其持有第三被申请人股权权利的重大处置行为。

故，综合考虑 1018《股权转让协议书》的形式、内容、第三被申请人处没有协议原件等事宜，基于本案现有证据及《鉴定报告》的鉴定结论，仲裁庭对 1018《股权转让协议书》

45

不予采信。

仲裁庭另注意到，第一、第二被申请人在案件过程中曾提出进一步核查《股权转让协议书》原件的申请，鉴于仲裁庭已经同意第一、第二被申请人的鉴定申请，并且申请人在鉴定过程中提交了案涉《股权转让协议书》的原件、鉴定机构已经出具了《鉴定报告》，故仲裁庭认为第一、第二被申请人的前述申请已经处理。仲裁庭还注意到，第一、第二被申请人曾提交了《调查取证 ST2019036 案件所有案卷材料的申请书》，仲裁庭认为当事人已提交了前案的 349 号裁决书，没有必要调取前案的全部案卷资料，故不予同意前述申请。

2、关于第三被申请人中的 48%股权是否属于申请人所有。

如前所述，仲裁庭对申请人提交的 1018《股权转让协议书》不予采信。申请人未提交其它证据材料证明第三被申请人 48%股份的权属，根据《民诉法》的规定，当事人未能提供证据或者证据不足以证明其事实主张的，由负有举证证明责任的当事人承担不利的后果。故对申请人要求确认第三被申请人 48%股份属于申请人所有的请求不予支持。

3、关于第一被申请人、第二被申请人应向申请人支付的费用范围。

申请人主张第一、第二被申请人支付的费用包括三个部分，分别是违约金、股权转让过程中的税费以及律师费。

46

关于违约金，如前所述，由于申请人主张的第三被申请人的48%股权应属于申请人的请求未得到仲裁庭的支持，故第一、第二被申请人不存在未办理股权变更的违约责任，对申请人主张的违约金部分不予支持。

关于股权转让过程中的税费，第一、第二被申请人认可各方履行了0908《股权转让协议书》，根据0908《股权转让协议书》第1.2条约定，股权转让过程中的所有税费由甲乙方即第一、第二被申请人与申请人各承担50%，申请人已举证证明其在股权转让过程中所缴纳的税费金额，故对申请人主张第一、第二被申请人承担50%税费的请求予以支持。

关于律师费，由于第一、第二被申请人的违约责任在前案仲裁中已做处理，本案中亦未支持申请人要求受让第三被申请人中48%股份的仲裁请求，故对申请人主张为了维护自身合法权益而支出律师费的主张不予支持。

4、关于第三被申请人是否应承担担保责任。

如前所述，第一、第二被申请人无需承担违约责任，根据0908《股权转让协议书》第6.2条约定，税费亦不属于第三被申请人的担保责任范围，故第三被申请人在本案中无担保责任。

（四）关于申请人的仲裁请求

1、关于裁决第一被申请人在第三被申请人中的48%股权属于申请人所有的仲裁请求。

47

如前所述，对申请人的该项仲裁请求不予支持。

2、关于裁决第一、第三被申请人履行变更登记手续，将第一被申请人再第三被申请人中 48%的股份过户给申请人的仲裁请求。

如前所述，对申请人的该项仲裁请求不予支持。

3、关于裁决第一、第二被申请人支付违约金 2,160,000 美元（折合人民币 13,769,568 元，按照 2021 年 12 月 20 日美元兑换人民币汇率 6.3748 换算）的仲裁请求。

如前所述，第一、第二被申请人在 0908《股权转让协议书》项下的违约责任在前述仲裁案件中已做处理，本案中第一、第二被申请人无违约责任，对申请人的该项仲裁请求不予支持。

4、关于裁决第一、第二被申请人支付申请人股权转让过程中的税费人民币 69,959.60 元的仲裁请求。

如前所述，对申请人的该项仲裁请求予以支持。

5、关于裁决第一、第二被申请人支付申请人律师费人民币 400,000 元的仲裁请求。

如前所述，申请人在本案中支出的律师费应由申请人自行承担，对申请人的该项仲裁请求不予支持。

6、关于裁决第三被申请人对仲裁请求第 3、4、5 项承担担保责任的仲裁请求。

如前所述，未发生第三被申请人应承担担保责任的情形，

48

对该项仲裁请求不予支持。

7、关于裁决第一、第二、第三被申请人承担本案的仲裁费、保全费以及保险担保费等各项费用的仲裁请求。

根据《仲裁规则》第四十七条的规定，仲裁庭认为，如前所述，第一、第二、第三被申请人在本案中无需承担违约责任，对该项仲裁请求不予支持。

8、关于本案的鉴定费

基于本案现有证据及《鉴定报告》的鉴定结论，仲裁庭对 1018《股权转让协议书》不予采信，但落款处"孙琳达"签名是第二被申请人本人所写，右侧骑缝处"森科木业（昆山）有限公司"印文盖印完整，故仲裁庭根据《仲裁规则》第四十七条的规定并结合本案的实际情况认为本案第一、第二、第三被申请人缴纳的鉴定费由其自行承担。

## 三、裁　决

仲裁庭裁决如下：

（一）第一被申请人、第二被申请人向申请人支付股权转让发生的税费人民币 69,959.60 元；

（二）驳回申请人其它仲裁请求；

（三）本案仲裁费人民币 622,865 元，由申请人承担，与其预缴的仲裁费相冲抵。

上述第（一）项裁决所涉款项支付义务，第一、第二被

申请人应于本裁决生效之日起十日内向申请人履行完毕。

本裁决为终局裁决，自作出之日起生效。

（以下无正文）

（以下无正文）

首席仲裁员：　陈峰

仲　裁　员：　韩不友

仲　裁　员：　黄峰

二〇二六年一月十九日于上海

51

联 系 我 们



SHIAC 公众号

