## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SUNCO TIMBER (KUNSHAN) CO., LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 1:22-cv-10833 |
| v. | ) |
| | ) |
| LINDA SUN, individually, DAVID SUN, individually | ) |
| SHILLOCK YUAN-SUN, individually, and INFINITY | ) |
| WOOD PRODUCTS, LLC., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| SUNCO, INC., EASTMAN ST. DISTRIBUTORS LLC, | ) **SECOND DECLARATION OF** |
| EASTMAN ST. WOODWORKS, INC., | ) **DONALD J. LEWIS, J.D., L.L.M.** |
| INFINITY REALTY COMPANY LLC, and | ) |
| NEW SUN LIMITED PARTNERSHIP | ) |
| | ) |
| Reach and Apply Defendants, and | ) |
| Fraudulent Conveyance Defendants | ) |
| | ) |
| | ) |
| Linda Sun | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Sunco Timber (Kunshan) Co., Ltd. | ) |
| | ) |
| Counterclaim Defendant. | ) |
| | ) |
| | ) |
| Sunco, Inc. | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Sunco Timber (Kunshan) Co., Ltd. | ) |
| | ) |
| Counterclaim Defendant. | ) |
| | ) |

I, Donald J. Lewis, J.D., L.L.M., do hereby state as follows:

1.     I have provided an earlier Declaration ("First Declaration") in this matter regarding the procedural irregularties and due process concerns surrounding the arbitral proceedings between Sunco, Inc. ("Sunco US"), a U.S. corporation, and Jiangsu Qiyi Investment Co. Ltd. ("Qiyi"), a Mainland China company, relating to the ownership of shares in Sunco Timber (Kunshan) Co., Ltd. ("Sunco China"). The information I reviewed for my First Declaration consisted of:

    a.  The 2021 Arbitral Award issued by the Shanghai International Arbitration Center ("SHIAC") Tribunal on April 29, 2021 ("2021 Arbitral Award");

    b.  an arbitral award, dated January 19, 2026, ("2026 Arbitral Award") issued by a SHIAC Tribunal in a  separate arbitration commenced by Qiyi against Sunco US and Linda Sun on December 30, 2021;

    c.  A copy of the SHIAC Arbitration Rules (2015); and

    d.  Laws of the People's Republic of China (hereafter "PRC"), including the PRC Arbitration Law (1995); PRC Civil Procedure Law (2017); PRC Lawyers Law (2017); and the UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958) (New York Convention).

2.     I understand that Sunco China has provided a declaration by Patrick Zheng ("Mr. Zheng") to counter various points that I made in the First Declaration. I have been provided with Mr. Zheng's Declaration ("Zheng Declaration"), I submit this second declaration to respond to the Zheng Declaration.

3.     As a threshold matter, throughout the Zheng Declaration, Mr. Zheng cites to provisions of the PRC Arbitration Law  that went into effect on March 1, 2026, a law he defines

as the "PRC Arbitration Law (2025 Revision)," and which I refer to as the "PRC Arbitration Law (2026)," reflecting its effective date. However, the PRC Arbitration Law (2026) was not the law in effect as of the date of the 2021 Arbitral Award nor the 2026 Arbitral Award, which was rendered on January 19, 2026, more than a month before the PRC Arbitration Law (2026) went into effect. The PRC Arbitration Law (2026) did not have retroactive effect. The law in effect for both the 2021 Arbitral Award and 2026 Arbitral Award was the 1995 PRC Arbitration Law, which Mr. Zheng acknowledged obliquely in the Zheng Declaration (at ¶ 18).

4.      The first 18 pages of the Zheng Declaration offer, in essence, a primer on Chinese arbitration law and Chinese courts (largely under the inapplicable PRC Arbitration Law (2026)), without addressing specific points related to the arbitrations at issue. Therefore, I focus my reponse to the points raised by Mr. Zheng specifically relating the arbitrations and arbitral awards at issue in this case.

