**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SUNCO TIMBER (KUNSHAN) CO., LTD.,

Plaintiff,

v.

LINDA SUN, individually, DAVID SUN, individually SHILLOCK YUAN-SUN, individually, and INFINITY WOOD PRODUCTS, LLC.,

Defendants,

SUNCO, INC., EASTMAN ST. DISTRIBUTORS LLC, EASTMAN ST. WOODWORKS, INC., INFINITY REALTY COMPANY LLC, and NEW SUN LIMITED PARTNERSHIP

Reach and Apply Defendants, and Fraudulent Conveyance Defendants

Linda Sun

Counterclaim Plaintiff,

v.

Sunco Timber (Kunshan) Co., Ltd.

Counterclaim Defendant.

Sunco, Inc.

Counterclaim Plaintiff,

v.

Sunco Timber (Kunshan) Co., Ltd.

Counterclaim Defendant.

C.A. No. 1:22-cv-10833-MJJ

**OPPOSITION OF DEFENDANTS DAVID SUN, SHILLOCK YUAN-SUN, INFINITY WOOD PRODUCTS, LLC, SUNCO, INC., EASTMAN ST. DISTRIBUTORS LLC, EASTMAN ST. WOODWORKS, INC., AND INFINITY REALTY COMPANY LLC TO PLAINTIFF'S MOTION TO STRIKE**

## INTRODUCTION

Plaintiff's Motion to Strike (the "PMTS") is without merit. It makes essentially two arguments: (1) affidavits submitted by David, Shillock, and Linda, are "sham affidavits"; and (2) an expert affidavit by Donald Lewis and an exhibit on which it relies are inadmissible. Both arguments fail, and Plaintiff's motion must be denied.

Plaintiff tries to claim that David, Shillock, and Linda have introduced purportedly "sham affidavits" in support of summary judgment. In reality, however, Plaintiff simply disagrees with the facts as attested to by each of the three witnesses and wants the Court to agree with its interpretation of the facts. That is an inappropriate use of a motion to strike and a misunderstanding of the Court's role on summary judgment. Of course, the Court's role is not to weigh competing evidence, but rather to determine whether a triable issue of fact exists and, therefore, whether the parties' dispute can be decided as a matter of law. Plaintiff's disagreement with Defendants' witnesses has no place in determining whether such evidence is admissible.

David, Shillock, and Linda all gave testimony consistent with their prior deposition and interrogatory testimony. Plaintiff attempts to create an appearance of inconsistency, including by withholding critical facts from the Court, but that appearance falls apart under examination.

With respect to Mr. Lewis's affidavit, Plaintiff seems to misunderstand its purpose. Defendants[1] are not seeking to have Mr. Lewis's affidavit admitted as evidence. Mr. Lewis's expert opinion is being provided for the purpose of allowing the Court to assess whether a separate piece of evidence – the 2021 Arbitral Award[2] – should be excluded from evidence. Mr. Lewis's opinion is therefore not subject to the Federal Rules of Evidence.

[1] As used herein, "Defendants" excludes Linda Sun and New Sun Limited Partnership.

[2] Capitalized terms have the meaning defined in Defendants' Motion to Strike the 2021 Arbitral Award, unless otherwise defined herein.

## ARGUMENT

### I. Shillock's, David's, and Linda's Affidavits are not "Sham Affidavits," and Should Not be Stricken

#### A. Legal Standard

Plaintiff correctly cites the "sham affidavit" standard, which prevents a witness who has "given clear answers to unambiguous questions" from "creat[ing] a conflict and resist[ing] summary judgment with an affidavit that is clearly contradictory, [without] giv[ing] a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). "The reason for this is simple: if a plaintiff facing summary judgment could simply file a pleading inexplicably altering the factual landscape to which they had previously contributed in order to manufacture a genuine dispute as to a material fact, absurd results would follow." *Velez v. United Parcel Serv., Inc.*, 728 F. Supp. 3d 228, 232 (D. Mass. 2024) (Guzman, J.).

However, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002). "In determining whether the testimony constitutes an attempt to manufacture an issue of fact so as to defeat summary judgment, the court may consider the timing of the affidavit….The timing of the affidavit is probative of the party's intent, as an affidavit executed after the moving party moves for summary judgment suggests ill motive." *Malave-Torres v. Cusido*, 919 F. Supp. 2d 198, 203 (D.P.R. 2013).

