UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUNCO TIMBER (KUNSHAN) CO. LTD.,

Plaintiff,

v.

LINDA SUN, et al,

Defendants.

Civil Action No. 22-CV-10833-MJJ

July 30, 2026

BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA 02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

Connie C. Dai
Yun Cheng
Lion's Law P.C
154 Wells Ave
Suite 1d
Newton, MA 02459
617-682-7101
Email: Connie@lionslawgroup.com

Timothy K. Cutler
Cutler PC
20 Walnut Street
Suite 1
Wellesley, MA 02481
617-232-7500
Fax: 617-232-7560
Email: Tim@cutlerlegal.com

FOR THE DEFENDANTS:

Michele E. Connolly
Peter E. Ball
Malgorzata A. Mrozek
Fitch Law Partners LLP
84 State Street
11th Floor
Boston, MA 02109
617-747-7809
Email: Mec@fitchlp.com

Theodore J. Folkman
Rubin & Rudman LLP
53 State Street, 15th Flr.
Boston, MA 02109
617-330-7135
Email: Tfolkman@rubinrudman.com

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK: All rise.

(The Honorable Court Entered)

THE CLERK: Today is July 30, 2026. We're on the record in the matter of *Sunco Timber Company, Limited v. Sun, et al. Case Number is 22-CV-10833*. Will counsel please identify themselves for the record.

MS. DAI: Good morning, your Honor. Connie Dai for plaintiff and counter claimant.

THE COURT: Good morning.

MR. CHENG: Good morning, your Honor. Yun Cheng on behalf of plaintiff.

THE COURT: Good morning.

MR. CUTLER: Good morning, your Honor. Timothy Cutler on behalf of plaintiff.

THE COURT: Good morning.

MS. CONNOLLY: Good morning, your Honor. Michele Connolly on behalf of all of the defendants except for Linda Sun and New Sun Limited Partnership.

MR. BALL: Good morning, your Honor. Peter Ball on behalf of the same defendants.

MR. FOLKMAN: Good morning, your Honor. Ted Folkman for Linda Sun and New Sun Limited Partnership.

MS. MROZEK: Good morning, your Honor. Malgorzata Mrozek on behalf of all defendants other than Linda Sun and New

Sun Limited Partnership.

THE COURT: Great. So it's good to see all of you in person finally rather than over Zoom. So we don't have a whole lot of time. I'd like to keep this to an hour. If we have to go over just a little bit, I am willing to do that just so that you can sort of expect when we're going to conclude.

So what I would like to do is focus mainly on the motions for summary judgment. To the extent that you want to talk about the motions to strike, I think it makes sense in the context of if I grant or deny the motion to strike, how that would materially change or affect the motion for summary judgment. Does that make sense?

MR. CHENG: Yes.

THE COURT: All right. I should also say you can see in the back we have a number of law students here. So maybe, for their benefit, maybe you can each start off by giving a 30-second summary of what your case is and what your positions are just so that they can sort of put things into context as the hearing goes forward.

MR. CHENG: Thank you, your Honor. I will try to do it within 30 seconds but it's going to be hard. Our case, I think, is simple, despite the hundreds of pages of filings, the core facts are simple. We represent the Chinese company Sunco China and the defendant, main defendant, is Infinity. So Infinity ordered over $6.7 million of cabinets from Sunco China

and the Sunco China manufactured all of those cabinets and give it to Infinity, and Infinity accepted those cabinets without any objections and then Infinity transferred all of those cabinets to Sunco, Inc. without any considerations, and Sunco, Inc. then resold them in the United States for over $8 million and meanwhile, Sunco China never got any payment from it. So that's basically our case.

And, your Honor, do you want me to tell about summary judgment.

THE COURT: I think that's a good summary.

MS. CONNOLLY: Good afternoon, your Honor. So the case from our end is a little bit more complicated than that. We agree that Sunco China manufactured approximately $6.7 million in cabinets, that it sold to Infinity Wood Products and Infinity Wood Products sold those cabinets to Sunco US. This dispute is part of a broader dispute including disputes going on in China where plaintiff's majority shareholder had purchased shares from Sunco US, didn't pay for them and then agreed to forgive the invoices at issue in this case in lieu of a cash payment and that's why payment isn't required, and there are also a variety of claims that plaintiff has made to pierce the corporate veil of Infinity and alleged certain fraudulent transfers and we maintain there is no factual support for those allegations.

MR. FOLKMAN: And mine is a little bit out of left

field. As you know, your Honor, my client is Linda Sun who was a director of the Chinese company. The Chinese company sued her in China, lost and it brought the same claim against her here and so we are going to see if we can persuade the Court to recognize the Chinese judgment and once it's recognized to say that it's res judicata which bars the claim.

THE COURT: And just for my benefit, Ms. Connolly, in all of the papers when the parties variously referred to a loan, an offset agreement, this all relate to the shares that you mentioned?

MS. CONNOLLY: Yes, your Honor.

THE COURT: Okay. And these are the shares that Mr. Wu bought of Sunco, Inc.?

MS. CONNOLLY: Not of Sunco, Inc., your Honor. So the Plaintiff is Sunco China. We refer to it in shorthand Sunco China. Sunco, Inc. is referred to as Sunco US in shorthand to keep them separate. Sunco US owned 100 percent of the shares of Sunco China until 2014 at which time it sold 52 percent of those chairs to a company owned by Mr. Wu.

THE COURT: Go ahead.

MS. CONNOLLY: With respect to the loan, Sunco US has a counterclaim against Sunco China for a loan that Sunco US made to Sunco China in 2011 that's separate from the share transfer agreement.

THE COURT: Got it. Who is going to be arguing for

the plaintiff?

MR. CHENG: All right, your Honor, so I will start with the breach of contract claim because it's the foundation of this whole case. So, as I just said, there is no genuine dispute as to liability over the breach of contract claim. Your Honor, the purchase orders, the delivery of products, the invoices and the non-payment, they're all established by the record, by the evidence that we produced, and even by defendants' own documents, including there is Infinity's account confirmation letter which has David's signature on it confirming, acknowledging, $5.9 million of debt as of December 2018, and then we also have Shillock's e-mail to their own accountant confirming the full $6.7 million balance.

So, as Ms. Connolly just explained, their only defense is that at some point Mr. Wu, the majority shareholder of the Sunco China, had an offset agreement with Linda.

So that doesn't have any basis and we have multiple independent reasons to --

THE COURT: So let me ask. Is it your position that there never was any sort of offset agreement to begin or is it your argument that it existed but I shouldn't give any effect to it?

MR. CHENG: It never existed, your Honor. It's completely fabricated.

So the first thing first, your Honor, that whole issue

is already litigated in China by an arbitration. So in 2019, Sunco USA itself initiated arbitration against Mr. Wu, his company Qiyi, for the alleged non-payment of that 52 percent of the shares of Sunco China, and if defendants' story is true, then why would they initiate such arbitration against Mr. Wu for the very same shares, for the very same non-payment of those shares? So those two positions cannot co-exist, and despite that, they lost in the 2021 arbitration and now they're saying that it doesn't matter. It's convenient for them to file motion to strike for now, despite that we have -- it hasn't been produced for years and Linda Sun even herself in person went in Shanghai and testified in the arbitration and now they're calling it as an ambush, as a surprise.

THE COURT: So if I grant the motion to strike or even if I deny the motion to strike but I recognize the 2026 arbitration award, where does that leave you?

MR. CHENG: That doesn't change the fact that the offset agreement concerning the cabinets at issue is totally fabricated because, first, the 2026 arbitration result doesn't affect anything about 2021 arbitration result. And second --

THE COURT: I'm sorry. Say that again.

MR. CHENG: The 2026 arbitration award doesn't affect anything about the 2021 arbitration award. It's not relevant.