5.      The Zheng Declaration contends that the numerous procedural and due process irregularities enumerated in the First Declaration can be justified under the SHIAC Arbitral Rules and would not be grounds for vacating the 2021 Arbitral Award under Chinese law. It is my opinion that Mr. Zheng's conclusions with respect to each of these irregularities are unsupported.  However, even if any one irregularity by itself were not grounds for calling into question the fundamental fairness of the Arbitration, the cumulative effect of each of these procedural irregularities – all of which worked to Sunco China's benefit and Sunco US's detriment – the only reasonable conclusion, in my opinion, is that there are serious questions about the integrity and fairness of the arbitration ("2021 Arbitration") which resulted in the 2021 Arbitral Award.

**The Absence of an Arbitrator Appointed by Sunco US**

6.      The Zheng Declaration assesses the appointment of co-arbitrator Jiang Suping by SHIAC.  He appears to assume, without basis, that Sunco US was given an opportunity to and failed to nominate a co-arbitrator itself. The 2021 Arbitration record as provided to me allows no such assumption to be made. Based on the record I have been able to review, it appears Sunco US was not provided an opportunity to appoint its own arbitrator.

7.      While Mr. Zheng is correct that under the SHIAC Arbitration Rules, SHIAC itself may appoint an arbitrator when a party fails to nominate one, this does not address the issue that David Sun ("David") maintains that he did not receive, *inter alia*, (1) the Notice of Acceptance/Notice of Arbitration from the Secretariat, (2) the information packet consisting of the SHIAC Arbitration Rules (2015), and (3) the SHIAC Panel Lists of Chinese and Foreign Arbitrators. If these materials were not delivered to Sunco US, this would amount to non-disclosure of critically important rights-laden information impacting the formation and composition of the arbitral tribunal. This would be highly prejudicial to a foreign, U.S.-based party such as Sunco US. It would be a serious procedural irregularity constituting a denial of important rights available to all foreign parties under the SHIAC Rules and a clear violation of due process.

8.      A related issue would be whether Sunco US's Chinese counsel received such materials and did not disclose them to Sunco US. It is uncertain whether Sunco US's Chinese counsel received this documentation, as I have been informed by David that counsel for Sunco US during the 2021 Arbitration ceased communication with Sunco US.[1] David maintains that his

---

[1] As I noted in my previous affidavit, Sunco US's counsel from the 2021 Arbitration has cut off all communication with Sunco US, likely in violation of counsel's obligations under the applicable rules of professional responsibility, and so I cannot know with certainty what opportunities were or were not afforded to Sunco US.  This is an area that

3

Chinese counsel never informed him or Linda Sun of these important developments and documents.

9. Additionally, the Zheng Declaration fails to address the fact that Sunco US was also deprived of the opportunity to participate in the selection of the presiding arbitrator.[2] Under the SHIAC Arbitration Rules, specifically Articles 22.2 and 22.3, Sunco US should have been afforded the opportunity to participate in the selection of the presiding arbitrator. However, the SHIAC Chairman appointed the presiding arbitrator, without Sunco US having had the opportunity for consultation and input, as confirmed by David.

10. The result of these appointment irregularities was that the entire three-person tribunal ("Tribunal") was composed of Mainland Chinese nationals, with two of the three arbitrators in fact appointed by the SHIAC Chairman, the third appointed by Sunco China, adjudicating claims by a U.S.-based company, Sunco U.S., against a Mainland China-based company, Qiyi. This result does not accord with notions of procedural fairness, and it raises questions of bias against, and lack of due process for, Sunco US.

11. Mr. Zheng argues that because, unlike other regional arbitration entities, SHIAC does not *require* that the presiding arbitrator or party-appointed arbitrators to possess a nationality different from that of the parties, there is therefore nothing inappropriate or irregular with all three arbitrators being Mainland Chinese nationals. In my experience, it is often the case that even SHIAC tribunals involving foreign parties contain at least one non-Mainland Chinese arbitrator. While Mr. Zheng is correct that all arbitrators at SHIAC, including Mainland Chinese

_____

could have been developed with adequate discovery into the facts and circumstances surrounding the 2021 Arbitration.