#### B. Shillock's Affidavit Is Not a "Sham Affidavit," Nor Does It Violate Rule 37.

Plaintiff argues that Shillock's affidavit should be stricken in its entirety, on grounds that parts of it are a purported sham affidavit and that the entirety should be stricken under Fed.R.Civ.P. 37(c)(1). In so arguing, Plaintiff displays a fundamental misunderstanding of a

Rule 30(b)(6) witness's obligations. Shillock was designated as Defendants' Rule 30(b)(6) designee on certain matters of accounting and finance. Plaintiff seems to be under the mistaken impression that she should therefore have had the entirety of years of financial and accounting information committed to memory and that if she could not account for any specific transaction in detail, she failed to meet her Rule 30(b)(6) obligations.[3] That is not the standard, however.[4]

As Shillock testified, she is a certified public accountant and, at various times, performed accounting functions for Defendants. Doc. No. 238-4 ¶¶ 1, 2. She has intimate knowledge of the accounting and financial history of Defendants. *Id.* ¶ 2. Nothing about which she testified in her affidavit is inconsistent with her testimony at deposition, and everything in her affidavit is based on personal knowledge.

The first topic about which Plaintiff complains is Shillock's affidavit testimony concerning certain checks made out to Linda or to other individuals or entities on Linda's behalf. Doc. No. 252 at 7-8. Those checks form the basis of Plaintiff's fraudulent transfer (and, seemingly, reach-and-apply) claims, and Shillock's affidavit makes clear just how baseless those claims are. Each of the

---

[3] This stands in stark contrast to the behavior of Plaintiff's own Rule 30(b)(6) designees, who for the most part were unable to testify about *any* information for the vast majority of the topics for which they were designated. *See* Doc. No. 201, Doc. No. 207.

[4] Plaintiff seems to believe that being a Rule 30(b)(6) witness requires memorizing the details of thousands of pages of accounting entries. That is not the standard, however. "A deposing party may not demand that a corporate designee be prepared to speak with encyclopedic authority." *In Spite Telecom LLC v. Rosciti Constr. Co. LLC*, 747 F. Supp. 3d 270, 289 (D. Mass. 2024) (Cabell, M.J.). By way of example, the general ledger for Sunco US for 2018 – excerpts of which were provided as an exhibit at Doc. No. 238-38 – is 16,394 pages long, with multiple entries on either all or the vast majority of pages. Expecting Shillock to be prepared to testify from memory about every single entry on that general ledger, as well as the general ledgers for other years for Sunco US and for each of the remaining entities, is exactly the kind of "encyclopedic" knowledge courts do not demand of Rule 30(b)(6) deponents. *See In Spite Telecom*, 747 F. Supp. 3d at 289; *One World, LLC v. Manolakos*, No. 1:20-CV-11837-JEK, 2024 WL 3458347, at *3 (D. Mass. July 18, 2024) (Boals, M.J.) ("A corporate designee is 'not expected to be a corporate encyclopedia,' able to answer anything and everything about the company.")

purportedly fraudulent checks was made *for value* and therefore *cannot* be a fraudulent transfer. Doc. No. 238-4 ¶¶ 10-54. Rather than engage with the substance of Shillock's affidavit – because Plaintiff cannot do so – it seeks to have it stricken because it expands upon her deposition testimony in a way Plaintiff intentionally chose not to explore at Shillock's deposition.

Plaintiff first argues, without basis, that Shillock lacks personal knowledge regarding the facts, because the at-issue checks were made out to Linda, and therefore only Linda should be allowed to testify concerning them, notwithstanding that Shillock's affidavit is explicitly based on her own personal knowledge (*see* Doc. No. 238-4 at 1) and simply provides further detail regarding information already disclosed at Shillock's deposition. Plaintiff's argument neglects that these checks originated from Sunco US's bank account. *See* Doc. No. 249 (Combined Statement of Facts) at 49-51. Shillock, as Sunco US's accountant, has personal knowledge of the provenance of those checks and therefore should be permitted to testify concerning them. *See generally* Doc. No. 238-4. The checks had a sender and a recipient, and the idea that the sender should not be permitted to testify because the recipient was uncertain in her testimony is absurd. Plaintiff argues that "Defendants cannot now use a post-discovery affidavit from Shillock to supply, transaction by transaction, the very explanations that the person who actually received the money could not provide under oath." Doc. No. 252 at 8. But Sunco US issued the checks, and Shillock was Sunco US's accountant.[5]

More troubling, however, is that Plaintiff omits the fact that Plaintiff's counsel asked Shillock about many of the transactions underlying these very same checks at Shillock's own deposition, and Shillock provided deposition testimony consistent with her affidavit. *See, e.g.*, Doc.

[5] It bears noting that notwithstanding Plaintiff's claim, Linda herself did not "actually receive[] the money" in all cases, as many of the checks were sent to various third parties on her behalf.