THE COURT: Maybe I misunderstood. I thought the 2026 award said that the 2021 award was --

MR. CHENG: No, no, your Honor, no. The 2026 arbitration award doesn't concern anything about 2021 arbitration award.

THE COURT: Okay.

MR. CHENG: And for years they had opportunity to file a motion to vacate in China and they failed to do so, and what's even worse is that they was awarded 3 million RMB in that 2021 arbitration award and they brought it to a Chinese court to enforce it and they succeed, and we got a confirmation letter from the Chinese court saying that the 2021 arbitration case is closed because the award has to be satisfied in full, and we produced that as evidence in an exhibit.

And so now they're saying that 2021 arbitration award is completely invalid. So that's absurd, your Honor. And in that 2021 arbitration, nobody ever mentioned about this alleged offset agreement concerning this 2019 cabinets non-payment.

Also, even without that 2021 arbitration award, their defense is still baseless for multiple other reasons. First, there is no documentation about this so-called offset agreement between Linda and Mr. Wu anywhere. We couldn't find any clue or any traceable, you know, clues of that agreement. It's all oral. And David said he only heard about it from Linda in about 2016 or 2017. There is no writing, no accounting entry, no anything, and also David admitted that such alleged offset agreement identified no specific cabinets and so it could apply

to any cabinets at any time because according to David, Linda and Mr. Wu made that agreement back in 2016 or '17 but the agreement is concerning some cabinets that hasn't been manufactured yet, concerning cabinets in 2018 or '19. So how is that possible? And David just said, oh, it could apply to any cabinets at any time, and, your Honor, if that's the case, then it's not a contract. It's not an enforceable contract because the contract requires specific material terms.

And then another reason is that according to defendants themselves, their testimony said that Linda had no authority to even bind Infinity or Sunco, Inc. -- I mean, Sunco USA to enter into this offset agreement with Mr. Wu.

And also, the numbers just don't add up because according to the 2014 share purchase agreement where Mr. Wu bought the 52 percent of the shares of Sunco China, the purchase price was 20 million RMB which is about $3 million, and now they're owing $6.7 million worth of cabinets. So the numbers just don't add up.

And finally, your Honor, the subsequent conduct of both parties is entirely inconsistent with this offset agreement because from the plaintiff's perspective, they have been demanding the non-payment by sending out the invoices, by following up with e-mails after 2019, and they wouldn't do that if Mr. Wu really entered into an agreement in 2016 or '17 with Linda.

And also, as I mentioned earlier, your Honor, defendants themselves, they signed a confirmation letter in 2018, December 2018, acknowledging $5.9 million in debt, and also, they talked about it with their own --

THE COURT: So I had a question about that. Why the -- where does the $5.9 million come from if the cabinets are worth 6.7?

MR. CHENG: That's a good question, your Honor. Because it's not one purchase order. It's multiple purchase orders throughout 2018 and 2019, and as of the end of 2018, the non-payment was only $5.9 million. Then Sunco China also manufactured other products, other cabinets, and shipped it to the defendants and cumulatively it's $6.7 million.

THE COURT: So when David acknowledged $5.9 million, did anyone from Sunco China say, hey, wait a second, it's 6.7?

MR. CHENG: I'm sorry. Say it again.

THE COURT: So what happened when Sunco China received that acknowledgment? Did it say anything or dispute the figure?

MR. CHENG: They didn't dispute the figure because the figure was correct at the time.

THE COURT: The 5.9?

MR. CHENG: 5.9 at the end of December 2018.

THE COURT: I see. Got it. Then there were more?

MR. CHENG: Yes, then there were more.

THE COURT: Got it.

MR. CHENG: So defendants -- I think you should have noticed, your Honor, defendants couldn't respond to any of those arguments in their oppositions and their only argument is that the sanction order against plaintiff bars everything, every argument about this offset agreement or their affirmative defense, and that's absurd because that sanction order only bars any undisclosed facts before the deposition of the plaintiff and didn't -- it doesn't bar the legal arguments, the legal theories of this, concerning this offset agreement.

So that's all I am going to say about the breach of contract claim because their only defense fails and then we have a summary judgment.

THE COURT: So I agree with you. I think the breach of contract claim is your strongest argument for summary judgment but I think you have some work --

MR. CHENG: Yes, yes. We also have piercing of the corporate veil, your Honor.

So, first, with regard to Infinity and Sunco USA, it's undisputed that they're alter egos. They're essentially the same company because the defendants admitted themselves in the response to interrogatories and also in depositions that Infinity had no independent employees and Infinity is just a shell company. The only purpose for the Infinity is to import the cabinets from Sunco China in order to avoid some

regulations or tax issues from China. So it's just a shell company to import cabinets and they will transfer it to Sunco USA. Sunco USA is the one who operates.

THE COURT: So I was a little fuzzy about exactly what it is that you are arguing. Is your argument veil piercing? Is it alter ego liability? Is it enterprise liability? What is it?

MR. CHENG: It's both actually. Infinity and the Sunco, Inc., they're alter egos, and with regard to the other affiliated entities and also the independent defendants, we're arguing that it's a whole enterprise. Those companies are the same enterprise controlled by the same family, by Linda, by David and by Shillock together. That's our argument, your Honor, and we are supported with evidence.

THE COURT: But you need more than that, don't you, than to say the same three individuals control all of these entities?

MR. CHENG: Correct, your Honor. So the Court can look at what we call the *Pepsi* factors. There are 12 factors and I believe we established the majority of them. We established the common ownership. You know, that's undisputed because in their family, the Sun family, controlled all of those affiliated entities, and we have pervasive control from Linda, from David, and we have confused intermingling of business activity assets or management. That's what is

happening with this case. It's very confusing the relationship between Sunco, Inc. and -- between Sunco USA and Infinity and also between the Eastman Street Wood Products and Sunco USA.

Also, we have the thin capitalization. That's also one of the factors. Infinity doesn't -- they are admitting in the deposition that Infinity couldn't pay for the purchase price of the cabinets unless Sunco USA gave money to them. So Infinity is absolutely thin capitalizing, and after it transferred all of the cabinets to Sunco USA, it became insolvent, your Honor.

And we have nonobservance of corporate formalities.

And there is no corporate records with regard to Sunco USA's daily operations and other Infinity entities' daily operations. They don't have the, like, board meetings, minutes. They don't have the voting results.

And we have siphoning away of corporate assets where Infinity transferred the cabinets to Sunco, Inc. and then Sunco, Inc. distributed all of them to different entities. It would pay the -- that's actually concerning the fraudulent transfer, your Honor. So Sunco, Inc. would pay rent to a real estate company called Infinity Realty Company and Sunco, Inc. would pay checks to Linda's personal account and Sunco, Inc. would pay tax liabilities for Linda, and after the Infinity Realty sold their warehouse for $17 million, Sunco, Inc. got the money and distributed to Linda and also to David.

So that's -- so we have the majority of the *Pepsi* factors to establish piercing corporate veil, your Honor.

THE COURT: So I think I understand. I mean, it's pretty straightforward. Cabinets get sold to Infinity. Infinity receives the cabinets, transfers the cabinets to Sunco, Inc. and then Sunco, Inc. sells them all to their customers.

I am having more difficulty with the I guess I will call them downstream transfers, further transfers of the funds. So you can trace the goods from China to Infinity to Sunco, Inc. I didn't see much in the record about how you're tracing the proceeds from the sales of those cabinets to all of the individual defendants or the other entities.

MR. CHENG: Yes, your Honor. That's a concept of fraudulent transfer. So, first, I don't think there is any dispute that the Infinity's transfer of the cabinets to Sunco, Inc. without any consideration is fraudulent transfer, and once that is established, then Sunco, Inc. transferred all of the proceeds to the other affiliated entities, they need to establish that the downstream transfer is in good faith and they cannot establish that because --

THE COURT: So it's your position that it's their burden to produce evidence that these transfers were all legitimate and not your burden to show that they were fraudulent?