[2] Again, whether this deprivation resulted from failures by the Tribunal or by Sunco US's counsel in China in contravention of its professional obligations is impossible to tell on the record I have received. Further discovery would likely yield the answer to this question.

arbitrators, are required to remain independent and impartial, there is a reason that it is often the case that foreign-related arbitrations have non-domestic arbitrators and there is a reason that other regional arbitration entities require it.  That is because it can be difficult for even well-meaning individuals to set aside natural biases.

12.    Moreover, it is well known nationalist bias is rife within the Chinese legal system and that some Chinese arbitrators may not be impartial and, indeed, can favor one of the parties (typically the Chinese party that appointed them) as a matter of Chinese arbitral practice. The prospect of Chinese national bias is a primary motivation why foreign businesses, for many years, have generally steered clear of Mainland arbitration and have opted instead for third-country arbitration when they have been able to negotiate to do so. Similarly, Chinese national bias against foreigners for political reasons has been for decades a persistent fear and concern of foreigners living and doing business in Mainland China. Arbitral tribunals and commissions, as well as the People's Courts, can be politically motivated.

13.    Concern over arbitrator bias is one of the key reasons that, as Mr. Zheng himself notes, other prominent Chinese international arbitration institutions in close geographical and cultural proximity to Mainland China, namely the Hong Kong International Arbitration Centre ("HKIAC") and the Singapore International Arbitration Center ("SIAC"), categorically do not permit the appointment of arbitrators who are of the same nationality as the parties. This is an acknowledgment, in part, of the likelihood of Mainland Chinese bias in favor of its own nationals in international arbitrations and that such practices are inherently discriminatory. In contrast to much of the world, international arbitrations in Mainland China often retain protectionist, pro-Chinese practices and procedures, which are unfair and discriminatory against foreign parties and rise to the level of procedural defects and a denial of due process.

5

**The Lack of Investigation into Credible Allegations of Inauthentic Documents**

14.    Mr. Zheng dismisses the suggestion that the SHIAC Tribunal acted improperly in not ordering a forensic examination of alleged 2015 and 2016 offset agreements ("Disputed Documents") for authenticity purposes despite Sunco US and Linda Sun's credible assertions during the arbitral proceedings that the Disputed Documents were fraudulent.  The Tribunal has the authority to investigate exactly these claims under SHIAC Rules Article 38 or to request expert determinations under SHIAC Rules Article 39 and, in my experience, arbitral tribunals frequently exercise their investigative authorities when faced with accusations of inauthenticity, particularly where the at-issue documents proved so central to the Tribunal's award. It is noteworthy that the Tribunal never provided an explanation to the parties why it did not do so.

15.    In responding to my invocation of a later arbitration between the parties ("Second Arbitration"), Mr. Zheng misstates my opinion.  I did not say that because the tribunal in the Second Arbitration ("Second Arbitral Tribunal") investigated claims of inauthenticity that fact retroactively obligates the first Tribunal to have done so.  Rather, my reference to the Second Arbitration is to highlight the typical procedure arbitral tribunals follow, in my experience, and to demonstrate that at least one arbitral tribunal took Sunco US's claims of inauthenticity seriously, claims that were ultimately bourne out by the evidence. As set forth in the previous affidavit, the Second Arbitral Tribunal appointed a forensic expert to review the authenticity of a similar document introduced by Mr. Guoqing Wu and his company and found on the basis of that forensic expert's opinion, that the document was not authentic.