No. 223-7 at 219:24-222:4; 305:9-307:8. Plaintiff misleadingly claims that Shillock "was separately asked about other intercompany transactions" (Doc. No. 252 at 7), creating the impression that she did not testify about the checks at issue.

In citing to Rule 37(c)(1), Plaintiff claims that it "lost the opportunity to examine this accounting narrative at deposition, test the underlying records, seek follow-up discovery, or obtain responsive expert analysis on a narrative that surfaces for the first time after discovery." Doc. No. 252 at 8. That is a grossly counterfactual argument. Shillock walked through various transactions with Plaintiff's counsel at her deposition, much as she did in her affidavit. For example, she explained that: "Well, the way the money moved, Sunco [US] owes rent to IRC. IRC owes a note payable to NST. So another entry would be IRC – so all the money, the expenditures going out, left from Sunco [US], because rather than writing four checks, I pay you, you pay her, going back, you just write a check from here to here, here to here." Doc. No. 223-7 at 126:5-15. She further explained, "So depending on the transaction that month. Okay? There are other transactions going on. There are management fees. There are administrative fees. There are third-party vendor fees. So instead of Sunco [US] paying IRC and then IRC writing a check to them, or going back and forth, the accountant does a – do all the accounting and then the net, they will write a check to whoever is owed the money." *Id*. at 126:17-127:4; *see also id*. at 341:11-343:17. That is entirely consistent with Shillock's affidavit testimony, in which she walks through those specific transactions to demonstrate how money moved, something she could have done with Plaintiff's counsel had Plaintiff's counsel been willing to put the documents in front of her. Plaintiff's counsel may be correct that he was not *obligated* to do so, but Plaintiff cannot now complain that Shillock went through those same documents in her affidavit.

In addition, Shillock repeatedly asked counsel for Plaintiff to show her the underlying documents during her deposition precisely so that she could walk Plaintiff through the exact transactions the way she did in her affidavit. *See, e.g.*, Doc. No. 223-7 at 304:4-8 (Shillock asked "Can you show me the checks?" Counsel responded that he would not; 302:15-23 (Shillock said "You have to show me."); 308:21:-309:1 (noting that "I need to see – I need more information."); 309:8-15 ("I don't know actually. I need to have that information in front of me," referring to a transaction in Defendants' records about which Plaintiff's counsel was asking); 311:14-22 ("That I don't know. I need to have information in front of me. I don't know.");[6] 207:13-20 ("I would need to see…2011's financials."); *see also id.* at 221:22-222:4 (explaining what would be seen on trial balances); 277:16-20 (identifying what would be found in accounting reconciliation documents); 279:12-280:2 (noting that she cannot recall the number because she would need the trial balance document in front of her). And to be clear, each of the documents that Shillock was requesting to see had already been produced to the Plaintiff.

Moreover, at Shillock's deposition, counsel for certain of the Defendants objected to Plaintiff's strategy of asking Shillock questions about checks and other transactions without actually showing her the documents themselves. *Id*. at 305:11-306:20. In response, Plaintiff's counsel asserted "I have no obligation to give her the checks." *Id*. at 306:2-3. For Plaintiff now to claim that it was somehow denied the opportunity to do exactly what Shillock had been asking Plaintiff's counsel to do at her deposition is disingenuous.

---

[6] The purported transaction about which Plaintiff's counsel was asking in this particular question and answer set appears not to exist at all, as there is no one-million-dollar payment from Sunco US to ESW on September 23, 2022, highlighting the limitations on Plaintiff's "gotcha" strategy of asking Defendants' accountant to testify purely from memory about transactions from many years prior. Had Plaintiff shown the relevant documents to Shillock as she had requested, she could have pointed this out during her deposition.

Plaintiff argues that Shillock lacks personal knowledge to submit an affidavit in this matter. In support of that claim, Plaintiff cites to one answer to one question from her deposition, in which she was asked if she "managed the bank accounts of Sunco, Inc." and she said she did not. Doc. No. 252 at 8. That ignores the fact that she also testified that she was intimately involved in accounting for Sunco US, liaised with Sunco US's outside accountants on accounting matters, and "had to take over" the accounting department at Sunco US. Doc. No. 223-7 at 93:17-94:6. It also ignores that Shillock's affidavit explicitly attested that she has "personal knowledge of the facts set forth in this affidavit." Doc. No. 238-4 at 1.

Plaintiff inexplicably claims that Defendants somehow "elicit[ed] sworn ignorance from the witness with the most direct knowledge, then produc[ed] a comprehensive affidavit from a different witness after discovery is closed." Doc. No. 252 at 9. Defendants did not elicit sworn testimony from Linda. Defendants did not put forth Linda as the witness most knowledgeable about Defendants' accounting practices. It was Plaintiff who chose to ask Linda about the at-issue checks and it was Plaintiff who chose to forego the opportunity to ask Defendants' in-house accountant, who was, in fact, presented as the most knowledgeable witness, to walk through Defendants' accounting records.