MR. CHENG: Yes. After the transfer, after we established the fraudulent transfer between Sunco, Inc. and between Infinity and Sunco USA, then the downstream transferees, for Linda, for the realty company, for David, they have the burden to show that they're in good faith, they're good faith transferees, and that's what the statute says, your Honor. So the judgment can't be entered to any subsequent transferees unless they're both in good faith and also the transfers are for value, your Honor. And in their opposition, they only talk about the for value issue. They said all of the transfers that are for value they are legitimate but they cannot establish that they're in good faith.

THE COURT: All right. I am just going to leave that aside just for a minute. So what evidence is there in the record that there were any transfers to New Sun? That's the entity that's controlled by Linda.

MR. CHENG: I'm sorry, your Honor. Can you repeat your question?

THE COURT: Sure. Isn't New Sun a defendant?

MR. FOLKMAN: Yes, your Honor.

THE COURT: For the reach and apply.

MR. CHENG: Yeah, for reach and apply and for fraudulent transfer.

THE COURT: So I am asking you, maybe I missed it, where in the record can I find evidence of a transfer to New

Sun?

MR. CHENG: There are records showing that Sunco, Inc. paying New Sun and New Sun paying Linda.

THE COURT: Okay. It's in there? I must have missed it.

MR. CHENG: It's in there.

THE COURT: Go ahead.

MR. CHENG: And so that's our piercing the corporate veil and fraudulent transfer arguments, your Honor.

And for reach and apply, that claim follows naturally once we establish the fraudulent transfer because if those transfers are traceable, then the assets, the proceeds held by those downstream transferees, they're not theirs anymore.

THE COURT: Well, I don't think it's that simple. I think you still have to identify assets or property that might be subject to the reach and apply, right? Have you been able to identify any assets?

MR. CHENG: We have identified -- so first, it's about the proceeds, it's the money itself, and the Court can enter a reach and apply judgment on only the monetary asset.

THE COURT: But Infinity has nothing?

MR. CHENG: Infinity has nothing, and Sunco, Inc. now became insolvent as well. So the individual defendants, they have the money. And also, we have our expert establishing that in 2021, facing this litigation, Sunco, Inc. actually

transferred the majority of its assets to Eastman Street Wood Products to another company because in that year, the inventory -- the financial statements says that the inventory was down 89 percent in fixed assets of $4.9 million, so for -- that's less than $600,000, and then Eastman Street Wood Products suddenly had capital for only $200,000 and then it suddenly had a revenue, generated revenue, for $2.8 million, your Honor, in the same year. So that's evidence showing that Sunco, Inc., in order to avoid the liabilities, transferred the assets, transferred the cabinets to Eastman Wood Street (sic) Products.

THE COURT: All right. Given the time, I just have one question about the Chinese judgment, the one that you mentioned or I think Ms. Connolly actually mentioned it. Sunco China had brought a suit against Linda Sun in China. It was about the fiduciary duty. So to the extent that you're bringing that claim against Linda here, why shouldn't I rely on that?

MR. CHENG: Yes, your Honor. So that's a good question. The res judicata doesn't apply where a plaintiff couldn't have known the full emissions of the claim where the prior action was filed, and I want you to look closely into the Chinese judgment because the Chinese court actually said that Sunco China's receivables "have been demanded but not yet collected" and that cannot be directly characterized as a

conduct that harms the company's interest and the Chinese court also said that it cannot confirm the debt was uncollectible because Sunco China had not taken other remedial measures beyond sending the demand letter and even point out to the confirmation letter that David signed that I mentioned earlier in the end of 2018 where Infinity acknowledging the $5.9 million of the debt. The Chinese court said, look, they are acknowledging about this debt so try to collect it in other ways and then you can come back. If you can really show that it's uncollectible, then you can come back to our court. That's essentially what the Chinese court is saying, your Honor.

So we're not saying that the whole Chinese judicial system is not impartial or should be challenged. We're just saying that in this specific case it would be an injustice to bar Sunco China's fiduciary duty claim against Linda because of the Chinese judgment because it's a new fact, it's a new conduct after the Chinese judgment. The Chinese judgment entered in I think about 2018 or '19, and in this litigation we gathered evidence showing that they will never pay for those cabinets. They admitted it and they raise the affirmative defense about it. So there is no dispute that they're not going to pay for those cabinets and that's exactly the thing that the Chinese court is looking for, your Honor.

THE COURT: Thank you.

MR. CHENG: Do you have time for me to briefly talk about the counterclaims because we filed summary judgment on the counterclaims as well?

THE COURT: Sure.

MR. CHENG: Yes. So thank you, your Honor. So for the counterclaims, we have three independent reasons why it should be knocked out. First, there are no enforceable terms. There are no loan agreements. There is no paperwork. There is nothing and they cannot identify who made the loan because the only thing that they said supporting their position in the loan agreement is the report of Sunco China in 2019 where it says Linda was owed 21 million RMB which is about $3 million by Sunco China. And it's ironic, your Honor, they are arguing that Linda's loan is Sunco, Inc.'s loan, but during this whole litigation, they have been trying to separate Linda from all the other defendants. They have been trying to isolate her from all of the liabilities, and now they're saying Linda's loan is Sunco, Inc.'s loan. They cannot have it both ways, your Honor.

And second --

THE COURT: Before you go on, let's say that I disagree with you. I haven't decided anything yet, by the way. I am just playing -- sort of thinking out loud. If I recognize that a loan did exist, that doesn't go to liability under breach of contract, it sort of goes towards damages, and would

you agree with that?

MR. CHENG: No, your Honor, because that loan was completely fabricated, and it's not from Sunco, Inc.

THE COURT: I understand your position that it's fabricated, it didn't exist, I shouldn't consider it, but I am saying if it did exist --

MR. CHENG: If it did exist, then you should take it into consideration when evaluating the damages. Yeah, I agree with that. And also, your Honor, the claim is time barred. It's barred by statute of limitations, your Honor. They're saying the loan was made in 2011 and there is no specific repayment, and by the way, your Honor, they said there is no repayment schedule, no maturity date, no interest provisions, and that itself is not enforceable contract. It's not enforceable loan agreement.

THE COURT: And then there is nothing that you have discovered during the course of this case, any written document, reflecting the loan?

MR. CHENG: No, nothing, your Honor. It's also barred by statute of limitations because the case law says that for a loan agreement which doesn't have any specific repayment date, then if no payment has been made by the debtor and if there is no demand has been made by the creditor, then the statute of limitations runs out in ten years, your Honor. So they said the loan agreement was made in 2011, then the statute of

limitations ended in 2021. So that's our second reason.

THE COURT: Okay.

MR. CHENG: And the third reason is that in the 2014 share purchase agreement that they have been talking about where they said that Mr. Wu didn't pay for those shares, in that same agreement there is an indemnification clause, very broad indemnification clause, Clause 3.12, requiring Linda and Sunco, Inc. to handle all pre-transfer liabilities themselves. So those liabilities doesn't cure out to Sunco China and that's another independent reason to bar this loan, counterclaim.

THE COURT: All right, thank you.

MR. CHENG: Thank you, your Honor.

THE COURT: Ms. Connolly.

MS. CONNOLLY: Thank you, your Honor. I'd like to start with plaintiff's veil piercing claims because they've been a moving target throughout this litigation, so much so that we're hearing arguments today for the very first time that weren't even in the summary judgment papers.

When plaintiff brought this suit and brought its veil piercing claims, it brought a claim to pierce the corporate veil of Infinity Wood Products, sometimes called IWP because there is an Infinity Realty Company, to pierce the corporate veil of IWP, to David, Shillock and Linda. When it sought to amend its complaint to add the affiliated entities, it sought to add them as fraudulent conveyance and reach and apply

defendants. Nowhere did they say anything about extending alter ego liability to these defendants, enterprise liability to these defendants. They were added as fraudulent transfer and reach and apply defendants.