**The Lack of Arb-Med Procedures**

16.     Mr. Zheng minimizes the vital role that Arb-Med procedures[3] typically play in Chinese arbitrations. Mediation as an informal dispute resolution mechanism in China is pervasive and well-developed. It is present in many contexts, for example: judicial mediation, administrative mediation, labor dispute mediation, and family-law mediation. Moreover, Arb-Med can be invoked by the parties or the relevant tribunal at almost any time, during formal proceedings, and even afterwards, even pending appeals.

17.     While Mr. Zheng is technically correct that mediation in China is "voluntary," the word "voluntary" does not have the same force when dealing with the authorities in Mainland China as it would in the United States. As noted by several Western scholars, Chinese mediation, including Arb-Med, is frequently coercive – intended to force the parties to reach a "voluntary" agreement, which in actual fact is an agreement dictated by third parties, such as an arbitral tribunal or higher arbitration or other authorities.

18.     The absence of Arb-Med in the first SHIAC Arbitration is, in my experience, highly irregular. While we cannot know with any degree of certainty precisely why the Tribunal chose not to exert its considerable influence to press for mediation, it can be indicative that the Tribunal had a vested interest in resolving the dispute itself, suggesting the possibility that the Tribunal had a predetermined outcome in mind.

19.     In light of the Tribunal's other procedurally irregular decisions in Mr. Wu's favor along with the ultimate award in Mr. Wu's favor, the Tribunal's decision to retain the power to decide the case for itself rather than encouraging the parties to pursue the more conciliatory path

---

[3] Arb-Med procedures are the combination of arbitration with mediation, the distinctive Chinese form of consensual, informal dispute resolution stresses compromise.

7

of Arb-Med to resolve their dispute between themselves raises the unfortunate specter that the Tribunal may have predetermined the outcome.

**The Lack of Evidence of Institutional Scrutiny**

20.     Article 48 of the SHIAC Rules provides for institutional scrutiny of draft awards before they are rendered. Mr. Zheng states that this scrutiny process is exclusively an internal administrative process between the arbitral tribunal and the arbitral institution that occurs and, by implication, involves no communication of the process to the parties. Mr. Zheng futher asserts there is no generally accepted international arbitral practice requiring an arbitral award to contain an express statement confirming that institutional scrutiny has occurred.

21.     Mr. Zheng maintains under the arbitration rules of major international arbitral institutions—including the ICC, SIAC, and leading Chinese arbitral institutions—the scrutiny or internal review of draft awards is treated as an institutional process conducted behind the scenes in secret, in other words, again without any communication with the parties.  But this is not correct. The ICC Secretariat, for example, will typically communicate with the parties at the start of the scrutiny and at the conclusion of the scrutiny. Once the draft award is approved, the Secretariat will formally notify the parties that the award has been approved. In the 2021 Arbitral Award, there was no statement or acknowledgement that the draft award had been subject to the scrutiny process and apparently there were no communications between the SHIAC and the parties about the process. There is simply no indication that I have seen an institutional review was conducted.  If no review was conducted, this would constitute another procedural irregularity and a denial of key protections for Sunco US, a foreign party.

8

**The Lengthy Delay**

22.    Mr. Zheng recognizes that the SHIAC tribunal was in breach of SHIAC Rules regarding the time for rendering the 2021 Arbitral Award. The award was rendered approximately one year later than the period set forth by the SHIAC Rules. Mr. Zheng opines that "extensions are not uncommon in practice," but nowhere asserts that any extensions here were requested or granted, nor any basis for such a lengthy extension.

23.    I have seen no indication that the Tribunal articulated justifiable reasons for this significant delay, as it is required to do under the SHIAC Rules (SHIAC Arbitration Rules, Article 44.3). Moreover, no reasons for this year-long delay are given in the 2021 Arbitral Award. As Mr. Zheng states, under Chinese law, delay alone would not ordinarily constitute a ground for setting aside an award *unless* the delay resulted in a specific violation of a party's procedural rights or otherwise affected the fairness of the proceedings. Here, where no further evidence was taken by the tribunal following the hearing, the unexplained one-year delay in rendering the 2021 Arbitral Award raises questions as to whether there were potentially prejudicial causes of the extensive delay.