Shillock's affidavit is consistent with her deposition testimony and therefore does not constitute a sham affidavit. She fully met her obligations as a Rule 30(b)(6) witness and therefore Rule 37 does not apply.

### C. David's Affidavit Is Not a "Sham Affidavit."

Plaintiff's argument that David's affidavit should be stricken as a purported "sham affidavit" relies upon a misrepresentation to the Court. Plaintiff claims David's affidavit is inconsistent with his deposition testimony – "as it strategically alters critical timelines and facts" (Doc. No. 252 at 6)

– while Plaintiff *omits* the very deposition testimony that is entirely consistent with his later affidavit.

In essence, Plaintiff argues that at his deposition, David claimed that the "offset" agreement was reached in 2016 or 2017, but that in his affidavit David claimed the agreement was reached in 2019. To the contrary, David testified at his deposition that Mr. Wu approached Linda in 2016 or 2017 to discuss using the cabinets as payment for the outstanding purchase price on Mr. Wu's company's purchase of shares in Sunco China, and that in April of 2019, David spoke with Linda after a conversation between Linda and Mr. Wu, at which time Linda informed David that she and Mr. Wu had agreed that the invoices would not need to be paid. *See* Doc. No. 223-6 at 41:21-45:1; 71:3-73:7. In his affidavit, David testified the same way: he testified that in 2015 or 2016, Linda told David that "Mr. Wu had approached her to propose that rather than pay cash for the balance of the amount owed on the share transfer, QiYi would have Sunco China ship cabinets to Sunco US as payment on the share transfer" and that in the spring of 2019, Linda and Mr. Wu had a meeting concerning payment of the share price, after which Linda informed David that IWP did not have to pay the outstanding invoices. Doc. No. 238-2 ¶¶ 13-17. That is, his deposition testimony and affidavit testimony are consistent.

Notwithstanding that clear testimony, Plaintiff misleadingly cites only to the portion of David's deposition testimony concerning the "2016 or 2017" discussion, while selectively *omitting* the portion of the deposition testimony concerning the discussion in April of 2019. Plaintiff then argues that the affidavit's reference to the spring of 2019 is an after-the-fact attempt to "manufacture a defense that this deposition testimony foreclosed," asserting that David only "now claims that Linda met with Mr. Wu in the 'spring of 2019,'" and accusing David of "shift[ing] the timeline by three years." Doc. No. 252 at 6.

The defense was not "foreclosed" by David's deposition testimony, but rather *supported* by it. During his deposition, David was asked "Did Linda Sun tell anyone at Infinity Wood Products that Sunco [US], that includes you and Shillock or anyone, not to [sic] pay for the cabinets at issue?" Doc. No. 223-6 at 71:3-6. David responded that "Linda Sun said that the receivables were not owed and would be in payment for the 52 percent." *Id*. at 71:10-12. When asked when that conversation occurred, David testified "April of 2019" (*see id*. at 71:23-72:1), i.e., the very time period Plaintiff claims that David has only now "manufactured." David further explained that "Mr. Wu and her [Linda] had an agreement with Sunco [US], with all the parties, that he didn't have the money to pay and the payment of the 52 percent shares would go through the receivables of Sunco China." *Id*. at 73:3-7. That *deposition* testimony is fully consistent with his testimony in paragraphs 16 and 17 of his *affidavit* that Linda met with Mr. Wu in the spring of 2019 and that after that meeting, Linda told David that IWP did not have to pay the invoices at issue in this case. Doc. No. 238-2 ¶¶ 16, 17.

Plaintiff fares no better in its claim that David's affidavit concerning whether Linda negotiated the sale of the 52 percent ownership share in Sunco China from Sunco US to Mr. Wu's company is somehow a sham. While it is true that David testified he had not *authorized* Linda in advance to negotiate the sale of the shares (*see* Doc. No. 223-6 at 77:22-78:2), that does not mean that Linda did not, in fact, negotiate the sale.[7]

[7] Defendants continue to be confused by Plaintiff's insistence that Linda was not authorized to negotiate the sale of the 52 percent ownership stake in Sunco China to Mr. Wu's company. If Linda had no authority and the sale was invalid, then Sunco China would continue to be owned 100 percent by Sunco US and Mr. Wu would have had no authority to initiate this suit on Sunco China's behalf.