Now suddenly in summary judgment, plaintiff is asking to assert a brand new count against these five entities without ever having to disclosed that before. It's far too late for them to do that and plaintiff's counsel's own argument explains why.

Plaintiff claims that there are no board minutes or voting records in the record so corporate formalities weren't followed and that also displays an absence of records. Number one, that argument is not in their brief and so we couldn't respond to it by showing such documents, and the discovery around the affiliated defendants was around fraudulent transfer and reach and apply, not nonobservance of corporate formalities, not getting into all of this that is completely new and different than the summary judgment.

THE COURT: So why don't we just focus on Infinity. It had no employees. It had no assets. I mean, just looking at the record, it doesn't seem like it had any other business other than receiving these cabinets and giving them away. So what was the legitimate business function of this company?

MS. CONNOLLY: The legitimate function was to act as an importer for Sunco US.

THE COURT: For that one time?

MS. CONNOLLY: Throughout the course. For years and years, Sunco China was paid millions of dollars by Infinity Wood Products as a result of this relationship and --

THE COURT: It had more than one -- like in this instance, Infinity contracted with Sunco China, received the cabinets and then transferred them to Sunco US.

MS. CONNOLLY: Correct.

THE COURT: Did it have other customers besides Sunco US?

MS. CONNOLLY: It did not. It sold the cabinets to Sunco US, as it had done for many years before, always in exchange for the same consideration.

THE COURT: So why didn't Sunco US directly transact with Sunco China? Why this intermediary?

MS. CONNOLLY: Because it was Sunco US's understanding that due to regulations and bureaucratic difficulties in China that it would be extremely difficult for Sunco China to export cabinets to its own shareholder.

THE COURT: So the only purpose of Infinity was to be this middle person between Sunco China and Sunco US?

MS. CONNOLLY: The purpose of Infinity was to act as an importer and is a perfectly legitimate business purpose. It's a single-purpose entity. The cases are rife with examples.

THE COURT: Yeah, I'm just trying to understand it here.

MS. CONNOLLY: So, yeah, that was its purpose. It maintained its own bank account, its own general ledgers, its own filings with the Secretary of the Commonwealth, its own tax filings. It did everything by the book and maintained corporate separateness in every way. When Sunco US employees performed work on behalf of Infinity Wood Products, it charged a fee for that, and there is, as we cite in our brief, there is First Circuit precedent saying that overlapping employees doesn't mean veil piercing and doesn't mean corporate separateness. They did what you're supposed to do when you've got separate corporations. They kept everything separate. But this shouldn't even be a discussion about Sunco US because it wasn't a defendant apparently until summary judgment. The question is whether the veil should be pierced to the individuals; and as we state in our brief, you can't pierce the corporate veil to David and Shillock because they don't own Infinity.

What is a veil piercing claim? In the law, we have owners and we have corporations and there is a veil that separates them. When deciding whether to pierce that veil, the court is deciding whether to remove the veil between the owners and the entity, not some officer or director or manager. If David and Shillock don't own the company, the veil can't be

pierced.

THE COURT: I thought there was something in the record about David owning 60 percent of Infinity and Shillock owning 40 percent or something like that.

MS. CONNOLLY: It's undisputed -- and I do want to make a comment about this. Plaintiff throughout its brief and its arguments here has used the word "undisputed" very freely to refer to things that are absolutely disputed.

So when I say that it's undisputed that David and Shillock do not individually own any membership interest in Infinity, we put that in our statement of facts and plaintiff responded "undisputed." It's trusts that own the membership interests. David and Shillock as trustees of those trusts own the membership interests but not them individually. The trusts are a separate legal entity.

THE COURT: Okay.

MS. CONNOLLY: So I think one of the things that plaintiff tries to do in its brief is create a lot of smoke and mirrors because it doesn't have much to say about Infinity so it talks about the other entities, but when deciding whether or not to pierce Infinity's corporate veil, the Court needs to look at Infinity's conduct, not what all these other entities did, what Infinity did, and as I mentioned, Infinity kept things separate. It had separate bank accounts, separate accounting. It had its own operating agreement. It filed

documents with the Secretary of the Commonwealth.

All of the things that plaintiff points to about transfers in between entities, that all relates to all the other entities. The only actual fact with respect to IWP they point to is the fact the IWP used Sunco US's employees for which it paid a fee which demonstrates corporate separateness.

Looking at the actual *Pepsi-Cola* factors, the commingling of funds. The question is did David and Shillock or them as trustee more particularly commingle their funds with the company. There are no allegations of that. All of the allegations about commingling relate to affiliated entities, not IWP.

With respect to thin capitalization, that's assessed at the time of inception. Infinity was established in 2009. First registered with the Secretary of the Commonwealth in 2011. It operated for years. There is no allegations of any kind about the capitalization at the time of the inception. They claim that Infinity was insolvent at the time of the litigated transaction. That's also not true.

Infinity handled these $6.7 million in cabinets the way it handle every other. It bought the cabinets from Sunco China and in exchange it gave Sunco China an account payable. It then sold the cabinets to Sunco US and got an account payable in exchange from Sunco US. Now, we contend with the affirmative defense that I will get to in a moment that that

payable from IWP to Sunco China was forgiven and so the payable from Sunco US to IWP was forgiven, but in both instances it balances. Either there is a payable and payable or forgiveness and forgiveness, but in neither case do the liabilities outstrip the assets. So there was no insolvency.

With respect to the corporate records and corporate formalities, those were all followed and plaintiff can't point to any evidence that it wasn't for IWP.

The main issue here is the issue of fraud or confusion. Fraud is -- whether the business was used to promote fraud is the 12 *Pepsi-Cola* factors the Court needs to consider, and it is necessary for there to have been either fraud or confusion on plaintiff's behalf in order to have veil piercing. Plaintiff has to have been confused about with which entity it was dealing. There is no confusion here.

While at the beginning of this case plaintiff claimed to have been utterly shocked that there was any relationship between David Sun and Infinity Wood Products or Linda Sun and Infinity Wood Products, plaintiff's documents show otherwise. We show e-mail after e-mail after e-mail that are exhibits in the record that include David as a member of Infinity Wood Products. There are document after document after document that shows the relationship between Sunco US and Infinity Wood Products, documents that plaintiff itself has produced in this case show that plaintiff understood that it was shipping

products to IWP that would then be sold to Sunco US.

There is no confusion. There is no deception here. So there can't be any veil piercing.

As the First Circuit put it in *Platten*, there can't be veil piercing where plaintiffs have never alleged that they were confused about the identity of the legal entity with which they were contracting and where plaintiff -- where plaintiffs were never misled about which corporate entity was obligated to them or was dealing with them.

In another case in the First Circuit, *Birbara* --

THE COURT: I think I'm all set on the veil piercing. Why don't we go on to the fraudulent transfers.

MS. CONNOLLY: Certainly, your Honor. So with respect to the fraudulent transfer, you have to have a debtor that transfers an asset, either, one, with the intent to hinder, defraud or delay or, two, for something other than reasonably equivalent value. Got to have one of the two of those.

The only debtor here alleged is Infinity Wood Products. The only transfer that they alleged Infinity Wood Products made is the transfer of the cabinets. Infinity got in exchange a receivable from Sunco US for an equivalent amount. Doesn't follow -- so it can't be number two that they didn't get reasonably equivalent value, and it can't be number one because this is the way that IWP had sold its cabinets to Sunco US for years, that it followed standard protocol that it had

been following for years in transferring these cabinets, the protocol that netted Sunco China millions of dollars over the years. And plaintiff points to this $5.9 million confirmation of balances at the end of 2018 but neglects to mention that in 2019 IWP was still paying Sunco China. It made $2.7 million in payments to Sunco China in 2019.