**The Award of Costs to Mr. Wu's Company**

24.    While Mr. Zheng is correct that the Tribunal had procedural discretion to award costs, that the Tribunal chose to do so *sua sponte* is further evidence of the Tribunal using its discretion to benefit Mr. Wu's company – a domestic Chinese party – and to harm Sunco US, without explanation or stated justification.

25.    It is an unfortunate aspect of business and law in Mainland China that such local protectionism is prevalent.

9

**The Cumulative Impact of the Tribunal's Decisions**

26.    Mr. Zheng sets forth reasons he believes that:

a.    the Tribunal's lack of an arbitrator appointed by Sunco US did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award;

b.    the Tribunal's lack of any non-Mainland Chinese arbitrator did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award;

c.    SHIAC failure to notify Sunco US of the possibility of the appointment of foreign arbitrators did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award;

d.    the Tribunal's failure to investigate credible accusations regarding the authenticity of key documents did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award;

e.    the Tribunal's failure to press the parties into the commonplace Arb-Med process did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award;

f.    the lack of evidence of institutional scrutiny of the Arbitral Award did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award

g.    the significant delays in issuing the Arbitral Award and the absence of any explanation for such delay did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award; and

10

h.   the Tribunal's *sua sponte* decision to award the majority of costs to Mr. Wu's company did not itself constitute a defect calling into question the fairness and validity of the Arbitration Award.

27.    What Mr. Zheng fails to grapple with, however, is the cumulative effect of these deviations from standard and expected practice.  Mr. Zheng refers to individual decisions as being within the discretion of the Tribunal.  As to any given decision, he may be correct.  The pattern and cumulative effect, however, are what raise the issue from one of an imperfect arbitration – which all processes naturally are – to one that is so one-sided that it raises meaningful concerns about whether Sunco US was afforded a fair and impartial process.

28.    Notably absent from Mr. Zheng's opinion are any examples of discretionary decisions by the Tribunal that cut in Sunco US's favor.  If the arbitration had followed the typical process, one would expect to see some discretionary matters come out in Mr. Wu's favor and some to come out in Sunco US's favor.  The fact that nearly every decision benefitted Mr. Wu's company and harmed Sunco US is, in light of the unfortunately pervasive nationalism and country protectionism in China, indicative not just of an imperfect arbitration, but a partial and biased one.

**A Comment on My Experience**

29.    In Plaintiff's brief in opposition to Defendants' Motion to Strike, Plaintiff argues that I have "no knowledge or experience about Chinese court's [sic] role in supervising arbitration proceeding [sic], set aside award [sic], or custom practices [sic] of arbitration rules in SHIAC."  That is untrue and I note that Plaintiff does not cite any support for that claim.

30.    I have 46 years of experience in Chinese law and practice. My opinion has been accepted as expert in the field of Chinese law and the Chinese legal system in the United States

11

District Courts for the District of Northern California, Eastern District of New York, District of Columbia, Northern District of Texas, and the Central District of California. I have given expert testimony in Canada, South Africa, Hong Kong, and Australia.

31.    In addition, I have been a lecturer and/or visiting scholar on Chinese law and legal systems at some of the world's leading educational institutions, including Stanford Law School, Harvard Law School, the University of Hong Kong Faculty of Law, Peking University Law Department, China University of Political Science and Law, and the University of Wisconsin at Madison School of Law, among other places. I was a Fulbright Law Professor to China in the Fulbright Program for the U.S. Department of State.

32.    I have authored and edited several books concerning business and law in China. I have authored dozens of articles and chapters, presented at academic and industry conferences and workshops, and been interviewed in various forms of traditional and nontraditional media.

33.    Further information regarding my credentials can be found in my curriculum vitae attached as Exhibit 1 to my first declaration, which I understand is filed at Doc. No. 243-1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2026.

_____
Donald J. Lewis, J.D., L.L.M.

12