### D. Linda's Affidavit Is Not a "Sham Affidavit."

Plaintiff takes issue with two aspects of Linda's affidavit: (1) her testimony concerning the "offset" agreement; and (2) her testimony concerning Sunco US's loan to Sunco China, which forms the basis of Sunco US's counterclaim. Both arguments fail because Linda's testimony in both cases does not constitute "sham" testimony.

#### 1. The Offset Agreement.

With respect to the offset agreement, Plaintiff claims Linda's affidavit testimony that she spoke with David in 2019 and told him about her meeting with Mr. Wu and her belief that IWP did not have to pay the at-issue invoices as a result of the offset agreement is flatly inconsistent with her testimony at her deposition. Plaintiff is wrong. First, Plaintiff claims that Linda was asked whether she "ever" had discussions with David about IWP's payment of the invoices in question. Doc. No. 252 at 4. The testimony cited does not reflect that characterization, however.

Plaintiff's counsel asked Linda: "What conversations have you have with your son regarding this litigation?" Doc. No. 223-3 at 95:7-9. Linda, who testified through a Mandarin interpreter, answered "No" and then further answered "He did not contact me. We had no contact." *Id*. at 95:10-12. Plaintiff's counsel then asked: "What conversations have you had with his wife, Shillock, regarding this litigation?" and she answered "None." *Id*. at 95:13-15. Plaintiff's counsel asked: "And so what conversations did you have with David regarding the nonpayment of the cabinets?" *Id*. at 96:7-9. Counsel for Linda interjected about an issue of the joint defense privilege, and asked that Linda first answer the question of whether she had any such conversations, to which she answered by beginning to describe her discussions with Mr. Wu, which relate to her testimony about when and why she spoke with David in the spring of 2019 about the payment of the cabinets, and Linda's counsel interjected to ask Linda simply to answer "yes" or "no," so that counsel could

assess whether a privilege – based on the joint defense privilege – could be asserted. *Id*. at 97:10-98:19. That privilege would apply to conversations concerning this litigation and therefore do not relate to issues predating the litigation. At best, the line of questioning was confusing as to time frame, because the prefatory questions had been about this litigation. It cannot be said that Linda provided a "clear answer[] to [an] unambiguous question[]." *Colantuoni*, 44 F.3d at 4-5.

The second citation to Linda's deposition on which Plaintiff relies has nothing whatsoever to do with conversations between David and Linda. Plaintiff misleadingly claims that it "pressed further" on the issue, but cites, rather, to the second day of Linda's deposition, not at all in the context of Linda's conversations with David. Doc. No. 252 at 4-5 (citing Doc. No. 233-4 at 53:4-54:14). The topic of the cited testimony was instead whether anyone at *Sunco China* ever spoke with Linda about IWP's payment of the invoices.

Equally important, even if Linda's affidavit in support of summary judgment and her deposition testimony could be read to be an inconsistency involving a clear answer to an unambiguous question, it is clear that Linda did not "create a conflict and resist summary judgment with an affidavit" (*Colantuoni*, 44 F.3d at 4) because her affidavit testimony is consistent with her sworn testimony in response to interrogatories given years earlier. Plaintiff asked Linda to "Describe your understanding of why Infinity has not paid Sunco for the Cabinets and set forth all facts and reasons supporting your understanding." Doc. No. 231.6 at 3. Linda answered, "I did once discuss with my son David whether Infinity should pay the invoice, but I do not control Infinity and do not know why, in the end, Infinity did not pay." *Id*. If Plaintiff believed Linda's deposition testimony to be that she had never had a conversation with David at any point – and not just since the litigation began – about why IWP did not make payment on the invoices, it could have

asked her to explain her interrogatory response, which is inconsistent with that interpretation of her deposition testimony. It did not do so.

"The timing of the affidavit is probative of the party's intent, as an affidavit executed after the moving party moves for summary judgment suggests ill motive." *Malave-Torres*, 919 F. Supp. 2d at 203. Similarly, the Appeals Court of Massachusetts has made clear that sworn testimony that *predates* conflicting deposition testimony does not fall within the ambit of the sham affidavit rule. *Zaleskas v. Brigham & Women's Hosp.*, 97 Mass. App. Ct. 55, 60 (2020) (finding no sham affidavit where the affidavit in question "came before -- not after -- the deposition.") Given the importance of timing and of determining whether given testimony is actually inconsistent with prior testimony, it is notable that Plaintiff chose to withhold Linda's prior *consistent* testimony from its argument to the Court. It is one thing to present one's best case to the Court by emphasizing supporting arguments; it is another thing entirely to fail to disclose relevant evidence that cuts directly against one's position. Plaintiff was free to argue – if it could – why Linda's interrogatories should not prevent a finding of a "sham affidavit"; it was not, however, proper for Plaintiff to withhold such information from the Court.