So the idea that in 2018 it was transferring cabinets to Sunco US in order to hinder, delay or defraud Plaintiff Sunco China in some way while simultaneously paying Sunco China millions of dollars makes no sense.

So if the initial transfer wasn't fraudulent, then none of the rest of them need to be addressed, but let's assume for the moment that that initial transfer was fraudulent or that there was a genuine dispute of fact. None of the rest of transfers meet any of the standards. So plaintiff refers to a set of checks that Sunco US has written and then this, you know, several million dollar payment as a result of real estate that was sold, and I want to talk about that latter one first because it really has nothing to do with anything in this case.

In 1992, the Sun Family Trust bought that property and it stayed in the Sun Family Trust's hands until 2021. It wasn't acquired with any of the proceeds of the sale. The proceeds of the sale have absolutely nothing to do with that.

The Sun Trust at the time the property was sold in 2021, the sole beneficiary of the Sun Family Trust was Infinity

Realty Company. So when the property was sold to a bona fide third-party, a fact that the plaintiff does not dispute in the statement of facts, the proceeds from the sale of that property were distributed to Infinity Realty Company as the beneficiary of the trust and then to David Sun as its sole member.

What's really interesting here, aside from the fact that that property sale had nothing to do with the proceeds in the case is that when David Sun received the proceeds of that sale as the sole member of Infinity Realty Company, he took $1.2 million and injected it back into Sunco US. That is hardly behavior that is consistent with someone trying to insulate these entities from recovery in a judgment. He took $1.2 million that he indisputably was entitled to as the sole member of IRC and injected it back into the company, a company that was operating at a loss at the time.

Turning to the checks. Now, Sunco US -- Sunco China argues that the fact that Sunco US was making payments is somehow evidence of fraudulent transfer. That's not the case. You can't just point to a transfer and say, well, a transfer was made so it must have been fraudulent.

THE COURT: And what do you say to Mr. Cheng's argument that it's your burden to show that it was legitimate?

MS. CONNOLLY: I would say to Mr. Cheng, where is that in any case or in the statute? It's not there. You have to establish that it was a fraudulent transfer. You have to

establish that it was either made with the intent to hinder, defraud or delay or that it was made other than for value.

Now, what Section 9 of the statute says is that where a transfer is made in good faith to a third-party who bought for value, then even if it's a fraudulent transfer, you can't go to that good faith purchaser and get it back, but none of that negates the obligation to show that it was a fraudulent transfer in the first place. So how were any of these transfers fraudulent?

THE COURT: So let's say I agree with you about all of that, there was no fraud from the get-go.

MS. CONNOLLY: Yes.

THE COURT: At least as to the breach of contract claim, and there is no dispute that IWP ordered these cabinets, it received those cabinets and then it transferred those cabinets to Sunco, US.

MS. CONNOLLY: Correct.

THE COURT: It never paid for any of the cabinets, that's undisputed.

MS. CONNOLLY: I would put a slightly finer point on that, your Honor, and say that it never gave cash for those cabinets.

THE COURT: So what is your best argument that at least as to liability on the breach of contract claim, why summary judgment should not enter for the plaintiff?

MS. CONNOLLY: Because Sunco China forgave those invoices in connection with Mr. Wu receiving forgiveness of his obligation to pay the remainder of the purchase price for his 52 percent interest in Sunco China.

THE COURT: And so where in the record can I find that?

MS. CONNOLLY: You can find it in David's testimony and in Linda's testimony.

THE COURT: I guess I should have been more specific. So other than verbal testimony, there is nothing documented anywhere?

MS. CONNOLLY: There is nothing documented in there but there is a reason for that. So, as Linda testified, when she was approached by Mr. Wu at some point in 2015 or 2016 with his proposal to do this, he brought with him a stack of papers that was an application to the authorities in China for permission to do this. We asked for those documents. Plaintiff's 30(b)(6) witness on the topic of their document production testified that he never asked anyone for them. All he did was search a couple of e-mails and then pulled the invoices. We explicitly asked for any document sent to the government authorities and were told that the search was done but then when we spoke with the 30(b)(6) witness, it turns out he never actually went to look for any of these documents. Didn't ask the lawyers for them. Didn't look in the records

for them.

So we have very good reason to believe these documents exist and plaintiff just refused to produce them, and our argument is supported by testimony; plaintiff's is not.

THE COURT: I would think that if such a document existed that you would also have a copy. Hey, your loan is forgiven or the invoices are forgiven.

MS. CONNOLLY: Not of this document, your Honor. This document was an application that Mr. Wu was making to the Chinese government for permission from the Chinese government to send these cabinets and not get paid back, and Linda actually testified that she asked for copy of it and Mr. Wu refused.

What you won't find in the record, your Honor, is any testimony from any witness disputing the existence of this agreement. We put this agreement and modifications to it in our Rule 30(b)(6) notice as a topic. We put the arbitration the plaintiff refers to as a topic in our 30(b)(6) notice. And as we detail in the briefing, their 30(b)(6) witness, Mr. Zhao, either knew nothing about it or refused to answer questions deferring to counsel instead.

So plaintiff now hasn't presented an affidavit from Mr. Wu saying that this agreement didn't exist and that maybe because such an affidavit would be precluded by this Court's sanctions order, but there is no one saying that this agreement

doesn't exist. Even the arbitration that plaintiff wants to get into evidence doesn't say this agreement modification doesn't exist. What it does say is that the share price had been paid.

THE COURT: Remind me. What was the reason for forgiving the invoices?

MS. CONNOLLY: Because -- so when Mr. Wu's company purchased the 52 percent in Sunco China from Sunco US there was initial payment to be made and then a series of installment payments. He made the initial payment but then didn't make any of the installment payments. And Linda kept, as she testified, she kept approaching Mr. Wu asking when the payments were going to be made. Then he eventually approached her and said that he didn't have the cash for it and so he proposed to use forgiveness of cabinet invoices in exchange.

Now, plaintiff makes a big deal about the fact that specific cabinets weren't identified but there is no need to. What mattered was the amount, not the specific cabinets.

Plaintiff also points to the fact that the amount due on the share purchase agreement was less than the balance of the cabinets, but that makes perfect sense because Sunco China -- Sunco US owns 48 percent of Sunco China. So if it forgave invoices --

THE COURT: But it doesn't really make sense to me because the shares, Mr. Wu bought it in his personal capacity.

MS. CONNOLLY: On behalf of a company that he owned, a company by the name of Qiyi.

THE COURT: Right, which is separate from Sunco China.

MS. CONNOLLY: Correct.

THE COURT: So why would Sunco China forgive the invoices for something that Mr. Wu bought for this other company?

MS. CONNOLLY: Because Sunco -- because Mr. Wu's company and Sunco US, as the only two shareholders of Sunco China, agreed that Sunco China would do that.

THE COURT: And where in the record can I see that?

MS. CONNOLLY: You can't, your Honor, in large part because plaintiff refused to produce documents that would show this application to the government to allow them to do that. It is telling that there is nothing on plaintiff's side disputing the existence. There is no evidence. There is just the lawyers arguing.

THE COURT: So I think maybe this touches upon your arguments about the discovery sanction that I entered. So in your view, what does the discovery sanction exclude?

MS. CONNOLLY: The discovery sanction excludes anything that the Rule 30(b)(6) witness didn't testify about. So that would be everything with respect to veil piercing. We cite the entirety of the testimony that Mr. Zhao gave with respect to the questions we asked about veil piercing and the

factual bases therefor, and plaintiff agreed in response to our statement of facts that that was his sole testimony. There was no other testimony other than that. He doesn't include any of these factors that plaintiff now relies on or the documents that plaintiff points to. It was fraudulent transfer, the only thing that Mr. Zhao identified as a fraudulent transfer were the transfer of the cabinets from IWP to Sunco US.