Here, there can be no doubt that Linda's affidavit is consistent with her prior sworn interrogatory responses. Accordingly, the affidavit cannot be a sham created solely for purposes of defeating summary judgment. To the extent Plaintiff argues that Linda's interrogatory responses are inconsistent with her deposition testimony, that would be an issue of credibility for a Plaintiff to explore at trial, not of admissibility.

**2. <u>Sunco US's Loan to Sunco China.</u>**

With respect to the loan at issue in Sunco US's counterclaim, the deposition testimony to which Plaintiff cites that is purportedly contradictory to Linda's affidavit is, in fact, wholly

consistent with her affidavit. Doc. No. 252 at 5. In her affidavit, Linda explained that she informed David in 2011 "that Sunco China needed a loan to cover its expenses." Doc. No. 231 ¶ 10. The purportedly contradictory testimony from Linda's deposition merely explains that since 2009, Sunco China was operating at a loss and, so, Sunco US wired money to Sunco China. Doc. No. 223-3 at 140:16-141:1. Plaintiff's description of Linda's testimony as saying that "she only knew about it because 'they told me so'" is just not what Linda testified to. Doc. No. 252 at 5. Linda was asked about whether she had seen *documents* evidencing the loan, and she testified she was aware of the existence of those documents because "[t]hey told me so." *Id*. at 141:12-17.] There is simply no inconsistency there. In both her affidavit and her deposition, Linda testified that Sunco China needed money and Sunco US supplied those moneys.

* * *

In summary, Plaintiff's arguments to strike the deposition testimony of Shillock, David and Linda rely upon a pattern of failing to provide complete information to the Court. Regarding Shillock, Plaintiff claims it was denied the opportunity to ask Shillock questions about certain checks (Doc. No. 252 at 8) while failing to disclose to the Court that not only did Plaintiff ask Shillock questions about the transactions underlying those checks, but Shillock and Defendants' counsel explicitly requested that Plaintiff's counsel put those very same checks in front of Shillock at her deposition, and Plaintiff's counsel refused to do so (*see supra* at 5-7). Regarding David, Plaintiff claims that, with respect to when the "offset" agreement occurred, David "shift[ed] the timeline by three years" between his deposition testimony and affidavit testimony in an attempt to "manufacture a defense" (Doc. No. 252 at 6), but chose to withhold from the Court – by selectively citing only a portion of the relevant deposition testimony – the fact that David testified to the same timeline at his deposition (*see supra* at 8-10). Regarding Linda, Plaintiff claims that Linda is

attempting "to manufacture factual disputes" in her affidavit in order to avoid summary judgment, arguing that "the timing of Linda's affidavit compounds the problem" (Doc. No. 252 at 4-5), while failing to disclose to the Court that Linda testified under oath in *2023* – long before summary judgment – in a manner consistent with her summary judgment affidavit (*see supra* at 10-12). These undisclosed facts disprove Plaintiff's argument, and Plaintiff's motion to strike affidavit testimony from Shillock, David, and Linda should be denied.

## II. <u>Neither the Lewis Declaration Nor the 2026 Arbitral Award Should Be Stricken</u>

### A. <u>Defendants Do Not Rely on the Lewis Declaration as Evidence.</u>

Plaintiff's argument that the Lewis Declaration should be stricken rests upon a misapprehension of the role of the Declaration. Defendants are not arguing that Mr. Lewis should be a trial expert, nor are Defendants arguing that the Court should rely on Mr. Lewis's Declaration in deciding the parties' respective summary judgment motions. Rather, Defendants rely upon Mr. Lewis's Declaration in deciding whether the *2021 Arbitral Award* is admissible evidence. Accordingly, Fed.R.Civ.P. 26(a)(2) is inapplicable and Plaintiff's arguments are irrelevant.

Fed.R.Civ.P. 26(a)(2) provides in relevant part: "(2) *Disclosure of Expert Testimony*. (A) *In General*. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any <u>*witness it may use at trial*</u> to present evidence under Federal Rule of Evidence 702, 703, or 705." (emphasis added). As the Lewis Declaration is not being presented as evidence in support of summary judgment, nor will it be entered into evidence at trial, Federal Rules of Evidence 702, 703, and 705 are not implicated.

Plaintiff has sought to rely upon the 2021 Arbitral Award in support of its motion for summary judgment and in opposition to Defendants' motion for summary judgment. *See* Doc. No. 249 at 16-26, 94, 95, 99. Defendants contend that the 2021 Arbitral Award should be stricken for several reasons, including that the Award resulted from a highly irregular arbitration that raises

significant concerns regarding the fairness and impartiality of the arbitration. *See* Doc. No. 242 at 11-17. The Lewis Declaration is offered in support of that argument, no more.