All the rest of this he was asked point-blank, "Does plaintiff allege that Sunco US made any fraudulent transfers to anybody else?" And he couldn't answer. "That either IWP or Sunco US made any fraudulent transfer of any transfer other than cabinets to anyone else?" "I don't know." None of this was disclosed at his depositions.

We asked him whether the 2014 share purchase agreement whereby Mr. Wu's company bought the 52 percent from Sunco US whether there were any amendments to that agreement and he said, I don't know, ask the parties to the agreement. Well, Sunco China was a party to that agreement and it was one of the topics that we designated.

We asked for a witness prepared to testify about the arbitration that plaintiff now seeks to put in and not only was he unprepared to testify about it, he didn't even know that he was a designee for that topic and he didn't really know what arbitration was.

Now, plaintiff talks about what was in the record in

front of the arbitral tribunal in the 2021 arbitration but that's pure speculation because we don't have those documents. They're not part of the productions in this case and they're certainly not before the Court.

What is before the Court is the arbitral tribunal's award which is hearsay. They haven't moved to have it enforced. They're not seeking collateral estoppel or res judicata.

THE COURT: Was that award final, by the way?

MS. CONNOLLY: It was final, yes. My understanding is it was not appealed.

THE COURT: But the award itself was produced in discovery?

MS. CONNOLLY: The award itself was produced in discovery.

THE COURT: Couldn't get any additional discovery about it?

MS. CONNOLLY: Correct. We asked for it.

THE COURT: So why can't I consider the award itself?

MS. CONNOLLY: Because it's hearsay, your Honor. It's hearsay, that's the number one argument. Number two, it's precluded by the Court's sanctions order because they never brought it up as a rebuttal to our affirmative defense, affirmative defense we disclosed in the very first pleading in this case answering the complaint and because, as our own

expert, Donald Lewis, explains, there are a variety of problems with that arbitration, not least of which is the fact that it relies entirely upon two documents that Mr. Wu claims Linda signed binding Sunco US, which is inconsistent which its position in this case where it says Linda didn't have the ability to bind Sunco US, but it's based on two documents where Linda purportedly said to Mr. Wu, You have done so much for this company, you've gone above and beyond performing so much work for this company that on behalf of Sunco US, I am going to forgive all of your company's debt as compensation for the enormous amount of work that you've done for our company.

As the Court knows, in this court, plaintiff took the position that Mr. Wu was not involved in the company, didn't know anything about anything and didn't do anything. Those inconsistencies certainly support our argument that those two documents are fraudulent. Linda never signed them. Mr. Wu made them up, just like he made up the contract that's the subject of the 2026 arbitration wherein he claims that in October of 2014, just one month after the original share purchase agreement was signed, Linda, on behalf of Sunco US again, purportedly signed an amendment that gave enormous rights to Mr. Wu for no consideration. Those rights involve Mr. Wu looking five years into the future and seeing at the end of 2019 Infinity Wood Products would have a balance, receivables balance owed to Sunco China, and Mr. Wu's company,

as a result of that balance that would happen five years in the future, Mr. Wu's company would be entitled to Sunoco's US's 48 percent share, Sunco US would forfeit it.

And in that arbitration in China, Sunco US alleged the document was a forgery. So that arbitration panel sends it off to a forensic expert who looked at it and said, yeah, there are problems with this document. Looks like the first three pages of it were slapped on top of Linda's signature. They weren't printed at the same time. And the arbitration panel in reliance on that forensic expert's analysis agreed and said this is not an authentic document and we're not going to rely on it.

What is particularly telling is in this case repeatedly plaintiff has filed that share transfer agreement and it's filed the September 2014 agreement, not the October 2014 agreement that Mr. Wu claims in China superseded the September agreement. In connection with this very summary judgment, plaintiff filed that September 2014 agreement. Nowhere said we're contending in China this agreement isn't operative anymore because it was replaced by a separate agreement a month later.

So that 2021 arbitration that plaintiff now wants to rely on is full of issues, not least of which is these documents that we contend are forgeries. We asked for discovery into it and plaintiff refused. One of the rulings

from your court -- from your Honor's sanctions ruling was that plaintiff can't rely on documents that it tried to produce really late. Minutes before the depositions in Bangkok started, plaintiff's counsel tried to produce those two agreements, what we contend are the forged agreements on which the arbitration hinged. It's been cherry-picking things out of this arbitration the whole time.

If they had intended to seek preclusive effect of this agreement, then we would have fought over the discovery for this. Either they have to seek enforcement of the judgment in which case we get to get into whether or not due process was followed and all of the arguments that plaintiff is making against Linda's argument that her Chinese case should be given res judicata effect, either plaintiff has to seek to have it enforced and apply res judicata, or it's patently hearsay. It's being offered for the truth of the matter asserted. So the Court can't rely on it for more.

THE COURT: We're at the one hour mark so why don't I hear from Mr. Folkman about that Chinese judgment.

MR. FOLKMAN: Thank you, your Honor. I wish I had one of those buzzers that you probably had where you can stop people so that you get a little bit of time but I appreciate you putting me in at the end.

THE COURT: You mean with the electrical charge?

MR. FOLKMAN: Exactly or the eject button or whatever

it is that you do.

Let me start with the Chinese judgment and I just want to pass over a few of the arguments that I think are the weaker arguments not saying very much about. The statute is not a discretionary statute. Once you find that the judgment is authentic, which really is not disputed, unless one the statutory exceptions apply, the judgment, under Massachusetts law, must be recognized.

I am not going to talk about public policy because we have laid out the reasons why they're wrong about that in the statute and I just want to focus on what I think are the most intuitive or commonsensical points that my brother is making and explain why they're not correct.

It's true that you don't have the same pretrial discovery in China as you do in the United States, and asterisk, that's true in every other country in the world. That's true in the United kingdom. That's true in Canada. That's true anywhere you look. No one has what we have in terms of pretrial discovery. It is not the case that that is a reason not to recognize judgments from other countries because if that were the rule, then you would never recognize any judgments from anywhere. No one has the pretrial discovery that we have.

Of course, it all begs the question if they felt they needed pretrial discovery, why did they sue in China in the

first place? Why didn't they sue Linda here in the first instance? Nevertheless, we cite cases that say that the fact that there is differences in what discovery is allowed in the foreign jurisdictions is not a grounds for refusing recognition of a foreign judgment, and I'd also point out to you that if you think about what statutory exception to recognition this is going to fall under, it's going to have to be they were denied due process. That's the only one that's even arguably applicable, but we cite cases that say that there is no constitutional right or due process right to pretrial discovery here in the United States, and if that's the case, then it cannot be the case that differences between pretrial discovery in different countries is a denial of due process that warrants not recognizing a foreign judgment.

Let me talk about the supposed failure of the Chinese court to investigate supposed collusion between Linda and David. By the way, Linda is the mastermind when my brother was opposing our motion for summary judgment. David is the mastermind when my brother is opposing David's motion for summary judgment. I think they can't quite make up their mind, but anyway, what they say is the Chinese court had a duty under Chinese law to investigate the supposed collusion and because it didn't do that, the judgment shouldn't be recognized.

As Professor Wang points out in our rebuttal expert report, actually what the Chinese rule says is that when there

is grounds for thinking that there is collusion between parties to the litigation, the Chinese court might have some obligation to investigate, but of course, David who is not a party to the Chinese case, no one other than Linda was a defendant in that case. So that rule just simply doesn't apply, and even if it did apply, that's a case-specific problem that if it existed they could have appealed in China, they could have sought a retrial in China, they did none of that. So that argument also has to fail.