**1. Fed.R.Civ.P. 26 Does Not Apply**

Expert declarations may be used by the Court in determining questions of foreign law. Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); *see also BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil*, 184 F.R.D. 3, 9 (D.D.C. 1999) ("Khalil complains that this "evidence" should be excluded because no expert report was provided in compliance with Rule 26(a)(2). . . . the argument gives profile to the curious position of expert testimony on questions of law, which is only permissible in limited circumstances. . . . Is such testimony "evidence" or is it argument? Whatever the answer may be, for questions of foreign law, Rule 44.1 of the Federal Rules of Civil Procedure, which permits expert testimony on such questions, controls.").

As a result, counsel for Linda and New Sun Limited Partnership ("NST") raised the issue of affidavits from lawyers regarding matters of foreign law at the Court's October 8, 2025 status conference, seeking clarification of whether a report pursuant to Rule 26 would be necessary. The Court responded "if it's simply an interpretation of some foreign law they're going to put in some affidavit form, I am not sure that anything else is required, other than, you know, agreement on what is an acceptable interpretation and translation, these sorts of issues, but I am not sure that you need an expert report." *See* **Exhibit A** attached hereto (Transcript of October 8, 2025, Status Conference) at 8:4-9:3. Out of an abundance of caution, counsel for Linda and NST emailed counsel for Plaintiff to seek agreement that such foreign law expert affidavits would not need expert reports pursuant to Rule 26, writing "can we agree that we both can offer expert declarations on

these matters in support of or in opposition to motions for summary judgment, without the need for expert reports?" *See* **Exhibit B** attached hereto. Counsel for Plaintiff responded "I think this approach works for us." *Id*.

Undersigned counsel did not disclose that Defendants intended to rely upon a declaration from Mr. Lewis because Plaintiff had not previously relied on the 2021 Arbitral Award in attempting to rebut Defendants' "offset agreement" defense. Defendants cannot be faulted for failing to disclose an expert declaration that was not necessary at the time. It was only after Plaintiff relied upon the 2021 Arbitral Award for the first time in its summary judgment papers that the need for an expert declaration on Chinese arbitration law became necessary. Plaintiff argues that "Mr. Lewis is not the Chinese-law expert Defendants disclosed," but Defendants did not disclose any particular Chinese law expert. Nor would it have mattered if Linda and NST's counsel had, because the principle is the same: experts in foreign law are not subject to the requirements of Rule 26 in providing an expert opinion for the Court, as opposed to a jury, to consider.

Defendants cannot be held responsible for Plaintiff's own silence on the use of the 2021 Arbitral Award. As explained further *infra*, Defendants challenged the use of the 2021 Arbitral Award at the first moment at which challenge was possible. Moreover, once the parties were in agreement that the parties would forgo Rule 26(a)(2)(B) disclosure for experts related to Chinese law and judgments, there was no cause to reiterate the agreement for the 2021 Arbitral Award, which also implicates Chinese law and judgments. Further, the expert declarations regarding Chinese law and judgments are to aid the Court in determining questions of law, not aid the jury in determining factual issues – as such, the Court can give the expert declarations the weight to Court sees fit. *See Beijing Abace Biology Co. v. Zhang*, 122 F.4th 448, 453 (1st Cir. 2024) ("We hasten to add that the district court was not obligated to give the views of any expert any particular

weight. . . . In the last analysis, the dimensions of foreign law must be determined by the inquiring court, not simply by rubber-stamping the views of some expert witness.").

Plaintiff opines that Defendants have known of the 2021 Arbitral Award for years, but have done nothing until now. This argument is also in error. Plaintiff never sought to have the 2021 Arbitral Award enforced in the United States, failed to produce almost any documents relating to the 2021 Arbitration, objected to the production of such documents as irrelevant and unduly burdensome,[8] and never asserted that Defendants' affirmative defense was precluded by the 2021 Arbitral Award. Because Plaintiff had not put the Award at issue, Defendants had no need or obligation to address it. *See Molecular Dynamics, Ltd. v. Spectrum Dynamics Med. Ltd.*, 143 F.4th 70, 85 (2d Cir. 2025) ("Under Article V [of the New York Convention], only after an award has been "invoked" against a party may that party urge the court to refuse recognition and enforcement. . . .The New York Convention therefore envisions a mostly limited, reactive role for the losing party in an arbitration.").

For this same reason, Mr. Lewis's reliance on conversations with David are not problematic in the way Plaintiff claims. Defendants are not seeking to introduce Mr. Lewis's testimony into evidence. It therefore does not need to be free of hearsay.