Finally, the new facts point. I think this is the most surprising thing that we saw in their expert's report. It was not something that was ever disclosed, and I associate myself with all of my sister's comments about how you should enforce your orders about new arguments that were never disclosed before. Nevertheless, they say there is new facts that justify not giving this judgment res judicata effect even if you recognize it.

What are the new facts? Well, Infinity, we pleaded in China that Infinity wasn't going to pay or hadn't paid or wouldn't pay for the cabinets. Now Infinity says we're really not going to pay for the cabinets. That's not a new fact. That's just Infinity repeating what was the reason for the Chinese lawsuit in the first place, that they hadn't paid and they wouldn't pay.

That Infinity is insolvent, well, you know, their

allegation all along is Infinity is just a shell company that doesn't actually have any real business. That's not a new fact. I would encourage your Honor to look at Footnote 3 in our reply brief which explains -- and it gives references to the dates and so forth -- explains that all of the transfers that are alleged to have occurred that relate to Linda anyway, the checks and the payment for the real estate, all of that happened before the date of the Chinese judgment. So even on sort of, you know, their theory, none of this is new to the Chinese case.

But I think the main point on this new facts theory is that the rule in China, as Professor Wang explains, is the same as the rule we have here which is that if you have a final judgment, the fact that there might be grounds to re-open that judgment doesn't deprive the judgment of whatever res judicata effect it has unless you actually go ahead and do it, unless you ask for the retrial or get the retrial, but even if you ask for the retrial, you know, the judgment is a judgment and has its res judicata effect unless and until the Chinese court says otherwise. None of that has happened.

So for all of those reasons, I think we are entitled to summary judgment on this fiduciary duty claim. There really is no -- you know, they've abandoned all of the arguments that we thought they were going to make, that they said they were going to make. Even the arguments that they are making lack

merit.

Asterisk, one final point on fiduciary duty. It's a little bit baffling to me why anybody would think that the director of a Chinese corporation who was in China at the relevant times and allegedly breached her fiduciary duties to that Chinese company, why anybody would think that that would be a claim for breach of fiduciary duty under Massachusetts law which is what they say it is.

Let me talk very briefly about veil piercing. It is -- I understand my sister's position on who the owners of Infinity are. It's not David and Shillock individually. It's trusts. Our position is a little bit different which is that it's undisputed that Linda had no ownership interest or beneficial interest. She was never an officer, director or anything of Infinity. Those facts are at something like Paragraph 103 or 105, that sort of range in our statement of facts, and that's not disputed.

THE COURT: But if I understand the plaintiff's argument on this, I think they argue that ownership is not necessary, that if Linda participated in sort of a unified enterprise, that that is enough.

MR. FOLKMAN: So a few things about that. Number one, that hasn't been their argument until today. If you look at what the complaint says, the count is breach of the -- or piercing the corporate veil of Infinity Wood Products, that's

the count we thought we were responding to, and Linda never had any -- there is no evidence that she had any managerial or other authority or did anything really with connection with Infinity. The one piece of evidence there is David's testimony that says that Linda told him that she thought that those invoices due to -- that otherwise would have been due to Sunco China weren't due and didn't have to be paid.

THE COURT: I thought there was some facts in the record that seem to indicate that Linda was the one who actually negotiated the sale of the $6.7 million worth of cabinets.

MR. FOLKMAN: I don't know what you're referring to exactly, your Honor. I think that -- I am not sure exactly what you're referring to. Linda certainly was associated with Sunco US at the time of the sale of the cabinets and had something to do with it. She was in China sort of working at this compound that they had, but I am not exactly sure what it is you're referring to.

As a downstream transferee --

THE COURT: Before you get there. Assume that I might consider it, the argument, could Massachusetts law permit piercing the veil if the record shows that she had actual control even though she might not have had any ownership?

MR. FOLKMAN: I do think that it's conceivable that someone who dominates an entity, controls it, runs it,

whatever, even if they're not technically the shareholder, I do think that there could be an argument for veil piercing in that circumstance, but there is no allegation of that with Linda with respect to Infinity which is the entity whose veil is supposed to be pierced.

Now, Linda as a downstream transferee, and there is really two buckets of transfers here. One are these checks that have been referred to. This is I think it's between 3 and $400,000 of checks that were written to Linda or for her benefit for various reasons that are explained in Shillock's affidavit which we have explained in our main brief and there is also this larger payment or distribution from New Sun Limited Partnership to Linda following the partial repayment of the debt that Infinity Realty owed to New Sun Limited Partnership on account of the sale of the beneficial interest in the Sun trust which owned that property. That's very complicated but those are the two buckets of transfers I think we're talking about.

Here is the one instance where I do really want to talk about your sanctions order and that is because we were told -- we were told that you can't take any actual discovery about the fraudulent transfers. We're going to give you an expert report that is going to explain everything about the fraudulent transfers and we relied on that. We didn't hire an expert, and I just want you to understand a little about the

expert that is on the defense side in this case. Obviously, that expert is helpful to us. It is not our expert. I never spoke with him. I made some suggestions about things I would like the expert to address which were not adopted by the other defendants who had hired the expert. If I had known that these checks were not just part of the fraudulent transfer case as it respected my client but actually the whole of the case, I certainly would have hired an expert to talk about that and I think it's blatantly and patently unfair having had the answer from the other side that, you know, the expert report, that's what it's going to be, you can rely it, then to have these checks sort of put in our face at summary judgment. The checks were not a surprise. We knew about them. They asked Linda about them. She didn't know about them. But we were not expecting to see this as the centerpiece of their case on fraudulent transfer. The piece that their expert did address, this payment from Infinity or to New Sun Limited Partnership which then flowed on to Linda and the other limited partner of New Sun, that was disclosed in the expert report, but interestingly, that's not in their brief. That's not what they talk about as the fraudulent transfer. And I just want you to know that that is a real repayment of a real debt for a real transfer in real estate. In other words, that transaction has every hallmark of good faith and of being for value. It was a true antecedent debt.

So I disagree with my brother about who has the burden of proof. They're seeking summary judgment. You know, if you look at the statute, Section 9 of Chapter 109A, it does not say, as my brother suggested, it does not say who has the burden of proof, and I am not aware of any authority that says that if I go to the store and buy cabinets at Lowe's and it turns out that those cabinets had been stolen and I am unwittingly the transferee of a fraudulent transfer, that I had any burden to prove anything. I don't think that's what the law is, and so that's really what I have to say about fraudulent transfer.

THE COURT: All right, thank you.

I'll give you five minutes for rebuttal.

MS. CONNOLLY: Your Honor, I didn't get to respond to the Sunco US counterclaim. Could I take two minutes to do that?

THE COURT: Sure.

MS. CONNOLLY: So plaintiff made the argument that there are no documents supporting this claim. That's not true. We've got the original wire transfers showing these amounts transferred over to China for this $2.4 million counterclaim. We also have plaintiff's documents themselves. As the Court may recall, we moved to compel accounting and financial documents from plaintiff because we believed that plaintiff had inaccurately reported this loan as a loan from Linda as opposed

to Sunco US. Plaintiff swore, you know, up, down and center that no such documents exist. It searched. It searched. It searched. No such document exists.

Well, at the 30(b)(6), the 30(b)(6) designee testified that he never even looked for the documents because he thought that they were irrelevant and that if we were to look through all of the accounting and financial documents, that loan would probably be reflected in all of those documents.

So the idea that there are no documents is just not true and we have put in front of the Court an audit report and a confirmation of balances from Sunco China showing this loan.

With respect to the statute of limitations issue, General Law Chapter 260, Section 13 provides that where there is a loan such as this one and it is acknowledged in a writing, signed by the debtor, the statute of limitations restarts.

Exhibit 76 is a confirmation of balances that plaintiff sent to Linda in 2018 asking her to confirm the amount of the loan at issue, so well within the limitations period and that restarted the limitations period.