### 2. Expert Testimony Does Not Require Personal Knowledge

Plaintiff faults the Lewis Declaration for lacking personal knowledge. Experts, however, testify regarding their expertise, not their personal knowledge of the facts underlying their expert opinion. Plaintiff is correct that Mr. Lewis did not participate in the 2021 Arbitration. He does not

---

[8] Defendants sought documents concerning litigation and/or arbitration in China between Plaintiff, Linda, David, and/or Sunco US. *See* Doc. No. 114-2 at 18 (Plaintiff's response to document request 39, refusing to produce documents relating to any litigation or arbitration except the litigation referenced in Linda's counterclaim, i.e., not the arbitration resulting in the 2021 Award.)

need to. His role is to provide his expert opinion regarding the ways in which the arbitration differed from Chinese law, the arbitral tribunal rules, and the customary practice of international arbitration in China.

**B. Defendants Do Not Rely on the 2026 Arbitral Award as Evidence.**

Plaintiff misconstrues Defendants' use of the 2026 Arbitral Award – Defendants are not relying upon the award as evidence at summary judgment, but to contest Plaintiff's use of the 2021 Arbitral Award in its summary judgment motion. As with the Lewis Declaration – and unlike Plaintiff with respect to the 2021 Arbitral Award – Defendants do not contend that the 2026 Arbitral Award is admissible evidence. To the contrary, Defendants argue that arbitration awards, such as the 2021 Award, are inadmissible, on hearsay and other grounds. Rather, Defendants rely up on the 2026 Arbitral Award in support of their argument that the 2021 Award should be stricken.

The 2026 Arbitral Award, like the 2021 Arbitral Award, relates to a dispute between Sunco US and QiYi arising from the transfer of shares in Sunco China from Sunco US to QiYi. *See* Doc. No. 243-2; Doc. No. 243-3. The first arbitration between the parties related to a share transfer agreement dated September 14, 2014, whereby QiYi – owned by Mr. Wu – purchased 52% of shares in Sunco China from Sunco US. Doc. No. 243-2 at p. 5-6. QiYi contended that Linda Sun later, in 2015 and 2016, signed two agreements that purportedly offset the remaining funds owed by QiYi for the purchased shares. Doc. No. 243-2 at p. 22. Sunco US contended that Linda never signed such agreements and the agreements were forged. *Id*. Despite this grave allegation, the arbitral tribunal failed to invoke its investigatory powers or order expert examination of the allegedly forged documents.

In contrast, in the second arbitration, in which QiYi claimed it now owned the entirety of Sunco China under a Share Transfer Agreement dated October 18, 2014 (an agreement QiYi never

raised in the first arbitration), Sunco US again challenged the authenticity of QiYi's proffered documents. Doc. No. 243-3 at 14. The second arbitral tribunal did invoke its investigatory powers, investigating the authenticity of the document on which QiYi and Mr. Wu relied. As a result, the tribunal found serious authenticity issues with the document, ultimately determining on the basis of forensic analysis that the document was inauthentic. *Id*. at 52. The results of the investigations by the second arbitral tribunal support the argument that the first tribunal's failure to investigate denied Sunco US due process in the 2021 Arbitral Award. The concerns about lack of due process should, thus, preclude the use of the 2021 Arbitral Award for res judicata and collateral estoppel purposes in the instant litigation.

Notably, in arguing that the 2026 Award is inadmissible, Plaintiff argues that it is hearsay. Doc. No. 252 at 16-17. Defendants agree. The 2026 Award, like the 2021 Award, is unquestionably hearsay to the extent any party seeks to rely on it as evidence for the truth of the matters asserted therein. Defendants' position is consistent. Plaintiff's is not. If the 2026 Award is hearsay when offered for the truth, then the 2021 Award is also hearsay.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion to Strike should be denied in its entirety.

Respectfully submitted,

DAVID SUN, SHILLOCK YUAN-SUN, INFINITY WOOD PRODUCTS, LLC, SUNCO, INC., EASTMAN ST. DISTRIBUTORS, LLC, EASTMAN ST. WOODWORKS, INC., and INFINITY REALTY CO. LLC,

By their attorneys:

*/s/ Michele Connolly*

Peter E. Ball (BBO No. 546031)
Michele E. Connolly (BBO No. 680946)
Malgorzata Mrózek (BBO No. 699035)
FITCH LAW PARTNERS LLP
84 State St.
Boston, MA 02109
(617) 542-5542
peb@fitchlp.com
mec@fitchlp.com
mam@fitchlp.com

Dated: July 15, 2026

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 15, 2026.

*/s/Michele E. Connolly*
Michele E. Connolly