And that's all I have to say about the counterclaim. Thank you, your Honor.

THE COURT: Thanks.

MR. CHENG: Yes, your Honor. So I have too many things to respond and I will try to make it as concise as possible.

So let's talk about the loan first. Opposing counsel still couldn't respond to the fact that there is an indemnification clause in that 2014 share agreement where it completely bars the loan claim against Sunco China or Mr. Wu, and I don't think they state the right law about statute of limitations and we cited all the case laws in the briefings and I'm not going to talk about it here anymore.

And with regard to the documents, the evidence of the loan, they should have had records for themselves as well because as they said, if Sunco, Inc. actually lent the money to Sunco China, why wouldn't they keep a record of it themselves?

That's all I have to say about the counterclaim.

And also, let's talk about who is Linda, what is Linda's involvement in this case, because it's curious and ironic the Infinity defendants try to say that Linda had substantial involvement in this case by cutting a deal with Mr. Wu and negotiating the share purchase with Mr. Wu, and while my brother, Attorney Folkman, says that, oh, Linda doesn't have any substantial involvement in this case, she didn't have the authority, he couldn't even respond to your question whether Linda actually negotiated the alleged offset agreement, your Honor. So that's the contradiction between themselves.

THE COURT: So where in the record can I find that Linda negotiated the transaction for these cabinets?

MR. CHENG: First, we don't agree that there is ever an offset agreement concerning the cabinets at issue.

THE COURT: I am not concerned about the offset.

MR. CHENG: Okay. Then about the 2014 share transfer --

THE COURT: No, no. About the cabinets.

MR. CHENG: About the cabinets?

THE COURT: That she negotiated the sale of the cabinets.

MR. CHENG: We don't have the evidence in writing to show that she negotiated those cabinets because it's automatic. So what happened was that she founded Sunco US in the 1980s in the U.S. and she founded Sunco China, and then in 2011 when she divorced with her husband, she gave her -- she gave the U.S. company, Sunco US, to herself and then she went to China.

THE COURT: Yeah, but I can only rely on what's in the record. So in the record, where can I find evidence that she negotiated the sale of these cabinets, the $6.7 million worth?

MR. CHENG: Yes. We have deposition records, your Honor. We have depos from our 30(b)(6) deponent saying that until her departure in 2019 Linda has been handling all of the invoices, all of the ordering, purchase orders of the cabinets, dealing with the U.S. affairs because that's how they have been handling this whole enterprise since the beginning, David handling the U.S. affairs and Linda handles the Chinese affairs

in the factory. She stayed in the factory for ten years, your Honor.

THE COURT: Okay.

MR. CHENG: And let's talk about the new claims argument that they said. So I want to be transparent with this Court. Our original complaint, the piercing corporate veil is only against the Infinity and the individual defendants. Then, without their disclosure, we found out ourselves about those information about those affiliated entities so we filed a motion to amend and they opposed to it and we won the motion to amend; and they filed a motion to dismiss, we won again. So we finally successfully added those affiliated entities into this lawsuit.

And it's true, that it might be confusing to the Court because in the amended complaint under the caption of piercing corporate veil claim, we said it's against all defendants but we didn't specifically say also against the affiliated entities. So it might be confusing, but what matters is in the factual pleadings, we plead all the facts concerning the piercing corporate veil against all the affiliated entities. We talk about the common ownership. We talk about the intermingling of funds. So that's what matters because the law says that the courts are not constricted to consider only the labels or legal theories that plaintiffs have put on the claim. The court should consider the facts, what plaintiffs said about

the facts in the complaint. So that's our argument about the new claims.

And with regard to the ownership of Infinity, your Honor, it's true that Infinity was owned 60 percent by David's trust and 40 percent by his wife Shillock's trust and they said that David is trustee and Shillock is trustee of her trust but what they didn't say is that David is also the only beneficiary or the lifetime beneficiary of his trust and then they pass it to their daughter and Shillock is the only beneficiary of her trust. So it's completely traceable, your Honor. It's obvious what they're trying to do, your Honor. They're just trying to avoid the liabilities behind the trusts and the Court cannot allow that.

Let's move to the Infinity. All of the things that Attorney Connolly just described is just using a flourish language to admit, sort of admit that Infinity is just the shell of Sunco, Inc. and that's obvious. Infinity had no independent employees. Infinity had no sufficient assets, admitted by their own depositions. Infinity -- we deposed one of the Infinity employees, Catherine Li. She couldn't even testify whether she was working for Infinity or Sunco, Inc. and she said in their office when she is supposed to work for Sunco, Inc. there is a sign saying that the company is Infinity. And also Shillock's -- the e-mail signature of Catherine Li, one of the employees, says Infinity/IWP which is

Infinity Wood Products, and Shillock's e-mail also has a signature identifying Eastman Street Wood Products as a DBA of Sunco, Inc. So as you see, your Honor, they're all commingled there. Even their own employees are confused about who are those entities. And they use the same attorney, they used to share the same address and they used the same accountant. They filed consolidated financial reports, your Honor, to the bank.

THE COURT: I'm sorry. Say that last part again.

MR. CHENG: They filed consolidated financial statements.

THE COURT: Who is they?

MR. CHENG: All of the affiliated entities. They identified themselves as affiliated entities, Infinity, Sunco, Inc., Eastman Wood Products, New Sun and Eastman Street Distributors, your Honor.

THE COURT: All right, thank you.

MR. CHENG: And also they want to say that for piercing corporate veil actual fraud or actual confusion is a necessary element but that's not the case, your Honor. So when arguing that --

THE COURT: I think I'm all set. I will take a look.

MR. CHENG: Okay, okay. And I want to talk about the arbitration, your Honor. So I didn't want to go into too much of the details earlier because I think it only confuses the Court about what's the actual reasoning behind the 2021

arbitration award and what's happening with the 2026 arbitration award but I think right now I have to explain the details about arbitration.

THE COURT: I am all set on that as well. The only question I have is when the defendants noticed their 30(b)(6) deposition and listed this, why didn't you designate Mr. Wu as the 30(b)(6) rather than the other person? He's the one who would know.

MR. CHENG: Yeah, he knows, but the fact is Sunco China was not a party of the transactions of the 2014 share transfer or the 2021 arbitration. Sunco China was never a party named. And we designated Mr. Wu and produced Mr. Wu for deposition and they didn't ask him about the 2021 arbitration, and our own counsel, Ms. Dai, she produced the 2021 arbitration record in front of Mr. Wu and asked him questions about it and they still got the chance to redirect him but they chose not to.

And also the 2021 arbitration award, your Honor, is final, it's undisputed, Linda is happening in -- -

THE COURT: No, it's disputed as to whether it's a forgery.

MR. CHENG: No, it's not. Linda -- 2026, the forgery is not -- doesn't concern the 2021 arbitration, your Honor. The forgery doesn't concern -- the alleged forgery doesn't concern the 2021 arbitration. So Linda went to Shanghai to

testify in person, and they got a chance to appeal to the decision. They failed to do so. And as I mentioned earlier, they brought this arbitration award to a Chinese court to enforce it and we produced a notice letter from the Chinese court, and as my brother says, this court should respect the Chinese judgment and then that confirmation letter should be respected, your Honor.

THE COURT: We're way over time now.

MR. CHENG: I understand, but let talk about the hearsay issue of 2021.

THE COURT: I'm all set on that.

MR. CHENG: And the preclusive issue, your Honor.

THE COURT: I'm all set.

MR. CHENG: Do you have any other questions about anything?

THE COURT: No.

MR. CHENG: Okay, your Honor.

THE COURT: Thank you all very much.

(A-D-J-O-U-R-N-E-D)

\- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin____________ August 6, 2026
Jamie K. Halpin, CRR, RMR, RPR Date
Official Court Reporter